No. 23-2027

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

CENTRIPETAL NETWORKS, LLC,

*Appellant,*

v.

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
KEYSIGHT TECHNOLOGIES, INC.,

*Appellees.*

On Appeal from the United States Patent and Trademark Office
Nos. IPR2022-00182, IPR2022-001151, IPR2022-01199

## APPELLANT'S OPENING BRIEF

MATTHEW J. DOWD
ROBERT J. SCHEFFEL
DOWD SCHEFFEL PLLC
1717 Pennsylvania Ave.,
NW Ste 1025
Washington, D.C. 20006
(202) 559-9175

PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellant Centripetal Networks, LLC*

September 25, 2023

## CERTIFICATE OF INTEREST

Counsel for Appellant, Centripetal Networks, LLC, certifies the following:

1.     The full name of every party represented by us is: Centripetal Networks, LLC.

2.     There is no other real party in interest for Centripetal Networks, LLC.

3.     Centripetal Networks, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4.     The names of all law firms, partners, and associates that have not entered an appearance in this appeal and appeared for Centripetal Networks, LLC in the lower tribunal or are expected to appear in this Court are:

Kramer Levin Naftalis & Frankel LLP:
    James Hannah, Jeffrey H. Price, Jenna Fuller, Paul J. Andre

Banner & Witcoff, Ltd.:
    Bradley C. Wright, Scott M. Kelly, John R. Hutchins, Blair Silver

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal is: *Centripetal Networks, LLC v. Cisco Systems, Inc.*, No. 2:18-cv-00094-EWH-LRL, Eastern District of Virginia.


Dated: September 25, 2023

s/Paul D. Clement
Paul D. Clement

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................... i

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF RELATED CASES .................................................... ix

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT .......................................................... 4

STATEMENT OF THE ISSUES ............................................................... 4

STATEMENT OF THE CASE ................................................................... 5

I.     Factual Background ........................................................................ 5

       A.     Secure Communications ..................................................... 5

       B.     Prior Network Security Technology ................................ 6

       C.     The '856 Patent Solves the "Unsolvable" Problem ............................ 8

II.    The Initial Round Of Patent-Infringement Litigation ................................. 10

III.   Proceedings Below ........................................................................ 14

       A.     Palo Alto Networks Petitions for Inter Partes Review of Claims 1, 24, and 25 of the '856 Patent ............................ 14

              1.     Buruganahalli ........................................................... 15

              2.     Baehr ........................................................................ 16

              3.     The Challenged Claims ......................................... 16

       B.     The Board Institutes Inter Partes Review ........................... 17

       C.     Cisco and Keysight File Substantively Identical Petitions and Motions for Joinder ................................... 18

       D.     Centripetal Moves for Recusal and Vacatur After Learning of an APJ's Ownership of Cisco Stock .................................. 18

E.  The Board Grants Cisco's and Keysight's Respective Petitions for Inter Partes Review and Motions for Joinder ................ 19

F.  APJs McNamara and Amundson Belatedly Withdraw ...................... 20

G.  The Board Denies Centripetal's Recusal and Vacatur Motion, Calling it "Highly Inappropriate"—and Threatening Reprisals ............................................................. 20

H.  The Board Issues its Final Written Decision ..................................... 21

I.  The PTO's *Volte Face* on Recusal ..................................................... 24

SUMMARY OF ARGUMENT ................................................................. 25

STANDARDS OF REVIEW .................................................................... 27

ARGUMENT ......................................................................................... 28

I.  Centripetal Suffered Irremediable Prejudice In The Proceedings Below ..................................................................................................... 28

A.  The Board's Decision Denying Centripetal's Recusal Motion and Attacking Centripetal for Questioning APJs' Impartiality Flouted OGE Regulations and the Bedrock Principles Animating Them ............................................................................... 28

B.  Vacatur of the Institution Decision Is Necessary to Preserve Justice and Public Confidence ............................................. 35

II.  The Board Improperly Invalidated Centripetal's Claims Based On A Purported Written-Description Deficiency That Petitioners Never Raised And Were Statutorily Barred From Raising During Inter Partes Review ....................................................................................... 40

A.  The Board's *Sua Sponte* Written-Description Analysis Violated the APA and Deprived Centripetal of Due Process ............. 40

B.  The Board's Written-Description Analysis Also Violated Statutory Limitations on the Scope of Inter Partes Review .............. 44

III.  The Board's Unpatentability Rulings Are Legally Erroneous ...................... 46

A.   The Board Erred in Concluding That Buruganahalli Discloses the Challenged Claims' Rule-Based Filtering of Encrypted Packets ................................................................................. 47

    1.   The Board disregarded the challenged claims' plain language .................................................................. 47

    2.   The Board adopted a wholly unsustainable construction of "Uniform Resource Identifier" ...................... 50

    3.   The Board ignored unrebutted evidence that the challenged claims significantly advanced the prior art............ 53

B.   The Board Improperly Discounted or Dismissed Centripetal's Objective Evidence of Nonobviousness............................................. 55

    1.   The Board ignored compelling evidence that Cisco copied the challenged claims .................................................. 56

    2.   The Board unduly minimized Centripetal's evidence that the challenged claims addressed a long-felt industry need to detect security threats hidden in encrypted web traffic ............................................................. 58

CONCLUSION .................................................................................... 60

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*ACCO Brands Corp., v. Fellowes, Inc.*,
  813 F.3d 1361 (Fed. Cir. 2016) ..........................................................27

*Apple Inc. v. Corephotonics, Ltd.*,
  2023 WL 5838695 (Fed. Cir. Sept. 11, 2023) ............................. 40, 43

*Belden Inv. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) ..........................................................42

*Butz v. Economou*,
  438 U.S. 478 (1978) ............................................................................32

*CAB v. Delta Air Lines, Inc.*,
  367 U.S. 316 (1961) ............................................................................46

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
  38 F.4th 1025 (Fed. Cir. 2022) .................................................. *passim*

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
  492 F.Supp.3d 615 (E.D. Va. 2020) ..............................................10, 11

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
  526 F.Supp.3d 137 (E.D. Va. 2021) ....................................................12

*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
  393 U.S. 145 (1968) ............................................................................33

*Cuozzo Speed Techs., LLC v. Lee*,
  579 U.S. 261 (2016) ...................................................................... 45, 46

*FCC v. Prometheus Radio Project*,
  141 S.Ct. 1150 (2021) .........................................................................28

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
  535 U.S. 743 (2002) ............................................................................33

*Gibson v. Berryhill*,
  411 U.S. 564 (1973) ............................................................................34

*Graham v. John Deere Co. of Kan. City*,
  383 U.S. 1 (1966) ................................................................. 54

*In re Centripetal*,
  2023 WL 3477282 (Fed. Cir. 2023) ..................................... 21

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat.
  Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) ................................ 55

*In re IPR Licensing, Inc.*,
  942 F.3d 1363 (Fed. Cir. 2019) ............................................ 42

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016) ..................................... 26, 40

*In re NuVasive, Inc.*,
  841 F.3d 966 (Fed. Cir. 2016) .............................................. 44

*In re United Shoe Mach. Corp.*,
  276 F.2d 77 (1st Cir. 1960) .................................................. 37

*In re Van Os*,
  844 F.3d 1359 (Fed. Cir. 2017) ............................................ 28

*Leo Pharm. Prod., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) ............................................ 55

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847 (1988) ..................................................... *passim*

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  941 F.3d 1133 (Fed. Cir. 2019) ............................. 55, 56, 58

*Maier v. Orr*,
  758 F.2d 1578 (Fed. Cir. 1985) ............................................ 35

*Neptune Generics, LLC v. Eli Lilly & Co.*,
  921 F.3d 1372 (Fed. Cir. 2019) ............................................ 44

*Nike, Inc. v. Adidas AG*,
  955 F.3d 45 (Fed. Cir. 2020) ................................... 26, 42, 44

vi

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014) .................................................... 47, 53

*PersonalWeb Techs., LLC v. Apple, Inc.*,
    917 F.3d 1376 (Fed. Cir. 2019) ...........................................................28

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
    882 F.3d 1056 (Fed. Cir. 2018) ...........................................................55

*Polaroid Corp. v. Eastman Kodak Co.*,
    867 F.2d 1415 (Fed. Cir. 1989) ...........................................................37

*Qualcomm Inc. v. Intel Corp.*,
    6 F.4th 1256 (Fed. Cir. 2021) .............................................. 42, 43, 44

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
    948 F.3d 1342 (Fed. Cir. 2020) ...........................................................45

*SAS Inst., Inc. v. Iancu*,
    138 S.Ct. 1348 (2018) ........................................................ 32, 40, 46

*Shell Oil Co. v. United States*,
    672 F.3d 1283 (Fed. Cir. 2012) .................................................. 27, 35

*United States v. Owens*,
    902 F.2d 1154 (4th Cir. 1990) .............................................................37

*United States v. Sineneng-Smith*,
    140 S.Ct. 1575 (2020) ..........................................................................40

*Ward v. Village of Monroeville*,
    409 U.S. 57 (1972) ................................................................................36

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) ............................................ 55, 56, 58

*Williams v. Pennsylvania*,
    579 U.S. 1 (2016) ..................................................................................36

**Constitutional Provision**

U.S. Const. amend. XI ............................................................................ 33

**Statutes**

5 U.S.C. §706(2) ..................................................................28

18 U.S.C. §208 ....................................................................29

35 U.S.C. §142 .....................................................................4

35 U.S.C. §284 ....................................................................12

35 U.S.C. §311 .......................................................... *passim*

35 U.S.C. §315 ....................................................................18

35 U.S.C. §321(b) ...............................................................44

**Regulations**

5 C.F.R. §2635.101 .............................................................30

5 C.F.R. §2635.501(a) .........................................................30

5 C.F.R. §2635.501(b) Note ................................................31

5 C.F.R. §2635.502(d) .................................................... 2, 30

5 C.F.R. §2638.102 .............................................................30

5 C.F.R. §2640.202 ...................................................... 29, 34

37 C.F.R. §90.3(a)(1) ........................................................ 4

**Other Authorities**

Katherine K. Vidal, *Mem. to Members of the Patent Trial and Appeal Board and the Trademark Trial and Appeal Board* (Sept. 22, 2023), bit.ly/468iVic ................................................ 24, 25, 34, 38

Kenneth Culp Davis, *Administrative Law* (1972)....................................34

## STATEMENT OF RELATED CASES

Centripetal filed a mandamus petition based on the proceedings below.  *In re: Centripetal Networks, LLC*, 2023-127, decided May 16, 2023, by Judges Lourie, Prost, and Wallach.  The decision is unreported, but available at 2023 WL 3477282.

The Court's decision in this appeal may directly affect or be directly affected by the following pending case:  *Centripetal Networks, LLC v. Cisco Systems, Inc.*, No. 2:18-cv-00094-EWH-LRL, Eastern District of Virginia.

## INTRODUCTION

The proceedings below have subjected Centripetal Networks, LLC ("Centripetal") to a wholly unjustified double standard, while denying it the appearance of impartiality and yielding a final written decision riddled with errors. Indeed, the facts of this case would be hard to make up. Years of litigation and reams of evidence culminated in a $2.6-billion judgment against Cisco Systems, Inc. ("Cisco") for willfully infringing four of Centripetal's patents. That judgment was wiped out without even considering the merits, because years into the proceedings the presiding judge learned that his wife owned roughly $4,500 of Cisco stock, and placed it in a blind trust, rather than selling it outright. This Court required the strong medicine of vacatur because an adjudicator with even a minimal financial interest "creates not only an appearance of impropriety but impropriety itself." *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1037 (Fed. Cir. 2022).

Given that painful experience, the last thing Centripetal expected was to find itself before a different adjudicator with a potentially even-greater ongoing and direct ownership stake in Cisco. Yet that is precisely what happened. And when Centripetal asked the conflicted APJ to recuse himself, rather than promptly recuse or divest, the APJ proceeded to issue multiple decisions in Cisco's favor. The Board followed that up not by giving Centripetal any relief, but by giving it a tongue-lashing for even raising the issue. Remarkably, the PTO now purports to see the

1

light:  Under a brand-new directive published in September 2023, the PTO will require APJs to recuse in situations just like this—but it will guarantee the appearance of impartiality only prospectively; the new PTO directive expressly declines to grant any retrospective relief, thus leaving Centripetal emptyhanded.

None of this can stand.  All federal officials must recuse from matters in which their participation would "raise a question in the mind of a reasonable person about [their] impartiality."  5 C.F.R. §2635.502(d).  The APJ's Cisco-stock ownership plainly fits the bill—as the PTO now belatedly recognizes.  Yet the Board failed to grapple with (or even mention) the relevant recusal regulations, instead resting its decision on a criminal safe harbor that hardly exhausts the need for executive-branch officials, especially adjudicators, to ensure the appearance of impartiality.

Even putting all that aside, the Board's final written decision is both procedurally unsound and substantively untenable.  The patent at issue in the IPR (U.S. Patent No. 9,917,856) discloses a method for detecting threats to a computer network using rule-based filtering of encrypted data packets during a secure communication session.  It represents a revolution in digital security:  Whereas the prior art decrypts traffic and inspects its contents before making a security determination (and then re-encrypts traffic that receives a green light), Centripetal's '856 patent allows traffic to be analyzed *in its encrypted form*, preserving privacy while ensuring security.  Cisco itself has recognized that this technology "solves a

network security challenge previously thought to be unsolvable." Appx7171. Nevertheless, the Board instituted IPR of claims 1, 24, and 25 of the '856 patent and ultimately concluded that those claims were obvious in light of the prior art, specifically U.S. Patent No. 9,680,795 ("Buruganahalli").

The linchpin of the Board's decision to cancel was a finding that the challenged claims lack an adequate written description, supposedly due to an error by the patent examiner during prosecution. But no party raised the written-description issue, or the purported error by the patent examiner, at any point in the IPR proceedings. Nor did the Board mention either issue in its 92-page decision instituting IPR, or in its decisions granting Cisco and another company's joinder petitions, or at the oral hearing on the consolidated matters. Perhaps that was because the Board is statutorily forbidden from canceling patents in IPR based on a written-description defect. Or perhaps that was because the '856 patent plainly describes its key innovation. Indeed, the Board concluded otherwise only because it completely failed to understand how the filtering described in the '856 patent occurs (as is nearly inevitable when no party briefs an issue and no evidence or expert testimony is presented on it). Had the Board received testimony and argument on the issue, it would have realized that there is no basis for its conclusion, and—like the district court—would have understood that the '856 patent is a significant technical advance that solved a previously "unsolvable" network security problem.

For any of all of these reasons, the Board's decisions cannot stand.

## JURISDICTIONAL STATEMENT

The Board, which had jurisdiction under 35 U.S.C. §311, issued its final written decision on May 23, 2023.  Appx0001-0061.  Centripetal timely appealed that decision on June 8, 2023.  *See* 35 U.S.C. §142; 37 C.F.R. §90.3(a)(1).  This Court has jurisdiction under 35 U.S.C. §§141 & 319 and 28 U.S.C. §1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.    Whether executive-branch regulations designed to safeguard against both the appearance of impropriety and impropriety itself compel vacatur here given that, after this Court reversed a multibillion-dollar willful-infringement judgment against Cisco because the district judge's spouse held less than $5,000 in Cisco stock, (a) an APJ voted to institute IPR on one of the same patents while owning up to $15,000 in Cisco stock, (b) the same APJ voted to join Cisco to the IPR proceeding, and (c) the Board threatened sanctions in response to a good-faith recusal motion.

2.    Whether the final written decision, which depended on a *sua sponte* determination that the '856 patent specification fails to adequately describe the claims and a misconstruction of a term the parties never disputed, comports with due process, the Administrative Procedure Act, and the America Invents Act.

4

3.    Whether the Board erred as a matter of law in finding the challenged claims obvious based on the asserted prior art of Buruganahalli.

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Secure Communications

When a client computer communicates with a server, electronic data are exchanged in the form of individual packets.  In recent years, encryption has increasingly been used as a means of keeping such communications private.  Appx5924(¶31).  Internet communications that employ the Hypertext Transfer Protocol ("HTTP"), used for viewing webpages, are often secured by the Transport Layer Security ("TLS") protocol.  Appx5924(¶32) (noting that TLS is an upgraded version of the Secure Sockets Layer ("SSL") protocol).  The encryption of HTTP communications with TLS or SSL is known as HTTP Secure.  Appx5925(¶33).

TLS and SSL typically use the following procedure, known as a "handshake," to set up a secure communication channel:

(1) The client computer sends an unencrypted "hello message" to a server computer.

(2) The server computer responds with an unencrypted message conveying a digital certificate, which typically includes the server's name, a certificate authority, and a public key that will be used to encrypt the transmission of a random number.

(3) The client may confirm that the certificate was issued by the certificate authority.

(4) If the client is satisfied that the certificate is valid—and therefore agrees to initiate a secure communication session—the client sends a random number encrypted with the server's public key to the server computer.

Appx5925(¶32); *accord* Appx2023(11:30-47).  Once the client has agreed to initiate a secure session, "both the client computer and the server computer … generate a unique session key" that permits the client and the server to encrypt and decrypt all further communications that they exchange during that session.  Appx5925(¶32).

### B.    Prior Network Security Technology

Encryption technologies protect sensitive information, but they also create challenges for network security.  Appx5926(¶33).  Bad actors may "obfuscat[e]" malware or cyberattacks by "embedd[ing] [them] inside encrypted communications."  Appx5923-24(¶31); *see, e.g.*, Appx0103(1:17-18).  "This can lead to problems such as viruses being transferred over secure connections and entering the network"—"instead of being blocked"—"because the gateway security appliances could not inspect the data."  Appx4056(¶18).

Before the '856 patent, one common way to address this vulnerability was by configuring a firewall as a "trusted man-in-the-middle."  Appx5924(¶31); *see, e.g.*, Appx4702-4704(¶¶2:47-5:12).  Such a firewall would intercept and decrypt secure communications from the server before they reached the client; analyze these decrypted communications for security threats; and, if no threats were identified, re-encrypt the communications before passing them along to the client.

6

Appx5924(¶31); Appx0034-0036.  This approach can get the job done, but only with significant downsides.  First, all traffic—including traffic that legitimately should be encrypted—must have its privacy broken; the "trusted man-in-the-middle" approach cannot inspect traffic without decrypting it first.  Appx5924(¶31).  Second, because "decryption and re-encryption is difficult to perform in real-time," running a large volume of encrypted communications through a trusted man-in-the-middle may "undesirably slow[] down network traffic and consume[] computing power."  Appx5924(¶31); *see also* Appx6035(53:25-54:2).

Instead of routing all encrypted traffic through a "trusted man-in-the-middle," some pre-'856 firewalls sort data flows at the threshold, i.e., before establishing any secure session, by inspecting the "handshake" procedure.  Appx5961-62 (citing Appx2019(4:16-44); Appx2020(5:24-6:1); Appx2022-2023(10:54-11:58)).  They do so by extracting the destination domain (e.g., "mynetwork.com," Appx3758) from the initial, unencrypted "hello message" sent by the client and comparing it against a "whitelist" of safe domains and a "blacklist" of potentially risky domains.  Appx5930(¶41); *see* Appx2020(5:27-35); Appx2023(11:34-41).  If the domain is on the whitelist, traffic need not be decrypted before a secure connection is established; the firewall may allow the establishment of a secure connection, and the free flow of encrypted messages, without requiring the intervening step of decryption and re-encryption by the trusted man-in-the-middle.  Appx5930-5931(¶43).  But that is true

only for domains on the whitelist.  If a domain is unknown or on the blacklist, the

firewall may block the unencrypted client hello message from passing through to the

server, in which case no secure connection is ever established, Appx5931-

5932(¶¶44-45), or allow a secure session but route the traffic from that session to a

trusted man-in-the-middle for decryption and further analysis, Appx5933-34(¶46).

### C.     The '856 Patent Solves the "Unsolvable" Problem

Centripetal's '856 patent is "a significant advancement" over this existing

technology—a leap forward that most thought unachievable.   Appx5947(¶66).

Unlike the prior art, which must decrypt communications from unknown domains to

inspect their contents, Centripetal developed technology that makes a security

decision by analyzing the traffic *in its encrypted form*, without needing to decrypt

the encrypted communications.  Appx0115(25:15-45); Appx5946-5947(¶¶64-65).

To effectuate this critical change, Centripetal developed rules for filtering

encrypted packets based on one or more of the following: "a uniform resource

identifier" ("URI"), "data indicating a protocol version," "data indicating a method,"

"data indicating a request," or "data indicating a command."  Appx0115(25:30-45).

The '856 technology examines not only "handshake messages … that comprise

unencrypted data" and/or DNS queries that comprise unencrypted data,

Appx105(5:2-30); Appx0107(9:61-63), but also the unencrypted information in the

headers of encrypted packets, Appx0107(10:4-5); *see also* Appx3264(¶7).  It also

collects and logs data about the encrypted packets transmitted during a secure session, including information found in the packet headers, information found in the payload, and other information "associated with but not solely derived from the packets themselves," all of which can be used to filter packets during future sessions. Appx0104-0105(4:64-5:55); Appx5940(¶55).

This methodology offers several advantages over the prior art. First, the '856 technology can determine security threats associated with encrypted packets without decrypting the packets. Appx5940(¶54); *see* Appx0107(9:66-10:14); Appx0108(11:51-65). In other words, the '856 technology helps to ensure security while maintaining privacy. Second, the '856 technology can modify its filtering of encrypted packets *during* a secure session based on "rule updates that are received after [the] session was initiated." Appx5940(¶55); *see* Appx0109-0110(14:19-16:26); Appx0113(22:20-51). This real-time processing allows firewalls and other network devices to "(i) end a secure session that is later deemed to be a threat per an updated rule, or (ii) allow a secure session to pass through without any further processing per an updated rule that indicates the secure session is not a threat." Appx5940(¶56); *see* Appx0109-0110(14:19-16:26); Appx0113(22:20-51). In addition, the '856 technology provides the ability to reconfigure packet-filtering rules based on the encrypted-packet data it collects and logs. Appx5940(¶55); *see* Appx0092-0101; Appx0109(14:4-18); Appx0112(20:22-27); Appx0113(22:18-19);

Appx0114(23:58-62). It also equips a firewall or network device to apply rules that will permit a secure session initially but end the session after a time- or data-limit is exceeded. Appx5940-5941(¶56); *see* Appx0107(9:33-46); Appx0108(11:28-35). This enables the device to prevent too much data from being extracted by bad actors if the session's length, the quantity of data exchanged, or some other aspect of the session raises security concerns. Appx5941(¶56).

## II.   The Initial Round Of Patent-Infringement Litigation

1. Centripetal sued Cisco in 2018, alleging willful infringement of several Centripetal patents, including the '856. Appx3233-3234. The late Judge Henry Coke Morgan, Jr., presided over a six-week trial that included "an over 3,507-page record, 26 witnesses, and over 300 exhibits." Appx9190.

Several weeks after the close of trial, but before he had issued a decision, Judge Morgan learned that his wife owned 100 shares of Cisco stock, then valued at $4,687.99. He promptly disclosed this information to the parties. When he did so, he "explain[ed] that the shares 'did not and could not have influenced [his] opinion on any of the issues in this case," as he did not learn of the shares until after a "full draft of [his] opinion had been prepared" and "[v]irtually every issue" had already been decided. *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 492 F.Supp.3d 615, 617 (E.D. Va. 2020).

Cisco responded "by filing [a] motion for recusal." *Id.* at 618.  After further briefing, Judge Morgan held a hearing at which he "informed the parties" that he and his wife had "contacted their personal attorney to request the creation of a blind trust to divest the shares." *Id.*  He also "provided the completed trust documents to the parties." *Id.*

Judge Morgan denied Cisco's motion.  He concluded that recusal was not required under 28 U.S.C. §455(b)(4), as he did not learn of his wife's stock ownership until he had already decided "virtually" every issue and drafted the bulk of his opinion. *Id.* at 622-23.  He further concluded that, even assuming §455(b)(4) would otherwise apply, he could keep the case under 28 U.S.C. §455(f), under which a judge who would otherwise be disqualified need not recuse if "substantial judicial time has been devoted to the matter" and the judge "divests himself … of the interest that provides the grounds for the disqualification." *Id.* at 623-25.  Judge Morgan had undisputedly devoted substantial time to the matter, and he reasoned that "[d]ivestment to a blind trust [was] the proper remedy" because "an outright sale" would risk creating an "appear[ance]" that he had secured a "benefit" by unloading Cisco stock on the eve of a substantial damages award against Cisco, which "would undermine the purpose of section 455." *Id.* at 623-24.

2. On October 5, 2020, Judge Morgan issued a 167-page opinion setting forth his findings of fact and conclusions of law.  *See* Appx3233-3410.  At the threshold,

Judge Morgan found Centripetal's '856 patent valid, rejecting Cisco's arguments that it was anticipated, obvious, or lacked an adequate written description. Appx3291-3299. He also concluded that Cisco had infringed claims 24 and 25 of the '856 patent, Appx3262-3289, and that three other Centripetal patents were valid and infringed, Appx3255. Judge Morgan further found that Cisco's infringement was "willful and egregious," Appx3398, due in part to "compelling evidence" that Cisco had deliberately copied all four Centripetal patents, Appx3388-3389.

The willfulness finding triggered 35 U.S.C. §284, under which a court "may increase the damages up to three times the amount found or assessed." Judge Morgan determined that it was appropriate to multiply the damages award by 2.5, for a total of $1.89 billion. Once interest, costs, and an ongoing royalty for six future years were added, Judge Morgan entered judgment awarding Centripetal damages of more than $2.6 billion. Appx3394; Appx3397-3398.

Cisco filed several post-trial motions challenging some of the findings of infringement as well as the willfulness finding and the quantum of damages. *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 526 F.Supp.3d 137, 139-40 (E.D. Va. 2021). On March 17, 2021, Judge Morgan denied all post-trial motions. *See id.* at 140. Cisco timely appealed the various district-court decisions. Appx8665.

3. This Court reversed Judge Morgan's non-recusal decision, concluding that Judge Morgan was required to recuse under §455(b)(4) because he became aware of

his wife's ownership of Cisco stock before issuing his opinion, and that placing the stock in a blind trust was not proper "divest[ment]" under §455(f).  *Centripetal*, 38 F.4th at 1031-33.

Much of the Court's opinion involved harmless-error analysis—i.e., whether the placement of the stock in a blind trust, instead of selling it outright, required vacatur of Judge Morgan's findings of fact, conclusions of law, and denials of post-trial relief.  *See id.* at 1034-40.  In deciding whether vacatur was warranted, the Court considered: "(1) 'the risk of injustice to the parties in the particular case'; (2) 'the risk that the denial of relief will produce injustice in other cases'; and (3) 'the risk of undermining the public's confidence in the judicial process.'"  *Id.* at 1034 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

The Court found that the first factor favored vacatur.  *Id.* at 1038.  The Court explained that a judge's "known financial interest" in a pending matter—even an interest of less than $5,000—"creates not only an appearance of impropriety but impropriety itself."  *Id.* at 1037.  While Judge Morgan "stated that his views as to the appropriate resolution of the case were fixed" before he learned of his wife's ownership of the stock, the Court found that Cisco still could have been prejudiced because Judge Morgan had the "prerogative to change his mind or to otherwise revise the decision … until the time it issued."  *Id.* at 1036.

13

On the second factor, the Court found that allowing Judge Morgan's ruling to stand "would have a significant adverse effect in other cases." *Id.* at 1039. The Court observed that judicial stock ownership is "an increasingly common problem," citing a then-recent *Wall Street Journal* article. *Id.* at 1038. "[F]ailure to vacate" could wreak mischief in future cases by "suggest[ing] that sitting on a case in which the judge's family has a financial interest is not a serious issue." *Id.*

The Court likewise found the third factor satisfied, because "[i]t is seriously inimical to the credibility of the judiciary for a judge to preside over a case in which he has a known financial interest in one of the parties and for courts to allow those rulings to stand." *Id.* at 1039. Even though Judge Morgan's wife owned a relatively small amount of Cisco stock and Judge Morgan ruled *against* Cisco, the Court concluded that "vacatur [was] essential to preserve public confidence" given the judge's "known financial interest in one of the parties." *Id.*

The Court reversed Judge Morgan's non-recusal decision, vacated his merits rulings, and "remand[ed] for further proceedings before a newly appointed judge." *Id.* at 1040.

## III.    Proceedings Below

### A.    Palo Alto Networks Petitions for Inter Partes Review of Claims 1, 24, and 25 of the '856 Patent

Six weeks after Judge Morgan denied Cisco's motions for post-trial relief, Palo Alto Networks ("PAN")—a party against whom Centripetal *has never asserted*

*the '856 patent* (or any related patent)—petitioned for IPR of claims 1, 24, and 25 of the '856 patent.  *See* Appx0360; Appx0410.  PAN contended that the challenged claims were obvious based on the prior art disclosed by Buruganahalli or, in the alternative, Buruganahalli in view of U.S. Patent No. 5,878,231 ("Baehr"). Appx0367; *see* Appx0377-0409.  PAN's petition did not premise its challenge on any purported lack of written-description support for the claims.

### 1. Buruganahalli

As relevant here, Buruganahalli describes extracting the hostname with which the client wishes to connect—i.e., the destination domain—from the unencrypted "hello message" sent by the client at the start of the TLS "handshake" process. Appx5930(¶41);   Appx0033-0034;   Appx2019(4:33-44);   Appx2023(11:30-51). Buruganahalli also describes "applying a security policy based on the destination domain to filter traffic at the security device." Appx2021(7:39-42); *see* Appx0031. If a destination is on a predetermined "whitelist" of trusted domains, the device allows the client hello message to pass through to the server so a secure connection may be established.   Appx5930-5931(¶43); Appx2021(7:43-51).   But if the destination is unknown or on a predetermined "blacklist" of potentially threatening domains, the device either blocks the client hello message, such that no connection is established, Appx5931-5932(¶¶44-45); Appx2020(5:64-6:1), or allows the client hello message and the establishment of a secure session but routes encrypted traffic

from that session to an intermediary for decryption and further analysis, Appx5933-5934(¶46); Appx2020(6:12-38).  In short, Buruganahalli describes sorting packet flows at the threshold—not applying dynamic, rule-based policies to encrypted packets during a secure session.

## 2.  Baehr

Baehr relates to a system for screening packets transmitted between a private network and a public network.  Appx2035(1:9-17); *see* Appx5938-5959(¶¶51-53); Appx0198-0202.  Baehr describes using a separate "proxy network" to protect the private network against potential threats.  Appx2035(2:26-42).  Packets received from the public network host are subject to initial screening, during which some packets intended for the private network host may instead be routed to the proxy network, which may perform functions as though it were the private network host while remaining invisible to the public network and preventing potential intruders from ever entering the private network.  Appx2038(8:36-47).  While Baehr describes a proxy network, it does not cure the deficiencies of Buruganahalli.

## 3.  The Challenged Claims

Claim 1 of the '856 patent exemplifies the subject matter of all three challenged claims (claims 1, 24, and 25):

1. A method comprising:

receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality

of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;

[1.b] identifying packets comprising unencrypted data; [1.c] identifying packets comprising encrypted data; [1.d] determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and

the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Appx0025 (alterations in original) (quoting Appx0115(25:14-49)).

## B.     The Board Institutes Inter Partes Review

On May 25, 2022, the Board instituted PAN's IPR.  According to the Board,

the Buruganahalli device's threshold determination and subsequent identification of

all encrypted packets "belonging to" the same flow—i.e., its "correlat[ion]" of all

17

packets in a session with "the hostname (destination domain) extracted from the handshake traffic"—amounts to "filter[ing]" encrypted communications. Appx0186-0187.  On that basis, the Board concluded that PAN made enough of a showing "that Buruganahalli teaches 'filtering encrypted packets' as required by the '856 patent's claims" to warrant IPR.  Appx0138-0139.  The decision did not identify any written-description or claim construction issues as the basis for instituting.  *See* Appx0145-0207.  Centripetal timely requested rehearing.  Appx4509.

### C.    Cisco and Keysight File Substantively Identical Petitions and Motions for Joinder

Until the Board issued its institution decision, Cisco and Keysight Technologies, Inc. ("Keysight") were time-barred from seeking IPR of the '856 patent because more than a year had elapsed since they were "served with a complaint alleging infringement of the patent."  35 U.S.C. §315(b); *see* Appx8029; Appx9484-9485.  Under §315(c), however, the PAN institution decision gave them an opportunity to file substantively identical joinder petitions, which they did. Appx7099 & n.2; Appx7215; Appx8816; Appx9218.

### D.    Centripetal Moves for Recusal and Vacatur After Learning of an APJ's Ownership of Cisco Stock

While Centripetal's request for rehearing of the institution decision was still pending, Centripetal learned that one of the APJs presiding over the matter, Brian McNamara, owned up to $15,000 of Cisco stock and was continuing to receive an

annual share of profits from a law firm that earns fees from Cisco for lobbying work. Appx6351-6362. Naturally, Centripetal moved to recuse the panel and vacate its prior decisions. Appx6344-6364. As Centripetal pointed out, while Cisco was not yet a party to the IPR, its petition and joinder motion had been pending for more than six months—and it was plain that Cisco had a direct and material interest in the IPR, given the potential impact on the remand proceedings in Centripetal's separate suit against it for willfully infringing its patents, including the '856. Appx6350-6351.

### E.    The Board Grants Cisco's and Keysight's Respective Petitions for Inter Partes Review and Motions for Joinder

Only a week after Centripetal filed its recusal motion, a three-member panel—including APJ McNamara—granted Cisco's and Keysight's IPR petitions and joinder motions, without any mention of Centripetal's motion. Appx0210; Appx0276. The decision granting Cisco's petition expressly acknowledged that Centripetal had previously won an award of "at least $2.6 billion" for Cisco's willful infringement of the '856 patent; that the award had been vacated due to a judicial stock-ownership issue; and that the decision to institute IPR (and the resolution of those proceedings) could affect that ongoing, high-stakes lawsuit. Appx0247-0248; Appx0250-0253.

The panel separately denied Centripetal's request for rehearing of the institution decision in the PAN matter, in an order issued the same day. Appx6627.

### F.     APJs McNamara and Amundson Belatedly Withdraw

APJ McNamara abruptly withdrew from the panel the next day.  Appx6652.

He did not deny his stake in Cisco; he claimed that it "ha[d] been a matter of public

record for ten years," Appx6652, and attempted to downplay it as "less than 0.04%

of the value" of his total disclosed assets, Appx6651 n.1.  Despite asserting that the

motion was "without merit," APJ McNamara claimed that his withdrawal would

"reduce the number of issues and simplify the briefing."  Appx6652.

APJ Steven Amundson also later withdrew.  He too claimed that Centripetal's

motion "lack[ed] merit" on both APJ McNamara's conflict and APJ McNamara's

influence on the panel's other members, and repeated the cryptic "reduce the number

of issues" basis for withdrawing.  Appx6702.

The third member of the original panel, APJ Aaron Moore, did not withdraw.

On January 19, 2023, two new panelists were assigned.  Appx6753.

### G.     The Board Denies Centripetal's Recusal and Vacatur Motion, Calling it "Highly Inappropriate"—and Threatening Reprisals

On February 3, 2023, the sole remaining member of the original panel (APJ

Moore) issued a decision denying Centripetal's motion for vacatur.  Appx0062.  The

decision concluded that APJ McNamara's stock ownership was not disqualifying

because "Cisco was not a party to th[e] proceeding at the time of the Institution

Decision" and the value of APJ McNamara's holding was below the criminal safe

harbor threshold set forth in regulations applicable to all executive-branch officials.

Appx0062; Appx0071.    The decision said nothing of the original panelists'
knowledge that Cisco would immediately benefit from the decision to institute IPR.
Nor did it address APJ McNamara's and Amundson's decisions to grant Cisco's
follow-on petition and motion to join the proceedings, which came *after* Centripetal
had raised the stock-ownership and appearance-of-partiality issues.    Worse, the
decision responded to the serious issues Centripetal raised with defensiveness and
vitriol, decrying the motion as "highly inappropriate" and threatening Centripetal
with "sanctions" if it made further "arguments directed at the Board, its members,
or its process." Appx0074; Appx0082.[1]

## H.    The Board Issues its Final Written Decision

Just one week later, the Board issued its final written decision.    The Board
rejected Centripetal's "primary argument" based on a purported defect in the '856
patent's written description:  The Board found that even if "Buruganahalli does not
disclose applying the claimed rule set to encrypted packets, … the '856 patent *also*
does not describe applying the claimed rules to encrypted packets."  Appx0004.
According to the Board, the patent examiner made an "error … during prosecution"

---

[1] Centripetal responded by filing a petition for writ of mandamus in this Court.
This Court denied the petition on May 16, 2023, in a short, non-precedential order.
*In re Centripetal*, 2023 WL 3477282 (Fed. Cir. 2023).  The Court did not resolve the
merits of Centripetal's recusal request, instead holding that Centripetal had not
established entitlement to the "extraordinary remedy" of mandamus because it could
"raise its arguments after [the Board's] final written decision."  *Id.* at *1.

by approving claims that "recite filtering encrypted packets using a set of criteria appropriate for decrypted packets, without any explanation of how that can be done." Appx0004; Appx0044; *see* Appx0023.   Notably, neither PAN, nor Cisco, nor Keysight (collectively, "Petitioners") made this argument or anything like it.[2]   The Board then essentially rewrote the challenged claims to omit the portions it found inadequately described, concluding that "[t]he patent does not describe" "applying rules directly to encrypted packets."  Appx0023-0024; *accord* Appx0043-0044.

The Board followed up its *sua sponte* written-description analysis by embracing another unbriefed argument:  that Buruganahalli's threshold routing of packets based on "domain name" discloses the '856 patent's method of filtering encrypted packets based on "a Uniform Resource Identifier" ("URI").  Appx0004; *see* Appx0044.  Although "no party … sought a construction of 'URI'"—and the record contained ample evidence explaining not only that URIs provide much greater specificity than domain names, but that URIs are found in encrypted traffic, whereas domain names can be found in the unencrypted "hello message"—the Board construed the term of its own accord, asserting that its "plain language would

---

[2] That is perhaps because of the limitations on IPR set forth in 35 U.S.C. §311(b). *See infra*, Part II.B.   The Board tried to circumvent those limitations by recharacterizing its written-description conclusion as an obviousness conclusion. *See* Appx0024 n.7 (disavowing any "consider[ation]" of whether the purported written-description defect "might give rise to a problem under §112").

encompass domain names, which are a 'uniform' way of 'identifying' a 'resource.'" Appx0044. The Board further held that Centripetal had "waived" any opportunity to refute this construction of URI because it did not contest it until the oral hearing, even though Petitioners did not make this argument in any of their briefs and first tried to equate "URI" with "domain name" *at the oral hearing*. Appx0044; *see also* Appx7067-7072; Appx7077-7080.

Having thus transformed the '856 patent's packet-filtering methodology to make it appear "essentially the same" as Buruganahalli, the Board concluded that "Buruganahalli presents a strong case of obviousness and, in fact, is essentially anticipatory, describing both the hello message technique that the '856 patent uses for filtering packets in a flow and the man-in-the-middle technique that the '856 patent uses for filtering decrypted packets." Appx0042-0050.

Finally, the Board brushed aside Centripetal's objective evidence of nonobviousness, finding that it "would be insufficient to overcome even a weak case of obviousness." Appx0050. The Board refused to examine any of Centripetal's evidence that Cisco had copied the challenged claims; it simply asserted, without explanation, that it was "not in a position" to "weigh witness testimony[] and make a factual finding about copying." Appx0054. On the flip side, the Board disputed the long-felt need for a solution to "the problem of detecting threats in encrypted traffic," despite *Cisco's own press release* describing the problem as "unsolvable."

Appx0051.  The Board then asserted that this problem "had, in fact, already been solved in Buruganahalli, using the very same hello message, correlation, and man-in-the-middle techniques described in the '856 patent."  Appx0051.  It also found that Centripetal could not "establish a nexus" between its patent claims and any long-felt need for methods of detecting threats in encrypted traffic because, in the Board's view, the claims were not "*novel*."  Appx0054.

## I.   The PTO's *Volte Face* on Recusal

On September 22, 2023—just one business day before this brief was due—PTO Director Vidal sent a memorandum to the Board providing interim "Guidance on Paneling of Cases."  Katherine K. Vidal, *Mem. to Members of the Patent Trial and Appeal Board and the Trademark Trial and Appeal Board*, at 1 (Sept. 22, 2023), bit.ly/468iVic ("PTO Mem.").  The memorandum affirms that—as Centripetal has been arguing all along—"the *appearance* of conflicts of interest may counsel in favor of recusal even when the financial interests in question fall below the thresholds identified in the relevant rules applicable to all USPTO employees."  *Id.* at 2.  Given the myriad "executive branch regulations" making that point clear (which the Board ignored here), and "given PTAB and TTAB judges' unique roles," Director Vidal is "directing PTAB and TTAB management … to avoid empaneling cases to judges who hold stock or bonds (publicly traded or privately held) in any of the disclosed parties or real parties in interest, *regardless of the dollar value*."  *Id.*

Despite the emphatic nature of the directive and its reliance on longstanding regulations, the guidance is expressly prospective-only. *Id.* at 4 (guidance takes "effect [in] 60 days" and is not a ground on which the USPTO will "revisit any prior Decisions"). Director Vidal made no effort to reconcile this new policy with the Board's chastisement of Centripetal for raising an issue that would henceforth trigger mandatory recusal.

## SUMMARY OF ARGUMENT

**I.** Federal regulations require executive-branch officials to recuse from matters where their participation raises concerns about an appearance of partiality. The regulations put appearance-of-partiality concerns front and center for all executive-branch employees who perform government functions, but those concerns are at their zenith when it comes to Article I employees serving what is essentially an Article III role. The decision below, however, brushed appearance concerns aside because of the size of the financial holding. That falls far short of what the regulations—and basic notions of justice—demand. While APJs are not subject to the same statutory recusal rules as federal judges, the applicable regulations, not to mention basic principles of due process, require vacatur of the Board's decisions for many of the same reasons that this Court wiped out the nearly-$3-billion verdict Centripetal obtained in the related federal-court proceedings. "[P]ublic confidence"

25

in fair adjudication demands nothing less, as the PTO itself has now belatedly recognized. *See Centripetal*, 38 F.4th at 1039.

**II.** Even putting that threshold issue aside, the Board's decision violated due process, the APA, and the America Invents Act. The linchpin of the Board's decision is a finding that the '856 patent specification does not adequately disclose how the claimed filtering rules apply to encrypted packets. The problem with that finding—besides the fact that it is wrong—is that no one ever raised this issue below. Under black-letter law, the Board not only is prohibited from "adopt[ing] arguments" that "were not[] raised by the petitioner during an IPR," *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016), but is obligated to give parties "fair notice" and "an opportunity to respond" in "all aspects of an IPR proceeding," *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 51-52 (Fed. Cir. 2020). The Board violated both requirements here, issuing a de facto ruling on the '856 patent's written description that contravened the statutorily limited scope of IPR, *see* 35 U.S.C. §311(b), and deprived Centripetal of the chance to explain, through briefing and evidence, why the Board's invented written-description deficiency is illusory—and why the conclusion Judge Morgan reached on that issue is exactly correct.

**III.** Perhaps because of the lack of adversarial briefing, the Board's decision is riddled with substantive errors. The Board's central finding (that the challenged claims "do not describe applying the claimed rules to encrypted packets") ignores

the patent's plain text, which unambiguously describes just that. The Board had no legal basis for rewriting the patent or its claims to exclude aspects of claims that the Board deemed inadequately explained. Next, the Board erred by conflating the "destination domain" that Buruganahalli uses to route data flows with the "Uniform Resource Identifier" ("URI") that the '856 patent uses as one of its criteria for filtering encrypted packets. The Board's *sua sponte* construction of "URI" was both procedurally improper and flatly contrary to abundant record evidence about the term's meaning. In addition, the Board ignored a wealth of evidence showing Centripetal's claims to be nonobvious, including unrebutted expert testimony explaining how the patented invention was an advance over Buruganahalli, and evidence of Cisco's willful copying, precisely because the invention fulfilled a long-felt need for a better tool to identify security threats in encrypted traffic.

### STANDARDS OF REVIEW

A failure to recuse is reviewed for abuse of discretion. *Shell Oil Co. v. United States*, 672 F.3d 1283, 1288 (Fed. Cir. 2012). Unless an error is harmless, vacatur is appropriate. *See Liljeberg*, 486 U.S. at 862; *Centripetal*, 38 F.4th at 1039.

This Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence under the APA. *ACCO Brands Corp., v. Fellowes, Inc.*, 813 F.3d 1361, 1365 (Fed. Cir. 2016). The Court must set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.  5 U.S.C. §706(2)(A).  To meet this standard, "agency action [must] be reasonable and reasonably explained," and must comport with the applicable substantive law.  *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).

"Obviousness is a question of law based on subsidiary findings of fact." *In re Van Os*, 844 F.3d 1359, 1360 (Fed. Cir. 2017).  The Court reviews "the Board's ultimate determination of obviousness de novo and its underlying factual determinations for substantial evidence." *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1381 (Fed. Cir. 2019).

## ARGUMENT

### I.     Centripetal Suffered Irremediable Prejudice In The Proceedings Below.

#### A.     The Board's Decision Denying Centripetal's Recusal Motion and Attacking Centripetal for Questioning APJs' Impartiality Flouted OGE Regulations and the Bedrock Principles Animating Them.

After seeing its multibillion-dollar willful-infringement judgment against Cisco wiped away because the district judge's spouse held a few thousand dollars in Cisco stock and the judge's chosen means of divestiture was deemed an insufficient cure, the last thing Centripetal expected was to have the validity of its patent decided by an adjudicator who owned potentially even more Cisco stock.  Yet when Centripetal learned that was its fate and moved for recusal, it received a tongue-lashing:  The Board lambasted the motion as "frivolous" and "highly inappropriate" and warned that future efforts to raise the issue "may be met with sanctions." Appx0073-0074; Appx0082.

The Board's thinly reasoned and intemperate decision denying Centripetal's motion for vacatur fails on its own terms and confirms the appearance problems. In the Board's telling, Centripetal's motion was "frivolous" because Office of Government Ethics ("OGE") regulations provide a safe harbor from criminal liability when the financial interest is publicly traded and worth no more than $15,000. *See* Appx0069-0073 (quoting 5 C.F.R. §2640.202). (It is generally a crime for an executive-branch "officer or employee" to "participate[] personally and substantially" in "a judicial or other proceeding" if he or his family has "a financial interest" in a party. 18 U.S.C. §208.) But it should go without saying that the standard for criminal liability for all executive-branch officials is not remotely equivalent to the standard for avoiding the appearance of impartiality by those charged with adjudicatory functions involving potentially billions of dollars. And yet despite that obvious reality, the decision below equated the two, deeming §2640.202's criminal safe harbor the beginning *and end* of the inquiry: Because the APJ held less than $15,000 in a publicly traded stock, the Board ruled that there was nothing to see here—and chastised Centripetal for having the temerity to suggest otherwise. Appx0074.

That decision was plainly erroneous. OGE regulations are not limited to §2640.202's criminal safe harbor. They also require all federal employees to "comply with the requirements of government ethics laws and regulations" and

ensure that they do not "los[e] impartiality *or appear*[] *to lose impartiality* in carrying out official duties." 5 C.F.R. §2638.102 (emphasis added); *see also, e.g.*, *id.* §2635.101 ("Employees shall not hold financial interests that conflict with the conscientious performance of duty."). These obligations are not passive. "Consistent with the fundamental principle that public service is a public trust," *id.* §2638.102, all federal officials must "take[] appropriate steps to avoid an appearance of loss of impartiality in the performance of [their] official duties"—including by "not participat[ing] in a particular matter involving specific parties which [they] know[] [are] likely to affect the financial interests of a member of [their] household" if "a reasonable person with knowledge of the relevant facts would question [their] impartiality in the matter." *Id.* §2635.501(a).

Of particular relevance here, the regulations clarify that *even if a financial interest is small enough that not recusing* "would not violate 18 U.S.C. 208(a)," federal employees and officials *should still recuse* from a matter when a financial holding in a party would, under the circumstances, "raise a question in the mind of a reasonable person about [their] impartiality," unless "the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's … operations." *Id.* §2635.502(d). That, as the regulations take pains to note, is because "[q]uestions regarding

impartiality *necessarily arise* when an employee's official duties impact upon the employee's own financial interests." *Id.* §2635.501(b) Note (emphasis added).

The Board's casual dismissal of all these regulations, and its chastisement of Centripetal for even suggesting the need for recusal, only served to exacerbate the appearance of impropriety.  For instance, the Board relied on the fact that Cisco was not a formal party to this IPR at the time of the panel's institution decision.  *See* Appx0071.  But that overlooks both that the APJs who instituted knew full well about Cisco's enormous financial interest in the '856 patent and that APJ McNamara specifically joined a decision adding Cisco as a party to this very IPR the day *before* withdrawing from the panel.  *See* Appx8738-8739; Appx8774-8775.  The Board's reasoning focused solely on the safe harbor's $15,000 threshold.  But that not only conflates a criminal safe harbor with a need to ensure the appearance of impartiality—it misses the broader context of this case.

Every patent holder deserves the appearance of impartiality in a proceeding that risks invalidating a hard-earned patent.  But a party that has just lost a substantial infringement verdict based on a holding of less than $5,000 in Cisco stock surely deserves a proceeding free from adjudicators who may hold larger amounts of Cisco stock—and just as surely deserves a respectful hearing, rather than a scolding.  A reasonable observer aware of all the circumstances would expect nothing less.  Yet instead of taking Centripetal's concerns seriously, the Board chastised Centripetal

for raising them and gratuitously denied an unopposed *pro hac vice* motion by Centripetal's lead trial lawyer, who signed the recusal motion. That is literally the opposite of giving careful attention to the appearance of impartiality.

The Board's utter lack of concern for appearances is particularly troubling given that APJs are no ordinary federal employees. While APJs are of course not the same as Article III judges, the word "judge" is in their job title for a reason. Most federal employees do not decide legal questions that just as easily could be resolved in an Article III court. And very few executive-branch officials oversee "an adversarial process … that mimics civil litigation." *SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1352 (2018) (describing IPR).

Proceedings before APJs have many of the trappings of Article III proceedings for good reason: They reflect the serious stakes and the heightened need to convey the appearance and reality of impartiality before someone is deprived of a valuable property interest. And those considerations properly shape both the perceptions of the reasonable observer concerning the need for impartiality and even the constitutional analysis. For example, ALJs and APJs enjoy absolute judicial immunity, rather than the qualified immunity that extends to most executive-branch officials, because their role "is 'functionally comparable' to that of a judge." *Butz v. Economou*, 438 U.S. 478, 513 (1978). Similarly, the states' Eleventh Amendment immunity against the exercise of "judicial power" in "suit[s] at law or equity," U.S.

Const. amend. XI, extends to adjudicatory proceeding before federal agencies because "such a proceeding 'walks, talks, and squawks very much like a lawsuit.'" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 757 (2002).

All of that should have been particularly obvious to the Board, given that it simultaneously denied Centripetal lawyer's motion for pro hac vice admission. *See* Appx6780. Most executive-branch employees preside over meetings, not formal adjudications replete with a formal bar and the need to file motions to appear *pro hac vice*. APJs cannot enjoy all the trappings and immunities of judicial office and then turn around and insist that merely avoiding criminal prohibitions applicable to ordinary federal employees suffices to provide an appearance of impartiality and satisfy the demands of due process. The need for a heightened guarantee of the reality and appearance of impartiality thus inheres in the APJ/ALJ role. Indeed, the Supreme Court has described ALJs as "*the impartial officer* designated to hear a case," and characterized their role as "similar to that of an Article III judge." *S.C. State Ports Auth.*, 535 U.S. at 758 (emphasis added). And as the Supreme Court has long made clear, "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 150 (1968).

All of that should make crystal clear that the threshold for criminal liability applicable to all executive-branch officials cannot be the final word on impartiality

concerns for APJs.   Given that appearance-of-partiality problems matter for everyday federal employees, basic principles of due process require that they matter all the more so to, and be given all the more serious consideration by, executive-branch officials acting in an adjudicative capacity.  *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) ("It has … come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest'" that applies to Article III judges "'applies with equal force to … administrative adjudicators.'" (first alteration added) (quoting Kenneth Culp Davis, *Administrative Law*, §12.04, p.250 (1972))).   The PTO itself now seems to recognize that APJs need to be held to a much higher standard than what suffices for ordinary executive-branch employees.   Indeed, the interim guidance specifically invokes APJs' "unique roles" as "judges" as the key basis for "directing … Board management[] to avoid empaneling cases to judges who hold stock or bonds (publicly traded or privately held) in any of the disclosed parties or real parties in interest, *regardless of the dollar value*"—i.e., even if it is below the $15,000 threshold in §2640.202's criminal safe harbor.  PTO Mem. at 2.

The PTO's new approach is utterly irreconcilable with what transpired here.   The panel chastised Centripetal for raising an issue that will henceforth trigger mandatory recusal.   Even APJ McNamara apparently saw enough of an issue with his continued participation in the proceedings to withdraw, despite his self-serving statement that the recusal motion was "without merit."  Appx6652.   Yet he delayed

his withdrawal until after he voted to grant Cisco's motion to join.  No reasonable observer could fail to see a problem with this vote-first-recuse-later course of conduct.  After all, once a judge becomes aware of a conflict that warrants recusal, he may not take any further action in the case "other than the ministerial act of transferring the case to another judge." *Shell Oil*, 672 F.3d at 1289-91.  So, if there was a basis to recuse, then APJ McNamara had zero business ruling on Cisco's petition and joinder motion or Centripetal's request for rehearing of the institution decision.  But if there was *no* basis to recuse, then he should not have withdrawn. *See Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985) ("Absent a factual showing of a reasonable basis for questioning his or her impartiality … a judge should participate in cases assigned.").  Whichever it is, joining decisions that decide critical issues in the teeth of an asserted conflict—and deciding them in favor of Cisco—but then withdrawing from the case the next day is no way to handle Centripetal's valid concerns.  It reinforces, rather than remedies, the appearance of partiality.

### B.  Vacatur of the Institution Decision Is Necessary to Preserve Justice and Public Confidence.

Like 28 U.S.C. §455, the OGE regulations "neither prescribe[] nor prohibit[] any particular remedy" for failure to recuse.  *Cf. Liljeberg*, 486 U.S. at 862.  Under *Liljeberg* and this Court's decision in *Centripetal v. Cisco*, "there are three factors courts should consider when deciding whether to vacate a judgment" due to an improper failure to recuse: "(1) 'the risk of injustice to the parties in the particular

case'; (2) 'the risk that the denial of relief will produce injustice in other cases'; and (3) 'the risk of undermining the public's confidence in the judicial process.'"  38 F.4th at 1034 (quoting *Liljeberg*, 486 U.S. at 864).  Each factor weighs in favor of vacatur here.  Both the decision to institute IPR of the '856 patent and the Board's final written decision (not to mention the decision to join Cisco) were tainted by the participation of an APJ with a known financial interest in the proceedings. Centripetal was "entitled to a neutral and detached judge in the first instance," *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972), and the deprivation of that right compromised the impartiality of the entire process.  *See Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016) ("[J]udges who were exposed to a disqualified judge may still be influenced by their colleague's views when they rehear the case.").  Rehearing before an entirely new panel of APJs is thus necessary, as it is "neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process." *Id*. at 14-15.

The Board tried to brush aside the obvious risk of prejudice to Centripetal because three months passed between Centripetal's receipt of long-requested copies of APJ McNamara's 2014-2019 financial disclosures (on September 29, 2022) and its filing of the motion for recusal and vacatur (on December 30, 2022).  Appx0081-0082.  The idea that Centripetal waited too long to file is difficult to take seriously, especially given that the Board simultaneously criticized it for leveling supposedly

unfounded accusations; apparently the Board wanted Centripetal to file those "unfounded" claims even sooner, before it had completed its due diligence. In all events, the three-month time-lapse here was entirely reasonable, as Centripetal spent this time researching the conflict and requesting additional financial disclosures from the Department of Commerce. *See* Centripetal Reply Brief (No. 23-127, Dkt.22) at 26-30. Such due diligence should be encouraged, not denounced.[3]

In all events, Centripetal's conduct bears no resemblance to the cases on which the Board relied, which involve litigants sitting on disqualifying information for years or waiting for the adjudicator to issue its decision before seeking recusal. *See* Appx0082 (citing *In re United Shoe Mach. Corp.*, 276 F.2d 77, 79 (1st Cir. 1960) (two-and-a-half-year delay); *United States v. Owens*, 902 F.2d 1154, 1156 (4th Cir. 1990)); *see also Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1421 (Fed. Cir. 1989) (six-and-a-half-year delay). Here, by contrast, Centripetal filed its motion before the Board issued any further rulings or orders in the IPR proceedings.

Furthermore, no "substantial time" had "passed since the rulings in question"; in fact, because the Board's final written decision was issued pursuant to a statutory deadline, there was no undue delay yielding "staleness of evidence or fading of …

---

[3] Nor should the mere act of seeking public documents related to conflicts of interest be met with the veiled threat of criminal repercussions. *See* Centripetal Reply Brief (No. 23-127, Dkt.22) at 27.

memories." *Centripetal*, 38 F.4th at 1035-36.  Nor can Petitioners claim a "special hardship by reason of their reliance on the original judgment." *Id.* at 1036 (quoting *Liljeberg*, 486 U.S. at 869).  The judgment was covered with the specter of a conflicted APJ after Centripetal raised the issue before a final written decision, and Centripetal has appealed to this Court both by mandamus petition (preserving reviewability of the decision to institute) and in the normal course.

Denying vacatur here would "produce injustice in other cases." *Liljeberg*, 486 U.S. at 868.  It is hard to see how this Court could *not* find the facts of this proceeding to be "symptomatic of an increasingly common problem" of adjudicators "presiding over cases in which they or relevant family members owned stock in a party," given this Court's decision vacating Judge Morgan's judgment.  *See Centripetal*, 38 F.4th at 1038-39.  Indeed, even the PTO Director now recognizes that "the *appearance* of conflicts of interest may counsel in favor of recusal even when the financial interests in question fall below the [safe harbor] threshold[.]"  PTO Mem. at 2.

Reaching the opposite conclusion here would threaten public confidence in proceedings before the Board, sending the message that impartiality is a matter of grace, not right.  *Centripetal*, 38 F.4th at 1038 (finding that the second and third *Liljeberg* factors ran in parallel due to concerns that refusal to vacate over stock ownership would "have a significant adverse effect in other cases" by sending a message to judges that this "is not a serious issue").  As this Court made clear in

vacating the multibillion-dollar willful-infringement judgment against Cisco, it is "seriously inimical" to judicial credibility "for a judge to preside over a case in which he has a known financial interest in one of the parties *and for courts to allow those rulings to stand.*" *Id.* at 1039 (emphasis added). That is no less true when the one adjudicating a patent dispute is an APJ rather than an Article III judge. On the flipside, it cannot "plausibly be argued" that "public confidence" in an adjudication "will be degraded by a decision that vacates a judge's rulings rendered while he had a known financial interest in one of the parties." *Id.* After all, the whole point of the harmless-error doctrine in this context is to ensure that courts do not impose a "draconian remedy" for "forgetful judges." *Liljeberg*, 486 U.S. at 862.

In addition, the Board's intemperate response to Centripetal's recusal motion heightens the public confidence concerns. If the Board cannot even entertain a good-faith suggestion for (soon-to-be-mandatory) recusal without chastising the litigant for raising the issue, then it is hard to see why the public should have confidence that the system guarantees truly impartial justice. In sum, "failure to vacate here" would undermine "'public confidence'" in proceedings before the Board. *See Centripetal*, 38 F.4th at 1039 (quoting *Liljeberg*, 486 U.S. at 862).

## II.    The Board Improperly Invalidated Centripetal's Claims Based On A Purported Written-Description Deficiency That Petitioners Never Raised And Were Statutorily Barred From Raising During Inter Partes Review.

The procedural unfairness below was not limited to the participation of a financially interested adjudicator.  In its final written decision, the Board invalidated claims 1, 24, and 25 of Centripetal's '856 patent under a theory Petitioners never advanced—that the '856 patent does not contain an adequate written description of "applying the claimed rules to encrypted packets."  Appx0004.  That was reversible error several times over.

### A.    The Board's *Sua Sponte* Written-Description Analysis Violated the APA and Deprived Centripetal of Due Process.

This Court has expressly rejected the notion "that the Board is free to adopt arguments" that "were not[] raised by the petitioner during an IPR."  *Magnum Oil Tools*, 829 F.3d at 1381 (reversing final written decision that held all challenged claims were unpatentable as obvious); *see, e.g.*, *Apple Inc. v. Corephotonics, Ltd.*, 2023 WL 5838695, at *5-7 (Fed. Cir. Sept. 11, 2023).  That makes sense, as IPR is "an adversarial process … that mimics civil litigation," *SAS Inst.*, 138 S.Ct. at 1352, and it is black-letter law that courts in civil litigation must "normally decide only questions presented by the parties," *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020).  Nevertheless, the Board once again ignored the constraints on its power, deciding an issue that the parties did not brief and that Centripetal had no

chance to defend against—and using its resolution of that issue as the linchpin of its ultimate obviousness ruling canceling the challenged claims.

The parties' briefs below started from the proposition that the '856 patent describes rule-based filtering of encrypted packets; the critical contested issue was whether Buruganahalli "disclose[s] applying the claimed rule set to encrypted packets." Appx0004; *see* Appx6078-6088 (PAN briefing); Appx6319-6331 (Centripetal briefing). The Board recognized as much, yet it sidestepped the issue altogether by finding, *sua sponte*, that "the '856 patent *also* does not describe applying the claimed rules to encrypted packets." Appx0004. Although Petitioners never argued anything of the kind, the Board speculated that the patent examiner "err[ed] … during prosecution" by amending the proposed claims so as to "recite filtering encrypted packets using a set of criteria appropriate for decrypted packets, without any explanation of how that can be done." Appx0004; Appx0044. The Board then used this purported written-description defect as the foundation for its obviousness finding. The Board ruled that the '856 patent does not actually "describe applying rules to encrypted patents [sic]," and instead merely uses Buruganahalli's "hello message approach," Appx0043-0044—apparently because the Board did not believe it is "possible to apply some of those rules to encrypted packets," Appx0023-0024.

The Board's *sua sponte* written-description analysis is flatly wrong, is not supported by substantial evidence, is premised on a fundamental failure to comprehend what the '856 technology does and why it is so significant, and starkly demonstrates why factfinders should decide only those issues that have been vetted through briefing and, where appropriate, expert testimony. *See infra*, Part III. But even putting all that aside, the decision to jettison the issues the parties raised in favor of one that no one did contravened "basic principles of administrative law," which "impose important limits on the Board's authority during inter partes reviews." *In re IPR Licensing, Inc.*, 942 F.3d 1363, 1368 (Fed. Cir. 2019).

Even where (unlike here) the Board is justified in raising a patentability issue *sua sponte*—for example, when a patent owner seeks to amend a claim during IPR under §316(d), which entitles the Board to independently consider whether the revised or substituted claim is patentable—the APA still requires the Board to provide parties "fair notice" and "an opportunity to respond" to any issue it raises. *Nike*, 955 F.3d at 51-53; *see also, e.g.*, *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1262-63 (Fed. Cir. 2021); *Belden Inv. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015). The Board provided no such opportunity for Centripetal to address *either* the purported defects in the examiner's amendment *or* the Board's *sua sponte* conclusion that "*the '856 patent* does not describe applying rules to encrypted patents [sic]." Appx0044 (emphasis added). As noted, Petitioners never raised

42

either issue—and neither did the Board in its 92-page decision granting PAN's petition to institute IPR, *see* Appx0118-0209, or in its subsequent decisions granting Cisco's and Keysight's respective petitions, *see* Appx0210-0342, or at the oral hearing it held on the consolidated matters, *see* Appx7020-7081.

Nor did the Board provide Centripetal with an opportunity to brief why the Board was wrong to equate the "domain name" that Buruganahalli extracts from the handshake traffic with the "Uniform Resource Indicator" that is among the criteria the '856 patent uses to filter encrypted packets. Even though "[n]o party ha[d] sought a construction of 'URI' or 'Uniform Resource Identifier,'" the Board reached out to construe the term. Appx0044. Not surprisingly given the absence of briefing or argument on the issue, the Board's construction of the term was erroneous, as explained below. *See infra*, Part III.A.2. But even putting that aside, the fact that the Board construed "URI" at all—and then misconstrued it to find obviousness, *see* Appx0044—confirms the problem and underscores the need for vacatur. After all, "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Qualcomm*, 6 F.4th at 1263.

"On this record," Centripetal "had no reason to anticipate that the [purported written-description] error would be the basis for the Board's decision, given that the parties did not brief, argue, or even suggest this [issue] was dispositive," or even in play. *Apple*, 2023 WL 5838695, at *7. The Court should thus vacate and remand.

43

*See, e.g., Qualcomm*, 6 F.4th at 1267; *Nike*, 955 F.3d at 54; *In re NuVasive, Inc.*, 841 F.3d 966, 971-72, 975 (Fed. Cir. 2016).[4]

## B. The Board's Written-Description Analysis Also Violated Statutory Limitations on the Scope of Inter Partes Review.

Beside the fact that the challenged claims plainly describe the key innovation, there is another good reason no Petitioner said a word about the written-description issue below:  It is not a valid basis for IPR.  Congress "expressly limited [IPR's] scope … to a subset of grounds" of unpatentability.  *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019).  A party seeking IPR may assert only "ground[s] that could be raised under section 102 or 103."  35 U.S.C. §311(b).  Obviousness under §103 is one such ground, but adequacy of written description under §112 is not.  *See id.*; *cf. id.* §321(b) (authorizing post-grant review to consider written description).  That is yet another reason why the decision to cancel Centripetal's claims based on a purported written-description deficit cannot stand.

---

[4] To the extent Centripetal needs to show prejudice, it can readily do so.  *Cf. Qualcomm*, 6 F.4th at 1263 & n.3 (declining to resolve whether a showing of prejudice is required).  Centripetal "had no reason to brief" the adequacy of the '856 patent's written description, or to "establish an evidentiary record supporting it"— e.g., by submitting supplemental expert testimony.  *See id.* at 1263-64 (finding prejudice under similar circumstances).  Further, as detailed below, the America Invents Act expressly precludes a petitioner from basing its unpatentability challenge on a purported deficiency under 35 U.S.C. §112, including written description.

This Court's precedents make clear that the Board may not cancel a patent based on a §112 issue improperly raised by a petitioner during IPR—let alone raise such an issue "on its own accord." *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1351 (Fed. Cir. 2020). *Samsung* involved an IPR in which the Board concluded, *sua sponte*, that certain claims were "indefinite" and thus failed §112. *Id.* The challenger argued that even though §311(b) precluded the Board from "institut[ing] inter partes review based on a claim's indefiniteness," the Board nonetheless could "cancel … claim[s] on indefiniteness grounds" if the issue arose in the course of the proceedings. *Samsung*, 948 F.3d at 1350. This Court squarely rejected that argument, holding that "[i]t would not be proper for the Board to cancel claims on a ground that is unavailable in an IPR." *Id.* at 1353. A straightforward application of that principle should have precluded the Board from canceling the challenged claims based on a purported written-description failing, which likewise falls under §112 and is not a valid basis for IPR. *See Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 275 (2016) (noting that the Board would "act outside its statutory limits" if it "cancel[ed] a patent claim … under §112 in inter partes review").

Apparently recognizing as much, the Board tried to frame its ultimate decision in terms of obviousness. The Board even went so far as to drop a footnote asserting that, given §311(b), it was "not consider[ing]" whether the purported written-description defect "might give rise to a problem under §112." Appx0024 n.7. This

Court should not be fooled. As explained, the Board's *sua sponte* written-decision analysis was the linchpin of its final written decision on obviousness. *See supra*, Part II.A. The purported written-description defect was the singular justification the Board provided for sidestepping Centripetal's "primary argument," Appx0004, and it undergirded the Board's oft-repeated (but flat wrong) conclusion that the '856 patent is "essentially the same" as Buruganahalli, *see infra*, Part III.A.1.

The Board's attempt to evade the limitations of §311 falls flat. After all, the Board may no more "do indirectly what it cannot do directly." *SAS Inst.*, 138 S.Ct. at 1358 n.* (quoting *CAB v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961)). This Court should not countenance such "shenanigans" by the Board—particularly without the benefit of expert testimony, briefing, and argument focused on the critical issue. *See id.* (quoting *Cuozzo*, 579 U.S. at 275).

## III. The Board's Unpatentability Rulings Are Legally Erroneous.

On top of the serious procedural defects that independently justify vacatur, the Board's decision contains glaring substantive errors. The Board concluded that the challenged claims are "the same" as Buruganahalli only by rewriting the text of the '856 patent, adopting an unsupportable construction of well-known term ("URI"), and ignoring unrebutted expert testimony. The Board also gave short shrift to Centripetal's objective evidence of nonobviousness—including compelling evidence that Cisco copied the patented invention and that the claims filled a long-

felt need for methods to detect network threats within encrypted traffic. Procedural errors aside, the substance of the Board's decision is untenable.

### A.    The Board Erred in Concluding That Buruganahalli Discloses the Challenged Claims' Rule-Based Filtering of Encrypted Packets.

To succeed on their obviousness challenge, Petitioners had to prove that "all claimed limitations" in claims 1, 24, and 25 of the '856 patent "are disclosed in the prior art," i.e., Buruganahalli. *See Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014). The Board ruled that Petitioners carried that burden, finding that the challenged claims are "essentially the same" as Buruganahalli. Appx0004. This conclusion was legally erroneous and not supported by substantial evidence, for multiple reasons.

### 1.    The Board disregarded the challenged claims' plain language.

The parties' dispute centered on whether Buruganahalli discloses filtering encrypted packets "based on at least one of [A] a uniform resource identifier (URI) …, [B] data indicating a protocol version …, [C] data indicating a method …, [D] data indicating a request …, or [E] data indicating a command." Appx0042 (alterations in original) (quoting Appx0115(25:30-37)); *see* Appx0042-0048. As discussed above, the Board found that "the '856 patent … does not describe applying the[se] claimed rules to encrypted packets." Appx0004. In the Board's view, the '856 patent "[i]nstead … describes" "filtering encrypted packets by correlating them with unencrypted data in other packets." Appx0044; *see also* Appx0023-0024.

That finding defies the plain text of the '856 patent.  The patent specifically describes rule-based filtering of encrypted packets separate from the threshold routing of unencrypted packets (e.g., step #17) and separate from the filtering of decrypted data by a proxy (e.g., step #22).  In steps #19 and #35, the patent describes using rules to perform three actions: (1) "identify the packets"; (2) "determine … that the packets comprise data corresponding to the network-threat indicators … by correlating the packets with one or more packets previously determined … to comprise data corresponding to the network-threat indicators based on data stored in logs 214"; and (3) "one or more of log … or drop the packets."  Appx0107(9:66-10:14); Appx0109(14:19-34).   The third action—using rules to log or drop the encrypted packets—is rule-based filtering of encrypted packets.  Indeed, *even the Board* recognized in its summary of the '856 patent that step #19 involves these three separate actions "acting on *encrypted* packets."  Appx0015-0016 (emphasis added).

Nevertheless, the Board essentially rewrote the patent specification to nullify this key innovative aspect by deeming it inadequately described.  *See* Appx0004, Appx0023-0024; Appx0043-0044.  An examiner's amendment during prosecution had added that "the filtering is based on a URI or one of four other types of data in the packets."  Appx0023.  The Board—and only the Board—saw "a problem with the examiner's amendment" because purportedly "the rules that were added to the claim by the amendment are those that the patent describes applying in step 22, by

rule gate 124, which is operating on *decrypted* packets." Appx0023 (emphasis added). That reasoning makes no sense. To be sure, the '856 patent describes how the rules are used for filtering decrypted packets (in step #22). But it does not stop there. It goes on to describe how the same rules are used for filtering *encrypted* packets (e.g., at steps #19 and #35). *See* Appx0093-0094; Appx0107(9:66-10:14); Appx0109(14:4-34). The Board simply ignored the parts of the specification that contradicted its theory.

The Board compounded its error by further asserting, without any evidence, that "it does not appear possible to apply some of those rules to encrypted packets because at least some of the data (i.e., the protocol version, method, request, or command) would be encrypted." Appx0023. Aside from omitting one of the claimed rules (specifying the URI), this assertion fails for the simple reason that—as the specification makes clear—the rules *can*, in fact, be applied to encrypted packets, thanks in part to the earlier-claimed determining step. *See* Appx5940(¶¶54-55); Appx5946-5948(¶¶64-67). That is, the packet-filtering system can assume an encrypted packet has similar data to a related packet that was previously decrypted, and then apply the rules based on that data to filter the encrypted packet without decrypting it. The claims do not require the rules to analyze the encrypted payload portion of the encrypted packets; they require that the rules (1) specify the claimed data and (2) are a basis for filtering the encrypted packets. For example, the claims

do not require comparing a URI from inside an encrypted packet with a URI of a rule, but rather recite "filtering … based on … a uniform resource identifier (URI) specified by the plurality of packet-filtering rules … the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators." Appx0115(25:30-45).

As noted above, the adequacy of the '856 patent's written description was not (and could not have been) at issue during IPR. *See supra*, Part II. It should come as no surprise, then, that the Board failed to understand how the filtering occurs, as it received no briefing, argument, or expert testimony focused on explaining that point. In all events, despite the Board's confused *ipse dixit*, the claims plainly "recite filtering encrypted packets" using five criteria not disclosed by Buruganahalli—regardless of whether the Board understood "*how* that can be done" or believed that the criteria are "appropriate [only] for decrypted packets." Appx0004 (emphasis added).

## 2. The Board adopted a wholly unsustainable construction of "Uniform Resource Identifier."

The Board further erred by equating the "domain name" that Buruganahalli extracts from the handshake traffic with the URI that the '856 patent uses to filter encrypted packets. The "domain name" specified in a "hello message" is just a top-level identifier (e.g., "mynetwork.com"). Appx3758(4:13-18); *accord* Appx2023(11:35-36). By contrast, the URI for a given session is a far more specific

identifier (e.g., "http://www.mynetwork.com/files/downloads/malicious"), which "includes the method or protocol use[d] retrieve the file, the host name, the port and the path." Appx7078; *see* Appx3758(4:13-18). Moreover, whereas the top-level domain name is found, unencrypted, in the "hello message," *e.g.*, Appx5930(¶41) & n.4, the URI for a particular session is found in the encrypted "application layer" of a packet, Appx7079. *See also* Appx1904(¶64); Appx1951; Appx2021(8:11-24). The '856 technology uses a URI (which was logged when previously filtering a related unencrypted packet) when applying rules to filter encrypted packets based on the unencrypted portion of their data. Appx0107(10:2-14); *see* Appx0105(5:31-6:5); Appx0109(14:22-34). That is why Petitioners' briefing below never attempted to equate the "destination domain" referenced in Buruganahalli with the "uniform resource identifier" used as a filtering criterion in the challenged claims.[5]

That did not stop the Board. "No party ha[d] sought a construction of 'URI' or 'Uniform Resource Identifier,'" but the Board took it upon itself to construe the term anyway. Appx0044. Without even considering the context in which the

---

[5] To the extent PAN's petition asserted that Buruganahalli filters packets based on Uniform Resource Locators ("URLs"), which "are examples of uniform resource identifiers," it made clear that this filtering occurred *after* decryption of the "application layer." Appx0394. Centripetal refuted this argument in its preliminary response, distinguishing such filtering of *decrypted* packets from the challenged claims' filtering of encrypted packets. *See* Appx3948-3954. PAN subsequently disclaimed this theory, Appx4147, and Petitioners' post-institution brief never raised it again, *see* Appx6068-6101.

challenged claims use that term, or any of the record evidence that reveals the term's meaning, the Board "conclude[d] that [its] plain language would encompass domain names, which are a 'uniform' way of 'identifying' a 'resource.'" Appx0044. This bizarre, *sua sponte* "construction" contradicts abundant record evidence indicating what a URI is and how it differs from a domain name. *See supra*, pp.50-51. It cannot possibly sustain the Board's conclusion that Buruganahalli discloses the challenged claims' use of a URI to filter encrypted packets of data during a secure session.

The Board's suggestion that Centripetal "waived" any objection to its construction of URI is even more absurd. Petitioners first attempted to equate Buruganahalli's "destination domain" with the challenged claims' "URI" at the oral hearing (and during rebuttal, no less). Appx7067-7072; Appx7077. Centripetal's counsel immediately disputed the point, calling it a "fundamental technical misunderstanding"; observing that "Petitioner[s] never ma[de] the argument before"; and citing numerous pieces of record evidence that refute it. Appx7077-7080. It makes zero sense to allow one party to raise (and expound upon) a point at oral argument and then forbid the other party from responding—though that double-standard is certainly consistent with the Board's treatment of Centripetal throughout these proceedings. Nor is there any merit to the Board's suggestion that Centripetal's briefing should have affirmatively raised the point as a "patentability argument[]." Appx0044. After all, it was *Petitioners' burden* to demonstrate that Buruganahalli

disclosed all of the challenged claims' limitations. *See Par Pharm.*, 773 F.3d at 1194. The Board's unsupportable construction of "URI" also warrants reversal.

### 3. The Board ignored unrebutted evidence that the challenged claims significantly advanced the prior art.

In concluding that the challenged claims are "essentially the same" as Buruganahalli, Appx0004, the Board ignored several other ways that the challenged claims represent "a significant advancement over the prior art," Appx5947.

First, even assuming *arguendo* that Buruganahalli's initial blacklist/whitelist determination could be considered "filtering," that determination undisputedly occurs "*prior to* the set-up of the encrypted data communication." Appx0029-0030 (emphasis added) (quoting Appx2019(4:33-44)). Buruganahalli merely makes a threshold decision (i) to allow a secure connection with no decryption or filtering; (ii) to allow a secure connection with decryption and filtering; or (iii) to block any secure connection from being initiated. *See* Appx5930-5934(¶¶42-46). That is a far cry from the challenged claims, which disclose a method for *ongoing* rule-based filtering of encrypted packets, without decryption, *during* a secure session. *See* Appx5946-5947(¶65); Appx0107(9:66-10:14); Appx0108(11:36-65); Appx0109-0110(14:19-16:26).

Second, whereas Buruganahalli only applies rules to unencrypted (and decrypted) packets, the '856 patent is not so limited: It performs not only rule-based filtering of unencrypted packets (e.g., at step #17) and decrypted data (e.g., at steps

#22 or #36), but also rule-based filtering of *encrypted* packets (e.g., at steps #19 and #35). The rule-based filtering of encrypted packets at step #35 can "account[] for possible rule updates that are received after a secure session is initiated"—without computationally-expensive decryption. Appx5940(¶55); *see also* Appx0109-0110(14:19-16:26); Appx0113(22:20-51). This provides "added flexibility … to: (i) end a secure session that is later deemed to be a threat per an updated rule, or (ii) allow a secure session to pass through without any further processing per an updated rule that indicates the secure session is not a threat." Appx5940(¶56).

Third, Buruganahalli's threshold routing determination rests solely on a top-level domain name, e.g., mynetwork.com. *See supra*, pp.7-8, 15-16. The challenged claims, in contrast, apply rules based on multiple different criteria. *See* Appx0115(25:30-45). The '856 patent thus offers the "advantage" of being able to "allow a secure session initially and end it after a time or data limit is exceeded." Appx5940-5941(¶56). It also "reconfigures rules based on encrypted-packet log data" that it collects *during* secure sessions, which is not collected under Buruganahalli. Appx5940(¶55).

The Board failed to engage with any of these differences between the '856 patent and Buruganahalli. This, too, was error. After all, ascertaining "differences between the prior art and the claims at issue" is a critical component of any obviousness inquiry. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (1966).

The record simply does not support the Board's conclusion that Burunganahalli is "essentially the same" as—or even "anticipatory" of—the challenged claims. *Contra* Appx0004; Appx0050.

### B.    The Board Improperly Discounted or Dismissed Centripetal's Objective Evidence of Nonobviousness.

The Board further erred by failing to meaningfully consider other evidence that the challenged claims would not have been obvious to a person of skill in the art.    This Court has held that objective indicia of nonobviousness "must be considered in *every* case," as they "play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).    Indeed, indicia of nonobviousness "may often be the most probative and cogent evidence in the record." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1071 (Fed. Cir. 2018).

Despite this Court's many precedents emphasizing the importance of objective indicia of nonobviousness, the Court has frequently needed to remind the Board that such evidence may not be "relegate[d] to 'secondary status.'" *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1078 (Fed. Cir. 2012); *see, e.g.*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1136-39 (Fed. Cir. 2019); *Polaris Indus.*, 882 F.3d at 1071-73; *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1357-59 (Fed. Cir. 2013).    The present case is yet

another example of the Board giving the back of its hand to strong evidence of nonobviousness.

### 1. The Board ignored compelling evidence that Cisco copied the challenged claims.

It is well settled that "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336. To be sure, not every act of infringement indicates copying; "more is needed than merely showing that similarity exists between the patent and the competitor's accused product." *Liqwd*, 941 F.3d at 1137. But where there is "evidence of actual copying efforts"—e.g., "access to an *issued patent* coupled with circumstantial evidence regarding changes to a competitor's design"—the Board must take it into account. *See id.* at 1138-39 (vacating obviousness determination because it disregarded evidence of copying).

Centripetal introduced unrebutted evidence that its executives met with Cisco in 2016 (at Cisco's invitation) and presented confidential information about the '856 patent's method for "inspect[ing] encrypted traffic." Appx4943; *see* Appx4937-4944. Unchallenged internal Cisco communications confirmed Cisco's desire and intent to study Centripetal's patents, *see* Appx4849-4850, and expert testimony established that Cisco likely copied Centripetal's patented technology in developing the new products Cisco released in June 2017, *see* Appx4849-4850; Appx3523-3524. Judge Morgan found this same evidence to be "compelling evidence" of copying—as he explained, Cisco's release of "products with Centripetal's

functionality within a year of [the] meetings goes beyond mere coincidence"—and he relied on his finding of copying in finding willful infringement and awarding the largest patent-damages award in U.S. history. *See* Appx3388-3389; Appx3393; Appx3398.

The Board did not analyze *any* of this evidence. That was error. Although the district court's decision had been vacated by the time the Board issued its final written decision (but, notably, was still in effect when the Board instituted IPR), even the Board acknowledged that "the underlying evidence" was still "available" to it. Appx0054; *see also, e.g.*, Appx4680 (Centripetal brief citing such evidence). Yet the Board asserted that it was "not in a position to evaluate the entirety of the litigation record, weigh witness testimony, and make a factual finding about copying by Cisco." Appx0054. That *ipse dixit* falls flat. In almost every case, the Board weighs written testimony and makes factual findings on such issues. And, of course, the Board would not need to "evaluate the *entirety* of the litigation record" to do so. If the Board was unable for some reason to perform this necessary inquiry, it should have credited the district court's finding of copying that contributed to its willful infringement verdict and that gave light to the circumstances of the '856 patent's technology. The path it chose instead—inventing grounds for cancelation based on a misconstruction of the claims and misunderstanding of the technology, all while ignoring actual evidence of copying—is untenable. The Board's failure to consider

Centripetal's evidence that Cisco willfully copied the challenged claims is yet another ground for vacatur. *See, e.g.*, *Liqwd*, 941 F.3d at 1138-39.

### 2. The Board unduly minimized Centripetal's evidence that the challenged claims addressed a long-felt industry need to detect security threats hidden in encrypted web traffic.

In addition, evidence that a challenged claim fulfills "a long felt but unresolved need tends to show nonobviousness because it is reasonable to infer that the need would have not persisted had the solution been obvious." *WBIP*, 829 F.3d at 1332. There is no serious dispute that the telecommunications industry had long recognized the need for methods to detect threats in encrypted traffic without decrypting the traffic. Centripetal presented the Board with ample evidence of the long-felt need for such technology. *See* Appx3515-3522 (expert testimony explaining industry's need to offer network security without "decrypt[ing] all of the data" as network traffic speeds increase and more attacks exploit encrypted communications); Appx4686-4687 (2017 Cisco press release describing the "unsolvable" challenge of detecting security threats in encrypted traffic). Tellingly, Petitioners did not dispute the industry's long-felt need; they merely argued that the '856 patent did not satisfy it. *See* Appx6100-6101. And while the Board quibbled with the Cisco press release's characterization of the problem as "unsolvable"— speculating, without any basis in law or fact, that it "amount[ed] to puffery"—it did

not contest any of Centripetal's other evidence, and ultimately assumed that the industry had a long-felt need to detect threats in encrypted traffic. *See* Appx0051.

The Board nevertheless rejected Centripetal's evidence of this long-felt need on the ground that Buruganahalli already solved it. Appx0051. The Board similarly concluded that the challenged claims lacked the requisite nexus to the long-felt need because (it said) they did not contain anything "novel"; the Board fell back on its assertion that the claims operate "in the same way Buruganahalli's system operates." Appx0053-0054. This line of reasoning ignores both the plain text of the '856 patent and Centripetal's valuable innovations over the prior art. *See supra*. On this record, neither the conclusion "that Buruganahalli presents a strong case of obviousness," nor the conclusion that Centripetal's evidence of nonobviousness would not "overcome even a weak case of obviousness," Appx0050, can be sustained.

## CONCLUSION

For the foregoing reasons, the Court should reverse the cancellation of claims 1, 24, and 25 of the '856 patent.  At the very least, the Court should vacate the Board's institution decision and remand with instructions for a new panel, untainted by any conflict, to decide institution afresh.

Respectfully submitted,

MATTHEW J. DOWD
ROBERT J. SCHEFFEL
DOWD SCHEFFEL PLLC
1717 Pennsylvania Ave.,
NW Ste 1025
Washington, D.C. 20006
(202) 559-9175

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN*
MARIEL A. BROOKINS*
JOSEPH J. DEMOTT
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

* Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellant Centripetal Networks, LLC*

September 25, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,882 words, excluding the parts of the brief exempted by Federal Circuit Rule 31(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

September 25, 2023

s/Paul D. Clement
Paul D. Clement