# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

CENTRIPETAL NETWORKS, LLC,

*Appellant*,

v.

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
KEYSIGHT TECHNOLOGIES, INC.,

*Appellees*.

On Appeal from the United States Patent and Trademark Office
Nos. IPR2022-00182, IPR2022-001151, IPR2022-01199

## APPELLANT'S CORRECTED OPENING BRIEF

MATTHEW J. DOWD
ROBERT J. SCHEFFEL
DOWD SCHEFFEL PLLC
1717 Pennsylvania Ave.,
NW Ste 1025
Washington, D.C. 20006
(202) 559-9175

PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Appellant Centripetal Networks, LLC*

October 27, 2023

**REPRESENTATIVE PATENT CLAIM AT ISSUE**

1. A method comprising:

receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;

identifying packets comprising unencrypted data;

identifying packets comprising encrypted data;

determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and

the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Appx0115(25:14-49).

## CERTIFICATE OF INTEREST

Counsel for Appellant, Centripetal Networks, LLC, certifies the following:

1.     The full name of every party represented by us is: Centripetal Networks, LLC.

2.     There is no other real party in interest for Centripetal Networks, LLC.

3.     Centripetal Networks, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4.     The names of all law firms, partners, and associates that have not entered an appearance in this appeal and appeared for Centripetal Networks, LLC in the lower tribunal or are expected to appear in this Court are:

Kramer Levin Naftalis & Frankel LLP:
    James Hannah, Jeffrey H. Price, Jenna Fuller, Paul J. Andre

Banner & Witcoff, Ltd.:
    Bradley C. Wright, Scott M. Kelly, John R. Hutchins, Blair Silver

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal is: *Centripetal Networks, LLC v. Cisco Systems, Inc.*, No. 2:18-cv-00094-EWH-LRL, Eastern District of Virginia.

Dated: October 27, 2023

                        s/Paul D. Clement
                        Paul D. Clement

# TABLE OF CONTENTS

REPRESENTATIVE PATENT CLAIM AT ISSUE.................................. i

CERTIFICATE OF INTEREST............................................... ii

TABLE OF AUTHORITIES................................................. vi

STATEMENT OF RELATED CASES ...................................... x

INTRODUCTION ........................................................ 1

JURISDICTIONAL STATEMENT ......................................... 4

STATEMENT OF THE ISSUES .......................................... 4

STATEMENT OF THE CASE.............................................. 5

I.     Factual Background ............................................. 5

       A.    Secure Communications.................................. 5

       B.    Prior Network Security Technology...................... 6

       C.    The '856 Patent Solves the "Unsolvable" Problem ........... 8

II.    The Initial Round Of Patent-Infringement Litigation ............. 10

III.   Proceedings Below ............................................. 14

       A.    Palo Alto Networks Petitions for Inter Partes Review of
             Claims 1, 24, and 25 of the '856 Patent ..................... 14

             1.    Buruganahalli ..................................... 15

             2.    Baehr ............................................. 16

             3.    The Challenged Claims.............................. 16

       B.    The Board Institutes Inter Partes Review...................... 17

       C.    Cisco and Keysight File Substantively Identical Petitions and
             Motions for Joinder ........................................ 18

D.     Centripetal Moves for Recusal and Vacatur After Learning of an APJ's Ownership of Cisco Stock ................................................... 18

E.     The Board Grants Cisco's and Keysight's Respective Petitions for Inter Partes Review and Motions for Joinder ............... 19

F. APJs McNamara and Amundson Belatedly Withdraw ............................ 20

G.     The Board Denies Centripetal's Recusal and Vacatur Motion, Calling it "Highly Inappropriate"—and Threatening Reprisals .............................................................................................. 20

H.     The Board Issues its Final Written Decision .................................... 21

I. The PTO's *Volte Face* on Recusal ........................................................... 24

SUMMARY OF ARGUMENT ............................................................................... 25

STANDARDS OF REVIEW ................................................................................... 27

ARGUMENT ........................................................................................................... 28

I.     Centripetal Suffered Irremediable Prejudice In The Proceedings Below. ............................................................................................................ 28

A.     The Board's Decision Denying Centripetal's Recusal Motion and Attacking Centripetal for Questioning APJs' Impartiality Flouted OGE Regulations and the Bedrock Principles Animating Them ................................................................................. 28

B.     Vacatur of the Institution Decision Is Necessary to Preserve Justice and Public Confidence ............................................................ 35

II.     The Board Improperly Invalidated Centripetal's Claims Based On A Purported Written-Description Deficiency That Petitioners Never Raised And Were Statutorily Barred From Raising During Inter Partes Review ......................................................................................................... 40

A.     The Board's *Sua Sponte* Written-Description Analysis Violated the APA and Deprived Centripetal of Due Process. ............ 40

B.     The Board's Written-Description Analysis Also Violated Statutory Limitations on the Scope of Inter Partes Review. .............. 44

iv

III.     The Board's Unpatentability Rulings Are Legally Erroneous...................... 46

   A.     The Board Erred in Concluding That Buruganahalli Discloses the Challenged Claims' Rule-Based Filtering of Encrypted Packets. ................................................................................. 47

           1.     The Board disregarded the challenged claims' plain language. ................................................................. 47

           2.     The Board adopted a wholly unsustainable construction of "Uniform Resource Identifier." ...................... 50

           3.     The Board ignored unrebutted evidence that the challenged claims significantly advanced the prior art............ 53

   B.     The Board Improperly Discounted or Dismissed Centripetal's Objective Evidence of Nonobviousness............................................. 55

           1.     The Board ignored compelling evidence that Cisco copied the challenged claims. ................................................. 56

           2.     The Board unduly minimized Centripetal's evidence that the challenged claims addressed a long-felt industry need to detect security threats hidden in encrypted web traffic. ............................................................. 58

CONCLUSION ...................................................................................... 60

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands Corp., v. Fellowes, Inc.*,
 813 F.3d 1361 (Fed. Cir. 2016) ........................................................27

*Apple Inc. v. Corephotonics, Ltd.*,
 2023 WL 5838695 (Fed. Cir. Sept. 11, 2023) ............................ 40, 43

*Belden Inv. v. Berk-Tek LLC*,
 805 F.3d 1064 (Fed. Cir. 2015) ........................................................42

*Butz v. Economou*,
 438 U.S. 478 (1978) ..........................................................................32

*CAB v. Delta Air Lines, Inc.*,
 367 U.S. 316 (1961) ..........................................................................46

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
 38 F.4th 1025 (Fed. Cir. 2022) ................................................. *passim*

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
 492 F.Supp.3d 615 (E.D. Va. 2020) ............................................10, 11

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
 526 F.Supp.3d 137 (E.D. Va. 2021) ..................................................12

*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
 393 U.S. 145 (1968) ..........................................................................33

*Cuozzo Speed Techs., LLC v. Lee*,
 579 U.S. 261 (2016) ..................................................................... 45, 46

*FCC v. Prometheus Radio Project*,
 141 S.Ct. 1150 (2021) .......................................................................28

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
 535 U.S. 743 (2002) ..........................................................................33

*Gibson v. Berryhill*,
 411 U.S. 564 (1973) ..........................................................................34

*Graham v. John Deere Co. of Kan. City*,
383 U.S. 1 (1966)................................................................................54

*In re Centripetal*,
2023 WL 3477282 (Fed. Cir. 2023).....................................................21

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) ...............................................55

*In re IPR Licensing, Inc.*,
942 F.3d 1363 (Fed. Cir. 2019)............................................................42

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ................................................... 26, 40

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016)..............................................................44

*In re United Shoe Mach. Corp.*,
276 F.2d 77 (1st Cir. 1960) ..................................................................37

*In re Van Os*,
844 F.3d 1359 (Fed. Cir. 2017)............................................................28

*Leo Pharm. Prod., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013)............................................................55

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)................................................................... *passim*

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
941 F.3d 1133 (Fed. Cir. 2019) ........................................... 55, 56, 58

*Maier v. Orr*,
758 F.2d 1578 (Fed. Cir. 1985)............................................................35

*Neptune Generics, LLC v. Eli Lilly & Co.*,
921 F.3d 1372 (Fed. Cir. 2019)............................................................44

*Nike, Inc. v. Adidas AG*,
955 F.3d 45 (Fed. Cir. 2020) ................................................. 26, 42, 44

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014) ..................................................... 47, 53

*PersonalWeb Techs., LLC v. Apple, Inc.*,
   917 F.3d 1376 (Fed. Cir. 2019) ........................................................28

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
   882 F.3d 1056 (Fed. Cir. 2018) ........................................................55

*Polaroid Corp. v. Eastman Kodak Co.*,
   867 F.2d 1415 (Fed. Cir. 1989) ........................................................37

*Qualcomm Inc. v. Intel Corp.*,
   6 F.4th 1256 (Fed. Cir. 2021) ............................................... 42, 43, 44

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
   948 F.3d 1342 (Fed. Cir. 2020) ........................................................45

*SAS Inst., Inc. v. Iancu*,
   138 S.Ct. 1348 (2018) ......................................................... 32, 40, 46

*Shell Oil Co. v. United States*,
   672 F.3d 1283 (Fed. Cir. 2012) .................................................. 27, 35

*United States v. Owens*,
   902 F.2d 1154 (4th Cir. 1990) ..........................................................37

*United States v. Sineneng-Smith*,
   140 S.Ct. 1575 (2020) .......................................................................40

*Ward v. Village of Monroeville*,
   409 U.S. 57 (1972) ............................................................................36

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) .......................................... 55, 56, 58

*Williams v. Pennsylvania*,
   579 U.S. 1 (2016) ..............................................................................36

**Constitutional Provision**

U.S. Const. amend. XI ............................................................................ 33

**Statutes**

5 U.S.C. §706(2) ......................................................................28

18 U.S.C. §208 ........................................................................29

35 U.S.C. §142 ..........................................................................4

35 U.S.C. §284 ........................................................................12

35 U.S.C. §311 ................................................................ *passim*

35 U.S.C. §315 ........................................................................18

35 U.S.C. §321(b) ...................................................................44

**Regulations**

5 C.F.R. §2635.101 .................................................................30

5 C.F.R. §2635.501(a) .............................................................30

5 C.F.R. §2635.501(b) Note ....................................................31

5 C.F.R. §2635.502(d) ........................................................ 2, 30

5 C.F.R. §2638.102 .................................................................30

5 C.F.R. §2640.202 ........................................................... 29, 34

37 C.F.R. §90.3(a)(1) ............................................................... 4

**Other Authorities**

Katherine K. Vidal, *Mem. to Members of the Patent Trial and Appeal Board and the Trademark Trial and Appeal Board* (Sept. 22, 2023), bit.ly/468iVic ............................................... 24, 25, 34, 38

Kenneth Culp Davis, *Administrative Law* (1972)....................................34

**STATEMENT OF RELATED CASES**

Centripetal filed a mandamus petition based on the proceedings below. *In re: Centripetal Networks, LLC*, 2023-127, decided May 16, 2023, by Judges Lourie, Prost, and Wallach. The decision is unreported, but available at 2023 WL 3477282.

The Court's decision in this appeal may directly affect or be directly affected by the following pending case: *Centripetal Networks, LLC v. Cisco Systems, Inc.*, No. 2:18-cv-00094-EWH-LRL, Eastern District of Virginia.

## INTRODUCTION

The proceedings below have subjected Centripetal Networks, LLC ("Centripetal") to a wholly unjustified double standard, while denying it the appearance of impartiality and yielding a final written decision riddled with errors. Indeed, the facts of this case would be hard to make up. Years of litigation and reams of evidence culminated in a $2.6-billion judgment against Cisco Systems, Inc. ("Cisco") for willfully infringing four of Centripetal's patents. That judgment was wiped out without even considering the merits, because years into the proceedings the presiding judge learned that his wife owned roughly $4,500 of Cisco stock, and placed it in a blind trust, rather than selling it outright. This Court required the strong medicine of vacatur because an adjudicator with even a minimal financial interest "creates not only an appearance of impropriety but impropriety itself." *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1037 (Fed. Cir. 2022).

Given that painful experience, the last thing Centripetal expected was to find itself before a different adjudicator with a potentially even-greater ongoing and direct ownership stake in Cisco. Yet that is precisely what happened. And when Centripetal asked the conflicted APJ to recuse himself, rather than promptly recuse or divest, the APJ proceeded to issue multiple decisions in Cisco's favor. The Board followed that up not by giving Centripetal any relief, but by giving it a tongue-lashing for even raising the issue. Remarkably, the PTO now purports to see the

1

light:  Under a brand-new directive published in September 2023, the PTO will require APJs to recuse in situations just like this—but it will guarantee the appearance of impartiality only prospectively; the new PTO directive expressly declines to grant any retrospective relief, thus leaving Centripetal emptyhanded.

None of this can stand.  All federal officials must recuse from matters in which their participation would "raise a question in the mind of a reasonable person about [their] impartiality."  5 C.F.R. §2635.502(d).  The APJ's Cisco-stock ownership plainly fits the bill—as the PTO now belatedly recognizes.  Yet the Board failed to grapple with (or even mention) the relevant recusal regulations, instead resting its decision on a criminal safe harbor that hardly exhausts the need for executive-branch officials, especially adjudicators, to ensure the appearance of impartiality.

Even putting all that aside, the Board's final written decision is both procedurally unsound and substantively untenable.  The patent at issue in the IPR (U.S. Patent No. 9,917,856) discloses a method for detecting threats to a computer network using rule-based filtering of encrypted data packets during a secure communication session.  It represents a revolution in digital security:  Whereas the prior art decrypts traffic and inspects its contents before making a security determination (and then re-encrypts traffic that receives a green light), Centripetal's '856 patent allows traffic to be analyzed *in its encrypted form*, preserving privacy while ensuring security.  Cisco itself has recognized that this technology "solves a

network security challenge previously thought to be unsolvable." Appx7171. Nevertheless, the Board instituted IPR of claims 1, 24, and 25 of the '856 patent and ultimately concluded that those claims were obvious in light of the prior art, specifically U.S. Patent No. 9,680,795 ("Buruganahalli").

The linchpin of the Board's decision to cancel was a finding that the challenged claims lack an adequate written description, supposedly due to an error by the patent examiner during prosecution. But no party raised the written-description issue, or the purported error by the patent examiner, at any point in the IPR proceedings. Nor did the Board mention either issue in its 92-page decision instituting IPR, or in its decisions granting Cisco and another company's joinder petitions, or at the oral hearing on the consolidated matters. Perhaps that was because the Board is statutorily forbidden from canceling patents in IPR based on a written-description defect. Or perhaps that was because the '856 patent plainly describes its key innovation. Indeed, the Board concluded otherwise only because it completely failed to understand how the filtering described in the '856 patent occurs (as is nearly inevitable when no party briefs an issue and no evidence or expert testimony is presented on it). Had the Board received testimony and argument on the issue, it would have realized that there is no basis for its conclusion, and— like the district court—would have understood that the '856 patent is a significant technical advance that solved a previously "unsolvable" network security problem.

For any of all of these reasons, the Board's decisions cannot stand.

## JURISDICTIONAL STATEMENT

The Board, which had jurisdiction under 35 U.S.C. §311, issued its final written decision on May 23, 2023. Appx0001-0061. Centripetal timely appealed that decision on June 8, 2023. *See* 35 U.S.C. §142; 37 C.F.R. §90.3(a)(1). This Court has jurisdiction under 35 U.S.C. §§141 & 319 and 28 U.S.C. §1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.      Whether executive-branch regulations designed to safeguard against both the appearance of impropriety and impropriety itself compel vacatur here given that, after this Court reversed a multibillion-dollar willful-infringement judgment against Cisco because the district judge's spouse held less than $5,000 in Cisco stock, (a) an APJ voted to institute IPR on one of the same patents while owning up to $15,000 in Cisco stock, (b) the same APJ voted to join Cisco to the IPR proceeding, and (c) the Board threatened sanctions in response to a good-faith recusal motion.

2.      Whether the final written decision, which depended on a *sua sponte* determination that the '856 patent specification fails to adequately describe the claims and a misconstruction of a term the parties never disputed, comports with due process, the Administrative Procedure Act, and the America Invents Act.

3.     Whether the Board erred as a matter of law in finding the challenged claims obvious based on the asserted prior art of Buruganahalli.

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     Secure Communications

When a client computer communicates with a server, electronic data are exchanged in the form of individual packets.  In recent years, encryption has increasingly been used as a means of keeping such communications private. Appx5924(¶31).  Internet communications that employ the Hypertext Transfer Protocol ("HTTP"), used for viewing webpages, are often secured by the Transport Layer Security ("TLS") protocol.  Appx5924(¶32) (noting that TLS is an upgraded version of the Secure Sockets Layer ("SSL") protocol).  The encryption of HTTP communications with TLS or SSL is known as HTTP Secure.  Appx5925(¶33).

TLS and SSL typically use the following procedure, known as a "handshake," to set up a secure communication channel:

(1) The client computer sends an unencrypted "hello message" to a server computer.

(2) The server computer responds with an unencrypted message conveying a digital certificate, which typically includes the server's name, a certificate authority, and a public key that will be used to encrypt the transmission of a random number.

(3) The client may confirm that the certificate was issued by the certificate authority.

(4) If the client is satisfied that the certificate is valid—and therefore agrees to initiate a secure communication session—the client sends a random number encrypted with the server's public key to the server computer.

Appx5925(¶32); *accord* Appx2023(11:30-47).  Once the client has agreed to initiate a secure session, "both the client computer and the server computer … generate a unique session key" that permits the client and the server to encrypt and decrypt all further communications that they exchange during that session.  Appx5925(¶32).

## B.      Prior Network Security Technology

Encryption technologies protect sensitive information, but they also create challenges for network security.  Appx5926(¶33).  Bad actors may "obfuscat[e]" malware or cyberattacks by "embedd[ing] [them] inside encrypted communications."  Appx5923-24(¶31); *see, e.g.*, Appx0103(1:17-18).  "This can lead to problems such as viruses being transferred over secure connections and entering the network"—"instead of being blocked"—"because the gateway security appliances could not inspect the data."  Appx4056(¶18).

Before the '856 patent, one common way to address this vulnerability was by configuring a firewall as a "trusted man-in-the-middle."  Appx5924(¶31); *see, e.g.*, Appx4702-4704(¶¶2:47-5:12).  Such a firewall would intercept and decrypt secure communications from the server before they reached the client; analyze these decrypted communications for security threats; and, if no threats were identified, re-encrypt the communications before passing them along to the client.

6

Appx5924(¶31); Appx0034-0036.  This approach can get the job done, but only with significant downsides.  First, all traffic—including traffic that legitimately should be encrypted—must have its privacy broken; the "trusted man-in-the-middle" approach cannot inspect traffic without decrypting it first.  Appx5924(¶31).  Second, because "decryption and re-encryption is difficult to perform in real-time," running a large volume of encrypted communications through a trusted man-in-the-middle may "undesirably slow[] down network traffic and consume[] computing power." Appx5924(¶31); *see also* Appx6035(53:25-54:2).

Instead of routing all encrypted traffic through a "trusted man-in-the-middle," some pre-'856 firewalls sort data flows at the threshold, i.e., before establishing any secure session, by inspecting the "handshake" procedure.  Appx5961-62 (citing Appx2019(4:16-44); Appx2020(5:24-6:1); Appx2022-2023(10:54-11:58)).  They do so by extracting the destination domain (e.g., "mynetwork.com," Appx3758) from the initial, unencrypted "hello message" sent by the client and comparing it against a "whitelist" of safe domains and a "blacklist" of potentially risky domains. Appx5930(¶41); *see* Appx2020(5:27-35); Appx2023(11:34-41).  If the domain is on the whitelist, traffic need not be decrypted before a secure connection is established; the firewall may allow the establishment of a secure connection, and the free flow of encrypted messages, without requiring the intervening step of decryption and re-encryption by the trusted man-in-the-middle.  Appx5930-5931(¶43).  But that is true

only for domains on the whitelist.  If a domain is unknown or on the blacklist, the firewall may block the unencrypted client hello message from passing through to the server, in which case no secure connection is ever established, Appx5931-5932(¶¶44-45), or allow a secure session but route the traffic from that session to a trusted man-in-the-middle for decryption and further analysis, Appx5933-34(¶46).

### C.   The '856 Patent Solves the "Unsolvable" Problem

Centripetal's '856 patent is "a significant advancement" over this existing technology—a leap forward that most thought unachievable.  Appx5947(¶66).  Unlike the prior art, which must decrypt communications from unknown domains to inspect their contents, Centripetal developed technology that makes a security decision by analyzing the traffic *in its encrypted form*, without needing to decrypt the encrypted communications.  Appx0115(25:15-45); Appx5946-5947(¶¶64-65).

To effectuate this critical change, Centripetal developed rules for filtering encrypted packets based on one or more of the following: "a uniform resource identifier" ("URI"), "data indicating a protocol version," "data indicating a method," "data indicating a request," or "data indicating a command."  Appx0115(25:30-45).  The '856 technology examines not only "handshake messages … that comprise unencrypted data" and/or DNS queries that comprise unencrypted data, Appx105(5:2-30); Appx0107(9:61-63), but also the unencrypted information in the headers of encrypted packets, Appx0107(10:4-5); *see also* Appx3264(¶7).  It also

collects and logs data about the encrypted packets transmitted during a secure session, including information found in the packet headers, information found in the payload, and other information "associated with but not solely derived from the packets themselves," all of which can be used to filter packets during future sessions. Appx0104-0105(4:64-5:55); Appx5940(¶55).

This methodology offers several advantages over the prior art. First, the '856 technology can determine security threats associated with encrypted packets without decrypting the packets. Appx5940(¶54); *see* Appx0107(9:66-10:14); Appx0108(11:51-65). In other words, the '856 technology helps to ensure security while maintaining privacy. Second, the '856 technology can modify its filtering of encrypted packets *during* a secure session based on "rule updates that are received after [the] session was initiated." Appx5940(¶55); *see* Appx0109-0110(14:19-16:26); Appx0113(22:20-51). This real-time processing allows firewalls and other network devices to "(i) end a secure session that is later deemed to be a threat per an updated rule, or (ii) allow a secure session to pass through without any further processing per an updated rule that indicates the secure session is not a threat." Appx5940(¶56); *see* Appx0109-0110(14:19-16:26); Appx0113(22:20-51). In addition, the '856 technology provides the ability to reconfigure packet-filtering rules based on the encrypted-packet data it collects and logs. Appx5940(¶55); *see* Appx0092-0101; Appx0109(14:4-18); Appx0112(20:22-27); Appx0113(22:18-19);

Appx0114(23:58-62). It also equips a firewall or network device to apply rules that will permit a secure session initially but end the session after a time- or data-limit is exceeded. Appx5940-5941(¶56); *see* Appx0107(9:33-46); Appx0108(11:28-35). This enables the device to prevent too much data from being extracted by bad actors if the session's length, the quantity of data exchanged, or some other aspect of the session raises security concerns. Appx5941(¶56).

## II.    The Initial Round Of Patent-Infringement Litigation

1. Centripetal sued Cisco in 2018, alleging willful infringement of several Centripetal patents, including the '856. Appx3233-3234. The late Judge Henry Coke Morgan, Jr., presided over a six-week trial that included "an over 3,507-page record, 26 witnesses, and over 300 exhibits." Appx9190.

Several weeks after the close of trial, but before he had issued a decision, Judge Morgan learned that his wife owned 100 shares of Cisco stock, then valued at $4,687.99. He promptly disclosed this information to the parties. When he did so, he "explain[ed] that the shares 'did not and could not have influenced [his] opinion on any of the issues in this case,'" as he did not learn of the shares until after a "full draft of [his] opinion had been prepared" and "[v]irtually every issue" had already been decided. *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 492 F.Supp.3d 615, 617 (E.D. Va. 2020).

Cisco responded "by filing [a] motion for recusal." *Id.* at 618. After further briefing, Judge Morgan held a hearing at which he "informed the parties" that he and his wife had "contacted their personal attorney to request the creation of a blind trust to divest the shares." *Id.* He also "provided the completed trust documents to the parties." *Id.*

Judge Morgan denied Cisco's motion. He concluded that recusal was not required under 28 U.S.C. §455(b)(4), as he did not learn of his wife's stock ownership until he had already decided "virtually" every issue and drafted the bulk of his opinion. *Id.* at 622-23. He further concluded that, even assuming §455(b)(4) would otherwise apply, he could keep the case under 28 U.S.C. §455(f), under which a judge who would otherwise be disqualified need not recuse if "substantial judicial time has been devoted to the matter" and the judge "divests himself … of the interest that provides the grounds for the disqualification." *Id.* at 623-25. Judge Morgan had undisputedly devoted substantial time to the matter, and he reasoned that "[d]ivestment to a blind trust [was] the proper remedy" because "an outright sale" would risk creating an "appear[ance]" that he had secured a "benefit" by unloading Cisco stock on the eve of a substantial damages award against Cisco, which "would undermine the purpose of section 455." *Id.* at 623-24.

2. On October 5, 2020, Judge Morgan issued a 167-page opinion setting forth his findings of fact and conclusions of law. *See* Appx3233-3410. At the threshold,

Judge Morgan found Centripetal's '856 patent valid, rejecting Cisco's arguments that it was anticipated, obvious, or lacked an adequate written description. Appx3291-3299. He also concluded that Cisco had infringed claims 24 and 25 of the '856 patent, Appx3262-3289, and that three other Centripetal patents were valid and infringed, Appx3255. Judge Morgan further found that Cisco's infringement was "willful and egregious," Appx3398, due in part to "compelling evidence" that Cisco had deliberately copied all four Centripetal patents, Appx3388-3389.

The willfulness finding triggered 35 U.S.C. §284, under which a court "may increase the damages up to three times the amount found or assessed." Judge Morgan determined that it was appropriate to multiply the damages award by 2.5, for a total of $1.89 billion. Once interest, costs, and an ongoing royalty for six future years were added, Judge Morgan entered judgment awarding Centripetal damages of more than $2.6 billion. Appx3394; Appx3397-3398.

Cisco filed several post-trial motions challenging some of the findings of infringement as well as the willfulness finding and the quantum of damages. *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 526 F.Supp.3d 137, 139-40 (E.D. Va. 2021). On March 17, 2021, Judge Morgan denied all post-trial motions. *See id.* at 140. Cisco timely appealed the various district-court decisions. Appx8665.

3. This Court reversed Judge Morgan's non-recusal decision, concluding that Judge Morgan was required to recuse under §455(b)(4) because he became aware of

his wife's ownership of Cisco stock before issuing his opinion, and that placing the stock in a blind trust was not proper "divest[ment]" under §455(f). *Centripetal*, 38 F.4th at 1031-33.

Much of the Court's opinion involved harmless-error analysis—i.e., whether the placement of the stock in a blind trust, instead of selling it outright, required vacatur of Judge Morgan's findings of fact, conclusions of law, and denials of post-trial relief. *See id.* at 1034-40. In deciding whether vacatur was warranted, the Court considered: "(1) 'the risk of injustice to the parties in the particular case'; (2) 'the risk that the denial of relief will produce injustice in other cases'; and (3) 'the risk of undermining the public's confidence in the judicial process.'" *Id.* at 1034 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

The Court found that the first factor favored vacatur. *Id.* at 1038. The Court explained that a judge's "known financial interest" in a pending matter—even an interest of less than $5,000—"creates not only an appearance of impropriety but impropriety itself." *Id.* at 1037. While Judge Morgan "stated that his views as to the appropriate resolution of the case were fixed" before he learned of his wife's ownership of the stock, the Court found that Cisco still could have been prejudiced because Judge Morgan had the "prerogative to change his mind or to otherwise revise the decision … until the time it issued." *Id.* at 1036.

On the second factor, the Court found that allowing Judge Morgan's ruling to stand "would have a significant adverse effect in other cases." *Id.* at 1039. The Court observed that judicial stock ownership is "an increasingly common problem," citing a then-recent *Wall Street Journal* article. *Id.* at 1038. "[F]ailure to vacate" could wreak mischief in future cases by "suggest[ing] that sitting on a case in which the judge's family has a financial interest is not a serious issue." *Id.*

The Court likewise found the third factor satisfied, because "[i]t is seriously inimical to the credibility of the judiciary for a judge to preside over a case in which he has a known financial interest in one of the parties and for courts to allow those rulings to stand." *Id.* at 1039. Even though Judge Morgan's wife owned a relatively small amount of Cisco stock and Judge Morgan ruled *against* Cisco, the Court concluded that "vacatur [was] essential to preserve public confidence" given the judge's "known financial interest in one of the parties." *Id.*

The Court reversed Judge Morgan's non-recusal decision, vacated his merits rulings, and "remand[ed] for further proceedings before a newly appointed judge." *Id.* at 1040.

## III. Proceedings Below

### A. Palo Alto Networks Petitions for Inter Partes Review of Claims 1, 24, and 25 of the '856 Patent

Six weeks after Judge Morgan denied Cisco's motions for post-trial relief, Palo Alto Networks ("PAN")—a party against whom Centripetal *has never asserted*

*the '856 patent* (or any related patent)—petitioned for IPR of claims 1, 24, and 25 of the '856 patent. *See* Appx0360; Appx0410. PAN contended that the challenged claims were obvious based on the prior art disclosed by Buruganahalli or, in the alternative, Buruganahalli in view of U.S. Patent No. 5,878,231 ("Baehr"). Appx0367; *see* Appx0377-0409. PAN's petition did not premise its challenge on any purported lack of written-description support for the claims.

### 1. Buruganahalli

As relevant here, Buruganahalli describes extracting the hostname with which the client wishes to connect—i.e., the destination domain—from the unencrypted "hello message" sent by the client at the start of the TLS "handshake" process. Appx5930(¶41); Appx0033-0034; Appx2019(4:33-44); Appx2023(11:30-51). Buruganahalli also describes "applying a security policy based on the destination domain to filter traffic at the security device." Appx2021(7:39-42); *see* Appx0031. If a destination is on a predetermined "whitelist" of trusted domains, the device allows the client hello message to pass through to the server so a secure connection may be established. Appx5930-5931(¶43); Appx2021(7:43-51). But if the destination is unknown or on a predetermined "blacklist" of potentially threatening domains, the device either blocks the client hello message, such that no connection is established, Appx5931-5932(¶¶44-45); Appx2020(5:64-6:1), or allows the client hello message and the establishment of a secure session but routes encrypted traffic

from that session to an intermediary for decryption and further analysis, Appx5933-5934(¶46); Appx2020(6:12-38). In short, Burunganahalli describes sorting packet flows at the threshold—not applying dynamic, rule-based policies to encrypted packets during a secure session.

### 2. Baehr

Baehr relates to a system for screening packets transmitted between a private network and a public network. Appx2035(1:9-17); *see* Appx5938-5959(¶¶51-53); Appx0198-0202. Baehr describes using a separate "proxy network" to protect the private network against potential threats. Appx2035(2:26-42). Packets received from the public network host are subject to initial screening, during which some packets intended for the private network host may instead be routed to the proxy network, which may perform functions as though it were the private network host while remaining invisible to the public network and preventing potential intruders from ever entering the private network. Appx2038(8:36-47). While Baehr describes a proxy network, it does not cure the deficiencies of Burunganahalli.

### 3. The Challenged Claims

Claim 1 of the '856 patent exemplifies the subject matter of all three challenged claims (claims 1, 24, and 25):

1. A method comprising:

   receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality

of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;

[1.b] identifying packets comprising unencrypted data; [1.c] identifying packets comprising encrypted data; [1.d] determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and

the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Appx0025 (alterations in original) (quoting Appx0115(25:14-49)).

## B. The Board Institutes Inter Partes Review

On May 25, 2022, the Board instituted PAN's IPR. According to the Board, the Buruganahalli device's threshold determination and subsequent identification of all encrypted packets "belonging to" the same flow—i.e., its "correlat[ion]" of all

packets in a session with "the hostname (destination domain) extracted from the handshake traffic"—amounts to "filter[ing]" encrypted communications. Appx0186-0187. On that basis, the Board concluded that PAN made enough of a showing "that Buruganahalli teaches 'filtering encrypted packets' as required by the '856 patent's claims" to warrant IPR. Appx0138-0139. The decision did not identify any written-description or claim construction issues as the basis for instituting. *See* Appx0145-0207. Centripetal timely requested rehearing. Appx4509.

## C. Cisco and Keysight File Substantively Identical Petitions and Motions for Joinder

Until the Board issued its institution decision, Cisco and Keysight Technologies, Inc. ("Keysight") were time-barred from seeking IPR of the '856 patent because more than a year had elapsed since they were "served with a complaint alleging infringement of the patent." 35 U.S.C. §315(b); *see* Appx8029; Appx9484-9485. Under §315(c), however, the PAN institution decision gave them an opportunity to file substantively identical joinder petitions, which they did. Appx7099 & n.2; Appx7215; Appx8816; Appx9218.

## D. Centripetal Moves for Recusal and Vacatur After Learning of an APJ's Ownership of Cisco Stock

While Centripetal's request for rehearing of the institution decision was still pending, Centripetal learned that one of the APJs presiding over the matter, Brian McNamara, owned up to $15,000 of Cisco stock and was continuing to receive an

annual share of profits from a law firm that earns fees from Cisco for lobbying work. Appx6351-6362. Naturally, Centripetal moved to recuse the panel and vacate its prior decisions. Appx6344-6364. As Centripetal pointed out, while Cisco was not yet a party to the IPR, its petition and joinder motion had been pending for more than six months—and it was plain that Cisco had a direct and material interest in the IPR, given the potential impact on the remand proceedings in Centripetal's separate suit against it for willfully infringing its patents, including the '856. Appx6350-6351.

### E. The Board Grants Cisco's and Keysight's Respective Petitions for Inter Partes Review and Motions for Joinder

Only a week after Centripetal filed its recusal motion, a three-member panel—including APJ McNamara—granted Cisco's and Keysight's IPR petitions and joinder motions, without any mention of Centripetal's motion. Appx0210; Appx0276. The decision granting Cisco's petition expressly acknowledged that Centripetal had previously won an award of "at least $2.6 billion" for Cisco's willful infringement of the '856 patent; that the award had been vacated due to a judicial stock-ownership issue; and that the decision to institute IPR (and the resolution of those proceedings) could affect that ongoing, high-stakes lawsuit. Appx0247-0248; Appx0250-0253.

The panel separately denied Centripetal's request for rehearing of the institution decision in the PAN matter, in an order issued the same day. Appx6627.

### F. APJs McNamara and Amundson Belatedly Withdraw

APJ McNamara abruptly withdrew from the panel the next day. Appx6652. He did not deny his stake in Cisco; he claimed that it "ha[d] been a matter of public record for ten years," Appx6652, and attempted to downplay it as "less than 0.04% of the value" of his total disclosed assets, Appx6651 n.1. Despite asserting that the motion was "without merit," APJ McNamara claimed that his withdrawal would "reduce the number of issues and simplify the briefing." Appx6652.

APJ Steven Amundson also later withdrew. He too claimed that Centripetal's motion "lack[ed] merit" on both APJ McNamara's conflict and APJ McNamara's influence on the panel's other members, and repeated the cryptic "reduce the number of issues" basis for withdrawing. Appx6702.

The third member of the original panel, APJ Aaron Moore, did not withdraw. On January 19, 2023, two new panelists were assigned. Appx6753.

### G. The Board Denies Centripetal's Recusal and Vacatur Motion, Calling it "Highly Inappropriate"—and Threatening Reprisals

On February 3, 2023, the sole remaining member of the original panel (APJ Moore) issued a decision denying Centripetal's motion for vacatur. Appx0062. The decision concluded that APJ McNamara's stock ownership was not disqualifying because "Cisco was not a party to th[e] proceeding at the time of the Institution Decision" and the value of APJ McNamara's holding was below the criminal safe harbor threshold set forth in regulations applicable to all executive-branch officials.

Appx0062; Appx0071. The decision said nothing of the original panelists' knowledge that Cisco would immediately benefit from the decision to institute IPR. Nor did it address APJ McNamara's and Amundson's decisions to grant Cisco's follow-on petition and motion to join the proceedings, which came *after* Centripetal had raised the stock-ownership and appearance-of-partiality issues. Worse, the decision responded to the serious issues Centripetal raised with defensiveness and vitriol, decrying the motion as "highly inappropriate" and threatening Centripetal with "sanctions" if it made further "arguments directed at the Board, its members, or its process." Appx0074; Appx0082.[1]

## H. The Board Issues its Final Written Decision

Just one week later, the Board issued its final written decision. The Board rejected Centripetal's "primary argument" based on a purported defect in the '856 patent's written description: The Board found that even if "Buruganahalli does not disclose applying the claimed rule set to encrypted packets, … the '856 patent *also* does not describe applying the claimed rules to encrypted packets." Appx0004. According to the Board, the patent examiner made an "error … during prosecution"

---

[1] Centripetal responded by filing a petition for writ of mandamus in this Court. This Court denied the petition on May 16, 2023, in a short, non-precedential order. *In re Centripetal*, 2023 WL 3477282 (Fed. Cir. 2023). The Court did not resolve the merits of Centripetal's recusal request, instead holding that Centripetal had not established entitlement to the "extraordinary remedy" of mandamus because it could "raise its arguments after [the Board's] final written decision." *Id.* at *1.

by approving claims that "recite filtering encrypted packets using a set of criteria appropriate for decrypted packets, without any explanation of how that can be done." Appx0004; Appx0044; *see* Appx0023.   Notably, neither PAN, nor Cisco, nor Keysight (collectively, "Petitioners") made this argument or anything like it.[2]  The Board then essentially rewrote the challenged claims to omit the portions it found inadequately described, concluding that "[t]he patent does not describe" "applying rules directly to encrypted packets."  Appx0023-0024; *accord* Appx0043-0044.

The Board followed up its *sua sponte* written-description analysis by embracing another unbriefed argument:  that Buruganahalli's threshold routing of packets based on "domain name" discloses the '856 patent's method of filtering encrypted packets based on "a Uniform Resource Identifier" ("URI").  Appx0004; *see* Appx0044.  Although "no party … sought a construction of 'URI'"—and the record contained ample evidence explaining not only that URIs provide much greater specificity than domain names, but that URIs are found in encrypted traffic, whereas domain names can be found in the unencrypted "hello message"—the Board construed the term of its own accord, asserting that its "plain language would

---

[2] That is perhaps because of the limitations on IPR set forth in 35 U.S.C. §311(b). *See infra*, Part II.B.   The Board tried to circumvent those limitations by recharacterizing its written-description conclusion as an obviousness conclusion. *See* Appx0024 n.7 (disavowing any "consider[ation]" of whether the purported written-description defect "might give rise to a problem under §112").

encompass domain names, which are a 'uniform' way of 'identifying' a 'resource.'" Appx0044. The Board further held that Centripetal had "waived" any opportunity to refute this construction of URI because it did not contest it until the oral hearing, even though Petitioners did not make this argument in any of their briefs and first tried to equate "URI" with "domain name" *at the oral hearing*. Appx0044; *see also* Appx7067-7072; Appx7077-7080.

Having thus transformed the '856 patent's packet-filtering methodology to make it appear "essentially the same" as Buruganahalli, the Board concluded that "Buruganahalli presents a strong case of obviousness and, in fact, is essentially anticipatory, describing both the hello message technique that the '856 patent uses for filtering packets in a flow and the man-in-the-middle technique that the '856 patent uses for filtering decrypted packets." Appx0042-0050.

Finally, the Board brushed aside Centripetal's objective evidence of nonobviousness, finding that it "would be insufficient to overcome even a weak case of obviousness." Appx0050. The Board refused to examine any of Centripetal's evidence that Cisco had copied the challenged claims; it simply asserted, without explanation, that it was "not in a position" to "weigh witness testimony[] and make a factual finding about copying." Appx0054. On the flip side, the Board disputed the long-felt need for a solution to "the problem of detecting threats in encrypted traffic," despite *Cisco's own press release* describing the problem as "unsolvable."

Appx0051. The Board then asserted that this problem "had, in fact, already been solved in Buruganahalli, using the very same hello message, correlation, and man-in-the-middle techniques described in the '856 patent." Appx0051. It also found that Centripetal could not "establish a nexus" between its patent claims and any long-felt need for methods of detecting threats in encrypted traffic because, in the Board's view, the claims were not "*novel*." Appx0054.

## I. The PTO's *Volte Face* on Recusal

On September 22, 2023—just one business day before this brief was due—PTO Director Vidal sent a memorandum to the Board providing interim "Guidance on Paneling of Cases." Katherine K. Vidal, *Mem. to Members of the Patent Trial and Appeal Board and the Trademark Trial and Appeal Board*, at 1 (Sept. 22, 2023), bit.ly/468iVic ("PTO Mem."). The memorandum affirms that—as Centripetal has been arguing all along—"the *appearance* of conflicts of interest may counsel in favor of recusal even when the financial interests in question fall below the thresholds identified in the relevant rules applicable to all USPTO employees." *Id.* at 2. Given the myriad "executive branch regulations" making that point clear (which the Board ignored here), and "given PTAB and TTAB judges' unique roles," Director Vidal is "directing PTAB and TTAB management … to avoid empaneling cases to judges who hold stock or bonds (publicly traded or privately held) in any of the disclosed parties or real parties in interest, *regardless of the dollar value*." *Id.*

Despite the emphatic nature of the directive and its reliance on longstanding regulations, the guidance is expressly prospective-only. *Id.* at 4 (guidance takes "effect [in] 60 days" and is not a ground on which the USPTO will "revisit any prior Decisions"). Director Vidal made no effort to reconcile this new policy with the Board's chastisement of Centripetal for raising an issue that would henceforth trigger mandatory recusal.

## SUMMARY OF ARGUMENT

**I.** Federal regulations require executive-branch officials to recuse from matters where their participation raises concerns about an appearance of partiality. The regulations put appearance-of-partiality concerns front and center for all executive-branch employees who perform government functions, but those concerns are at their zenith when it comes to Article I employees serving what is essentially an Article III role. The decision below, however, brushed appearance concerns aside because of the size of the financial holding. That falls far short of what the regulations—and basic notions of justice—demand. While APJs are not subject to the same statutory recusal rules as federal judges, the applicable regulations, not to mention basic principles of due process, require vacatur of the Board's decisions for many of the same reasons that this Court wiped out the nearly-$3-billion verdict Centripetal obtained in the related federal-court proceedings. "[P]ublic confidence"

in fair adjudication demands nothing less, as the PTO itself has now belatedly recognized. *See Centripetal*, 38 F.4th at 1039.

**II.** Even putting that threshold issue aside, the Board's decision violated due process, the APA, and the America Invents Act. The linchpin of the Board's decision is a finding that the '856 patent specification does not adequately disclose how the claimed filtering rules apply to encrypted packets. The problem with that finding—besides the fact that it is wrong—is that no one ever raised this issue below. Under black-letter law, the Board not only is prohibited from "adopt[ing] arguments" that "were not[] raised by the petitioner during an IPR," *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016), but is obligated to give parties "fair notice" and "an opportunity to respond" in "all aspects of an IPR proceeding," *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 51-52 (Fed. Cir. 2020). The Board violated both requirements here, issuing a de facto ruling on the '856 patent's written description that contravened the statutorily limited scope of IPR, *see* 35 U.S.C. §311(b), and deprived Centripetal of the chance to explain, through briefing and evidence, why the Board's invented written-description deficiency is illusory—and why the conclusion Judge Morgan reached on that issue is exactly correct.

**III.** Perhaps because of the lack of adversarial briefing, the Board's decision is riddled with substantive errors. The Board's central finding (that the challenged claims "do not describe applying the claimed rules to encrypted packets") ignores

the patent's plain text, which unambiguously describes just that. The Board had no

legal basis for rewriting the patent or its claims to exclude aspects of claims that the

Board deemed inadequately explained. Next, the Board erred by conflating the

"destination domain" that Buruganahalli uses to route data flows with the "Uniform

Resource Identifier" ("URI") that the '856 patent uses as one of its criteria for

filtering encrypted packets. The Board's *sua sponte* construction of "URI" was both

procedurally improper and flatly contrary to abundant record evidence about the

term's meaning. In addition, the Board ignored a wealth of evidence showing

Centripetal's claims to be nonobvious, including unrebutted expert testimony

explaining how the patented invention was an advance over Buruganahalli, and

evidence of Cisco's willful copying, precisely because the invention fulfilled a long-

felt need for a better tool to identify security threats in encrypted traffic.

## STANDARDS OF REVIEW

A failure to recuse is reviewed for abuse of discretion. *Shell Oil Co. v. United States*, 672 F.3d 1283, 1288 (Fed. Cir. 2012). Unless an error is harmless, vacatur is appropriate. *See Liljeberg*, 486 U.S. at 862; *Centripetal*, 38 F.4th at 1039.

This Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence under the APA. *ACCO Brands Corp., v. Fellowes, Inc.*, 813 F.3d 1361, 1365 (Fed. Cir. 2016). The Court must set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law. 5 U.S.C. §706(2)(A). To meet this standard, "agency action [must] be reasonable and reasonably explained," and must comport with the applicable substantive law. *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).

"Obviousness is a question of law based on subsidiary findings of fact." *In re Van Os*, 844 F.3d 1359, 1360 (Fed. Cir. 2017). The Court reviews "the Board's ultimate determination of obviousness de novo and its underlying factual determinations for substantial evidence." *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1381 (Fed. Cir. 2019).

## ARGUMENT

## I. Centripetal Suffered Irremediable Prejudice In The Proceedings Below.

### A. The Board's Decision Denying Centripetal's Recusal Motion and Attacking Centripetal for Questioning APJs' Impartiality Flouted OGE Regulations and the Bedrock Principles Animating Them.

After seeing its multibillion-dollar willful-infringement judgment against Cisco wiped away because the district judge's spouse held a few thousand dollars in Cisco stock and the judge's chosen means of divestiture was deemed an insufficient cure, the last thing Centripetal expected was to have the validity of its patent decided by an adjudicator who owned potentially even more Cisco stock. Yet when Centripetal learned that was its fate and moved for recusal, it received a tongue-lashing: The Board lambasted the motion as "frivolous" and "highly inappropriate" and warned that future efforts to raise the issue "may be met with sanctions." Appx0073-0074; Appx0082.

28

The Board's thinly reasoned and intemperate decision denying Centripetal's motion for vacatur fails on its own terms and confirms the appearance problems. In the Board's telling, Centripetal's motion was "frivolous" because Office of Government Ethics ("OGE") regulations provide a safe harbor from criminal liability when the financial interest is publicly traded and worth no more than $15,000. *See* Appx0069-0073 (quoting 5 C.F.R. §2640.202). (It is generally a crime for an executive-branch "officer or employee" to "participate[] personally and substantially" in "a judicial or other proceeding" if he or his family has "a financial interest" in a party. 18 U.S.C. §208.) But it should go without saying that the standard for criminal liability for all executive-branch officials is not remotely equivalent to the standard for avoiding the appearance of impartiality by those charged with adjudicatory functions involving potentially billions of dollars. And yet despite that obvious reality, the decision below equated the two, deeming §2640.202's criminal safe harbor the beginning *and end* of the inquiry: Because the APJ held less than $15,000 in a publicly traded stock, the Board ruled that there was nothing to see here—and chastised Centripetal for having the temerity to suggest otherwise. Appx0074.

That decision was plainly erroneous. OGE regulations are not limited to §2640.202's criminal safe harbor. They also require all federal employees to "comply with the requirements of government ethics laws and regulations" and

ensure that they do not "los[e] impartiality *or appear*[] *to lose impartiality* in carrying out official duties."  5 C.F.R. §2638.102 (emphasis added); *see also, e.g.*, *id.* §2635.101 ("Employees shall not hold financial interests that conflict with the conscientious performance of duty.").    These obligations are not passive. "Consistent with the fundamental principle that public service is a public trust," *id.* §2638.102, all federal officials must "take[] appropriate steps to avoid an appearance of loss of impartiality in the performance of [their] official duties"—including by "not participat[ing] in a particular matter involving specific parties which [they] know[] [are] likely to affect the financial interests of a member of [their] household" if "a reasonable person with knowledge of the relevant facts would question [their] impartiality in the matter."  *Id.* §2635.501(a).

Of particular relevance here, the regulations clarify that *even if a financial interest is small enough that not recusing* "would not violate 18 U.S.C. 208(a)," federal employees and officials *should still recuse* from a matter when a financial holding in a party would, under the circumstances, "raise a question in the mind of a reasonable person about [their] impartiality," unless "the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's … operations."  *Id.* §2635.502(d). That, as the regulations take pains to note, is because "[q]uestions regarding

impartiality *necessarily arise* when an employee's official duties impact upon the employee's own financial interests." *Id.* §2635.501(b) Note (emphasis added).

The Board's casual dismissal of all these regulations, and its chastisement of Centripetal for even suggesting the need for recusal, only served to exacerbate the appearance of impropriety. For instance, the Board relied on the fact that Cisco was not a formal party to this IPR at the time of the panel's institution decision. *See* Appx0071. But that overlooks both that the APJs who instituted knew full well about Cisco's enormous financial interest in the '856 patent and that APJ McNamara specifically joined a decision adding Cisco as a party to this very IPR the day *before* withdrawing from the panel. *See* Appx8738-8739; Appx8774-8775. The Board's reasoning focused solely on the safe harbor's $15,000 threshold. But that not only conflates a criminal safe harbor with a need to ensure the appearance of impartiality—it misses the broader context of this case.

Every patent holder deserves the appearance of impartiality in a proceeding that risks invalidating a hard-earned patent. But a party that has just lost a substantial infringement verdict based on a holding of less than $5,000 in Cisco stock surely deserves a proceeding free from adjudicators who may hold larger amounts of Cisco stock—and just as surely deserves a respectful hearing, rather than a scolding. A reasonable observer aware of all the circumstances would expect nothing less. Yet instead of taking Centripetal's concerns seriously, the Board chastised Centripetal

for raising them and gratuitously denied an unopposed *pro hac vice* motion by Centripetal's lead trial lawyer, who signed the recusal motion. That is literally the opposite of giving careful attention to the appearance of impartiality.

The Board's utter lack of concern for appearances is particularly troubling given that APJs are no ordinary federal employees. While APJs are of course not the same as Article III judges, the word "judge" is in their job title for a reason. Most federal employees do not decide legal questions that just as easily could be resolved in an Article III court. And very few executive-branch officials oversee "an adversarial process … that mimics civil litigation." *SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1352 (2018) (describing IPR).

Proceedings before APJs have many of the trappings of Article III proceedings for good reason: They reflect the serious stakes and the heightened need to convey the appearance and reality of impartiality before someone is deprived of a valuable property interest. And those considerations properly shape both the perceptions of the reasonable observer concerning the need for impartiality and even the constitutional analysis. For example, ALJs and APJs enjoy absolute judicial immunity, rather than the qualified immunity that extends to most executive-branch officials, because their role "is 'functionally comparable' to that of a judge." *Butz v. Economou*, 438 U.S. 478, 513 (1978). Similarly, the states' Eleventh Amendment immunity against the exercise of "judicial power" in "suit[s] at law or equity," U.S.

Const. amend. XI, extends to adjudicatory proceeding before federal agencies because "such a proceeding 'walks, talks, and squawks very much like a lawsuit.'" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 757 (2002).

All of that should have been particularly obvious to the Board, given that it simultaneously denied Centripetal lawyer's motion for pro hac vice admission. *See* Appx6780. Most executive-branch employees preside over meetings, not formal adjudications replete with a formal bar and the need to file motions to appear *pro hac vice*. APJs cannot enjoy all the trappings and immunities of judicial office and then turn around and insist that merely avoiding criminal prohibitions applicable to ordinary federal employees suffices to provide an appearance of impartiality and satisfy the demands of due process. The need for a heightened guarantee of the reality and appearance of impartiality thus inheres in the APJ/ALJ role. Indeed, the Supreme Court has described ALJs as "*the impartial officer* designated to hear a case," and characterized their role as "similar to that of an Article III judge." *S.C. State Ports Auth.*, 535 U.S. at 758 (emphasis added). And as the Supreme Court has long made clear, "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 150 (1968).

All of that should make crystal clear that the threshold for criminal liability applicable to all executive-branch officials cannot be the final word on impartiality

concerns for APJs. Given that appearance-of-partiality problems matter for everyday federal employees, basic principles of due process require that they matter all the more so to, and be given all the more serious consideration by, executive-branch officials acting in an adjudicative capacity. *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) ("It has … come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest'" that applies to Article III judges "'applies with equal force to … administrative adjudicators.'" (first alteration added) (quoting Kenneth Culp Davis, *Administrative Law*, §12.04, p.250 (1972))). The PTO itself now seems to recognize that APJs need to be held to a much higher standard than what suffices for ordinary executive-branch employees. Indeed, the interim guidance specifically invokes APJs' "unique roles" as "judges" as the key basis for "directing … Board management[] to avoid empaneling cases to judges who hold stock or bonds (publicly traded or privately held) in any of the disclosed parties or real parties in interest, *regardless of the dollar value*"—i.e., even if it is below the $15,000 threshold in §2640.202's criminal safe harbor. PTO Mem. at 2.

The PTO's new approach is utterly irreconcilable with what transpired here. The panel chastised Centripetal for raising an issue that will henceforth trigger mandatory recusal. Even APJ McNamara apparently saw enough of an issue with his continued participation in the proceedings to withdraw, despite his self-serving statement that the recusal motion was "without merit." Appx6652. Yet he delayed

his withdrawal until after he voted to grant Cisco's motion to join. No reasonable observer could fail to see a problem with this vote-first-recuse-later course of conduct. After all, once a judge becomes aware of a conflict that warrants recusal, he may not take any further action in the case "other than the ministerial act of transferring the case to another judge." *Shell Oil*, 672 F.3d at 1289-91. So, if there was a basis to recuse, then APJ McNamara had zero business ruling on Cisco's petition and joinder motion or Centripetal's request for rehearing of the institution decision. But if there was *no* basis to recuse, then he should not have withdrawn. *See Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985) ("Absent a factual showing of a reasonable basis for questioning his or her impartiality … a judge should participate in cases assigned."). Whichever it is, joining decisions that decide critical issues in the teeth of an asserted conflict—and deciding them in favor of Cisco—but then withdrawing from the case the next day is no way to handle Centripetal's valid concerns. It reinforces, rather than remedies, the appearance of partiality.

### B. Vacatur of the Institution Decision Is Necessary to Preserve Justice and Public Confidence.

Like 28 U.S.C. §455, the OGE regulations "neither prescribe[] nor prohibit[] any particular remedy" for failure to recuse. *Cf. Liljeberg*, 486 U.S. at 862. Under *Liljeberg* and this Court's decision in *Centripetal v. Cisco*, "there are three factors courts should consider when deciding whether to vacate a judgment" due to an improper failure to recuse: "(1) 'the risk of injustice to the parties in the particular

case'; (2) 'the risk that the denial of relief will produce injustice in other cases'; and (3) 'the risk of undermining the public's confidence in the judicial process.'" 38 F.4th at 1034 (quoting *Liljeberg*, 486 U.S. at 864). Each factor weighs in favor of vacatur here. Both the decision to institute IPR of the '856 patent and the Board's final written decision (not to mention the decision to join Cisco) were tainted by the participation of an APJ with a known financial interest in the proceedings. Centripetal was "entitled to a neutral and detached judge in the first instance," *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972), and the deprivation of that right compromised the impartiality of the entire process. *See Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016) ("[J]udges who were exposed to a disqualified judge may still be influenced by their colleague's views when they rehear the case."). Rehearing before an entirely new panel of APJs is thus necessary, as it is "neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process." *Id*. at 14-15.

The Board tried to brush aside the obvious risk of prejudice to Centripetal because three months passed between Centripetal's receipt of long-requested copies of APJ McNamara's 2014-2019 financial disclosures (on September 29, 2022) and its filing of the motion for recusal and vacatur (on December 30, 2022). Appx0081-0082. The idea that Centripetal waited too long to file is difficult to take seriously, especially given that the Board simultaneously criticized it for leveling supposedly

unfounded accusations; apparently the Board wanted Centripetal to file those "unfounded" claims even sooner, before it had completed its due diligence. In all events, the three-month time-lapse here was entirely reasonable, as Centripetal spent this time researching the conflict and requesting additional financial disclosures from the Department of Commerce. *See* Centripetal Reply Brief (No. 23-127, Dkt.22) at 26-30. Such due diligence should be encouraged, not denounced.[3]

In all events, Centripetal's conduct bears no resemblance to the cases on which the Board relied, which involve litigants sitting on disqualifying information for years or waiting for the adjudicator to issue its decision before seeking recusal. *See* Appx0082 (citing *In re United Shoe Mach. Corp.*, 276 F.2d 77, 79 (1st Cir. 1960) (two-and-a-half-year delay); *United States v. Owens*, 902 F.2d 1154, 1156 (4th Cir. 1990)); *see also Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1421 (Fed. Cir. 1989) (six-and-a-half-year delay). Here, by contrast, Centripetal filed its motion before the Board issued any further rulings or orders in the IPR proceedings.

Furthermore, no "substantial time" had "passed since the rulings in question"; in fact, because the Board's final written decision was issued pursuant to a statutory deadline, there was no undue delay yielding "staleness of evidence or fading of …

---

[3] Nor should the mere act of seeking public documents related to conflicts of interest be met with the veiled threat of criminal repercussions. *See* Centripetal Reply Brief (No. 23-127, Dkt.22) at 27.

memories." *Centripetal*, 38 F.4th at 1035-36. Nor can Petitioners claim a "special hardship by reason of their reliance on the original judgment." *Id.* at 1036 (quoting *Liljeberg*, 486 U.S. at 869). The judgment was covered with the specter of a conflicted APJ after Centripetal raised the issue before a final written decision, and Centripetal has appealed to this Court both by mandamus petition (preserving reviewability of the decision to institute) and in the normal course.

Denying vacatur here would "produce injustice in other cases." *Liljeberg*, 486 U.S. at 868. It is hard to see how this Court could *not* find the facts of this proceeding to be "symptomatic of an increasingly common problem" of adjudicators "presiding over cases in which they or relevant family members owned stock in a party," given this Court's decision vacating Judge Morgan's judgment. *See Centripetal*, 38 F.4th at 1038-39. Indeed, even the PTO Director now recognizes that "the *appearance* of conflicts of interest may counsel in favor of recusal even when the financial interests in question fall below the [safe harbor] threshold[.]" PTO Mem. at 2.

Reaching the opposite conclusion here would threaten public confidence in proceedings before the Board, sending the message that impartiality is a matter of grace, not right. *Centripetal*, 38 F.4th at 1038 (finding that the second and third *Liljeberg* factors ran in parallel due to concerns that refusal to vacate over stock ownership would "have a significant adverse effect in other cases" by sending a message to judges that this "is not a serious issue"). As this Court made clear in

vacating the multibillion-dollar willful-infringement judgment against Cisco, it is "seriously inimical" to judicial credibility "for a judge to preside over a case in which he has a known financial interest in one of the parties *and for courts to allow those rulings to stand.*" *Id.* at 1039 (emphasis added). That is no less true when the one adjudicating a patent dispute is an APJ rather than an Article III judge. On the flipside, it cannot "plausibly be argued" that "public confidence" in an adjudication "will be degraded by a decision that vacates a judge's rulings rendered while he had a known financial interest in one of the parties." *Id.* After all, the whole point of the harmless-error doctrine in this context is to ensure that courts do not impose a "draconian remedy" for "forgetful judges." *Liljeberg*, 486 U.S. at 862.

In addition, the Board's intemperate response to Centripetal's recusal motion heightens the public confidence concerns. If the Board cannot even entertain a good-faith suggestion for (soon-to-be-mandatory) recusal without chastising the litigant for raising the issue, then it is hard to see why the public should have confidence that the system guarantees truly impartial justice. In sum, "failure to vacate here" would undermine "'public confidence'" in proceedings before the Board. *See Centripetal*, 38 F.4th at 1039 (quoting *Liljeberg*, 486 U.S. at 862).

**II.    The Board Improperly Invalidated Centripetal's Claims Based On A Purported Written-Description Deficiency That Petitioners Never Raised And Were Statutorily Barred From Raising During Inter Partes Review.**

The procedural unfairness below was not limited to the participation of a financially interested adjudicator.  In its final written decision, the Board invalidated claims 1, 24, and 25 of Centripetal's '856 patent under a theory Petitioners never advanced—that the '856 patent does not contain an adequate written description of "applying the claimed rules to encrypted packets."  Appx0004.  That was reversible error several times over.

**A.    The Board's *Sua Sponte* Written-Description Analysis Violated the APA and Deprived Centripetal of Due Process.**

This Court has expressly rejected the notion "that the Board is free to adopt arguments" that "were not[] raised by the petitioner during an IPR."  *Magnum Oil Tools*, 829 F.3d at 1381 (reversing final written decision that held all challenged claims were unpatentable as obvious); *see, e.g.*, *Apple Inc. v. Corephotonics, Ltd.*, 2023 WL 5838695, at *5-7 (Fed. Cir. Sept. 11, 2023).  That makes sense, as IPR is "an adversarial process … that mimics civil litigation," *SAS Inst.*, 138 S.Ct. at 1352, and it is black-letter law that courts in civil litigation must "normally decide only questions presented by the parties," *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020).  Nevertheless, the Board once again ignored the constraints on its power, deciding an issue that the parties did not brief and that Centripetal had no

chance to defend against—and using its resolution of that issue as the linchpin of its ultimate obviousness ruling canceling the challenged claims.

The parties' briefs below started from the proposition that the '856 patent describes rule-based filtering of encrypted packets; the critical contested issue was whether Burugaanahalli "disclose[s] applying the claimed rule set to encrypted packets." Appx0004; *see* Appx6078-6088 (PAN briefing); Appx6319-6331 (Centripetal briefing). The Board recognized as much, yet it sidestepped the issue altogether by finding, *sua sponte*, that "the '856 patent *also* does not describe applying the claimed rules to encrypted packets." Appx0004. Although Petitioners never argued anything of the kind, the Board speculated that the patent examiner "err[ed] … during prosecution" by amending the proposed claims so as to "recite filtering encrypted packets using a set of criteria appropriate for decrypted packets, without any explanation of how that can be done." Appx0004; Appx0044. The Board then used this purported written-description defect as the foundation for its obviousness finding. The Board ruled that the '856 patent does not actually "describe applying rules to encrypted patents [sic]," and instead merely uses Buruganahalli's "hello message approach," Appx0043-0044—apparently because the Board did not believe it is "possible to apply some of those rules to encrypted packets," Appx0023-0024.

The Board's *sua sponte* written-description analysis is flatly wrong, is not supported by substantial evidence, is premised on a fundamental failure to comprehend what the '856 technology does and why it is so significant, and starkly demonstrates why factfinders should decide only those issues that have been vetted through briefing and, where appropriate, expert testimony. *See infra*, Part III. But even putting all that aside, the decision to jettison the issues the parties raised in favor of one that no one did contravened "basic principles of administrative law," which "impose important limits on the Board's authority during inter partes reviews." *In re IPR Licensing, Inc.*, 942 F.3d 1363, 1368 (Fed. Cir. 2019).

Even where (unlike here) the Board is justified in raising a patentability issue *sua sponte*—for example, when a patent owner seeks to amend a claim during IPR under §316(d), which entitles the Board to independently consider whether the revised or substituted claim is patentable—the APA still requires the Board to provide parties "fair notice" and "an opportunity to respond" to any issue it raises. *Nike*, 955 F.3d at 51-53; *see also, e.g.*, *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1262-63 (Fed. Cir. 2021); *Belden Inv. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015). The Board provided no such opportunity for Centripetal to address *either* the purported defects in the examiner's amendment *or* the Board's *sua sponte* conclusion that "*the '856 patent* does not describe applying rules to encrypted patents [sic]." Appx0044 (emphasis added). As noted, Petitioners never raised

42

either issue—and neither did the Board in its 92-page decision granting PAN's petition to institute IPR, *see* Appx0118-0209, or in its subsequent decisions granting Cisco's and Keysight's respective petitions, *see* Appx0210-0342, or at the oral hearing it held on the consolidated matters, *see* Appx7020-7081.

Nor did the Board provide Centripetal with an opportunity to brief why the Board was wrong to equate the "domain name" that Buruganahalli extracts from the handshake traffic with the "Uniform Resource Indicator" that is among the criteria the '856 patent uses to filter encrypted packets. Even though "[n]o party ha[d] sought a construction of 'URI' or 'Uniform Resource Identifier,'" the Board reached out to construe the term. Appx0044. Not surprisingly given the absence of briefing or argument on the issue, the Board's construction of the term was erroneous, as explained below. *See infra*, Part III.A.2. But even putting that aside, the fact that the Board construed "URI" at all—and then misconstrued it to find obviousness, *see* Appx0044—confirms the problem and underscores the need for vacatur. After all, "unlike with disputed terms, it is unreasonable to expect parties to brief or argue agreed-upon matters of claim construction." *Qualcomm*, 6 F.4th at 1263.

"On this record," Centripetal "had no reason to anticipate that the [purported written-description] error would be the basis for the Board's decision, given that the parties did not brief, argue, or even suggest this [issue] was dispositive," or even in play. *Apple*, 2023 WL 5838695, at *7. The Court should thus vacate and remand.

*See, e.g., Qualcomm*, 6 F.4th at 1267; *Nike*, 955 F.3d at 54; *In re NuVasive, Inc.*, 841 F.3d 966, 971-72, 975 (Fed. Cir. 2016).[4]

**B.    The Board's Written-Description Analysis Also Violated Statutory Limitations on the Scope of Inter Partes Review.**

Beside the fact that the challenged claims plainly describe the key innovation, there is another good reason no Petitioner said a word about the written-description issue below:  It is not a valid basis for IPR.  Congress "expressly limited [IPR's] scope … to a subset of grounds" of unpatentability.  *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019).  A party seeking IPR may assert only "ground[s] that could be raised under section 102 or 103."  35 U.S.C. §311(b).  Obviousness under §103 is one such ground, but adequacy of written description under §112 is not.  *See id.*; *cf. id.* §321(b) (authorizing post-grant review to consider written description).  That is yet another reason why the decision to cancel Centripetal's claims based on a purported written-description deficit cannot stand.

---

[4] To the extent Centripetal needs to show prejudice, it can readily do so.  *Cf. Qualcomm*, 6 F.4th at 1263 & n.3 (declining to resolve whether a showing of prejudice is required).  Centripetal "had no reason to brief" the adequacy of the '856 patent's written description, or to "establish an evidentiary record supporting it"— e.g., by submitting supplemental expert testimony.  *See id.* at 1263-64 (finding prejudice under similar circumstances).  Further, as detailed below, the America Invents Act expressly precludes a petitioner from basing its unpatentability challenge on a purported deficiency under 35 U.S.C. §112, including written description.

This Court's precedents make clear that the Board may not cancel a patent based on a §112 issue improperly raised by a petitioner during IPR—let alone raise such an issue "on its own accord." *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1351 (Fed. Cir. 2020). *Samsung* involved an IPR in which the Board concluded, *sua sponte*, that certain claims were "indefinite" and thus failed §112. *Id.* The challenger argued that even though §311(b) precluded the Board from "institut[ing] inter partes review based on a claim's indefiniteness," the Board nonetheless could "cancel … claim[s] on indefiniteness grounds" if the issue arose in the course of the proceedings. *Samsung*, 948 F.3d at 1350. This Court squarely rejected that argument, holding that "[i]t would not be proper for the Board to cancel claims on a ground that is unavailable in an IPR." *Id.* at 1353. A straightforward application of that principle should have precluded the Board from canceling the challenged claims based on a purported written-description failing, which likewise falls under §112 and is not a valid basis for IPR. *See Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 275 (2016) (noting that the Board would "act outside its statutory limits" if it "cancel[ed] a patent claim … under §112 in inter partes review").

Apparently recognizing as much, the Board tried to frame its ultimate decision in terms of obviousness. The Board even went so far as to drop a footnote asserting that, given §311(b), it was "not consider[ing]" whether the purported written-description defect "might give rise to a problem under §112." Appx0024 n.7. This

45

Court should not be fooled. As explained, the Board's *sua sponte* written-decision analysis was the linchpin of its final written decision on obviousness. *See supra*, Part II.A. The purported written-description defect was the singular justification the Board provided for sidestepping Centripetal's "primary argument," Appx0004, and it undergirded the Board's oft-repeated (but flat wrong) conclusion that the '856 patent is "essentially the same" as Buruganahalli, *see infra*, Part III.A.1.

The Board's attempt to evade the limitations of §311 falls flat. After all, the Board may no more "do indirectly what it cannot do directly." *SAS Inst.*, 138 S.Ct. at 1358 n.* (quoting *CAB v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961)). This Court should not countenance such "shenanigans" by the Board—particularly without the benefit of expert testimony, briefing, and argument focused on the critical issue. *See id.* (quoting *Cuozzo*, 579 U.S. at 275).

## III. The Board's Unpatentability Rulings Are Legally Erroneous.

On top of the serious procedural defects that independently justify vacatur, the Board's decision contains glaring substantive errors. The Board concluded that the challenged claims are "the same" as Buruganahalli only by rewriting the text of the '856 patent, adopting an unsupportable construction of well-known term ("URI"), and ignoring unrebutted expert testimony. The Board also gave short shrift to Centripetal's objective evidence of nonobviousness—including compelling evidence that Cisco copied the patented invention and that the claims filled a long-

felt need for methods to detect network threats within encrypted traffic. Procedural errors aside, the substance of the Board's decision is untenable.

## A. The Board Erred in Concluding That Buruganahalli Discloses the Challenged Claims' Rule-Based Filtering of Encrypted Packets.

To succeed on their obviousness challenge, Petitioners had to prove that "all claimed limitations" in claims 1, 24, and 25 of the '856 patent "are disclosed in the prior art," i.e., Buruganahalli. *See Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014). The Board ruled that Petitioners carried that burden, finding that the challenged claims are "essentially the same" as Buruganahalli. Appx0004. This conclusion was legally erroneous and not supported by substantial evidence, for multiple reasons.

### 1. The Board disregarded the challenged claims' plain language.

The parties' dispute centered on whether Buruganahalli discloses filtering encrypted packets "based on at least one of [A] a uniform resource identifier (URI) …, [B] data indicating a protocol version …, [C] data indicating a method …, [D] data indicating a request …, or [E] data indicating a command." Appx0042 (alterations in original) (quoting Appx0115(25:30-37)); *see* Appx0042-0048. As discussed above, the Board found that "the '856 patent … does not describe applying the[se] claimed rules to encrypted packets." Appx0004. In the Board's view, the '856 patent "[i]nstead … describes" "filtering encrypted packets by correlating them with unencrypted data in other packets." Appx0044; *see also* Appx0023-0024.

That finding defies the plain text of the '856 patent. The patent specifically describes rule-based filtering of encrypted packets separate from the threshold routing of unencrypted packets (e.g., step #17) and separate from the filtering of decrypted data by a proxy (e.g., step #22). In steps #19 and #35, the patent describes using rules to perform three actions: (1) "identify the packets"; (2) "determine … that the packets comprise data corresponding to the network-threat indicators … by correlating the packets with one or more packets previously determined … to comprise data corresponding to the network-threat indicators based on data stored in logs 214"; and (3) "one or more of log … or drop the packets." Appx0107(9:66-10:14); Appx0109(14:19-34). The third action—using rules to log or drop the encrypted packets—is rule-based filtering of encrypted packets. Indeed, *even the Board* recognized in its summary of the '856 patent that step #19 involves these three separate actions "acting on *encrypted* packets." Appx0015-0016 (emphasis added).

Nevertheless, the Board essentially rewrote the patent specification to nullify this key innovative aspect by deeming it inadequately described. *See* Appx0004, Appx0023-0024; Appx0043-0044. An examiner's amendment during prosecution had added that "the filtering is based on a URI or one of four other types of data in the packets." Appx0023. The Board—and only the Board—saw "a problem with the examiner's amendment" because purportedly "the rules that were added to the claim by the amendment are those that the patent describes applying in step 22, by

rule gate 124, which is operating on *decrypted* packets." Appx0023 (emphasis added). That reasoning makes no sense. To be sure, the '856 patent describes how the rules are used for filtering decrypted packets (in step #22). But it does not stop there. It goes on to describe how the same rules are used for filtering *encrypted* packets (e.g., at steps #19 and #35). *See* Appx0093-0094; Appx0107(9:66-10:14); Appx0109(14:4-34). The Board simply ignored the parts of the specification that contradicted its theory.

The Board compounded its error by further asserting, without any evidence, that "it does not appear possible to apply some of those rules to encrypted packets because at least some of the data (i.e., the protocol version, method, request, or command) would be encrypted." Appx0023. Aside from omitting one of the claimed rules (specifying the URI), this assertion fails for the simple reason that— as the specification makes clear—the rules *can*, in fact, be applied to encrypted packets, thanks in part to the earlier-claimed determining step. *See* Appx5940(¶¶54-55); Appx5946-5948(¶¶64-67). That is, the packet-filtering system can assume an encrypted packet has similar data to a related packet that was previously decrypted, and then apply the rules based on that data to filter the encrypted packet without decrypting it. The claims do not require the rules to analyze the encrypted payload portion of the encrypted packets; they require that the rules (1) specify the claimed data and (2) are a basis for filtering the encrypted packets. For example, the claims

do not require comparing a URI from inside an encrypted packet with a URI of a rule, but rather recite "filtering … based on … a uniform resource identifier (URI) specified by the plurality of packet-filtering rules … the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators." Appx0115(25:30-45).

As noted above, the adequacy of the '856 patent's written description was not (and could not have been) at issue during IPR. *See supra*, Part II. It should come as no surprise, then, that the Board failed to understand how the filtering occurs, as it received no briefing, argument, or expert testimony focused on explaining that point. In all events, despite the Board's confused *ipse dixit*, the claims plainly "recite filtering encrypted packets" using five criteria not disclosed by Buruganahalli— regardless of whether the Board understood "*how* that can be done" or believed that the criteria are "appropriate [only] for decrypted packets." Appx0004 (emphasis added).

### 2. The Board adopted a wholly unsustainable construction of "Uniform Resource Identifier."

The Board further erred by equating the "domain name" that Buruganahalli extracts from the handshake traffic with the URI that the '856 patent uses to filter encrypted packets. The "domain name" specified in a "hello message" is just a top-level identifier (e.g., "mynetwork.com"). Appx3758(4:13-18); *accord* Appx2023(11:35-36). By contrast, the URI for a given session is a far more specific

identifier (e.g., "http://www.mynetwork.com/files/downloads/malicious"), which "includes the method or protocol use[d] retrieve the file, the host name, the port and the path." Appx7078; *see* Appx3758(4:13-18). Moreover, whereas the top-level domain name is found, unencrypted, in the "hello message," *e.g.*, Appx5930(¶41) & n.4, the URI for a particular session is found in the encrypted "application layer" of a packet, Appx7079. *See also* Appx1904(¶64); Appx1951; Appx2021(8:11-24). The '856 technology uses a URI (which was logged when previously filtering a related unencrypted packet) when applying rules to filter encrypted packets based on the unencrypted portion of their data. Appx0107(10:2-14); *see* Appx0105(5:31-6:5); Appx0109(14:22-34). That is why Petitioners' briefing below never attempted to equate the "destination domain" referenced in Buruganahalli with the "uniform resource identifier" used as a filtering criterion in the challenged claims.[5]

That did not stop the Board. "No party ha[d] sought a construction of 'URI' or 'Uniform Resource Identifier,'" but the Board took it upon itself to construe the term anyway. Appx0044. Without even considering the context in which the

---

[5] To the extent PAN's petition asserted that Buruganahalli filters packets based on Uniform Resource Locators ("URLs"), which "are examples of uniform resource identifiers," it made clear that this filtering occurred *after* decryption of the "application layer." Appx0394. Centripetal refuted this argument in its preliminary response, distinguishing such filtering of *decrypted* packets from the challenged claims' filtering of encrypted packets. *See* Appx3948-3954. PAN subsequently disclaimed this theory, Appx4147, and Petitioners' post-institution brief never raised it again, *see* Appx6068-6101.

challenged claims use that term, or any of the record evidence that reveals the term's meaning, the Board "conclude[d] that [its] plain language would encompass domain names, which are a 'uniform' way of 'identifying' a 'resource.'" Appx0044. This bizarre, *sua sponte* "construction" contradicts abundant record evidence indicating what a URI is and how it differs from a domain name. *See supra*, pp.50-51. It cannot possibly sustain the Board's conclusion that Buruganahalli discloses the challenged claims' use of a URI to filter encrypted packets of data during a secure session.

The Board's suggestion that Centripetal "waived" any objection to its construction of URI is even more absurd. Petitioners first attempted to equate Buruganahalli's "destination domain" with the challenged claims' "URI" at the oral hearing (and during rebuttal, no less). Appx7067-7072; Appx7077. Centripetal's counsel immediately disputed the point, calling it a "fundamental technical misunderstanding"; observing that "Petitioner[s] never ma[de] the argument before"; and citing numerous pieces of record evidence that refute it. Appx7077-7080. It makes zero sense to allow one party to raise (and expound upon) a point at oral argument and then forbid the other party from responding—though that double-standard is certainly consistent with the Board's treatment of Centripetal throughout these proceedings. Nor is there any merit to the Board's suggestion that Centripetal's briefing should have affirmatively raised the point as a "patentability argument[]." Appx0044. After all, it was *Petitioners' burden* to demonstrate that Buruganahalli

disclosed all of the challenged claims' limitations. *See Par Pharm.*, 773 F.3d at 1194. The Board's unsupportable construction of "URI" also warrants reversal.

### 3. The Board ignored unrebutted evidence that the challenged claims significantly advanced the prior art.

In concluding that the challenged claims are "essentially the same" as Buruganahalli, Appx0004, the Board ignored several other ways that the challenged claims represent "a significant advancement over the prior art," Appx5947.

First, even assuming *arguendo* that Buruganahalli's initial blacklist/whitelist determination could be considered "filtering," that determination undisputedly occurs "*prior to* the set-up of the encrypted data communication." Appx0029-0030 (emphasis added) (quoting Appx2019(4:33-44)). Buruganahalli merely makes a threshold decision (i) to allow a secure connection with no decryption or filtering; (ii) to allow a secure connection with decryption and filtering; or (iii) to block any secure connection from being initiated. *See* Appx5930-5934(¶¶42-46). That is a far cry from the challenged claims, which disclose a method for *ongoing* rule-based filtering of encrypted packets, without decryption, *during* a secure session. *See* Appx5946-5947(¶65); Appx0107(9:66-10:14); Appx0108(11:36-65); Appx0109-0110(14:19-16:26).

Second, whereas Buruganahalli only applies rules to unencrypted (and decrypted) packets, the '856 patent is not so limited: It performs not only rule-based filtering of unencrypted packets (e.g., at step #17) and decrypted data (e.g., at steps

#22 or #36), but also rule-based filtering of *encrypted* packets (e.g., at steps #19 and #35). The rule-based filtering of encrypted packets at step #35 can "account[] for possible rule updates that are received after a secure session is initiated"—without computationally-expensive decryption. Appx5940(¶55); *see also* Appx0109-0110(14:19-16:26); Appx0113(22:20-51). This provides "added flexibility … to: (i) end a secure session that is later deemed to be a threat per an updated rule, or (ii) allow a secure session to pass through without any further processing per an updated rule that indicates the secure session is not a threat." Appx5940(¶56).

Third, Buruganahalli's threshold routing determination rests solely on a top-level domain name, e.g., mynetwork.com. *See supra*, pp.7-8, 15-16. The challenged claims, in contrast, apply rules based on multiple different criteria. *See* Appx0115(25:30-45). The '856 patent thus offers the "advantage" of being able to "allow a secure session initially and end it after a time or data limit is exceeded." Appx5940-5941(¶56). It also "reconfigures rules based on encrypted-packet log data" that it collects *during* secure sessions, which is not collected under Buruganahalli. Appx5940(¶55).

The Board failed to engage with any of these differences between the '856 patent and Buruganahalli. This, too, was error. After all, ascertaining "differences between the prior art and the claims at issue" is a critical component of any obviousness inquiry. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (1966).

The record simply does not support the Board's conclusion that Burunganahalli is "essentially the same" as—or even "anticipatory" of—the challenged claims. *Contra* Appx0004; Appx0050.

## B. The Board Improperly Discounted or Dismissed Centripetal's Objective Evidence of Nonobviousness.

The Board further erred by failing to meaningfully consider other evidence that the challenged claims would not have been obvious to a person of skill in the art. This Court has held that objective indicia of nonobviousness "must be considered in *every* case," as they "play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016). Indeed, indicia of nonobviousness "may often be the most probative and cogent evidence in the record." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1071 (Fed. Cir. 2018).

Despite this Court's many precedents emphasizing the importance of objective indicia of nonobviousness, the Court has frequently needed to remind the Board that such evidence may not be "relegate[d] to 'secondary status.'" *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1078 (Fed. Cir. 2012); *see, e.g.*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1136-39 (Fed. Cir. 2019); *Polaris Indus.*, 882 F.3d at 1071-73; *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1357-59 (Fed. Cir. 2013). The present case is yet

another example of the Board giving the back of its hand to strong evidence of nonobviousness.

### 1. The Board ignored compelling evidence that Cisco copied the challenged claims.

It is well settled that "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336. To be sure, not every act of infringement indicates copying; "more is needed than merely showing that similarity exists between the patent and the competitor's accused product." *Liqwd*, 941 F.3d at 1137. But where there is "evidence of actual copying efforts"—e.g., "access to an *issued patent* coupled with circumstantial evidence regarding changes to a competitor's design"—the Board must take it into account. *See id.* at 1138-39 (vacating obviousness determination because it disregarded evidence of copying).

Centripetal introduced unrebutted evidence that its executives met with Cisco in 2016 (at Cisco's invitation) and presented confidential information about the '856 patent's method for "inspect[ing] encrypted traffic." Appx4943; *see* Appx4937-4944. Unchallenged internal Cisco communications confirmed Cisco's desire and intent to study Centripetal's patents, *see* Appx4849-4850, and expert testimony established that Cisco likely copied Centripetal's patented technology in developing the new products Cisco released in June 2017, *see* Appx4849-4850; Appx3523-3524. Judge Morgan found this same evidence to be "compelling evidence" of copying—as he explained, Cisco's release of "products with Centripetal's

functionality within a year of [the] meetings goes beyond mere coincidence"—and he relied on his finding of copying in finding willful infringement and awarding the largest patent-damages award in U.S. history. *See* Appx3388-3389; Appx3393; Appx3398.

The Board did not analyze *any* of this evidence. That was error. Although the district court's decision had been vacated by the time the Board issued its final written decision (but, notably, was still in effect when the Board instituted IPR), even the Board acknowledged that "the underlying evidence" was still "available" to it. Appx0054; *see also, e.g.*, Appx4680 (Centripetal brief citing such evidence). Yet the Board asserted that it was "not in a position to evaluate the entirety of the litigation record, weigh witness testimony, and make a factual finding about copying by Cisco." Appx0054. That *ipse dixit* falls flat. In almost every case, the Board weighs written testimony and makes factual findings on such issues. And, of course, the Board would not need to "evaluate the *entirety* of the litigation record" to do so. If the Board was unable for some reason to perform this necessary inquiry, it should have credited the district court's finding of copying that contributed to its willful infringement verdict and that gave light to the circumstances of the '856 patent's technology. The path it chose instead—inventing grounds for cancelation based on a misconstruction of the claims and misunderstanding of the technology, all while ignoring actual evidence of copying—is untenable. The Board's failure to consider

Centripetal's evidence that Cisco willfully copied the challenged claims is yet another ground for vacatur. *See, e.g.*, *Liqwd*, 941 F.3d at 1138-39.

### 2. The Board unduly minimized Centripetal's evidence that the challenged claims addressed a long-felt industry need to detect security threats hidden in encrypted web traffic.

In addition, evidence that a challenged claim fulfills "a long felt but unresolved need tends to show nonobviousness because it is reasonable to infer that the need would have not persisted had the solution been obvious." *WBIP*, 829 F.3d at 1332. There is no serious dispute that the telecommunications industry had long recognized the need for methods to detect threats in encrypted traffic without decrypting the traffic. Centripetal presented the Board with ample evidence of the long-felt need for such technology. *See* Appx3515-3522 (expert testimony explaining industry's need to offer network security without "decrypt[ing] all of the data" as network traffic speeds increase and more attacks exploit encrypted communications); Appx4686-4687 (2017 Cisco press release describing the "unsolvable" challenge of detecting security threats in encrypted traffic). Tellingly, Petitioners did not dispute the industry's long-felt need; they merely argued that the '856 patent did not satisfy it. *See* Appx6100-6101. And while the Board quibbled with the Cisco press release's characterization of the problem as "unsolvable"— speculating, without any basis in law or fact, that it "amount[ed] to puffery"—it did

not contest any of Centripetal's other evidence, and ultimately assumed that the industry had a long-felt need to detect threats in encrypted traffic. *See* Appx0051.

The Board nevertheless rejected Centripetal's evidence of this long-felt need on the ground that Buruganahalli already solved it. Appx0051. The Board similarly concluded that the challenged claims lacked the requisite nexus to the long-felt need because (it said) they did not contain anything "novel"; the Board fell back on its assertion that the claims operate "in the same way Buruganahalli's system operates." Appx0053-0054. This line of reasoning ignores both the plain text of the '856 patent and Centripetal's valuable innovations over the prior art. *See supra*. On this record, neither the conclusion "that Buruganahalli presents a strong case of obviousness," nor the conclusion that Centripetal's evidence of nonobviousness would not "overcome even a weak case of obviousness," Appx0050, can be sustained.

## CONCLUSION

For the foregoing reasons, the Court should reverse the cancellation of claims 1, 24, and 25 of the '856 patent. At the very least, the Court should vacate the Board's institution decision and remand with instructions for a new panel, untainted by any conflict, to decide institution afresh.

Respectfully submitted,

MATTHEW J. DOWD
ROBERT J. SCHEFFEL
DOWD SCHEFFEL PLLC
1717 Pennsylvania Ave.,
NW Ste 1025
Washington, D.C. 20006
(202) 559-9175

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
JOSEPH J. DEMOTT
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellant Centripetal Networks, LLC*

October 27, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,882 words, excluding the parts of the brief exempted by Federal Circuit Rule 31(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

October 27, 2023

s/Paul D. Clement
Paul D. Clement

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
and KEYSIGHT TECHNOLOGIES, INC.,[†]
Petitioner

v.

CENTRIPETAL NETWORKS, INC.,
Patent Owner.

———————

IPR2022-00182
Patent 9,917,856 B2

———————

Before MICHELLE N. WORMMEESTER, NABEEL U. KHAN, and
AARON W. MOORE, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[†] Cisco Systems, Inc. and Keysight Technologies, Inc. filed petitions and
motions for joinder in IPR2022-01151 and IPR2022-01199, respectively, and have
been joined in this proceeding.

## TABLE OF CONTENTS

I. SUMMARY ................................................................................................. 3

II. BACKGROUND ........................................................................................ 4

   A. Background ......................................................................................... 4

   B. Related Matters .................................................................................. 5

   C. The '856 Patent ................................................................................. 6

      1. Specification ............................................................................... 6

         a. Structure ............................................................................ 7

         b. Generate and Provision Rule s ........................................ 10

         c. Domain Name Lookup ..................................................... 10

         d. Proxy System and Unencrypted Connection Sessions ......... 11

         e. Establish Encrypted Connection Sessions ...................... 13

         f. Send Encrypted Packets to Proxy System ..................... 14

         g. Proxy System .................................................................. 15

         h. Send Encrypted Packets to Destination ......................... 16

         i. Figure 7 Flowchart .......................................................... 17

      2. File History ................................................................................ 18

      3. The Challenged Claims ............................................................. 23

   D. Level of Ordinary Skill in The Art ................................................... 25

   E. Claim Construction ........................................................................... 25

III. PATENTABILITY ANALYSIS ............................................................. 27

   A. Overview of Buruganahalli ............................................................... 27

      1. Architecture ............................................................................... 31

      2. Hello Message Technique ......................................................... 32

      3. Man-in-the-Middle Technique .................................................. 33

      4. Security Device .......................................................................... 35

      5. Flowcharts ................................................................................. 37

B. Claim 1 in View of Buruganahalli ...................................... 37

   1. "[a] method"................................................................. 37

   2. "receiving, by a packet-filtering system . . . configured
to filter packets in accordance with a plurality of
packet-filtering rules, data indicating a plurality of network-threat
indicators, wherein at least one of the plurality of
network-threat indicators comprises a domain name
identified as a network threat".................................... 37

   3. "identifying packets comprising unencrypted data" and
"identifying packets comprising encrypted data"...................... 39

   4. "determining . . . based on a portion of the unencrypted data
corresponding to one or more network-threat indicators . . . ,
packets comprising encrypted data that corresponds to the
one or more network-threat indicators"........................................ 40

   5. "filtering . . . based on at least one of [A] a uniform resource
identifier (URI) . . . , [B] data indicating a protocol version . . . ,
[C] data indicating a method . . . , [D] data indicating a
request . . . , or [E] data indicating a command . . ." .................. 41

   6. [A] "packets comprising the portion of the unencrypted data
that corresponds to one or more network-threat indicators"
and [B]"the determined packets comprising the encrypted
data that corresponds to the one or more
network-threat indicators" ........................................................... 47

   7. "routing . . . filtered packets to a proxy system based on a
determination that the filtered packets comprise data that
corresponds to the one or more network-threat indicators" ....... 47

   8. Objective Indicia of Nonobviousness ......................................... 49

   9. Conclusion Regarding Claim 1 .................................................... 53

C. Claims 24 and 25 in View of Buruganahalli.................................... 53

IV. PATENTABILITY CONCLUSION...................................................... 54

V. REQUESTS FOR REHEARING.......................................................... 54

VI. ORDER ................................................................................................ 58

2

# I.    SUMMARY

For the reasons detailed below, we find that Petitioner has shown the challenged claims of the '856 patent unpatentable.  The patent describes filtering packets using "hello message" and "man-in-the-middle" techniques previously disclosed in Buruganahalli, which uses them in essentially the same way as described in the patent.

We find Patent Owner's primary argument—that Buruganahalli does not disclose applying the claimed rule set to encrypted packets—unpersuasive because the '856 patent *also* does not describe applying the claimed rules to encrypted packets.  The claims were originally drafted to cover the hello message technique used with *encrypted* packets but were rejected.  To secure allowance, the applicant amended the claims to add a set of criteria that the patent describes applying to *decrypted* packets in the distinct man-in-the-middle technique.  The issued claims thus seem to recite filtering encrypted packets using a set of criteria appropriate for decrypted packets, without any explanation of how that can be done.

However, one of the criteria used with the decrypted packets is a Uniform Resource Indicator ("URI"), which, we find, is a term that covers the domain name used in the hello message technique.  We thus conclude that Buruganahalli discloses the claimed steps of (a) receiving network-threat indicators including a domain name; (b) identifying packets with unencrypted and encrypted data; (c) determining, based on unencrypted data corresponding to a threat indicator (i.e., a hello message domain name), packets with encrypted data that corresponds the threat indicators (identified as being in the same "flow" or "session" as the packet with the hello message domain name); (d) filtering both types of packets (the flow/session) based on a URI (the domain name); and (e) routing both types of packets to a proxy system (that then applies the man-in-the middle technique).

## II.    BACKGROUND

*A.    Background*

Palo Alto Networks, Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 24, and 25 of U.S. Patent No. 9,917,856 B2 (Ex. 1001, "the '856 patent") under 35 U.S.C. §§ 311–319.  Paper 2 ("Pet.").  Centripetal Networks, Inc. ("Patent Owner") filed a Preliminary Response, Petitioner filed a Preliminary Reply, and Patent Owner filed a Preliminary Sur-reply.  *See* Paper 6; Paper 9; Paper 10.  On May 25, 2022, the Board instituted an *inter partes* review of all challenged claims.  *See* Paper 11 ("Decision"), 91.

In June of 2022, Patent Owner requested rehearing of the Institution Decision, arguing that the Board misapprehended or overlooked various matters. *See* Paper 13.  Patent Owner also requested that the Precedential Opinion Panel ("POP") review the Institution Decision.  *See id*. at 1.

Patent Owner then filed a Response (Paper 24, "PO Resp."), Petitioner filed a Reply (Paper 29, "Reply"), and Patent Owner filed a Sur-Reply (Paper 36, "Sur-Reply").

On December 6, 2022, the POP denied the request for POP review, and on January 4, 2023, as the POP process had completed, the panel denied the rehearing request.  *See* Papers 31, 40.

Cisco Systems, Inc. and Keysight Technologies, Inc. filed petitions and motions for joinder in IPR2022-01151 and IPR2022-01199, respectively, and have been joined in this proceeding.  *See* Papers 39, 41.

An oral hearing was held on February 15, 2023, and a transcript of the hearing is included in the record, as are the demonstratives.  *See* Paper 66 ("Transcript"); Ex. 1056 (Petitioner Demonstratives); Ex. 2046 (Patent Owner Demonstratives).

We issue this Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 and, for the reasons that follow, determine that Petitioner has shown by a preponderance of the evidence that claims 1, 24, and 25 are unpatentable.

B.    *Related Matters*

Petitioner and Patent Owner identify the following civil action involving the '856 patent: *Centripetal Networks, Inc. v. Cisco Systems, Inc.*, No. 2:18-cv-00094 (E.D. Va.).  Pet. 5; Paper 4, 1.  That case went to a bench trial and the District Court found claims 24 and 25 of the '856 patent infringed and not proven invalid.  *See* Ex. 1027, 57, 67.  The Federal Circuit subsequently vacated the judgment because it found that the presiding judge was disqualified due to his wife's ownership of Cisco stock.  *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1027 (Fed. Cir. 2022).  The District Court did not consider the prior art addressed in this decision because the validity defense presented by Cisco for the '856 patent at trial was that the accused products were in the prior art.  *See* Ex. 1027, 60 ("Dr. Schmidt, in his invalidity testimony, assumed the infringement analysis by Dr. Cole and opined that all of the same functionality that Dr. Cole relies on for infringement was in the accused products prior to the priority date of the '856 Patent.").  The District Court has set a new trial date of June 22, 2023.  *See* Paper 61, 10.

Petitioner identifies the following civil action in which Patent Owner asserted the '856 patent against joined party Keysight Technologies:  *Centripetal Networks, Inc. v. Keysight Technologies, Inc. et al.*, No. 2:17-cv-00383 (E.D. Va. filed July 20, 2017).  Pet. 5.

*C.    The '856 Patent*

*1.    Specification*

The '856 patent (Ex. 1001) is titled "Rule-Based Network-Threat Detection for Encrypted Communications" and issued on March 13, 2018, from an application filed on December 23, 2015.

According to the patent, network threats may "take a variety of forms (e.g., unauthorized requests or data transfers, viruses, malware, large volumes of traffic designed to overwhelm resources, and the like)." Ex. 1001, 1:8–11.  The patent explains that network-threat services may "provide information associated with network threats, for example, reports that include listings of network-threat indicators (e.g., network addresses, domain names, uniform resource identifiers (URIs), and the like)." *Id*. at 1:11–15.  The patent further explains that encrypted communications may "obfuscate data corresponding to network threats." *Id*. at 1:17–18.  The patent then identifies "a need for rule-based network-threat detection for encrypted communications." *Id*. at 1:18–20.

To address that alleged need, the '856 patent describes "a packet-filtering system configured to filter packets in accordance with packet-filtering rules" that receives "data indicating network-threat indicators." Ex. 1001, 1:32–36.  The rules may "cause the packet-filtering system to identify packets comprising unencrypted data and packets comprising encrypted data." *Id*. at 1:36–39.  A "portion of the unencrypted data may correspond to one or more of the network-threat indicators" and the rules may "cause the packet-filtering system to determine, based on the portion of the unencrypted data, that the packets comprising encrypted data correspond to the one or more network-threat indicators." *Id*. at 1:39–45.

6

    *a.    Structure*

    Figure 1 of the '856 patent shows an overall environment for rule-based threat detection:



*"FIG. 1 depicts an illustrative environment for rule-based network-threat detection for encrypted communications." Ex. 1001, 1:57–58.*

    The environment includes network 102, "associated with one or more individuals or entities," and network 104, which is "the Internet, a similar network, or portions thereof." Ex. 1001, 2:20–34. Network 102 includes "hosts 106, 108, and 110, proxy devices 112, 114, and 116, web proxy 118, rule gates 120, 122, 124, 126, and 128, domain name system (DNS) 130, Internet content adaptation protocol (ICAP) server 132, and gateway 134." *Id.* at 2:39–43. Network 104 includes "one or more rule providers 138, one or more threat-intelligence providers 140, and hosts 142, 144, and 146." *Id.* at 2:53–56. Gateway 134 serves as an interface between the networks. *See id.* at 2:50–60.

Figure 2 is a more detailed illustration of the structure of the patent's packet filtering system:



*"FIG. 2 depicts an illustrative packet-filtering system for rule-based network-threat detection." Ex. 1001, 1:60–62.*

The system includes "processors 202," "memory 204," "communication interfaces 206," and "data bus 208." Ex. 1001, 2:64–3:2.

Memory 204 includes (A) "program modules 210" with instructions to cause the system to perform certain functions; (B) "rules 212," "in accordance with which [the system] is configured to filter packets"; and (C) "logs 214" with "entries generated . . . in accordance with rules 212 for packets received" by the system. *Id*. at 3:4–14. Communication interfaces 206 may "interface" the packet-filtering system with "communication links" of networks 102 and 104, either directly, such as by links 236 and 244, or indirectly, such as by network device 240 or tap devices 238 and 242. *Id*. at 3:15–31. The system may "provision" the tap devices with rules to cause the tap devices to identify packets traversing the links that correspond to specified criteria "and route (or forward) the packets (or copies thereof)" to the taps. *Id*. at 3:31–36.

8

Figures 3A–C illustrate the operation of the system, and portions of Figures 3A and 3B are shown below, spliced together and annotated for reference:



*Board Annotated Version of Figures 3A and 3B of the '856 Patent*

###### b. Generate and Provision Rules

At **step 1**, "threat-intelligence providers 140 . . . communicate one or more threat-intelligence reports to rule providers 138." Ex. 1001, 3:65–67. At **steps 2– 4**, the rule provider(s) generate rules and send them to rule gate 120, which may use the "packet-filtering rules" to configure the rules to cause the system "to identify packets comprising data corresponding to at least one of the plurality of network-threat indicators." *Id*. at 4:16–21.

###### c. Domain Name Lookup

At **step 5**, "host 106 may generate a request." Ex. 1001, 4:22. For example, the host "may execute a web browser, and the web browser may generate a request in response to user input (e.g., navigation of the web browser to a URI)." *Id*. at 4:22–25.

At **step 6**, the host may generate a DNS query with the domain name from the request and send the query to domain name server 130.[2] If the domain name corresponds to a network-threat indicator, the rules may cause the rule gate 126 to (A) "identify one or more packets comprising the DNS query," (B) "determine that the packets comprise the domain name corresponding to the network-threat indicator," and/or (C) "responsive to" the identifying or determining, log and/or drop the packets. Ex. 1001, 4:29–42. The log data may include, for example, data indicating the host's network address. *See id*. at 4:39–46. Steps 6A and 6B depict packets being sent to the domain name server or dropped, respectively.

**Step 7** is a response from the domain name server, which may include a domain name corresponding to a network-threat indicator. As in step 6, the rules may cause rule gate 126 to (A) "identify" packets, (B) "determine that the packets

---

[2] "DNS" stands for Domain Name System, and a DNS query seeks an IP address for a given domain name. *See* Ex. 1007, 8–9.

comprise the domain name corresponding to the network-threat indicators," and (C) "responsive to" the identifying or determining, log and/or drop the packets. Ex. 1001, 4:54–64. As in step 6, the rule gate may generate log data, including host's address, and packets may be sent on or dropped. *See id*. at 4:64–5:15.

The Specification explains that the system may be configured to "correlate" packets of the unencrypted DNS query and reply, using the data that was stored in the logs. *See* Ex. 1001, 5:15–30. This may be done with network layer information, transport layer information, application layer information, other data in the packets, or environmental variables. *See id*. at 5:15–6:6.

<div align="center">

d.    *Proxy System and Unencrypted Connection Sessions*

</div>

At **step 8**, host 106 "may generate one or more packets destined for host 142 comprising data (e.g., a TCP:SYN handshake message) configured to establish a connection (e.g., a TCP connection or tunnel) between hosts 106 and 142" and "may communicate the packets toward host 142." Ex. 1001, 6:17–21. The rules may cause rule gate 120 to (A) identify the packets or (B) determine that the packets include data corresponding to the network-threat indicators by correlating the packets with previous packets. *See id*. at 6:24–32.

At **step 9**, rule gate 120 may "route" the packets with the connection data to proxy device 112 and, at **step 10**, rule gate 120 may "communicate" the packets to proxy device 112. *See* Ex. 1001, 6:33–36. The rules may cause rule gate 120 to "route" the packets to proxy device 112 based on data in the packets indicating the connection between hosts 106 and 142 will be encrypted. *See id*. at 6:36–45. The rules also may cause rule gate 120 to route the packets to proxy device 112 if a host is associated with a network address for which the rules indicate that encrypted communications should be established. *Id*. at 6:45–52.

<div align="center">

11

</div>

Proxy devices 112, 114, and 116 may be part of a "proxy system" used to "to filter packets comprising encrypted data based on information within the encrypted data." Ex. 1001, 6:53–56. The rules may be configured "to cause rule gate 120 to route the packets to proxy device 112 based on a determination that host 142 is associated with a network address of a domain corresponding to the network-threat indicators." *Id.* at 6:56–59. The network 102 may also include hosts for which the rules indicate that encrypted communication sessions should or should not use proxy devices. *Id.* at 6:60–7:11.

At **step 11**, proxy devices 112 and 114 exchange parameters determined from the configuration packets, such as network addresses in network-layer headers or ports indicated by transport-layer headers. *See* Ex. 1001, 7:33–40. Proxy device 112 uses the parameters to generate packets to establish a connection between proxy device 112 and host 106 and, at **step 12**, communicates the packets to host 106. *Id.* at 7:41–45. The rules may cause rule gate 120 to (A) identify packets, (B) "determine . . . that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets" with the earlier packets, and (C) "log [and/or] drop the packets." *Id.* at 7:45–55.

Proxy device 114 similarly uses parameters to generate packets to establish a connection between proxy device 114 and host 142 and, at **step 13**, communicates the packets to host 142. Ex. 1001, 7:56–60. On this side of the proxy system, the rules may be configured to cause rule gate 128 to identify packets, determine that the packets include data corresponding to the network-threat indicators by correlating the packets with earlier packets, log packets, and/or drop packets. *Id.* at 7:56–8:5.

Next, host 106 may generate packets to establish a connection between proxy device 112 and host 106 and, at **step 14**, communicate the packets to proxy

device 112. Ex. 1001, 8:7–11. The rules may cause rule gate 120 to identify packets, determine that the packets include data corresponding to the network-threat indicators by correlating the packets with earlier packets, log packets, and/or drop packets. *Id*. at 8:11–21.

Host 142 may then generate packets to establish a connection between proxy device 114 and host 142 and, **at step 15**, may communicate the packets to proxy device 114. Ex. 1001, 8:22–27. In response, proxy device 114 may generate packets comprising data configured to establish the connection between proxy device 114 and host 142 and, **at step 16**, communicates the packets to host 142. For each of those communications, the rules may cause rule gate 128 to identify packets, determine that the packets include data corresponding to the network-threat indicators by correlating the packets with earlier packets, log packets, and/or drop packets. *See id*. at 8:38–53.

> e.  *Establish Encrypted Connection Sessions*

At **step 17** and **step 18**, the proxy devices and hosts for each connection exchange data to establish encrypted communication sessions 306 and 308 corresponding to the unencrypted connection sessions 302 and 304. *See* Ex. 1001, 8:65–9:65.

At **step 17**, the rules may be configured to (A) identify the packets, (B) "determine . . . that the packets comprise data corresponding to the network-threat indicators, for example, *by correlating the packets*" with previous packets, and (C) log and/or drop the packets. Ex. 1001, 9:2–12 (emphasis added).

The rules also may cause rule gate 120 to (A) identify the packets or (B) "determine that the packets comprise data corresponding to the network-threat indicators *based on data included in the packets*." Ex. 1001, 9:14–16 (emphasis added). Specifically, the patent explains that the packets may include handshake

13

messages with "unencrypted data including a domain name corresponding to the network-threat indicators, for example, a hello message generated by the client . . . or a certificate message generated by the server." *Id*. at 9:21–25. The rules may cause rule gate 120 to (A) identify the packets and/or (B) "determine that the packets comprise data corresponding to the network-threat indicators based on data included in the one or more handshake messages." *Id*. at 9:29–32. Unencrypted information from the certificate message may also be used in the same way. *See id*. at 9:33–46.

The use of the rules at **step 18** includes (A) identifying the packets, (B) determining that the packets comprise data corresponding to the network-threat indicators, for example, *by correlating*, and (C) logging and/or dropping the packets. *See* Ex. 1001, 9:47–65. However, the correlating in this step uses either "one or more packets previously determined . . . to comprise data corresponding to the network-threat indicators" or "the packets comprising [the] handshake messages configured to establish session 308 that comprise unencrypted data (e.g., including the domain name) corresponding to the network-threat indicators." *Id*. at 9:56–65.

f.     *Send Encrypted Packets to Proxy System*

At **step 19**, the two encrypted communication sessions have been established and "host 106 may generate packets comprising data encrypted in accordance with one or more parameters of session 306" and "communicate the packets to proxy device 112 via session 306." Ex. 1001, 9:66–10:2. The rules may cause rule gate 120 to (A) identify the packets," (B) "determine . . . that the packets comprise data corresponding to the network-threat indicators, for example, *by correlating the*

*packets*" with previous packets, and/or (C) "log and/or drop the packets." *Id*. at 10:3–14 (emphasis added).[3]

This step is illustrated in orange in the Board's annotated version of Figures 3A and 3B (page 9, *supra*), with rule gate 120 (RG1) acting on *encrypted* packets between host 106 (Host1) and proxy device 112 (PD1).

> g.    *Proxy System*

At **step 22**, "[p]roxy device 112 may generate packets" and communicate [them] to proxy device 114." Ex. 1001, 10:56–58. Rule gate 124 may access "a communication link internal to the proxy system comprising proxy devices 112 and 114," and, thus, "packets traversing the communication link may comprise unencrypted data," such that "rule gate 124 may be 'the man in the middle' of proxy devices 112 and 114." *Id*. at 10:59–63.

The rules may cause rule gate 124 to (A) identify the packets, (B) "determine . . . that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets" with previous packets, and/or (C) log and/or drop the packets. Ex. 1001, 10:65–11:7.

In addition, the rules may cause rule gate 124 to (A) identify the packets or (B) "determine that the packets comprise data corresponding to the network-threat indicators *based on data included in the packets*, for example, *unencrypted data* in the packets corresponding to one or more of the network-threat indicators." Ex. 1001, 11:9–13 (emphasis added). In particular, the rules may cause rule gate 124 to "determine that the packets comprise data corresponding to the network-threat indicators based on the packets including [1] a URI . . . , [2] data indicating a

---

[3] Steps 20 and 21 involve communications between proxy device 112 and an "Internet content adaptation protocol (ICAP) server." *See* Ex. 1001, 2:42–43, 10:15–55.

protocol version . . . , [3] data indicating a method . . . , [4] data indicating a request . . . , [5] or data indicating a command . . . ." *Id*. at 11:19–28. This is the set of rules recited in the independent claims.

This step shown in red in the Board's annotated version of Figures 3A and 3B (page 9, *supr*a), with rule gate 124 (RG3) acting on unencrypted packets between proxy device 112 (PD1) and proxy device 114 (PD2).

> h.  *Send Encrypted Packets to Destination*

Proxy device 114 receives the packets and generates corresponding packets with data that is encrypted according to the parameters of session 308 and, at **step 23**, communicates the packets to host 142. *See* Ex. 1001, 11:36–40.

The rules cause rule gate 128 to (A) identify the packets, (B) "determine . . . that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets" with previous packets, and/or (C) log and/or drop the packets. Ex. 1001, 11:41–50.

This step is illustrated in orange in the Board's annotated version of Figures 3A and 3B, with rule gate 128 (RGN) acting on encrypted packets between proxy device 114 (PD2) and host 142 (Host1).

The process then continues with similar communications between host 142 and host 106, and rules applied in a similar fashion by rule gates 120, 124, and 128. *See* Ex. 1001, 11:51–12:27.

i.    *Figure 7 Flowchart*

Figure 7, reproduced below, is a flowchart for a "method for rule-based network-threat detection for encrypted communications." Ex. 1001, 23:63–65.



In **step 702**, "a packet-filtering system may receive data indicating network-threat indicators," for example, rules generated by rule providers 138 based on "network-threat indicators provided by threat-intelligence providers 140." Ex. 1001, 23:66–24:4. In **step 704**, "the packet-filtering system may configure packet-filtering rules in accordance with which it is configured to filter packets." *Id*. at 24:4–6.

In **step 706**, "the packet-filtering system may identify packets comprising unencrypted data," such as "a DNS query, a reply to a DNS query, or a handshake message configured to establish an encrypted communication session." Ex. 1001, 24:8–12. In **step 708**, "the packet-filtering system may identify packets comprising encrypted data." *Id*. at 24:13–17.

In **step 710**, "the packet-filtering system may determine based on a portion of the unencrypted data corresponding to the network-threat indicators that the packets comprising encrypted data correspond to the network-threat indicators." Ex. 1001, 24:18–21. For example, the system "may determine that a domain name included in the DNS query, the reply to the DNS query, or the handshake message corresponds to the network-threat indicators, and packet-filtering system 200 may determine that one or more of the packets" encrypted according to an SSL/TLS protocol "correlate to one or more packets comprising the DNS query, the reply to the DNS query, or the one or more handshake messages." *Id*. at 24:22–30.

Figure 7 thus describes looking for packets with network threat indicators in unencrypted information (e.g., a domain name in a hello message) and then determining that other, encrypted packets correlate to those packets.

## 2. *File History*

We discuss the prosecution history of the '856 patent in detail below because it bears on Patent Owner's arguments.

The application that issued as the '856 patent was filed with independent method claim 1, and corresponding independent system and computer readable media claims 24 and claim 25. *See* Ex. 1002, 43–49. Our discussion focuses on claim 1, but the same considerations apply to claims 24 and 25.

Original claim 1 read as follows:

1. A method comprising:

receiving, by a packet-filtering system configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators; and

configuring, by the packet-filtering system, the plurality of packet-filtering rules to cause the packet-filtering system to:

identify packets comprising unencrypted data;

identify packets comprising encrypted data; and

determine, based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, that the packets comprising encrypted data correspond to the one or more network-threat indicators.

Ex. 1002, 43.

Claim 1 thus originally recited (1) receiving data indicating a plurality of network-threat indicators, (2) configuring rules to identify packets with unencrypted data and identify packets with encrypted data, and (3) determining, based on a portion of the *unencrypted* data corresponding to a network-threat indicator, that the packets with *encrypted* data correspond to the network-threat indicator.

This is consistent with the Figure 7 flowchart and the operation of rule gates 120 and 128 in Figure 3B, as described above, where the packets with the unencrypted data would be the handshake packets with a domain name in the hello message, and the packets with the encrypted data would be encrypted packets that are correlated to the handshake packet.

19

The Examiner rejected the claims under § 103 as unpatentable over Spies and Sorensen,[4] citing Spies for most of the claimed subject matter and Sorensen for network-threat indicators. *See* Ex. 1002, 1070–72.

In an effort to overcome the rejection, the applicant amended claim 1 as follows:

1.  A method comprising:

receiving, by a packet-filtering system <u>comprising a hardware processor and a memory and</u> configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators; ~~and~~

~~configuring, by the packet~~ filtering ~~system, the plurality of packet filtering rules to cause the packet filtering system to:~~

~~identify~~ <u>identifying</u> packets comprising unencrypted data;

~~identify~~ <u>identifying</u> packets comprising encrypted data; ~~and~~

<u>determining, by the packet-filtering system and</u> ~~determine,~~ based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, ~~that the~~ packets comprising encrypted data <u>that corresponds</u> ~~correspond~~ to the one or more network-threat indicators<u>; and</u>

<u>filtering, by the packet-filtering system:</u>

<u>packets comprising the portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators;</u>

<u>and the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators.</u>

*See* Ex. 1002, 1352.

---

[4] "Spires" is U.S. Patent App. Pub. No. 2005/0138353 A1 and "Sorenson" is U.S. Patent App. Pub. No. 2012/0023576 A1. The Examiner also rejected claims 1, 24, and 25 under § 101, and under § 112(b) due to an "antecedent basis error." *See* Ex. 1002, 1064–69. Those rejections were overcome, but are not discussed further because they are not pertinent to our analysis.

This amendment addressed the Section 101 rejection and added that, in addition to determining that packets with encrypted data correspond to the indicators, the method would "filter" both the unencrypted and encrypted packets.

The applicant's attorney and the Examiner then conducted an interview, during which the Examiner "confirmed authorization from Attorney of record . . . to implement Examiner's Amendment based on Applicant's proposed examiner's amendment submitted by email on 12/06/2017." Ex. 1002, 1391.

The Examiner subsequently entered an amendment, presumably as submitted by the applicant.[5] Claim 1 was amended as follows:

1.   A method comprising:

receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the one or more network-threat indicators comprise a domain name identified as a network threat;

identifying packets comprising unencrypted data;

identifying packets comprising encrypted data;

determining, by the packet-filtering system and based on a portion of the

unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators; and

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

---

[5] The email with the proposed amendment does not appear to have been made of record in the prosecution.

packets comprising the portion of the unencrypted data that corresponds ~~corresponding~~ to one or more network-threat indicators of the plurality of network-threat indicators; and

the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Ex. 1002, 1380–81.

Essentially, the examiner's amendment added that (a) the network threat indicators include a domain name, (b) the filtering is based on a URI or one of four other types of data in the packets, and (c) the filtered packets are routed to a "proxy system" based on the determination that they include data corresponding to a threat indicator. The Examiner then allowed the claims. *See* Ex. 1002, 1386–1389.[6]

There appears to be a problem with the examiner's amendment, which complicates the patentability analysis, at least as argued by Patent Owner, because the rules that were added to the claim by the amendment are those that the patent describes applying in *step 22*, by rule gate 124, which is operating on *decrypted* packets. The patent does not describe filtering *encrypted* packets using that set of rules and, indeed, it does not appear possible to apply some of those rules to encrypted packets because at least some of the data (i.e., the protocol version, method, request, or command) would be encrypted. There is nothing in the patent that explains how to apply those rules to a packet without decrypting it first.

In addition, the patent does not appear to describe routing packets filtered using the claimed rules to a proxy system, because those rules are applied *within the proxy system*, not prior to routing to the proxy system, and the rules are only

---

[6] Patent Owner amended claims 1, 24, and 25 after allowance to make minor changes. *See* Ex. 1002, 1414, 1420–22.

described as being used to "identify the packets or determine that the packets comprise data corresponding to the network-threat indicators," not as a basis for further routing. *See* Ex. 1001, 11:8–35.[7]

These issues are material to our analysis because Patent Owner's primary argument is that "Buruganahalli does not teach rule-based filtering of encrypted packets, as recited in each of the Challenged Claims." PO Resp. 31; *see id*. at 20 (asserting that the patent's steps 19 and 23 "use rules to filter encrypted packets without decryption—an important difference over Buruganahalli as it was during prosecution and the Cisco litigation").

To be clear, to the extent the '856 patent describes filtering encrypted packets, it does so (a) by *correlation* at steps 19 and 23, for example, not by applying rules directly to encrypted packets, or (b) by *decrypting* the packets in the proxy system and applying the rules recited in the claims after the packets are decrypted.[8]

### 3.   *The Challenged Claims*

Petitioner challenges independent claims 1, 24, and 25. *See* Pet. 8. Claim 1 recites a method for filtering and routing packets comprising several steps. Claim 24 recites a system with a processor and a memory storing instructions for

---

[7] We do not consider whether these issues might give rise to a problem under 35 U.S.C. § 112 because this proceeding is limited to grounds "that could be raised under section 102 or 103." *See* 35 U.S.C. § 311(b).

[8] Notably, original dependent claim 14 recited applying the claimed rules to packets "generated by the proxy system," presumably referring packets that were generated by the proxy system's decryption of encrypted packets. *See* Ex. 1002, 47 (emphasis added).

performing steps similar to those of claim 1, and claim 25 recites a computer-readable medium with instructions for performing steps similar to those of claim 1.

Claim 1, which thus exemplifies the subject matter of the challenged claims, reads as follows (with some formatting added for clarity):

1. A method comprising:

receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;

[1.b] identifying packets comprising unencrypted data; [1.c] identifying packets comprising encrypted data; [1.d] determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and

the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Ex. 1001, 25:14–49.

D.    *Level of Ordinary Skill in The Art*

The level of skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis.  *See Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).  The level of skill in the art also informs the claim construction analysis.  *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015) (explaining that claim construction seeks the meaning "a skilled artisan would ascribe" to the claim term "in the context of the specific patent claim").

Petitioner asserts that a person of ordinary skill in the art "would have had a bachelor's degree in computer science, computer engineering, or an equivalent, and four years of professional experience" and that "[l]ack of work experience could be remedied by additional education, and vice versa."  Pet. 16 (citing Ex. 1003 ¶¶ 29–30).

Patent Owner argues that a person of ordinary skill in the art at the time of the invention "would have had a bachelor's degree in computer science or a related field, and either 2 or more years of industry experience and/or an advanced degree in computer science or a related field."  PO Resp. 26 (citing Ex. 2026 ¶¶ 26–30).

Neither side argues there is a difference in the competing proposals that would affect the patentability analysis or otherwise change the outcome.  As we did at institution, we will apply Petitioner's description of an ordinarily skilled artisan, as we find it consistent with the '856 patent and the asserted prior art.

E.    *Claim Construction*

Petitioner contends that the term "network-threat indicators" should be construed to mean "indicators that represent the identity of a resource associated with a network threat," a construction Petitioner argues is consistent with the '856 patent's specification and was adopted in IPRs filed against other of Patent

Owner's patents in which this same claim term appears. *See* Pet. 17 (citing Ex. 1001, 1:11–15, 3:65–4:4; Ex. 1003 ¶¶ 20–23, 85–87). Petitioner contends that "[a]ll other terms should be accorded their plain and ordinary meaning." *Id*. (citing Ex. 1003 ¶¶ 83–84).

Patent Owner argues that "Petitioner has not met its burden to address multiple district court claim constructions of 'network-threat indicators' and 'proxy system.'" PO Resp. 26. According to Patent Owner, "the Petition violates 37 C.F.R. §§ 42.104(b)(3) and 42.104(b)(4)" and "[t]he Board cannot cure this failure of compliance post-institution." *Id*. at 27. However, Patent Owner does not offer its own constructions for these terms or assert that Petitioner's construction of "network-threat indicators" is incorrect.

The Petition does not violate our rules. Rule 42.104(b)(3) simply requires that the Petition set forth "[h]ow the challenged claim is to be construed," which Petitioner has done by asserting that the language of the claims is entitled to its ordinary meaning, except for "network-threat indicators," for which Petitioner proposes a construction. Rule 42.104(b)(3) requires that the Petitioner set forth "[h]ow the construed claim is unpatentable under the statutory grounds identified" and "specify where each element of the claim is found in the prior art patents or printed publications relied upon," which Petitioner has also done. *See* Pet. 18–50. A petition must be complete and sufficient as presented, but we are aware of nothing that would require a Petitioner to base its unpatentability arguments in a petition on any particular claim construction.

Moreover, while it is true that the District Court's construction of "network-threat indicators" uses different words than the construction offered for that term in the Petition, it appears to be very similar substantively, and Patent Owner does not identify any difference that would have a material impact on our analysis.

Because we find Patent Owner's arguments unpersuasive, and because we find that Petitioner's proposed construction of "network-threat indicators" is consistent with how the term is used in the '856 patent, we apply Petitioner's proposed construction in this decision.

## III.    PATENTABILITY ANALYSIS

The Petition asserts that independent claims 1, 24, and 25 would have been obvious in view of Buruganahalli.[9]  The Petition then asserts that those same claims would have been obvious in view of Buruganahalli and Baehr.[10]

However, because Petitioner cites Baehr in the event the "proxy system" needs to be a separate system,[11] and no party requests a claim construction requiring that, or otherwise argues that the proxy system must be separate, we find that we need not address Baehr, and thus consider only the ground based on Buruganahalli alone.

*A.    Overview of Buruganahalli*

Buruganahalli is a U.S. patent titled "Destination Domain Extraction for Secure Protocols," that discloses "techniques for destination domain extraction for secure protocols."  Ex. 1001, 4:47–50.  It was a continuation of U.S. Patent Application No. 13/951,320, which was filed on July 25, 2013, and issued on June 13, 2017 as U.S Pat. No. 9,419,942.  The 2013 priority date makes Buruganahalli prior art to the '856 patent under §102(a)(2).  Palo Alto Networks was the applicant and original assignee.

---

[9] US 9,680,795 B2, issued June 13, 2017 (Ex. 1004).

[10] US 5,878,231, issued March 2, 1999 (Ex. 1005).

[11] *See* Transcript 11–12 ("[Q:] Is the Baehr reference in the case -- in case a proxy needs to be a separate system? . . . [Petitioner's counsel:] Right.").

Buruganahalli explains that "[f]irewalls typically deny or permit network transmission based on a set of rules," which are "often referred to as policies (e.g., network policies or network security policies)" and that, "[f]or example, a firewall can filter inbound traffic by applying a set of rules or policies to prevent unwanted outside traffic from reaching protected devices." Ex. 1004, 2:61–66.

Buruganahalli describes "stateless packet filtering firewalls" that "inspect the individual packets themselves and apply rules based on the inspected packets (e.g., using a combination of a packet's source and destination address information, protocol information, and a port number)." Ex. 1004, 3:2–24. It also describes "stateful firewalls" in which "each packet is examined within the context of a series of packets associated with that network transmission's flow of packets/packet flow." *Id*. at 3:40–44. Such firewalls "maintain[] records of all connections passing through the firewall and [are] able to determine whether a packet is the start of a new connection, a part of an existing connection, or is an invalid packet," and "the state of a connection can itself be one of the criteria that triggers a rule within a policy." *Id*. at 3:44–50.

One problem, however, was that "secure protocols [could] be used to evade detection by security devices, such as firewalls, by encrypting data communications between a client and a remote server." Ex. 1004, 4:16–19. Buruganahalli thus explains that "techniques for decrypting . . . secure communications are needed in order to monitor such encrypted data communications and to apply filtering based on a policy." *Id*. at 4:20–22.

Buruganahalli further explains that "it would be desirable and efficient to further facilitate policy-based filtering on . . . data communication flows (e.g., sessions) prior to the set-up of the encrypted data communication for such flows (e.g., to monitor the initial unencrypted/clear text data communications exchanged

as part of an initial handshake to setup a secure connection for a new session between a client and a remote server, which is prior to the establishment of the secure communication channel/tunnel after which any data communications intercepted between the client and the remote server would be encrypted)." Ex. 1004, 4:33–44.

The reference explains that "as part of a TLS protocol exchange, a client hello is generally the first message sent by a client to a remote server," but that an IP address in such a message is "often not accurate, because it is possible that a single IP address in the cloud can be hosting multiple virtual domains" such that "there is no easy way for the client to indicate to the server as to which domain" is the actual target. Ex. 1004, 4:59–64. However, Buruganahalli further explains that "a Server Name Indication (SNI) was added as part of the TLS protocol standard extension to the client hello message in order to allow the remote server to overcome this ambiguity." *Id*. at 4:64–5:1. The SNI "indicates what hostname (e.g., destination domain) that the client is attempting to connect to at the start of the hand shaking process for setting a secure TLS communication channel/session between a client and a remote server." *Id*. at 5:6–10.

Buruganahalli describes how the SNI extension can be used "as a mechanism to facilitate destination domain extraction for secure protocols without requiring decryption." Ex. 1004, 5:25–27. In particular, a firewall can "extract the hostname data from the SNI field (e.g., server name field of the SNI extension), which is sent as an unencrypted data communication from the client" to the server "at the start of the handshaking process for setting up a secure TLS communication channel/session between a client and a remote server)." *Id*. at 5:29–35. The "extracted hostname data (e.g., destination domain) can then be used by the firewall to perform an action(s) based on a firewall policy." *Id*. at 5:35–37.

The reference explains that "if a new flow is determined to violate a policy prior to the set-up of the encrypted data communication for that flow between a client and a remote server, then the flow can be blocked and decryption is not required." Ex. 1004, 5:65–6:1.

Alternately, the system may "determine whether a new session using a secure protocol should be initially allowed based on a policy (e.g., security policy, such as a firewall policy), and then to further monitor encrypted data communications associated with the session." Ex. 1004, 6:13–16. For example, "if a flow is initially determined to be permissible based on a policy prior to the set-up of the encrypted data communication for that flow between a client and a remote server, then the flow can be allowed, and a policy may require that the session be decrypted for further analysis and further potential filtering based on the policy." *Id*. at 6:17–23.

Buruganahalli also explains that the destination domain extraction can include "applying a security policy based on the destination domain to filter traffic at the security device." Ex. 1004, 7:39–42. The security policy can include a "malware detection policy," a "whitelist/blacklist policy," "and/or a uniform resource locator (URL)/category filtering policy." *Id*. at 7:43–51. The "whitelist/blacklist policy" involves not decrypting a session if the destination domain is on the whitelist, and decrypting a session if the destination domain is on the blacklist. *See id*. at 7:52–67.

The reference also explains that the "destination domain extraction may include monitoring encrypted network communications between a client and a remote server," such as with "man-in-the-middle decryption techniques" in which the "network communications are encrypted," and "performing an action based on

the decrypted network communications between the client and the remote server."
Ex. 1004, 8:45–54.

### 1. Architecture

Buruganahalli's Figure 1 shows the overall architecture:



*"FIG. 1 is a functional diagram of an architecture of a security device that can be used for destination domain extraction for secure protocols in accordance with some embodiments." Ex. 1004, 1:46–49.*

IP address and port engine 104 "determines an IP address and port number for a monitored traffic flow (e.g., a session) based on packet analysis," and "policy check engine 106 determines whether any policies can be applied based on the IP address and port number." Ex. 1004, 9:26–32. Application signature check engine 108 then "identifies an application," for example, determining what type of traffic the session involves (HTTP, SSL/TLS, etc.)" to allow an "appropriate decoder, such as decoders 112, 114, and 116, to decode the classified traffic for each monitored session's traffic flow." *Id.* at 9:33–43.

The known protocol decoder engine 112 decodes and analyzes flows that use known protocols and reports the analysis to report and enforce policy engine 120. Ex. 1004, 9:45–48. For example, it can decode certain secure protocols, such as SSL/TLS, to provide domain extraction using various techniques, including "parsing a client hello message to extract a hostname that identifies the destination domain being requested by the client to the remote server." *Id*. at 9:55–57.

If the monitored traffic is encrypted, "the security device can be configured (e.g., based on a firewall policy) to decrypt the monitored traffic using a decrypt engine 110 (e.g., applying trusted man-in-the-middle techniques using a self-signed certificate)." Ex. 1004, 9:63–67. For example, "if the extracted destination domain is not trusted . . . then the firewall can be configured to decrypt the monitored traffic for further traffic monitoring and inspection based on a policy (e.g., a firewall policy)." *Id*. at 9:67–10:4.

Firewall 100 may also include content-ID engine 122, with content that can be used to provide, for example, URL/category filtering to enforce various security/firewall policies/rules. *See* Ex. 1004, 10:21–28.

     2.    *Hello Message Technique*

Buruganahalli's FIG. 3A is a block diagram illustrating an SSL/TLS session passing through a firewall:



*FIG. 3A depicts an illustrative event sequence*
*for rule-based network-threat detection.*

32

In such a session, the firewall can only inspect the handshake traffic, "as all the application data is encrypted." Ex. 1004, 10:60–61. Client 302 "establishes a secure tunnel session . . . with a remote server 306" and then "can use the secure tunnel to access a network service 308, which can be a network service activity that is in violation of one or more firewall policies/rules implemented by the firewall device 304." *Id.* at 10:61–67. Because "the firewall 304 typically cannot decrypt the encrypted secure tunnel session traffic" it "cannot detect such firewall policy/rule violation(s)." *Id.* at 11:4–6.

However, Buruganahalli explains that by using its destination domain extraction techniques, the firewall can apply its policies "prior to and/or without having to decrypt the encrypted secure tunnel session traffic." Ex. 1004, 11:17–19.

Specifically, the client identifies, in the hello message, which hostname it wants to setup the secure connection with so that the server knows which public certificate to send back to the client. Ex. 1004, 11:25–28. The firewall can intercept and decode this handshake exchange to extract the hostname from the client hello message in order to apply policies based on the destination domain. *Id.* at 11:47–51.

Buruganahalli's hello message technique is essentially identical to the '856 patent's description of using unencrypted data in handshaking packets, including data in a hello message, as a basis for applying a policy to a session.

### 3.    *Man-in-the-Middle Technique*

Buruganahalli also describes "techniques for intercepting and decoding encrypted tunneling communications from a client to a remote server," including "a trusted man-in-the-middle technique that can be used for intercepting and decoding encrypted tunneling communications to further monitor such traffic in clear text (e.g., unencrypted)." Ex. 1004, 11:59–65. Buruganahalli explains that

"[t]hese decryption techniques can be used in addition to and/or in combination with the . . . destination domain extraction for secure protocols to further enhance the various security and firewall related techniques disclosed herein." *Id*. at 11:66–12:3.

Buruganahalli's man-in-the-middle technique is described in connection with Figure 3B:



*FIG. 3B depicts an illustrative event sequence*
*for rule-based network-threat detection.*

In this method, client 312 attempts to establish an SSL session with a remote server 316 and "the SSL session request is intercepted and detected by the firewall 314," which "performs a trusted man-in-the-middle technique by effectively splitting the SSL session between the client 312 and the remote server 316 into two half sessions, shown as Session A and Session B." Ex. 1004, 12:7–18.

In Session A, "the firewall 314 acts as the remote server 316 such that it is transparent to the client 312 that it is not communicating directly with the remote server 316" and "traffic is encrypted using the session key S1." Ex. 1004, 12:18–21. In Session B, "the firewall 314 acts as the client 312 such that it is transparent to the remote server 316 that it is not communicating directly with the client 312" and "traffic is encrypted using the session key S2." *Id*. at 12:22–26.

After the handshaking is completed for Sessions A and B, "any data that is communicated from the client 312 to the firewall 314 is decrypted using a session key S1 and is then inspected by the firewall 314." Ex. 1004, 12:30–32. Firewall 314 is thus "between the client 312 and the server 316 and can present itself as server of the session to the client and can present itself as the client of the session to the server" allowing it to "inspect decrypted traffic and re-encrypt it before forwarding it to the other party." *Id*. at 12:56–61.

Buruganahalli's man-in-the-middle technique is essentially identical to the '856 patent's description—at step 22—of using a proxy system to decrypt packets so they can be filtered based on their contents.

### 4. Security Device

Buruganahalli's Figure 4 is "a block diagram illustrating another network architecture that can be used for destination domain extraction for secure protocols in accordance with some embodiments." Ex. 1004, 13:5–8.

"[C]lient devices 404A, 404B, and 404C are in communication with the Internet 406 via a security device 402," which may include a firewall that performs "some or all of the functions described . . . with respect to FIGS. 1 and 3B." Ex. 1004, 13:8–10, 13:21–22. In this embodiment, "detection of security policy violations and/or vulnerabilities based on destination domain extraction for secure protocols can be reported to the security cloud service 410 by the security device 402," and "the security device 402 can extract destination domain information" and provide it to the "security cloud service 410 [to] facilitate identification of new, zero-day threats, new vulnerabilities, prevent false positives, and/or provide a feedback loop for any of such activities or trends aggregated and correlated using the security cloud service." *Id*. at 13:40–51.

Figure 6, shown below, "is a representation of logical components that can be included in security device 402," including a management plane 602 and a data plane 604. Ex. 1004, 14:13–14.



*FIG. 6 is a functional diagram of logical components*
*of a security device. Ex. 1004, 2:1–2.*

The "management plane is responsible for managing user interactions, such as by providing a user interface for configuring policies and viewing log data" and the "data plane is responsible for managing data, such as by performing packet processing and session handling." *Id*. at 14:15–20.

If a client 404A attempts to access a server 408B using an encrypted session protocol, network processor 606 is "configured to receive packets from client 404A, and provide the packets to data plane 604 for processing," flow 608 "identifies the packets as being part of a new session and creates a new session

flow," and "[s]ubsequent packets will be identified as belonging to the session based on a flow lookup." Ex. 1004, 14:23–28.

"[A]n initial TLS handshake exchange of that flow can be parsed to extract a hostname" to "apply one or more policies if applicable based on the extracted destination domain" and "[i]f applicable (e.g., using one or more policies based on the extracted destination domain), SSL decryption is applied by SSL decryption engine 610." Ex. 1004, 14:28–36.

     *5.    Flowcharts*

Buruganahalli's Figures 7 and 8 are flowcharts corresponding to the hello message and man-in-the-middle techniques, respectively.

**B.    *Claim 1 in View of Buruganahalli***

     *1.    "[a] method"*

Petitioner contends that Buruganahalli discloses the preamble because it describes "a method for filtering packets in communications between a client and a remote server." Pet. 28 (citing Ex. 1004, 4:31–40).

Patent Owner does not argue that Buruganahalli does not disclose "a method," and we find that it does.

     *2.    "receiving, by a packet-filtering system . . . configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat"*

Petitioner asserts that Buruganahalli discloses "a packet-filtering system . . . configured to filter packets in accordance with a plurality of packet-filtering rules" because it describes a "packet-filtering firewall" that filters packets in accordance with a "set of rules . . . referred to as policies." Pet. 29 (citing Ex. 1004, 2:55–60,

5:35–43; 7:27–29, 7:42–67, 8:1–44, 14:58–67, 10:66–11:2, 15:37–45, Fig. 6; Ex. 1003 ¶ 107).

Petitioner argues that the system "receiv[es] . . . data indicating a plurality of network-threat indicators," because it receives a "blacklist" or data that identifies "threats" or "vulnerabilities." Pet. 30 (citing Ex. 1004, 7:42-67; 13:43-52; Ex. 1003 ¶¶ 59–63, 109). Specifically, Petitioner cites a passage of Buruganahalli describing how the blacklist "comprises network-threat indicators (e.g., whether a destination domain presents security risk)" using data "based on 'identification of new, zero-day threats, new vulnerabilities, prevent false positives, and/or provide a feedback loop for any of such activities or trends aggregated and correlated using the security cloud service.'" *Id*. at 30 (citing Ex. 1004, 13:43–52; Ex. 1003 ¶¶ 59–63, 109). Petitioner asserts that at least one of the threat indicators received in Buruganahalli is a "domain name." *Id*. at 29–30 (citing Ex. 1004, 5:35–43, 7:27–29, 8:1–44, 10:66–11:2, 14:60–67, 15:37–45; Ex. 1003 ¶ 108).

Patent Owner argues that Petitioner has not shown "network-threat indicators" in Buruganahalli because it "does not teach that the destination domains on its blacklist indicate network threats." PO Resp. 49 (citing Ex. 2026 Decl. ¶ 105). Patent Owner argues that Buruganahalli "never characterizes the blacklist as being associated with network threats," "is silent as to how the blacklist is formed," and "merely describes that the destination domains on the blacklist are used to decide whether to block or decrypt packets." *Id*. at 49–50. According to Patent Owner, "Buruganahalli's blacklist is simply a list of domains that a network administrator has identified for monitoring or blocking." *Id*. at 50 (citing Ex. 2026 ¶ 107; Ex. 1004, 5:64–6:38; Ex. 2006, 1:25–36). Patent Owner also argues that "Petitioner's expert characterized Buruganahalli's blacklist as a list of domains that represent ***potential*** threats." *Id*.

We agree with Petitioner that one of ordinary skill in the art would have understood that Buruganahalli's blacklist would include "data indicating a plurality of network-threat indicators," including "a domain name identified as a network threat." They are identified for monitoring or blocking precisely because they may represent a threat to the network. *See* Ex. 1004, 9:67–10:4 (explaining that "if the extracted destination domain is not trusted . . . then the firewall can be configured to decrypt the monitored traffic for further traffic monitoring and inspection based on a policy (e.g., a firewall policy)"). We find it sufficient that the threat be "potential" because, in practice, any such system would have no way of knowing for certain that a given domain was an actual threat, as, for example, the content existing at the domain could have changed or disappeared since the threat was identified.

Patent Owner also argues that the passage regarding the security device 402 shows that it is "the security service cloud 410—not Buruganahalli's firewall having the blacklist—that identifies threats, vulnerabilities, etc." PO Resp. 51.

This argument is not persuasive because the claim does not require that the system *identifies* the threat, only that it "receiv[e] . . . data indicating a plurality of network-threat indicators." Figure 4 of Buruganahalli shows cloud security service 410 that "aggregate[s] and correlate[s]," among other things, "new, zero-day threats" and "new vulnerabilities" and sends them to the local security device 402.

We conclude that Petitioner has shown this limitation to be met in Buruganahalli.

> 3. *"identifying packets comprising unencrypted data" and "identifying packets comprising encrypted data"*

Petitioner contends that Buruganahalli discloses identifying packets with *unencrypted* data, namely packets with the "unencrypted/clear text data

communications exchanged as part of an initial handshake" and in the "hello message." *See* Pet. 30–31 (citing Ex. 1004, 4:37–43, 10:54–61, 11:7–42, 12:32–36, 14:25–29). Petitioner further contends that Buruganahalli discloses identifying packets with *encrypted* data because it describes "Flow 608" that "identifies the packets as being part of a new session and creates a new session flow," such that "[s]ubsequent packets will be identified as belonging to the session based on a flow lookup." *Id*. at 32 (citing Ex. 1004, 4:31–44, 5:43–52, 5:62–6:22, 12:33–48).

Patent Owner does not argue that Buruganahalli does not disclose identifying packets with unencrypted data and packets with encrypted data, and we find that it does.

4.     *"determining . . . based on a portion of the unencrypted data corresponding to one or more network-threat indicators . . . , packets comprising encrypted data that corresponds to the one or more network-threat indicators"*

Petitioner asserts that Buruganahalli describes determining, based on a portion of the unencrypted data (e.g., data in the unencrypted handshake traffic) that corresponds to a network-threat indicator (a destination domain on the blacklist), encrypted packets that correspond to a network-threat indicator.

Specifically, Petitioner contends that Buruganahalli extracts a domain name from handshake data and determines whether the destination domain is on the blacklist, and that one of ordinary skill in the art "would have understood that Buruganahalli teaches determining that encrypted packets correlate to a session initiated by a hello message in TLS handshake traffic." Pet. 33–34 (citing Ex. 1004, 9:25–28, 13:62–14:1; Ex. 1003 ¶¶ 119–120).

Petitioner further asserts that one of ordinary skill in the art "would have understood that Buruganahalli teaches determining encrypted packets comprising data corresponding to one or more network-threat indicators"—i.e., "a blacklisted

destination domain"—that is "based on data included in the hello message"—i.e., the "destination domain and associated IP address"—used to establish the encrypted session, because "both the encrypted session and the hello message would be associated with the same destination IP address of the remote server." Pet. 33–34 (citing Ex. 1003 ¶ 120).

Patent Owner does not argue that Buruganahalli does not meet this limitation,[12] and we find that Petitioner's showing is sufficient. Buruganahalli describes using unencrypted handshake data corresponding to network-threat indicators (domains on the blacklist) and identifies packets comprising encrypted data that correlate to those packets. This is essentially the same as the disclosure of the '856 patent, which describes "correlating the packets with one or more packets previously determined by packet-filtering system . . . to comprise data corresponding to the network-threat indicators based on data stored in [the] logs." Ex. 1001, 9:7–10.

> 5. *"filtering . . . based on at least one of [A] a uniform resource identifier (URI) . . . , [B] data indicating a protocol version . . . , [C] data indicating a method . . . , [D] data indicating a request . . . , or [E] data indicating a command . . ."*

Petitioner contends that "Buruganahalli discloses parsing a client's SSL/TLS request (*e.g.,* packets in handshake traffic, a hello message) to create a secure connection with a remote server to determine whether the destination domain extracted from the request corresponds to data on a blacklist" and that "[t]he system applies a security rule based on the destination domain extracted from the

---

[12] As noted above, Patent Owner does dispute that there are "network-threat indicators" in Buruganahalli.

request to 'filter traffic' from the request. Pet. 35 (citing Ex. 1004, Abstract, 5:24–52, 7:12–29, 7:39–51, 7:60–67; 8:25–44, 15:4–21; Ex. 1003 ¶¶ 122–124).

Petitioner further contends that "Buruganahalli discloses a firewall that filters packets based on identifiers for a 'domain' (e.g., 'uniform resource locator (URL)') specified in the firewall security policies or rules" and that it "discloses performing 'application layer filtering' and 'content scanning.'" Pet. 35 (citing Ex. 1004, 3:25–39, 4:1–3, 7:39–7:51, 9:16–24, 9:28–43, 10:15–28, 15:37–45). Petitioner asserts that one of ordinary skill in the art "would have understood, as was well-known and conventional, that URLs are examples of uniform resource identifiers." *Id.* (citing Ex. 1037, 12:25–27).

Patent Owner's primary argument is that "Buruganahalli does not teach rule-based filtering of encrypted packets, as recited in each of the Challenged Claims" because "Buruganahalli expressly requires that encrypted packets be decrypted prior to applying its firewall policies/rules. PO Resp. 31; *see* Transcript 35, 35 ([Patent Owner's Counsel]: "[in Buruganahalli] there's simply no application of any type of rules or any policy to that traffic before it's decrypted"; "[in Buruganahalli] there is not a single instance where it teaches this filtering of the . . . encrypted packets based on the claimed packet filtering rules with the criteria").

This argument is unpersuasive because Buruganahalli uses rules/policies to filter encrypted packets by correlating them with handshaking packets that have unencrypted data, in the same way that is done in the '856 patent. The only "filtering step" in the patent that "use[s] rules to filter encrypted packets without

42

decryption" (PO Resp. 20), is the hello message approach used, for example, at steps 19 and 23 (*see id*.), which is clearly disclosed in Buruganahalli.[13]

As explained above, the '856 patent does not describe applying rules to encrypted patents. Instead, it describes (a) filtering encrypted packets by correlating them with unencrypted data in other packets and (b) decrypting packets and applying the rules that are recited in the claims to unencrypted data.

As also explained above, the second amendment added the rules of step 22, which are applied to decrypted data, to a claim that was drafted to cover filtering of encrypted packets. *However*, among the criteria used in the filtering performed at step 22 is a "uniform resource identifier (URI)," which, we conclude, covers Buruganahalli's "domain name." Thus, despite the error made during prosecution, the claims that issued cover Buruganahalli's method of determining that a session should be filtered based on a domain name in unencrypted handshake data.

At the hearing, Patent Owner argued there is no URI (or URL) in Buruganahalli's handshake message. *See* Transcript 61. We find that argument waived, because it was not raised earlier. *See* Paper 12, 8 (warning that "any patentability arguments not raised in the response may be deemed waived"). But we also find that it would be unpersuasive even if it had been raised earlier. No party has sought a construction of "URI" or "Uniform Resource Identifier," and we conclude that the plain language would encompass domain names, which are a "uniform" way of "identifying" a "resource."

---

[13] Notably, Patent Owner's description of the patent focuses on the filtering of *encrypted* packets at steps 19 and 23, but then skips to a description of the criteria recited in the claim, without acknowledging that those criteria are actually used at distinct step 22, on *decrypted* packets. *See* PO Resp. 20–21.

Patent Owner argues that the Petition relies on Buruganahalli's man-in-the-middle technique for the claimed filtering. *See* PO Resp. 31–37. That is not correct. As explained above, the Petition contends that "Buruganahalli discloses parsing a client's SSL/TLS request (e.g., packets in handshake traffic, a hello message) to create a secure connection with a remote server to determine whether the destination domain extracted from the request corresponds to data on a blacklist" and then "applies a security rule based on the destination domain extracted from the request to 'filter traffic' from the request." Pet. 35. That is referring to Buruganahalli's hello message technique, not the man-in-the-middle technique.

Regarding Buruganahalli's hello message technique, Patent Owner argues that "packet-filtering rules are never applied to encrypted packets, *with or without* decryption." PO Resp. 38 (citing Ex. 2026 ¶¶ 88–89). Patent Owner claims that "[t]his technique . . . refers to the firewall's ability to determine whether a new flow 'violate[s] a policy prior to the set-up of the encrypted data communication' . . . so that 'the flow can be blocked and decryption is not required' . . . whereas the session is allowed without any filtering of encrypted packets if the domain is trusted." *Id*. Patent Owner contends that "the policies are applied to unencrypted packets before an encrypted session ever begins (i.e. prior to beginning the encrypted session), making decryption entirely because the session is either allowed without subjecting the encrypted packets to any filtering or blocked before any encrypted packets are received unnecessary (i.e. without having to decrypt encrypted packets)." *Id*. at 39 (citing Ex. 2026 ¶ 90). Patent Owner concludes that "[b]ecause Buruganahalli only applies policies to unencrypted packets to block a secure session before encrypted packets are received or to decrypted data,

Buruganahalli does not teach the claimed rule-based filtering of encrypted packets." *Id*. at 40.

This argument is not persuasive because, in addition to describing how the hello message technique can be used to allow or completely block a flow, Buruganahalli describes how its methods "can also be used to determine whether a new session using a secure protocol should be initially allowed based on a policy (e.g., security policy, such as a firewall policy), and then to further monitor encrypted data communications associated with the session." Ex. 1004, 6:12–16. The reference explains how the system "extract[s] . . . the destination domain by parsing the handshake traffic (e.g., parsing a client hello message to extract a hostname that identifies the destination domain being requested by the client to the remote server)" and then "can apply one or more firewall policies/rules implemented by the firewall device 304 (e.g., a policy that includes requirements or rules related to destination domains that may be used for secure protocol communications) prior to and/or without having to decrypt the encrypted secure tunnel session traffic." *Id*. at 11:9–19. Buruganahalli then explains that "a trusted man-in-the-middle technique . . . can be used for intercepting and decoding encrypted tunneling communications to *further monitor* such traffic in clear text (e.g., unencrypted)." *Id*. at 11:61–65 (emphasis added). This technique "can be used *in addition to and/or in combination with*" the hello message technique. *Id*. at 11:66–67 (emphasis added). Buruganahalli thus describes filtering encrypted packets for further analysis because they are in the same flow as packets that have exposed handshaking data that corresponds to a threat indicator.

Patent Owner argues that "the Petition and Board's institution decision both point to Buruganahalli's flow lookup for limitations [1.b] and [1.c] of 'identifying' unencrypted and encrypted packets, respectively" and that "[i]t is inconsistent and

contrary to the doctrine of attributing different meaning to different claim terms to rely on Buruganahalli's flow lookup for the separate step of 'filtering.'" PO Resp. 43 (citing Pet. 30–32; Decision 60–62). There is no inconsistency. The "identifying" is determining that the two types of packets are in a given flow; the "filtering" is taking an appropriate action because the unencrypted data in the handshaking data for that flow corresponds to a threat indicator.

Patent Owner also cites Figure 6 of Buruganahalli to argue that "flow lookup 608 is performed on encrypted packets without applying policies, decryption engine 610 decrypts the encrypted packets, and then decoder 614 applies policies to the decrypted data." PO Resp. 43. Patent Owner concludes that "Buruganahalli never discloses (and the Petition never asserts) that flow lookup uses policies to filter encrypted packets." *Id*. at 44 (citing Ex. 1004, 14:25–33). We do not agree.

Figure 6 describes a client attempting to access a server using an encrypted session protocol. *See* Ex. 1004, 14:21–22. Network processor 606 receives packets from client 404A and "[f]low 608 identifies the packets as being part of a new session and creates a new session flow." *Id*. at 14:25–26. Subsequent packets are identified as belonging to the session based on a flow lookup, which corresponds to the claimed "identifying" step. Then, the "handshake exchange of that flow can be parsed to extract a hostname to facilitate destination domain extraction for secure protocols," such as "apply[ing] one or more policies if applicable based on the extracted destination domain," which corresponds to the claimed "filtering" step. *Id*. at 14:29–33. Thus, contrary to Patent Owner's argument, Buruganahalli uses polices in conjunction with the flow lookup to filter encrypted packets.

Patent Owner also disputes Petitioner's contention that one of ordinary skill in the art would have found it obvious "in view of Buruganahalli to filter the

encrypted data of a secure session that was initiated by a handshake message with data corresponding to a network-threat indicator in order to monitor transmission, into or out of a protected network, of data that potentially presents a security risk." PO Resp. 46–47 (citing Pet. 38–39). However, Petitioner only made that argument "[t]o the extent it is argued that Buruganahalli does not explicitly disclose filtering the packets with encrypted data that corresponds to a network-threat indicator." Pet. 38. Because, for the reasons described above, we find that Buruganahalli does explicitly disclose "filtering the packets with encrypted data that corresponds to a network-threat indicator," this argument is moot.

We conclude that Petitioner has shown this limitation to be met in Buruganahalli.

> 6.    [A] "packets comprising the portion of the
>        unencrypted data that corresponds to one or more
>        network-threat indicators" and [B] "the determined packets
>        comprising the encrypted data that corresponds to the one or
>        more network-threat indicators"

As described above, Buruganahalli filters (A) the packets with the unencrypted data, for example those with the hello message, and (B) the encrypted packets that are part of the same flow/session. We, accordingly, find that Petitioner has shown this limitation to be met in Buruganahalli.

> 7.    "routing . . . filtered packets to a proxy system
>        based on a determination that the filtered packets
>        comprise data that corresponds to the one or
>        more network-threat indicators"

Petitioner contends that Buruganahalli teaches this limitation because it describes sending "the encrypted data communications" to a firewall with a decrypt engine that "applies 'trusted man-in-the-middle techniques using a self-signed certificate.'" Pet. 39–40 (quoting Ex. 1004, 9:66–67). Petitioner asserts that the firewall includes "functionality acting as a proxy for both the remote server

47

and the client by standing in line of their communications in a 'transparent' manner, as was known in the art." *Id*. at 40–41 (citing Ex. 1005, 4:50–63, 8:36–47, 8:65–9:7; Ex. 1034, 8:12–19; Ex. 1036, 14).

Patent Owner argues that "Buruganahalli's firewall does not route filtered packets to a proxy system." PO Resp. 51. Specifically, Patent Owner argues that "no filtering of encrypted packets occurs until after they have been decrypted, so the decrypt engine cannot receive filtered packets—it decrypts traffic so that the firewall can monitor and filter decrypted packets." *Id*. at 52.

This argument is unpersuasive because, as described above, Buruganahalli describes "filtering" packets based on their status as part of a flow, and then sending packets of the flow to a proxy system for decryption and further analysis. This, again, is essentially the same as how the system of the '856 patent works.

Patent Owner next contends that "Petitioner equates Buruganahalli's 'decrypt engine' with the claimed 'proxy system' and that "Buruganahalli's decrypt engines 110, 610 are not a proxy, and Petitioner never even attempted to demonstrate that it satisfies the proper construction of the term, which is 'a proxy system which intervenes to prevent threats in communications between devices.'" PO Resp. 53. This too is unpersuasive because the Petition actually relies on the firewall 314 shown in Buruganahalli's Figure 3B, which operates as a proxy between client 312 and server 316, decrypting the packets so that they can be inspected by the firewall. *See* Pet. 39–41 (reproducing and describing Figure 3B); Ex. 1004, 12:4–32; 9:67–10:4 ("if the extracted destination domain is not trusted . . . then the firewall can be configured to decrypt the monitored traffic for further traffic monitoring and inspection based on a policy (e.g., a firewall policy)"). Again, this is essentially the same as how the proxy system of the '856 patent operates. The patent's Host 106 corresponds to Buruganahalli's Client 312, the

patent's PD1, RG3, and PD2 correspond to Buruganahalli's Firewall 314, and the patent's Host 128 corresponds to Buruganahalli's Server 316.

We conclude that Petitioner has shown this limitation to be met in Buruganahalli.

### 8. *Objective Indicia of Nonobviousness*

Patent Owner argues that objective indicia of nonobviousness overcome Petitioner's obviousness showing. Specifically, Patent Owner points to evidence of a "long-felt need in the industry" and "substantial industry praise," as well as copying of the '856 patent by Cisco. *See* PO Resp. 68–70. We find the secondary considerations arguments unpersuasive.

As an initial matter, we observe that a strong showing of obviousness may stand "even in the face of considerable evidence of secondary considerations." *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1374–75 (Fed. Cir. 2018) (quoting *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009)); *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("secondary considerations of nonobviousness . . . simply cannot overcome a strong prima facie case of obviousness").

For the reasons described above, we find that Buruganahalli presents a strong case of obviousness and, in fact, is essentially anticipatory, describing both the hello message technique that the '856 patent uses for filtering packets in a flow and the man-in-the-middle technique that the '856 patent uses for filtering decrypted packets. Thus, even if Patent Owner's objective evidence was strong, we would find it insufficient to establish nonobviousness. We also find, however, that the evidence offered would be insufficient to overcome even a weak case of obviousness.

*Long Felt Need and Industry Praise*

Patent Owner argues that "the Cisco press release is evidence of long-felt need and industry recognition for the technology claimed in the '856 Patent because it describes the problem of detecting threats in encrypted traffic as 'unsolvable.'" PO Resp. 68 (citing Ex. 1027, 64). Given that this is a press release by a company announcing that company's new commercial product, however, we are reluctant to give the "unsolvable" characterization much weight, as it may amount to puffery. *See Bayer Healthcare v. Watson Pharms.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) (explaining that bare journal citations and self-referential commendation fall short of demonstrating industry praise). But beyond that, it appears that the problem identified as "unsolvable" in the press release— "detect[ing] known attack signatures even in encrypted traffic"—had, in fact, already been solved in Buruganahalli, using the very same hello message, correlation, and man-in-the-middle techniques described in the '856 patent. We thus cannot say that the press release identifies a long-felt need that was actually unsolved. *See ZUP*, 896 F.3d at 1374 (explaining that "[w]here the differences between the prior art and the claimed invention are . . . minimal . . . it cannot be said that any long-felt need was unsolved") (quoting *Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304–05 (Fed. Cir. 2010)).

Patent Owner also argues that the Cisco press release provides "compelling evidence of nonobviousness" because "[i]ndustry participants, especially competitors, are not likely to praise an obvious advance over the known art." PO Resp. 69 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc)). We find this unpersuasive because Cisco promoting its *own* new product does not appear to be an example of "the industry" or "a competitor" praising the claimed invention. This is quite different than the evidence in *Apple v.*

*Samsung*, which showed *competitors of Apple* praising *Apple's* patented "slide to unlock" feature. *See* 839 F.3d at 1053–1054.

    *Nexus*

    Patent Owner argues that "[t]he nexus between this evidence and the '856 Patent claims was . . . established by way of the court's finding that . . . Cisco's Encrypted Traffic Analytics [("ETA")] technology . . . infringed the '856 Patent." PO Resp. 69 (citing Ex. 1027, 30–57). Although the District Court's infringement finding has been vacated, the decision does describe the factual basis for the infringement conclusion.

    In particular, Patent Owner's expert explained that Cisco's "accused routers and switches will make a determination if the packets are encrypted or unencrypted" and then send "representations of information from the unencrypted portion of encrypted packets" to "Stealthwatch," "which is running both ETA and Cognitive Threat Analytics ("CTA")" using "Cisco's proprietary logging framework known as NetFlow." Ex. 1027, 34 (¶¶ 14–17).

    Stealthwatch, which "analyzes the NetFlow from the packets and identifies malware threats in encrypted traffic without running any form of standard decryption," receives "real-time threat intelligence indicators" that contain "known malicious IP addresses, domain names, protocol versions and other indicators of malicious traffic." Ex. 1027, 34 (¶ 17) Stealthwatch then "determines if any encrypted traffic in the network matches any known malicious signatures *based on unencrypted information provided in NetFlow such as the IDP, Server Name Indicator ("SNI") or Transport Layer Security ("TLS")." Id.* at 35 (¶¶ 18–20)

(emphasis added).[14]  Notably, SNI is the TLS extension from which Buruganahalli extracts its unencrypted hostname data.  *See* Ex. 1004, 5:6–51.

Stealthwatch next "sends the results of its analysis to the Identity Services Engine, which "will provision rules or change of authorizations . . . to the switches and routers."  Ex. 1027, 35–36 (¶¶ 21–22).  The switches and routers "operate inline and are able to drop incoming packets from the malicious source and outgoing packets containing sensitive data attempting to be exfiltrated by embedded malware" and "[b]locked packets are routed to a proxy system, known as a null interface, that is used to drop packet traffic."  *Id*. at 36 (¶¶ 22–23).

The District Court did not provide an element-by-element analysis of how the claims of the '856 patent cover the accused products.  *See* Ex. 1027, 41.  However, from the description, we understand the Court to have concluded that the Cisco system receives rules, identifies a set of packets as part of a flow using the NetFlow logs, "determines" that *encrypted* packets in the flow match known malicious signatures based on *unencrypted* data in other packets (e.g., data in the SNI), and then filters the flow based in a URI (e.g., that from the SNI), routing it to the null interface.  The Court does not describe *how* the system "determines" that encrypted packets match known malicious signatures based on information in unencrypted packets, but we assume that is done as in the '856 patent, by correlation, i.e., an encrypted packet is "determined" to match a threat indicator if it is in the same flow as a packet with unencrypted information that matches the threat indicator.

With that understanding, we conclude that the allegedly infringing system operates, as least at the level described in the court's decision, in the same way

---

[14] "IDP" is the "Initial Data Packet," which includes "data such as an HTTP URL, DNS hostname and address, and other data elements."  Ex. 1027, 33 (¶ 12).

Buruganahalli's system operates, filtering encrypted packets due to their presence in a flow that includes packets with unencrypted data, such as in a handshaking packet. It follows that Patent Owner is unable to establish a nexus, because "[w]here the offered secondary consideration actually results from something other than what is both claimed *and novel* in the claim, there is no nexus to the merits of the claimed invention." *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330 (Fed. Cir. 2017) (quoting *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011).

*Copying*

Patent Owner also argues that the District Court "found compelling evidence of copying" by Cisco. *See* PO Resp. 69–70. As Petitioner observes, however, District Court's decision has been vacated, so the Court's ultimate factual finding of copying by Cisco is not evidence upon which we can rely. And, although some of the underlying evidence on that issue may be available, we certainly are not in a position to evaluate the entirety of the litigation record, weigh witness testimony, and make a factual finding about copying by Cisco.

9.      *Conclusion Regarding Claim 1*

Petitioner's analysis establishes that Buruganahalli teaches every limitation of claim 1, Patent Owner's arguments regarding the prior art are unpersuasive, and Patent Owner's evidence of objective indicia of nonobviousness is insufficient. We thus conclude that Petitioner has proven claim 1 unpatentable under § 103 as obvious over Buruganahalli.

C.      *Claims 24 and 25 in View of Buruganahalli*

Petitioner contends that claims 24 and 25 are unpatentable under § 103 as obvious over Buruganahalli for essentially the same reasons as claim 1. *See* Pet. 28–42; Ex. 1003 ¶¶ 101–146.

Claim 1 is directed to a method with steps that are performed by a packet-filtering system, and claim 24 is directed to a packet filtering system with a processor and memory storing instructions that, when executed, perform the steps recited in claim 1.

Claim 25 is directed to computer readable media with instructions for performing a method similar to that of claims 1 and 24, but also requires that the URI specified by the packet-filtering rules "indicat[e] one or more of the plurality of network-threat indicators." Ex. 1001, 25:14–49, 28:59–30:31. Petitioner contends that Buruganahalli "discloses packet-filtering rules that indicate network-threat indicators" and "[f]or example, the rules are implemented for security purposes to protect the network." Pet. 35–36 (citing Ex. 1004, 1:32–36, 2:61–66, 7:27–29, 7:42–67, 8:1–44, 10:66–11:2, 13:43–52).

Patent Owner argues that claims 24 and 25 are patentable over Buruganahalli for the same reasons as claim 1. *See* PO Resp. 30–52 (arguing the independent claims together).

For the reasons discussed above for claim 1, we conclude that Petitioner has proven claims 24 and 25 unpatentable under § 103 as obvious over Buruganahalli.

D. *Patentability Conclusion*

Claims 1, 24, and 25 of the '856 patent are unpatentable because they would have been obvious under 35 U.S.C. § 103 in view of Buruganahalli.

## IV. REQUESTS FOR REHEARING

As noted above, we granted and joined petitions filed by Cisco Systems, Inc. and Keysight Technologies, Inc. in IPR2022-01151 and IPR2022-01199. *See* Papers 39, 41. Patent Owner filed Requests for Rehearing (Papers 48 and 49), arguing that the Cisco and Keysight institution decisions should be vacated (a) due to a conflict and (b) because the panel adopted an argument that Petitioner did not

raise. *See, e.g.,* Paper 48 ("Rh'g Req."), 1–2. Prior to the hearing, we addressed the conflict arguments and determined that there was no conflict that warranted vacatur. *See* Paper 55. We now turn to the second argument raised in the rehearing requests.

Patent Owner contends that the Board raised unpatentability theories never presented by the petitioner and also that those theories are incorrect. *See* Rh'g Req. 6–12. The gist of the argument is that "Buruganahalli discloses . . . that the decision to decrypt an encrypted communications flow is made at the policy check engine/flow processing engine based on the IP address and port number associated with the encrypted packet, not any of the criteria recited in the claimed packet-filtering rules," and that "the Board departed from the record and invented a new argument on behalf of Petitioners, namely that Buruganahalli discloses an embodiment in which policies are applied without first sending encrypted traffic for decryption." *Id.* at 8. Neither of those allegations is correct.

First, as explained above, Buruganahalli describes determining "whether a new session using a secure protocol should be initially allowed based on a policy" and "further monitor[ing] encrypted data communications associated with the session." Ex. 1004, 6:12–16. The system "extract[s] . . . the destination domain by parsing the handshake traffic" and then "can apply one or more firewall policies/rules implemented by the firewall device 304 (e.g., a policy that includes requirements or rules related to destination domains that may be used for secure protocol communications) prior to and/or without having to decrypt the encrypted secure tunnel session traffic." *Id.* at 11:9–19. "[I]n addition to and/or in combination with" the handshake traffic (hello message) technique, "a trusted man-in-the-middle technique . . . can be used for intercepting and decoding encrypted tunneling communications to further monitor such traffic in clear text

(*e.g.*, unencrypted)." *Id*. at 11:61–67. Buruganahalli thus describes filtering flows based on the presence of the domain name, and forwarding those filtered flows to a proxy system for decryption and further analysis. Patent Owner's argument that the filtering in Buruganahalli is "based on the IP address and port number associated with the encrypted packet" is unpersuasive because it does not address the filtering of flows based on the hello message domains.

Second, the Petitions clearly identify the hello message theory of filtering, stating, for example, that "Buruganahalli discloses parsing a client's SSL/TLS request (e.g., packets in handshake traffic, a hello message) to create a secure connection with a remote server to determine whether the destination domain extracted from the request corresponds to data on a blacklist" and that "[t]he system applies a security rule based on the destination domain extracted from the request to 'filter traffic' from the request." *See* IPR2022-01151, Paper 2, 51; IPR2022-1199, Paper 1, 37. The Board did not raise this theory on its own.

Because we find Patent Owner's rehearing arguments unpersuasive, the Requests for Rehearing are denied.

## V.   CONCLUSION

Petitioner has met its burden in showing claims 1, 24, and 25 are unpatentable. [15]

| Claim(s) | 35 U.S.C. § | Reference(s) | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 24, 25 | 103 | Buruganahalli | 1, 24, 25 | |
| 1, 24, 25 | 103[16] | Buruganahalli, Baehr | | |
| **Overall Outcome** | | | 1, 24, 25 | |

---

[15] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[16] We do not reach this ground because we determine that the challenged claims are unpatentable based on Buruganahalli alone.

## VI.    ORDER

For the reasons given, it is:

ORDERED that claims 1, 24, and 25 of U.S. Patent 9,917,856 B2 have been shown to be unpatentable;

ORDERED that Patent Owner's Motions for Reconsideration (Papers 48 and 49) are denied; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

James Hannah
Jeffrey Price
Jenna Fuller
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com
jprice@kramerlevin.com
jfuller@kramerlevin.com


FOR PATENT OWNER:

Bradley Wright
Scott Kelly
Blair Silver
BANNER & WITCOFF, LTD.
bwright@bannerwitcoff.com
skelly@bannerwitcoff.com
bsilver@bannerwitcoff.com

59

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
and KEYSIGHT TECHNOLOGIES, INC.,[†]
Petitioner

v.

CENTRIPETAL NETWORKS, LLC,
Patent Owner.

———————

IPR2022-00182
Patent 9,917,856 B2

———————

*Before* MICHELLE N. WORMMEESTER, NABEEL U. KHAN, and
AARON W. MOORE, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.


ORDER
Denying Patent Owner's Motion for Recusal and Vacatur and
Denying, in Part, Patent Owner's Motions for Rehearing
*37 C.F.R. § 42.5*

———————

[†] Cisco Systems, Inc. and Keysight Technologies, Inc. filed petitions and
motions for joinder in IPR2022-01151 and IPR2022-01199, respectively,
and have been joined in this proceeding.

## I.    INTRODUCTION

This Decision addresses Patent Owner's Motion for Recusal and Vacatur and, to the extent the issues overlap, Patent Owner's Requests for Rehearing of the decisions instituting and joining the Petitions filed in IPR2022-01151 and IPR2022-01199.

For the reasons detailed below, we find that the conduct of which Patent Owner complains (a) was fully compliant with the applicable ethical regulations, and (b) does not give rise to due process concerns. We further find no evidence of "actual bias" on the part of APJ McNamara, that there is no "inconsistency" between our result and the Federal Circuit's decision in the *Cisco* case, and that Patent Owner failed to timely raise the issues.

Patent Owner's Motion for Recusal and Vacatur is accordingly denied. Patent Owner's Requests for Rehearing of the decisions instituting and joining the Petitions filed in IPR2022-01151 and IPR2022-01199 are denied to the extent they are based on the alleged conflict.

## II.    BACKGROUND

*A.    This Proceeding*

On November 18, 2021, Palo Alto Networks, Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 24, and 25 of U.S. Patent No. 9,917,856 B2 (Exhibit 1001, "the '856 patent"). *See* Paper 2. The Petition alleged that the subject claims were unpatentable over United States patents previously issued to Buruganahalli and Baehr, which had not been considered by the Office when examining the claims of the '856 patent. *See id*. at 7, 9. Centripetal Networks, LLC ("Patent Owner") filed a Preliminary Response, Petitioner filed a Preliminary Reply, and Patent Owner filed a Preliminary Sur-reply. *See* Papers 6, 9, 10.

On May 25, 2022, the panel determined, in a ninety-page decision, that Petitioner had shown a reasonable likelihood of proving claims 1, 24, and 25 unpatentable under § 103, and instituted an *inter partes* review. *See* Paper 11 ("Institution Decision"). However, the panel explained that the decision was not "a final determination about the patentability of any challenged claim, the construction of any claim term, phrase, or limitation, or any other legal or factual issue." *Id.* at 90.

On June 8, 2022, Patent Owner requested rehearing of the Institution Decision, arguing that the Board misapprehended or overlooked various matters. *See* Paper 13 ("First Rehearing Request"). In that request, Patent Owner asked the Precedential Opinion Panel ("POP") to consider whether the Board should "entertain IPR petitions that collaterally attack a district court judgment when the totality of the circumstances indicates that the petition was filed to harass the patent owner." *Id.* at 1; *see* Ex. 3005.

On December 6, 2022, the POP denied the request for POP review, advising that "the original panel maintains authority over all matters, including considering the submitted rehearing request." Paper 31, 2.

On Friday, December 30, 2022, Patent Owner filed a Motion for Recusal and Vacatur (Paper 37, "Recusal Motion"), seeking recusal of the panel that issued the Institution Decision and an order vacating the Institution Decision.[2]

---

[2] The Recusal Motion was filed without authorization. It was also signed by an attorney, Paul Andre, who is neither registered to practice before the Office nor admitted *pro hac vice*. We allowed the briefing due to the gravity of the allegations, but Patent Owner is advised that future filings that are not in compliance with our rules will be expunged, and that relief sought by way of such filings may be denied, with prejudice, for non-compliance. A

On Wednesday, January 4, 2023, the second business day after the filing of the recusal motion, the panel issued an order denying the First Rehearing Request and decisions instituting and joining follow-on petitions in IPR2022-01151, filed by Cisco Systems, Inc., and IPR2022-01199, filed by Keysight Technologies, Inc. *See* Paper 40, 14 ("Rehearing Denial"); Papers 39 and 41 ("Joinder Decisions").

On January 5, 2023, APJ McNamara withdrew from the case "[i]n order to reduce the number of issues and simplify the briefing" and, on January 18, 2023, APJ Amundson also withdrew, identifying similar reasons. *See* Papers 43 and 47.

Also, on January 18, 2023, but after APJ Amundson's withdrawal, Patent Owner filed Requests for Rehearing of the Joinder Decisions. *See* Papers 48 and 48 ("Joinder Rehearing Requests").

On January 19, 2023, the Board entered a Panel Change Order, reconstituting the panel to include the undersigned and APJs Michelle N. Wormmeester and Nabeel U. Khan.

The Recusal Motion is now fully briefed, *see* Paper 46 ("Recusal Opposition"), Paper 54 ("Recusal Reply"), and the Hearing in this matter is scheduled for February 15, 2023. *See* Paper 53.

B.     *The Cisco Litigation*

In February of 2018, Patent Owner filed a complaint against Cisco Systems, Inc. ("Cisco") in the Eastern District of Virginia ("the *Cisco* case") alleging infringement of a number of patents, including the '856 patent. *See*

---

motion for admission of Mr. Andre has since been filed and a decision will issue in due course.

Ex. 1027, 1–2. In May and June of 2020, Judge Henry C. Morgan, Jr. conducted a bench trial in which Patent Owner asserted infringement of ten claims in five patents, including '856 patent claims 24 and 25. *See id.*[3]

In October of 2020, Judge Morgan issued an opinion with findings of fact and conclusions of law. *See* Ex. 1027. He found that Cisco had infringed claims in four of the five patents, including the '856 patent, determined that Cisco failed to prove the patents invalid,[4] and awarded Patent Owner damages and interest of approximately $1.9B, plus royalties for six years. *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 492 F. Supp. 3d 495, 604–608 (E.D. Va. 2020). Cisco appealed. *See* Ex. 1028.

The Federal Circuit did not reach the merits of the case; instead, on June 23, 2022, it vacated the judgment because it found that Judge Morgan was disqualified due to his wife's ownership of Cisco stock. *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1027 (Fed. Cir. 2022). Patent Owner petitioned for a writ of certiorari, and the petition was denied on December 5, 2022. *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 143 S. Ct. 487 (2022).

---

[3] Specifically, Centripetal asserted infringement of claims 63 and 77 of U.S. Patent No. 9,137,205, claims 9 and 17 of U.S. Patent No. 9,203,806, claims 11 and 21 of U.S. Patent No. 9,560,176, claims 18 and 19 of U.S. Patent No. 9,686,193, and claims 24 and 25 of the '856 Patent. *See* Ex. 1027, 2.

[4] The validity defense presented by Cisco for the '856 patent at trial was that the accused products were in the prior art. *See* Ex. 1027, 60 ("Dr. Schmidt, in his invalidity testimony, assumed the infringement analysis by Dr. Cole and opined that all of the same functionality that Dr. Cole relies on for infringement was in the accused products prior to the priority date of the '856 Patent.").

5

The Federal Circuit decision turned on 28 U.S.C. § 455(b), which requires that an Article III judge "shall . . . disqualify himself" if "he knows that he . . . or his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome." 28 U.S.C. § 455(f) allows a judge who only learns of a conflict "after substantial judicial time has been devoted to the matter" to avoid disqualification by "divest[ing] himself or herself of the interest that provides the grounds for the disqualification."

While he was drafting his decision, Judge Morgan learned that his wife owned Cisco stock. *See* 38 F.4th at 1028. He promptly disclosed that to the parties and placed the stock in a blind trust, evidently believing that to be divestiture under § 455(f) that would avoid disqualification. *See id.* The Federal Circuit, however, determined that placing the stock in a blind trust was insufficient, because "divestiture" requires one to relinquish ownership, which did not happen with a blind trust. *See* 38 F.4th 1031–1033. As a result, Judge Morgan was disqualified. *See id.* at 1033. The Court further determined that the trial decision had to be vacated because the disqualification was not harmless error. *See id.* at 1034–1039.

## III.   ANALYSIS

Patent Owner contends that APJ McNamara's ownership of a small amount of Cisco stock and receipt of payments from Foley & Larder LLP are conflicts that violate the applicable regulations and create a due process problem, requiring recusal of the entire panel and that the original and joinder institution decisions be vacated. We do not agree.

6

A. *Motion for Recusal and Vacatur*

According to Patent Owner, APJ McNamara "has owned Cisco stock and also has been paid a significant amount of money . . . from one of Cisco's lobbyist law firms while he was deciding IPR petitions against patents that Centripetal has asserted against Cisco in litigation" and that "[d]ue process, executive-branch ethics regulations, and common-sense notions of fairness dictate that the fate of the '856 Patent should not rest in the hands of an administrative judge with a financial stake in [Cisco]—a willful infringer with potentially billions of dollars hinging on the result of this IPR proceeding." Recusal Motion 1.[5]

Patent Owner argues that the alleged conflicts "cannot be reconciled with Federal Circuit precedent," as "[t]he Court recently vacated Centripetal's willful judgment award against Cisco—involving the same '856 Patent at issue here—based on the district court judge's wife holding approximately $4,500 of Cisco stock despite his prompt disclosure, good-faith attempt to divest, and rendering a decision adverse to Cisco." Recusal Motion 1 (emphasis omitted). According to Patent Owner, "[i]t simply cannot be correct that an Article III judge's wife's holding of Cisco stock can nullify his validity determination while an administrative judge can knowingly hold the same Cisco stock and decide a collateral attack on that very judgment." *Id.*

Patent Owner further argues that "[w]ildly different institution rates for Centripetal's patents following the Cisco judgment between panels

---

[5] Given that Judge Morgan's decision has been vacated, it does not appear that Cisco is, for now at least, accurately described as a "willful infringer."

including APJ McNamara (87.5%) and those without him (20%) raise the unfortunate specter of actual bias and contamination of the deliberative process." Recusal Motion 2; *see id*. at 4–5.

Patent Owner concludes that "[t]he entire [original] panel is now tainted with APJ McNamara's conflict" and "should be recused," and that "the decision to institute should be vacated." Recusal Motion 2.

*Executive Branch Ethical Standards*

Administrative Patent Judges are governed by the Standards of Ethical Conduct for Employees of the Executive Branch (the "Executive Branch Ethical Standards"), codified beginning at 5 C.F.R. § 2635. Employees of the executive branch must "endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards," where "[w]hether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts." 5 C.F.R. § 2635.101(b)(14).[6]

Under 5 C.F.R. § 2635.402, executive branch employees are prohibited "from participating personally and substantially in an official capacity in any particular matter in which, to [their] knowledge, [they] or any person whose interests are imputed to [them] . . . has a financial interest, if the particular matter will have a direct and predictable effect on that interest." A matter will not have a "direct effect" if "the chain of causation is attenuated or is contingent upon the occurrence of events that are

—————————————

[6] Notably, APJs are entitled to a "presumption of honesty and integrity." *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1030 (Fed. Cir. 2016) (rejecting allegations of improper bias against the Board).

speculative or that are independent of, and unrelated to, the matter" and there must be "a real, as opposed to a speculative possibility that the matter will affect the financial interest." 5 C.F.R. § 2635.402(b)(1)(i–ii).[7]

Pursuant to the authority granted in 18 U.S.C. § 208(b)(2), the Office of Government Ethics ("OGE") has issued specific "de minimis exemptions" to the rules regarding disqualifying financial interests. OGE issued those exemptions, which are codified at 5 C.F.R. § 2640, "based on its determination that particular interests are too remote or too inconsequential to affect the integrity of the services of employees to whom those exemptions apply." 5 C.F.R. § 2635.402(d)(1).

Section 2640.202(a) provides that "[a]n employee may participate in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership by the employee, his spouse or minor children of securities issued by one or more entities affected by the matter, if . . . (1) [t]he securities are publicly traded . . . and (2) [t]he aggregate market value of the holdings of the employee, his spouse, and his minor children in the securities of all entities does not exceed $15,000." That section provides the following example:

> An employee owns 100 shares of publicly traded stock valued at $3,000 in XYZ Corporation. As part of his official duties, the employee is evaluating bids for performing computer maintenance services at his agency and discovers that XYZ Corporation is one of the companies that has submitted a bid.

---

[7] Patent Owner cites 5 C.F.R. § 2635.502, which concerns "Personal and Business Relationships," including matters such as employment relationships and properly leases. The rules relating to financial interests, such as those raised here, are found in 5 C.F.R. § 2635.401–403.

Appx0069

> The employee is not required to recuse himself from continuing
> to evaluate the bids.

5 C.F.R. § 2640.202(a).

Section 2640.202(b) provides a corresponding exemption for situations in which the "securities [were] issued by one or more entities that are not parties to the matter but that are affected by the matter," where the threshold is raised to $25,000 for a single affected entity or $50,000 for all entities. A similar example is provided:

> A Food and Drug Administration advisory committee is asked
> to review a new drug application from Alpha Drug Co. for a
> new lung cancer drug. A member of the advisory committee
> owns $20,000 worth of stock in Mega Drug Co., which
> manufactures the only similar lung cancer drug on the market.
> If approved, the Alpha Drug Co.'s drug would directly compete
> with the drug sold by the Mega Drug Co., resulting in decreased
> sales of its lung cancer drug. The committee member may
> participate in the review of the new drug.

5 C.F.R. § 2640.202(b).

Section 2640.202(a), including the first example above, was originally issued in 1996, following notice and comment rulemaking, although the threshold was $5,000. *See Interpretation, Exemptions and Waiver Guidance Concerning 18 U.S.C. 208*, 61 FR 66841 (Dec. 18, 1996). The rules were updated in 2002, again following the notice and comment procedure, raising the 2640.202(a) threshold to $15,000 and adding Section 2640.202(b). *See Exemption Amendments Under 18 U.S.C. 208(b)(2)*, 67 FR 12443 (March 19, 2002).

10

Importantly, these exemptions were developed by a body that not only had expertise in ethics, but also was completely impartial and, of course, was unaware of Cisco, Patent Owner, Petitioner, or the '856 patent.[8]

As noted above, Patent Owner argues that APJ McNamara should be disqualified because (a) he owns Cisco stock in an amount between $1,001 and $15,000 and (b) he receives "an annual share of profits from the law firm Foley & Lardner LLP" which "represents Cisco in lobbying efforts and has received fees from Cisco." Recusal Motion 3–4.

Regarding the stock, Cisco was not a party to this proceeding at the time of the Institution Decision, and the value of the holdings falls well below the $25,000 threshold that § 2640.202(b) applies to matters affecting nonparties, and even below the threshold for parties. The Cisco stock is plainly not disqualifying under the rules.

The Foley & Lardner payments are also not a prohibited financial interest. Patent Owner's argument, as we understand it, is that because APJ McNamara receives retirement income from Foley, he would be inclined to favor Cisco because Cisco is a client that pays Foley for legal work. This argument has numerous fatal flaws.

---

[8] Patent Owner's argument that the ethical regulations are simply about avoiding criminal prosecution (*see* Recusal Motion 11) is incorrect. The Executive Branch Ethical Standards are consistent with, but exist separately and apart from the criminal statutes, providing a more comprehensive framework "[t]o ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section." 5 C.F.R. § 2635.101(a); *see id.* § 2635.101(c) (explaining that "there are conflict of interest statutes that prohibit certain conduct" "[i]n addition to the standards of ethical conduct").

First, there is nothing in the record to suggest that APJ McNamara was aware that Cisco was a Foley client, and knowledge is required for disqualification. *See* 5 C.F.R. § 2635.402 ("to his *knowledge*, he or any person whose interests are imputed to him . . . has a financial interest"). APJ McNamara certainly cannot have favored Cisco because it was a Foley client if he did not know Cisco was a Foley client.[9]

Second, there is simply nothing, at all, to suggest that the retirement payments were dependent on the firm's receipts from Cisco, which means that there is no evidence of a possible "direct effect" on a financial interest. *See* 5 C.F.R. § 2635.402(b)(1)(i) (explaining that a matter will not have a "direct effect" on a financial interest if "the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter").

Finally, there is nothing to suggest that a decision about the validity of a patent being asserted against Cisco would have any effect on the amount of work Foley was doing for Cisco, particularly given that the work appears to have nothing to do with patents, or even intellectual property. Patent Owner tries to fill that hole with a claim that "[t]he Foley firm recently listed Cisco as 'its most lucrative contract.'" Recusal Motion 4. That assertion, however, is based on a misunderstanding (or misrepresentation) of Patent Owner's Exhibit 2037, which actually is limited to a survey of fees received for *executive branch lobbying* in *Florida*. *See* Ex. 2037, 1 ("Florida Politics parsed the reports submitted by firms that lobby the state government in

---

[9] Because Patent Owner cites § 2635.502, we note that it also applies only where the "employee *knows* that a particular matter involving specific parties is likely to have a direct and predictable effect."

order to compile a definitive list of the state's top lobbying shops, at least in terms of revenues."). Cisco may have been Foley's "most lucrative" client in 2021 for the narrow category of executive branch lobbying in Florida, but the $100,000 that Cisco paid Foley for that work was surely insufficient to make Cisco the "most lucrative" client across Foley's many offices and practices, which generated more than $1B in revenue in 2021. *See* Paper 43, 2 n.2. Moreover, Patent Owner does not provide any explanation of how a decision regarding the validity of the '856 patent might affect Cisco's desire to have Foley assist with lobbying Florida legislators on "health services," "matters related to state procurement law and processes," and "matters related to Smart Cities transportation efforts." *See* Ex. 2039.

For these reasons, we conclude that APJ McNamara's relationship with Foley also would not be disqualifying under the regulations.

We further find that Patent Owner's argument that APJ McNamara's participation in this case ran afoul of "executive-branch ethics regulations" (Recusal Motion 1, 7–8) is frivolous. Patent Owner was aware of the exemptions,[10] there is no competent, good faith argument that the Cisco stock does not fall into exemptions, and the argument concerning the Foley payments is glaringly deficient on its face, as explained above.[11]

---

[10] *See* Ex. 1054, 9 (Patent Owner acknowledging the "the relaxed stock-ownership rules APJs appear to enjoy under 5 C.F.R. §2640.202(a)").

[11] Patent Owner's argument that APJ McNamara was biased in favor of Cisco is also undercut by its "actual bias" argument, discussed below, in which Patent Owner acknowledges that the institution rate on the 2018 Cisco petitions by panels including APJ McNamara was "roughly consistent with the Board's overall institution rate in the relevant timeframe." Recusal Motion 4.

That these arguments are so lacking in substance is especially concerning given their aim, as "[t]he assertion that a judge improperly participated in a case from which he or she should have recused constitutes a charge most grave." *Maier v. Orr*, 758 F.2d 1578, 1583–84 (1985). The Federal Circuit has made clear that counsel should not seek disqualification "precipitously or recklessly, nor on unsupported rumor, conjecture, and speculation" because "[t]o do so is to trifle with the court and the administration of justice." *Id.*; *see also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 827–28 (1986) ("Charges of disqualification should not be made lightly."). Patent Owner is advised that further baseless arguments directed at the Board, its members, or its process may be met with sanctions.

*Due Process: Cisco*

Patent Owner argues that "[i]t should be beyond debate that a judge with a financial interest that will be impacted materially by the outcome of the case must recuse, particularly if he has made no attempt to mitigate the conflict," citing *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973), to the effect that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." Recusal Motion 5. Patent Owner argues that "[d]ue process requires recusal here because decisions in the proceeding will directly impact Cisco, and APJ McNamara's stock ownership and partnership profits represent 'a direct, personal, substantial pecuniary interest' in Cisco." *Id.* at 6 (quoting *Tumey v. State of Ohio*, 273 U.S. 510, 522 (1927)).

We certainly agree that Patent Owner, like any other party that appears before the Board, is entitled to due process, the essential ingredients of which are notice and an opportunity to be heard by a disinterested

14

decision-maker. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876–81 (2009). But we do not agree that the ethical regulations under which the executive branch has operated since 1996 are inconsistent with due process.

The passage Patent Owner quotes from *Gibson v. Berryhill* states "those with **substantial** pecuniary interest in legal proceedings should not adjudicate these disputes." *Gibson*, 411 U.S. at 579 (emphasis added); *see also id.* (affirming that a board of optometrists had a pecuniary interest of "sufficient substance" that it could not preside over a hearing against competing optometrist). Similarly, Patent Owner's quotation from *Tumey v. State of Ohio* identifies as problematic "a direct, personal, **substantial** pecuniary interest." *Tumey*, 273 U.S. at 523 (emphasis added).

These cases identified by Patent Owner thus tell us that not *every* financial interest demands recusal; instead, recusal is required where the financial interest is *substantial*. *See also Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 59 (1972) (finding a due process violation where the revenue produced from the mayor's court provided "a substantial portion of a municipality's funds"); *Aetna*, 475 U.S. at 825–827 (finding "no basis" to conclude that certain justices were disqualified even though they "might conceivably have had a slight pecuniary interest").

Determining whether an interest might qualify as "substantial" can be difficult because the term is inherently subjective and highly dependent on the facts of a particular situation. *See Aetna*, 475 U.S. at 822 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955), to the effect that what degree or kind of interest is sufficient to disqualify "cannot be defined with precision"). In this instance, however, we find that we already have an answer sufficient to dispose of Patent Owner's arguments.

15

As described above, the Office of Governmental Ethics, an impartial body with particular expertise in this area, promulgated the "de minimus exemptions" for securities in 1996, and then revised them in 2002. This was done at the direction of Congress, and after soliciting public input. Critically, the rules themselves tell us that OGE developed the exemptions "*based on its determination that particular interests are too remote or too inconsequential to affect the integrity of the services of employees* to whom those exemptions apply." 5 C.F.R. § 2635.402(d)(1) (emphasis added).

We conclude that the "remote" and "inconsequential" interests falling within the "de minimis exemptions" of Section 2640.202 are *not* "substantial" interests that would give rise to the types of due process concerns raised in the Recusal Motion. [12] That conclusion is buttressed by the fact that the dollar limits in the regulations were deemed "too remote" and "too inconsequential" in *2002*, and the passage of twenty years has only made them *more* remote and inconsequential.

Because APJ McNamara's Cisco stock holdings fall within the exemption, and because we conclude that interests within the exemptions do not give rise to due process concerns, Patent Owner's due process arguments regarding the Cisco stock fail.

We pause to point out that Patent Owner is essentially asking us to decide that the ethical framework developed by OGE at Congress' direction, and with public input, and that has been in place for the last twenty-seven

---

[12] We don't know, but strongly suspect, that OGE would have been aware of the relevant authorities, such as *Gibson*, *Tumey*, and *Ward*, and that the exemptions were specifically crafted to be consistent with the law.

years, across most of the Executive Branch, is unconstitutional. We decline to do that.

The Foley payments do not fall within the exemptions, but, for the reasons explained above, Patent Owner's theory about how they might have influenced decision-making has no support and is far too remote and tenuous to support a due process argument.

For these reasons, Patent Owner has not shown that the Cisco relationships give rise to a due proces violation that would require recusal of any APJ on the original panel, or vacatur of the Institution Decision.

*Due Process: Alleged Actual Bias*

Patent Owner also argues that a "discrepancy between the post-judgment institution rates for panels with and without APJ McNamara—those decided after the extent of Cisco's liability was established—raises *at least an appearance of actual bias*." Recusal Motion 5 (emphasis added).

As an initial matter, it is unclear what "appearance of actual bias" means—the relevant inquiry looks for *either* "an appearance of bias" *or* "actual bias." *See, e.g.*, *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) ("To demonstrate a violation of due process because of judicial bias, a claimant must show either actual bias or an appearance of bias."). However, because "a litigant is not denied due process by either the 'appearance' of partiality or by circumstances which might lead one to speculate as to a judge's impartiality," but *only* "if he is in fact treated unfairly," *Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir. 1981), we will assume Patent Owner means to argue that its analysis provides evidence of *actual* bias.

The Supreme Court explained in *Aetna* that disqualification for personal bias would be constitutionally required "only in the most extreme of cases" and, as in *Aetna*, Patent Owner's arguments "fall well below that level." 475 U.S. at 821.

The mere fact that a judicial decision, or decisions, went against a party is insufficient alone to show bias. *See, e.g.*, *Bixler*, 596 F.3d at 762 ("Adverse rulings alone do not demonstrate judicial bias."). Thus, APJ McNamara's presence on panels that instituted IPRs on Patent Owner's patents, or found claims of Patent Owner's patents unpatentable, does not itself show bias against Patent Owner.

Presumably because it cannot show personal bias from the decisions themselves, Patent Owner argues, as noted above, that bias can be seen in "[t]he discrepancy between the post-judgment institution rates for panels with and without APJ McNamara." Recusal Motion 5. That argument has absolutely no basis in fact.

We first note that any "actual bias" supposedly indicated by the post-judgment cases would be against Patent Owner, not in favor of Cisco, because the record indicates that all but one of the patents in the eight post-judgment IPRs that are the subject of the higher institution rate argument have only been asserted against Petitioner, not Cisco. *See, e.g.*, IPR2021-01147, Paper 3, 1 (identifying as related only *Centripetal Networks, Inc., v. Palo Alto Networks, Inc.*, 2:21-cv-137 (E.D. Va.)).

Patent Owner has thus *pivoted* from arguing that APJ McNamara was biased *in favor of Cisco* for financial reasons to arguing that, following the *Cisco* verdict, he became biased *against Patent Owner* for some personal reason. But Patent Owner does not even try to explain *why* APJ McNamara

18

would have a personal bias against Patent Owner. Patent Owner does not point to *any* conduct, statement, or anything else during the first set of cases, or arising in any other context, that would reflect or explain any personal animosity. As noted above, adverse decisions do not show bias.

Notably, of the five patents asserted in the *Cisco* case, three—US 9,137,205, US 9,560,176, and US 9,686,193—were the subject of 2018 IPR petitions, and panels that included APJ McNamara instituted IPRs on the '205 patent, but denied institution of IPRs on both the '176 patent and '193 patents. *See* IPR2018-01443 and -01444 ('205 patent); IPR2018-01654 and -01655 ('176 patent); IPR2018–01559 ('193 patent). That panels including APJ McNamara *declined to review* two of the patents being asserted by Patent Owner against Cisco undercuts any argument of bias against Patent Owner, or in favor of Cisco.

Were the failure to provide any explanation for the alleged personal bias not itself fatal to this argument, we find Patent Owner's "statistics" completely inadequate to show bias. Patent Owner has not shown that the sample size is large enough to be statistically significant (particularly given that two of the cases in the second group are the joinder petitions), and the petitions involved different petitioners, entirely different patents, entirely different prior art, and were prepared by different firms. This is not an apples-to-apples comparison.

Perhaps the biggest problem, however, is that Patent Owner fails to account for the fact that the pre- and post-verdict panels were very different. To promote consistency, the Board assigns related cases to "the fewest total judges as is practicable." *See* PTAB Standard Operating Procedure 1, 9. The fourteen 2018 cases were thus assigned to panels drawn from a group of

six APJs. But because some of those APJs were no longer available, the panels for the 2021 and 2022 cases have been drawn from a very different group of seven APJs. Thus, even if the pre- and post-verdict Petitions were equivalent on the merits (and there is no reason to think that), the most logical explanation for a difference in institution rates (if there was a statistically significant difference, which Patent Owner has not shown) would be the influence of *new* APJs on the panels, not a sudden (and, again, completely unexplained) change of heart on the part of APJ McNamara.

Patent Owner's argument about institution rates does not even begin to approach the strict standard identified in *Aetna* for a showing of personal bias but, instead, is just another "reckless" attack based on "unsupported rumor, conjecture, and speculation." *Maier*, 758 F.2d at 1583–84.

### Alleged Inconsistency Between the
### Federal Circuit Case and this One

Patent Owner repeatedly argues there is a serious conflict between the Federal Circuit's decision vacating the *Cisco* judgment because Judge Morgan's wife owned a small amount of Cisco stock, and APJ McNamara being a member of the panel while owning a small amount of Cisco stock. *See, e.g.*, Recusal Motion 1, 10. That is not correct.

As explained above, the Federal Circuit reversed Judge Morgan because 28 U.S.C. § 455(b) prohibits ownership of *any* stock, and the blind trust was not a sufficient divestiture under § 455(f). But 28 U.S.C. § 455(b) does not apply to the Board,[13] and Patent Owner does not argue that it does. As also explained above, the regulations that *do* apply to the Board allow

---

[13] *See Chianelli v. Env't Prot. Agency*, 8 F. App'x 971, 980 (Fed. Cir. 2001) (explaining that § 455 "does not apply to . . . administrative judges").

ownership of up to $15,000 of stock in a party and up to $25,000 of stock in a non-party that may be affected by a matter handled by an APJ.

There is no "conflict[] [that] cannot be reconciled" (Recusal Motion 1) for the simple reason that the District Courts and the Board operate under different rules, and the Federal Circuit's decision did not address due process at all.[14]

Patent Owner is essentially making a policy argument, that, like Article III judges, APJs should not be permitted to own *any* stock in parties or affected entities.[15] But that is not the current policy and, critically, it was not the policy *at the time of the Institution Decision*. Patent Owner cannot reasonably or logically argue that an APJ was unethical or should have recused themselves from a panel *in the past* because the applicable standards should be different *in the future*. Under the standards that have been in place throughout this proceeding, there is no colorable argument for recusal.

### *Patent Owner's Unexplained Delay*

Patent Owner admittedly became aware of the facts underlying its conflict arguments at least as early as *September 29, 2022*. *See* Ex. 2029 (Andre Affidavit) ¶ 2. Patent Owner then sat on that information for more than *three months*.

---

[14] Notably, the standard for disqualification under the Due Process Clause is *less demanding* than that imposed by § 455, because § 455 "requires disqualification when others would have reasonable cause to question the judge's impartiality," but "[t]he Due Process Clause requires a judge to step aside [only] when a reasonable judge would find it necessary to do so." *U.S. v. Couch*, 896 F.2d 78, 82 (1990) (citing *Aetna*, 475 U.S. at 822).

[15] As noted above, Patent Owner is fully aware of the current policy. *See* Ex. 1054, 9 (acknowledging "the relaxed stock-ownership rules APJs appear to enjoy under 5 C.F.R. §2640.202(a)").

The extended delay, during which the panel was working on the rehearing request decision and the decisions on the joinder petitions, strongly suggests that Patent Owner was waiting to see if the original panel would issue a favorable decision on the reconsideration motion or, as Petitioner argues, that Patent Owner was waiting to see if it might receive a favorable decision from the Supreme Court. *See* Recusal Opposition 7. But no matter which it was, it was highly inappropriate, because a matter as serious as a conflict requiring recusal of multiple APJs should have been raised *immediately*, not held for strategic reasons.

We find that, even if there had been a conflict at institution, Patent Owner's unjustified delay in raising the issue would bar the relief now being sought, because "[t]imeliness is an essential element of a recusal motion." *U.S. v. Owens*, 902 F.2d 1154, 1155 (4th Cir. 1990); *see In re United Shoe Machinery Corp.*, 276 F.2d 77, 79 (1st Cir. 1960) ("One of the reasons for requiring promptness in filing [recusal motions] is that a party knowing of a ground for requesting disqualification, cannot be permitted to wait and decide whether he likes the treatment that he receives.").

*Withdrawal of APJs McNamara and Amundson*

In its reply brief, Patent Owner suggests that APJs McNamara and Amundson withdrew from the case due to undisclosed conflicts. *See* Recusal Reply 4–5. That is not correct. Had there been a conflict requiring them to withdraw, the panel change order would have listed "recusal," not "unavailability," as the reason. *See* PTAB Standard Operating Procedure 1, 13; Paper 51. Unavailability is an open-ended category that includes any reason for an APJ's withdrawal other than conflicts or deadlines.

*B.      Motions for Rehearing*

In the Joinder Rehearing Requests, Patent Owner argues that the Cisco and Keycite institution decisions must be vacated because APJ McNamara had a "conflict based on a pecuniary interest in Cisco." Paper 48, 6; Paper 49, 6.

Because, for the reasons discussed in Section II.A above, we find no conflict requiring recusal, Patent Owner's argument fails, and the rehearing requests are denied to the extent they are based on that argument. The panel will address other arguments made in the rehearing requests in due course.

## IV.      ORDER

For the foregoing reasons, it is ORDERED that

(a)  Patent Owner's Motion for Recusal and Vacatur (Paper 37) is denied; and

(b)  Patent Owner's Requests for Rehearing of the decisions instituting and joining the Petitions filed in IPR2022-01151 and IPR2022-01199 (Papers 48 and 49) are denied-in-part.

FOR PETITIONER:

Scott A. McKeown
Mark D. Rowland
James R. Batchelder
Andrew Radsch
Keyna Chow
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
mark.rowland@ropesgray.com
james.batchelder@ropegray.com
andrew.radsch@ropesgray.com
keyna.chow@ropesgray.com

Theodore M. Foster
David L. McCombs
Gregory P. Huh
HAYNES AND BOONE, LLP
ipr.theo.foster@haynesboone.com
david.mccombs.ipr@haynesboone.com
gregory.huh.ipr@haynesboone.com

Gerard M. Donovan
Peter J. Chassman
Jonathan I. Detrixhe
Sidharth Kapoor
REED SMITH LLP
gdonovan@reedsmith.com
pchassman@reedsmith.com
jdetrixhe@reedsmith.com
skapoor@reedsmith.com

For PATENT OWNER:

James Hannah
Jeffrey H. Price
Jenna Fuller
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com

24

jprice@kramerlevin.com
jfuller@kramerlevin.com

Bradley C. Wright
Scott M. Kelly
Blair A. Silver
BANNER & WITCOFF, LTD.
bwright@bannerwitcoff.com
skelly@bannerwitcoff.com
bsilver@bannerwitcoff.com



(12) **United States Patent**
Ahn et al.

(10) Patent No.: **US 9,917,856 B2**
(45) Date of Patent: **Mar. 13, 2018**

(54) **RULE-BASED NETWORK-THREAT DETECTION FOR ENCRYPTED COMMUNICATIONS**

(71) Applicant: **Centripetal Networks, Inc.**, Herndon, VA (US)

(72) Inventors: **David K. Ahn**, Winston-Salem, NC (US); **Sean Moore**, Hollis, NH (US); **Douglas M. DiSabello**, Leesburg, VA (US)

(73) Assignee: **Centripetal Networks, Inc.**, Portsmouth, NH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/757,638**

(22) Filed: **Dec. 23, 2015**

(65) **Prior Publication Data**

US 2017/0187733 A1      Jun. 29, 2017

(51) **Int. Cl.**
**H04L 29/06**        (2006.01)
**H04L 29/12**        (2006.01)

(52) **U.S. Cl.**
CPC ...... **H04L 63/1425** (2013.01); **H04L 61/1511** (2013.01); **H04L 63/0263** (2013.01); **H04L 63/0281** (2013.01); **H04L 63/1416** (2013.01); **H04L 63/20** (2013.01); **H04L 69/22** (2013.01)

(58) **Field of Classification Search**
USPC ............................................. 713/153
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,098,172 | A | 8/2000 | Coss et al. |
| 6,147,976 | A | 11/2000 | Shand et al. |
| 6,226,372 | B1 | 5/2001 | Beebe et al. |
| 6,317,837 | B1 | 11/2001 | Kenworthy |
| 6,484,261 | B1 | 11/2002 | Wiegel |
| 6,611,875 | B1 | 8/2003 | Chopra et al. |
| 6,662,235 | B1 | 12/2003 | Callis et al. |
| 7,089,581 | B1 | 8/2006 | Nagai et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2005328336 B2 | 9/2011 |
| AU | 2006230171 B2 | 6/2012 |

(Continued)

OTHER PUBLICATIONS

Apr. 15, 2016—(US) Notice of Allowance—U.S. Appl. No. 14/855,374.

(Continued)

*Primary Examiner* — Jason Lee
(74) *Attorney, Agent, or Firm* — Banner & Witcoff, Ltd.

(57)      **ABSTRACT**

A packet-filtering system configured to filter packets in accordance with packet-filtering rules may receive data indicating network-threat indicators and may configure the packet-filtering rules to cause the packet-filtering system to identify packets comprising unencrypted data, and packets comprising encrypted data. A portion of the unencrypted data may correspond to one or more of the network-threat indicators, and the packet-filtering rules may be configured to cause the packet-filtering system to determine, based on the portion of the unencrypted data, that the packets comprising encrypted data correspond to the one or more network-threat indicators.

**25 Claims, 13 Drawing Sheets**



**PAN EX1001**
**Palo Alto Networks v. Centripetal Networks**
**IPR2022-00182**
**Page 00001**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,107,613 B1 | 9/2006 | Chen et al. | |
| 7,215,637 B1 | 5/2007 | Ferguson et al. | |
| 7,227,842 B1 | 6/2007 | Ji et al. | |
| 7,237,267 B2 | 6/2007 | Rayes et al. | |
| 7,263,099 B1 | 8/2007 | Woo et al. | |
| 7,299,353 B2 | 11/2007 | Le Pennec et al. | |
| 7,331,061 B1 | 2/2008 | Ramsey et al. | |
| 7,478,429 B2 | 1/2009 | Lyon | |
| 7,539,186 B2 | 5/2009 | Aerrabotu et al. | |
| 7,610,621 B2 | 10/2009 | Turley et al. | |
| 7,684,400 B2 | 3/2010 | Govindarajan et al. | |
| 7,710,885 B2 | 5/2010 | Ilnicki et al. | |
| 7,721,084 B2 | 5/2010 | Salminen et al. | |
| 7,818,794 B2 | 10/2010 | Wittman | |
| 7,954,143 B2 | 5/2011 | Aaron | |
| 8,004,994 B1 | 8/2011 | Darisi et al. | |
| 8,037,517 B2 | 10/2011 | Fulp et al. | |
| 8,042,167 B2 | 10/2011 | Fulp et al. | |
| 8,117,655 B2 | 2/2012 | Spielman | |
| 8,176,561 B1 | 5/2012 | Hurst et al. | |
| 8,306,994 B2 | 11/2012 | Kenworthy | |
| 8,495,725 B2 | 7/2013 | Ahn | |
| 8,726,379 B1 | 5/2014 | Stiansen et al. | |
| 8,806,638 B1 | 8/2014 | Mani | |
| 8,856,926 B2 | 10/2014 | Narayanaswamy et al. | |
| 8,935,785 B2 | 1/2015 | Pandrangi | |
| 9,094,445 B2 | 7/2015 | Moore et al. | |
| 9,124,552 B2 | 9/2015 | Moore | |
| 9,137,205 B2 | 9/2015 | Rogers et al. | |
| 9,154,446 B2 | 10/2015 | Gemelli et al. | |
| 9,160,713 B2 | 10/2015 | Moore | |
| 2001/0039579 A1 | 11/2001 | Trcka et al. | |
| 2001/0039624 A1 | 11/2001 | Kellum | |
| 2002/0016858 A1 | 2/2002 | Sawada et al. | |
| 2002/0038339 A1 | 3/2002 | Xu | |
| 2002/0049899 A1 | 4/2002 | Kenworthy | |
| 2002/0164962 A1 | 11/2002 | Mankins et al. | |
| 2002/0165949 A1 | 11/2002 | Na et al. | |
| 2002/0186683 A1 | 12/2002 | Buck et al. | |
| 2002/0198981 A1 | 12/2002 | Corl et al. | |
| 2003/0035370 A1 | 2/2003 | Brustoloni | |
| 2003/0097590 A1 | 5/2003 | Syvanne | |
| 2003/0105976 A1 | 6/2003 | Copeland | |
| 2003/0120622 A1 | 6/2003 | Nurmela et al. | |
| 2003/0123456 A1 | 7/2003 | Denz et al. | |
| 2003/0142681 A1 | 7/2003 | Chen et al. | |
| 2003/0145225 A1 | 7/2003 | Bruton et al. | |
| 2003/0154297 A1 | 8/2003 | Suzuki et al. | |
| 2003/0154399 A1 | 8/2003 | Zuk et al. | |
| 2003/0188192 A1 | 10/2003 | Tang et al. | |
| 2003/0212900 A1 | 11/2003 | Liu et al. | |
| 2004/0010712 A1 | 1/2004 | Hui et al. | |
| 2004/0073655 A1 | 4/2004 | Kan et al. | |
| 2004/0088542 A1 | 5/2004 | Daude et al. | |
| 2004/0093513 A1 | 5/2004 | Cantrell et al. | |
| 2004/0098511 A1 | 5/2004 | Lin et al. | |
| 2004/0151155 A1 | 8/2004 | Jouppi | |
| 2004/0177139 A1 | 9/2004 | Schuba et al. | |
| 2004/0193943 A1 | 9/2004 | Angelino et al. | |
| 2004/0199629 A1* | 10/2004 | Bomer | G06F 11/362 |
| | | | 709/224 |
| 2004/0205360 A1 | 10/2004 | Norton et al. | |
| 2004/0250124 A1 | 12/2004 | Chesla et al. | |
| 2005/0010765 A1 | 1/2005 | Swander et al. | |
| 2005/0024189 A1 | 2/2005 | Weber | |
| 2005/0108557 A1 | 5/2005 | Kayo et al. | |
| 2005/0114704 A1 | 5/2005 | Swander | |
| 2005/0117576 A1 | 6/2005 | McDysan et al. | |
| 2005/0125697 A1 | 6/2005 | Tahara | |
| 2005/0138204 A1 | 6/2005 | Iyer et al. | |
| 2005/0138353 A1* | 6/2005 | Spies | H04L 63/0442 |
| | | | 713/153 |
| 2005/0141537 A1 | 6/2005 | Kumar et al. | |
| 2005/0183140 A1 | 8/2005 | Goddard | |
| 2005/0229246 A1 | 10/2005 | Rajagopal et al. | |
| 2005/0251570 A1 | 11/2005 | Heasman et al. | |
| 2005/0286522 A1 | 12/2005 | Paddon et al. | |
| 2006/0048142 A1 | 3/2006 | Roese et al. | |
| 2006/0053491 A1 | 3/2006 | Khuti et al. | |
| 2006/0070122 A1 | 3/2006 | Bellovin | |
| 2006/0104202 A1 | 5/2006 | Reiner | |
| 2006/0114899 A1 | 6/2006 | Toumura et al. | |
| 2006/0136987 A1 | 6/2006 | Okuda | |
| 2006/0137009 A1 | 6/2006 | Chesla | |
| 2006/0146879 A1 | 7/2006 | Anthias et al. | |
| 2006/0195896 A1 | 8/2006 | Fulp et al. | |
| 2006/0212572 A1 | 9/2006 | Afek et al. | |
| 2006/0248580 A1 | 11/2006 | Fulp et al. | |
| 2006/0262798 A1 | 11/2006 | Joshi et al. | |
| 2007/0083924 A1 | 4/2007 | Lu | |
| 2007/0211644 A1 | 9/2007 | Ottamalika et al. | |
| 2007/0240208 A1 | 10/2007 | Yu et al. | |
| 2008/0005795 A1 | 1/2008 | Acharya et al. | |
| 2008/0043739 A1 | 2/2008 | Suh et al. | |
| 2008/0072307 A1 | 3/2008 | Maes | |
| 2008/0077705 A1 | 3/2008 | Li et al. | |
| 2008/0163333 A1 | 7/2008 | Kasralikar | |
| 2008/0229415 A1 | 9/2008 | Kapoor et al. | |
| 2008/0235755 A1 | 9/2008 | Blaisdell et al. | |
| 2008/0279196 A1 | 11/2008 | Friskney et al. | |
| 2008/0301765 A1 | 12/2008 | Nicol et al. | |
| 2009/0138938 A1 | 5/2009 | Harrison et al. | |
| 2009/0172800 A1 | 7/2009 | Wool | |
| 2009/0222877 A1 | 9/2009 | Diehl et al. | |
| 2009/0240698 A1 | 9/2009 | Shukla et al. | |
| 2009/0328219 A1 | 12/2009 | Narayanaswamy | |
| 2010/0011433 A1 | 1/2010 | Harrison et al. | |
| 2010/0011434 A1 | 1/2010 | Kay | |
| 2010/0199346 A1 | 8/2010 | Ling et al. | |
| 2010/0211678 A1 | 8/2010 | McDysan et al. | |
| 2010/0232445 A1 | 9/2010 | Bellovin | |
| 2010/0242098 A1 | 9/2010 | Kenworthy | |
| 2010/0268799 A1 | 10/2010 | Maestas | |
| 2010/0296441 A1 | 11/2010 | Barkan | |
| 2010/0303240 A1 | 12/2010 | Beachem et al. | |
| 2011/0055916 A1 | 3/2011 | Ahn | |
| 2011/0055923 A1 | 3/2011 | Thomas | |
| 2011/0088092 A1 | 4/2011 | Nguyen et al. | |
| 2011/0141900 A1 | 6/2011 | Jayawardena et al. | |
| 2011/0185055 A1 | 7/2011 | Nappier et al. | |
| 2011/0270956 A1 | 11/2011 | McDysan et al. | |
| 2012/0023576 A1* | 1/2012 | Sorensen | G06F 21/577 |
| | | | 726/22 |
| 2012/0106354 A1 | 5/2012 | Pleshek et al. | |
| 2012/0113987 A1 | 5/2012 | Riddoch et al. | |
| 2012/0240135 A1 | 9/2012 | Risbood et al. | |
| 2012/0264443 A1 | 10/2012 | Ng et al. | |
| 2012/0314617 A1 | 12/2012 | Erichsen et al. | |
| 2012/0331543 A1 | 12/2012 | Bostrom et al. | |
| 2013/0047020 A1 | 2/2013 | Hershko et al. | |
| 2013/0059527 A1 | 3/2013 | Hasesaka et al. | |
| 2013/0061294 A1 | 3/2013 | Kenworthy | |
| 2013/0117852 A1 | 5/2013 | Stute | |
| 2013/0254766 A1 | 9/2013 | Zuo et al. | |
| 2013/0305311 A1 | 11/2013 | Puttaswamy Naga et al. | |
| 2014/0075510 A1 | 3/2014 | Sonoda et al. | |
| 2014/0115654 A1 | 4/2014 | Rogers et al. | |
| 2014/0201123 A1 | 7/2014 | Ahn et al. | |
| 2014/0215574 A1 | 7/2014 | Erb et al. | |
| 2014/0281030 A1 | 9/2014 | Cui et al. | |
| 2014/0283004 A1 | 9/2014 | Moore | |
| 2014/0283030 A1 | 9/2014 | Moore et al. | |
| 2014/0317397 A1 | 10/2014 | Martini | |
| 2014/0366132 A1 | 12/2014 | Stiansen et al. | |
| 2015/0207813 A1* | 7/2015 | Reybok | G06F 21/552 |
| | | | 726/22 |
| 2015/0237012 A1 | 8/2015 | Moore | |
| 2015/0304354 A1 | 10/2015 | Rogers et al. | |

(56)                **References Cited**

U.S. PATENT DOCUMENTS

2015/0334125 A1    11/2015    Bartos et al.
2015/0350229 A1    12/2015    Mitchell
2015/0373043 A1    12/2015    Wang et al.

FOREIGN PATENT DOCUMENTS

CA      2600236  A1    10/2006
EP      1006701  A2    6/2000
EP      1313290  A1    5/2003
EP      1484884  A2    12/2004
EP      1677484  A2    7/2006
EP      2385676  A1    11/2011
EP      2498442  A1    9/2012
EP      1864226  B1    5/2013
KR  20010079361  A    8/2001
WO    2005046145  A1    5/2005
WO    2006093557  A2    9/2006
WO    2006105093  A2    10/2006
WO    2007109541  A2    9/2007
WO    2011038420  A2    3/2011
WO    2012146265  A1    11/2012

OTHER PUBLICATIONS

ISR for PCT/US2013/057502, dated Nov. 7, 2013.
International Search Report off International Application No. PCT/US2014/023286, dated Jun. 24, 2014.
ISR off International Application No. PCT/US2013/072566, dated Mar. 24, 2014.
ISR off International Application No. PCT/US2014/027723, dated Jun. 26, 2014.
"Control Plane Policing Implementation Best Practices"; Cisco Systems; Mar. 13, 2013; <https://web.archive.org/web/20130313135143/http:www.cisco.com/web/about/security/intelligence/coppwp_gs.html>.
Reumann, John; "Adaptive Packet Filters"; IEEE, 2001, Department of Electrical Engineering and Computer Science, the University of Michigan, Ann Arbor, MI.
Greenwald, Michael; "Designing an Academic Firewall: Policy, Practice, and Experience with SURF"; IEEE, Proceedings of SNDSS, 1996.
Mizuno et al., A New Remote Configurable Firewall System for Home-use Gateways, Jan. 2005. Second IEEE Consumer Communications and Networking Conference, pp. 599-601.
"SBIR Case Study: Centripetal Networks Subtitle: How CNI Leveraged DHS S&T SBIR Funding to Launch a Successful Cyber Security Division 2012 Principal Investigators' Meeting"; Sean Moore, Oct. 10, 2014.
John Kindervag; "Build Security Into Your Network's DNA: The Zero Trust Network Architecture", Forrester Research Inc.; Nov. 5, 2010, pp. 1-26.
Palo Alto Networks; "Designing a Zero Trust Network With Next-Generation Firewalls"; pp. 1-10; last viewed on Oct. 21, 2012.
Jan. 11, 2016—(US) Non Final Rejection—U.S. Appl. No. 14/698,560.
Apr. 27, 2011—(WO) International Search Report and Written Opinion—App PCT/US2010/054520.
Mar. 4, 2011—(US) Notice of Allowance—U.S. Appl. No. 11/316,331.
Mar 3, 2011—(EP) Communication Pursuant to Rules 70(2) and 70a(2)—App 06758213.0.
Feb. 14, 2011—(EP) Search Report—App 06758213.0.
Fulp, Errin: "Errin Fulp," XP002618346, www.cs.wfu.edu/fulp/ewfPub.html, pp. 1-5 (Copyright 2010).
Sep. 30, 2010—(US) Office Action—U.S. Appl. No. 11/390,976.
Sep. 10, 2010—(AU) Office Action—App 2006230171.
Aug. 20, 2010—(AU) Office Action—App 2005328336.
Jun. 23, 2010—(US) Final Rejection—U.S. Appl. No. 11/316,331.
Apr. 29, 2010—(US) Interview Summary—U.S. Appl. No. 11/390,976.

Mar. 26, 2010—(US) Final Rejection—U.S. Appl. No. 11/390,976.
Sep. 14, 2009 (US) Office Action—U.S. Appl. No. 11/316,331.
Jun. 24, 2009—(US) Office Action—U.S. Appl. No. 11/390,976.
Jul. 3, 2008—(WO) Written Opinion of the International Searching Authority—App PCT/US06/11291.
Aug. 31, 2007—(EP) Communication Pursuant to Rules 109 and 110—App 05857614.1.
Acharya et al, "OPTWALL: A Hierarchical Traffic-Aware Firewall," Department of Computer Science, Telecommunications Program, University of Pittsburgh, pp. 1-11 (2007).
Sep. 11, 2006—(WO) Written Opinion of the International Searching Authority—App PCT/US05/47008.
Tarsa et al., "Balancing Trie-Based Policy representations for Network Firewalls," Department of Computer Science, Wake Forest University, pp. 1-6 (2006).
Fulp, "Trie-Based Policy Representations for Network Firewalls," Proceedings of the IEEE International Symposium on Computer Communications (2005).
E. Fulp, "Optimization of Network Firewall Policies Using Ordered Sets and Directed Acyclical Graphs", Technical Report, Computer Solent Department, Wake Forest University, Jan. 2004.
E. Fulp et al., "Network Firewall Policy Tries", Technical Report, Computer Science Department, Wake Forest University, 2004.
E. Al-Shaer et al., "Modeling and Management of Firewall Policies", IEEE Transactions on Network and Service Management, 1(1): 2004.
E.W. Fulp, "Firewall Architectures for High Speed Networks", U.S. Department of Energy Grant Application, Funded Sep. 2003.
E. Al-Shaer et al., "Firewall Policy Advisor for Anomaly Discovery and Rule Editing", Proceedings of the IFIP/IEEE International Symposium on Integrated Network Management, 2003.
V.P. Ranganath, "A Set-Based Approach to Packet Classification", Proceedings of the IASTED International Conference on Parallel and Distributed Computing and Systems, 889-894, 2003.
M. Christiansen et al., "Using IDDsfor Packet Filtering", Technical Report, BRICS, Oct. 2002.
Lee et al., "Development Framework for Firewall Processors," IEEE, pp. 352-355 (2002).
L. Qui et al., "Fast Firewall Implementations for Software and Hardware-Based Routers", Proceedings of ACM Sigmetrics, Jun. 2001.
D. Eppstein et al., "Internet Packet Filter Management and Rectangle Geometry", Proceedings of the Symposium on Discrete Algorithms, 827-835, 2001.
E. Fulp, "Preventing Denial of Service Attacks on Quality of Service", Proceedings of the 2001 DARPA Information Survivability Conference and Exposition II, 2001.
S. Goddard et al., "An Unavailability Analysis of Firewall Sandwich Configurations", Proceedings of the 6th IEEE Symposium on High Assurance Systems Engineering, 2001.
G.V. Rooij, "Real Stateful TCP Packet Filtering in IP Filter", Proceedings of the 10th USENIX Security Symposium, 2001.
P. Warkhede et al., "Fast Packet Classification for Two-Dimensional Conflict-Free Filters", Proceedings of IEEE INFOCOM, 1434-1443, 2001.
D. Decasper et al., "Router Plugins: A Software Architecture for Next-Generation Routers", IEEE/ACM Transactions on Networking, 8(1): Feb. 2000.
A. Feldmann et al., "Tradeoffs for Packet Classification", Proceedings of the IEEE INFOCOM, 397-413, 2000.
X. Gan et al., "LSMAC vs. LSNAT: Scalable Cluster-based Web servers", Journal of Networks, Software Tools, and Applications, 3(3): 175-185, 2000.
A. Hari et al., "Detecting and Resolving Packet Filter Conflicts", Proceedings of IEEE INFOCOM, 1203-1212, 2000.
O. Paul et al., "A full Bandwidth ATM Firewall", Proceedings of the 6th European Symposium on Research in Computer Security ESORICS'2000, 2000.
J. Xu et al., "Design and Evaluation of a High-Performance ATM Firewall Switch and Its Applications", IEEE Journal on Selected Areas in Communications, 17(6): 1190-1200, Jun. 1999.

(56)            **References Cited**

OTHER PUBLICATIONS

C. Benecke, "A Parallel Packet Screen for High Speed Networks", Proceedings of the 15th Annual Computer Security Applications Conference, 1999.
R. Funke et al., "Performance Evaluation of Firewalls in Gigabit-Networks", Proceedings of the Symposium on Performance Evaluation of Computer and Telecommunication Systems, 1999.
S. Suri et al., "Packet Filtering in High Speed Networks", Proceedings of the Symposium on Discrete Algorithms, 969-970, 1999.
J. Ellermann et al., "Firewalls for ATM Networks", Proceedings of INFOSEC'COM, 1998.
V. Srinivasan et al., "Fast and Scalable Layer Four Switching", Proceedings of ACM SIGCOMM, 191-202, 1998.
M. Degermark et al., "Small Forwarding Tables for Fast Routing Lookups", Proceedings of ACM SIGCOMM, 4-13, 1997.
S.M. Bellovin et al., "Network Firewalls", IEEE Communications Magazine, 50-57, 1994.
W.E. Leland et al., "On the Self-Similar Nature of Ethernet Traffic", IEEE Transactions on Networking, 2(1); 15, 1994.
G. Brightwell et aL., "Counting Linear Extensions is #P-Complete", Proceedings of the Twenty-Third Annual ACM Symposium on Theory of Computing, 1991.
M. Al-Suwaiyel et al., "Algorithms for Tile Compaction", ACM Transactions on Database Systems, 9(2): 243-263, Jun. 1984.
D. Comer, "Analysis of a Heuristic for Full Tile Minimization", ACM Transactions on Database Systems, 6(3): 513-537, Sep. 1981.
R.L. Graham et al., "Optimization and Approximation in Deterministic Sequencing and Scheduling: A Survey", Annals of Discrete Mathematics, 5: 287-326, 1979.
E.L. Lawler, "Sequencing Jobs to Minimize Total Weighted Completion oTime Subject to Precedence Constraints", Annals of Discrete Mathematics, 2: 75-90, 1978.
J.K. Lenstra et al., "Complexity of Scheduling Under Precedence Constraints", Operations Research, 26(1): 22-35,1978.
R. Rivest, "On Self-Organizing Sequential Search Heuristics", Communications of the ACM, 19(2): 1976.
W.E. Smith, "Various Optimizers for Single-Stage Productions", Naval Research Logistics Quarterly, 3: 59-66, 1956.
Bellion, "High Performance Packet Classification", http://www. hipac.org (Publication Date Unknown).
Oct. 18, 2011—(EP) Communication Pursuant to Article 94(3)—App 06 758 213.0.
Jun. 9, 2011—(US) Notice of Allowance—U.S. Appl. No. 11/390,976.
Jun. 26, 2012—(EP) Extended Search Report—App 05857614.1.
Jun. 9, 2012—(AU) Notice of Acceptance—App 2006230171.
Nov. 11, 2011—(AU) Second Office Action—App 2006230171.
Jan. 17, 2013—(CA) Office Action—App 2,600,236.
Jan. 16, 2013—(CA) Office Action—App 2,594,020.
Nov. 20, 2012—(EP) Communication under rule 71(3)—App 06 758 213.0.
Apr. 18, 2013—(EP) Decision to Grant a European Patent—App 06758212.0.
Aug. 25, 2011—(US) Non Final Rejection—U.S. Appl. No. 12/871,806.
Feb. 6, 2012—(US) Final Rejection—U.S. Appl. No. 12/871,806.
Aug. 7, 2012—(US) Non Final Rejection—U.S. Appl. No. 12/871,806.
Nov. 26, 2012—(US) Final Rejection—U.S. Appl. No. 12/871,806.
Apr. 4, 2013—(US) Notice of Allowance—U.S. Appl. No. 12/871,806.

Jan. 14, 2015—(EP) Extended Search Report—App 10819667.6.
May 26, 2014—(CA) Office Action—App 2010297968.
May 25, 2015—(AU) Notice of Acceptance—App 2010297968.
May 14, 2015—(US) Non Final Rejection—U.S. Appl. No. 13/940,240.
Nov. 27, 2015—(US) Final Rejection—U.S. Appl. No. 13/940,240.
Jul. 10, 2015—(WO) Communication Relating to the Results of the Partial International Search for International App—PCT/US2015/024691.
Jul. 23, 2015—(WO) International Preliminary Report on Patentability—App PCT/US2013/072566.
Jan. 28, 2016—(WO) International Search Report and Written Opinion—App PCT/US2015/062691.
International Search Report and Written Opinion for International App. No. PCT/US2015/024691, dated Sep. 16, 2015.
International Preliminary Report on Patentability for International App. No. PCT/US2013/057502, dated Apr. 28, 2015.
International Preliminary Report on Patentability for International App. No. PCT/US2014/023286, dated Sep. 15, 2015.
International Preliminary Report on Patentability for International App. No. PCT/US2014/027723, dated Sep. 15, 2015.
Dec. 22, 2015—(US) Final Office Action—U.S. Appl. No. 14/714,207.
Feb. 26, 2016—(US) Non Final Office Action—U.S. Appl. No. 14/253,992.
Nov. 2, 2015—(AU) Office Action—App 2013372879.
Apr. 26, 2016—(US) Office Action—U.S. Appl. No. 14/745,207.
May 6, 2016—(US) Office Action—U.S. Appl. No. 14/714,207.
May 13, 2016—(US) Office Action—U.S. Appl. No. 13/940,240.
Jun. 14, 2016—(US) Office Action—U.S. Appl. No. 14/625,486.
Feb. 25, 2016—(AU) Office Action—App 2014249055.
Feb. 24, 2016—(AU) Office Action—App 2014228257.
Jun. 9, 2016—(WO) International Search Report—PCT/US2016/026339.
Jun. 16, 2016—(CA) Office Action—App 2,888,935.
Jul. 11, 2016—(EP) Office Action—App 14720824.3.
Jul. 22, 2016—(US) Office Action—U.S. Appl. No. 14/921,718.
Jul. 20, 2016—(AU) Office Action—App 2013335255.
Oct. 5, 2016—(US) Notice of Allowance—U.S. Appl. No. 14/698,560.
Sep. 13, 2016—(CA) Office Action—App 2,902,206.
Sep. 14, 2016—(CA) Office Action—App 2,897,737.
Sep. 26, 2016—(CA) Office Action—App 2,902,158.
Oct. 26, 2016—(US) Office Action—U.S. Appl. No. 13/940,240.
Nov. 21, 2016—(US) Office Action—U.S. Appl. No. 14/745,207.
Dec. 5, 2016—(US) Notice of Allowance—U.S. Appl. No. 14/714,207.
Singh, Rajeev et al. "Detecting and Reducing the Denial of Service attacks in WLANs", Dec. 2011, World Congress on Information and Communication TEchnologies, pp. 968-973.
Feb. 10, 2017—(US) Notice of Allowance—U.S. Appl. No. 14/625,486.
Feb. 15, 2017—(US) Notice of Allowance—U.S. Appl. No. 14/921,718.
Mar. 6, 2017—(WO) International Search Report and Written Opinion—App PCT/US2016/068008.
Jun. 7, 2017—(US) Office Action—U.S. Appl. No. 14/745,207.
Sep. 4, 2015 (US) Notice of Allowance—U.S. Appl. No. 14/702,755.
Jun. 7, 2017—(WO) International Search Report and Written Opinion—App PCT/US2016/067111.

* cited by examiner



FIG. 1

IPR2022-00182 Page 00005



FIG. 2



FIG. 3A



FIG. 3B

IPR2022-00182 Page 00008



FIG. 3C

Appx0094



FIG. 4A

IPR2022-00182 Page 00010



FIG. 4B

IPR2022-00182 Page 00011



FIG. 4C

IPR2022-00182 Page 00012



FIG. 5A



FIG. 5B

IPR2022-00182 Page 00014



FIG. 6A



FIG. 6B



FIG. 7

US 9,917,856 B2

# RULE-BASED NETWORK-THREAT DETECTION FOR ENCRYPTED COMMUNICATIONS

## BACKGROUND

Network security is becoming increasingly important as the information age continues to unfold. Network threats may take a variety of forms (e.g., unauthorized requests or data transfers, viruses, malware, large volumes of traffic designed to overwhelm resources, and the like). Network-threat services provide information associated with network threats, for example, reports that include listings of network-threat indicators (e.g., network addresses, domain names, uniform resource identifiers (URIs), and the like). Such information may be utilized to identify network threats. Encrypted communications, however, may obfuscate data corresponding to network threats. Accordingly, there is a need for rule-based network-threat detection for encrypted communications.

## SUMMARY

The following presents a simplified summary in order to provide a basic understanding of some aspects of the disclosure. It is intended neither to identify key or critical elements of the disclosure nor to delineate the scope of the disclosure. The following summary merely presents some concepts of the disclosure in a simplified form as a prelude to the description below.

Aspects of this disclosure relate to rule-based network-threat detection for encrypted communications. In accordance with embodiments of the disclosure, a packet-filtering system configured to filter packets in accordance with packet-filtering rules may receive data indicating network-threat indicators and may configure the packet-filtering rules to cause the packet-filtering system to identify packets comprising unencrypted data, and packets comprising encrypted data. A portion of the unencrypted data may correspond to one or more of the network-threat indicators, and the packet-filtering rules may be configured to cause the packet-filtering system to determine, based on the portion of the unencrypted data, that the packets comprising encrypted data correspond to the one or more network-threat indicators.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present disclosure is pointed out with particularity in the appended claims. Features of the disclosure will become more apparent upon a review of this disclosure in its entirety, including the drawing figures provided herewith.

Some features herein are illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings, in which like reference numerals refer to similar elements, and wherein:

FIG. 1 depicts an illustrative environment for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure;

FIG. 2 depicts an illustrative packet-filtering system for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure;

FIGS. 3A-C, 4A-C, 5A-B, and 6A-B depict illustrative event sequences for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure; and

FIG. 7 depicts an illustrative method for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure.

## DETAILED DESCRIPTION

In the following description of various illustrative embodiments, reference is made to the accompanying drawings, which form a part hereof, and in which is shown, by way of illustration, various embodiments in which aspects of the disclosure may be practiced. It is to be understood that other embodiments may be utilized, and structural and functional modifications may be made, without departing from the scope of the disclosure.

Various connections between elements are discussed in the following description. These connections are general and, unless specified otherwise, may be direct or indirect, wired or wireless. In this respect, the specification is not intended to be limiting.

FIG. 1 depicts an illustrative environment for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure. Referring to FIG. 1, environment 100 may include networks 102 and 104. Network 102 may comprise one or more networks (e.g., Local Area Networks (LANs), Wide Area Networks (WANs), Virtual Private Networks (VPNs), or combinations thereof) associated with one or more individuals or entities (e.g., governments, corporations, service providers, or other organizations). Network 104 may comprise one or more networks (e.g., LANs, WANs, VPNs, or combinations thereof) that interface network 102 with one or more other networks (not illustrated). For example, network 104 may comprise the Internet, a similar network, or portions thereof.

Environment 100 may also include one or more hosts, such as computing or network devices (e.g., servers, desktop computers, laptop computers, tablet computers, mobile devices, smartphones, routers, gateways, firewalls, switches, access points, or the like). For example, network 102 may include hosts 106, 108, and 110, proxy devices 112, 114, and 116, web proxy 118, rule gates 120, 122, 124, 126, and 128, domain name system (DNS) 130, Internet content adaptation protocol (ICAP) server 132, and gateway 134. As used herein, "host" (or "hosts") refers to any type of network device (or node) or computing device; while such devices may be assigned (or configured to be assigned) one or more network-layer addresses, the term "host" (or "hosts") does not imply such devices necessarily are assigned (or configured to be assigned) one or more network-layer addresses.

Gateway 134 may be located at border 136 between networks 102 and 104 and may interface network 102 or one or more hosts located therein with network 104 or one or more hosts located therein. For example, network 104 may include one or more rule providers 138, one or more threat-intelligence providers 140, and hosts 142, 144, and 146, and gateway 134 may interface hosts 106, 108, and 110, proxy devices 112, 114, and 116, web proxy 118, rule gates 120, 122, 124, 126, and 128, DNS 130, and ICAP server 132 with rule providers 138, threat-intelligence providers 140, and hosts 142, 144, and 146.

FIG. 2 depicts an illustrative packet-filtering system for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure. Referring to FIG. 2, packet-filtering system 200 may be associated with network 102 and may include one or more of rule gates 120, 122, 124, 126, and 128. Packet-filtering system 200 may comprise one or more processors

3

202, memory 204, one or more communication interfaces 206, and data bus 208. Data bus 208 may interface processors 202, memory 204, and communication interfaces 206. Memory 204 may comprise one or more program modules 210, rules 212, and logs 214. Program modules 210 may comprise instructions that when executed by processors 202 cause packet-filtering system 200 to perform one or more of the functions described herein. Rules 212 may comprise one or more packet-filtering rules in accordance with which packet-filtering system 200 is configured to filter packets received via communication interfaces 206. Logs 214 may include one or more entries generated by processors 202 in accordance with rules 212 for packets received by packet-filtering system 200 via communication interfaces 206.

Communication interfaces 206 may interface packet-filtering system 200 with one or more communication links of environment 100 (e.g., of networks 102 and 104). In some embodiments, one or more of communication interfaces 206 may interface directly with a communication link of environment 100. For example, interfaces 216 and 224 may interface directly with links 236 and 244, respectively. In some embodiments, one or more of communication interfaces 206 may interface indirectly with a communication link of environment 100. For example, interface 220 may interface with links 236 and 244 via one or more network devices 240. Network devices 240 may provide interface 220 with access to (or copies of) packets traversing one or more of links 236 and 244, for example, via a switched port analyzer (SPAN) port of network devices 240. Additionally or alternatively, interfaces 218 and 222 may interface with links 236 and 244 via tap devices 238 and 242. For example, packet-filtering system 200 may provision tap device 238 with one or more of rules 212 configured to cause tap device 238 to identify packets traversing link 236 that correspond to specified criteria and route (or forward) the packets (or copies thereof) to interface 218, and packet-filtering system 200 may provision tap device 242 with one or more of rules 212 configured to cause tap device 242 to identify packets traversing link 244 that correspond to specified criteria and route (or forward) the packets (or copies thereof) to interface 222. Similarly, interfaces 226 and 234 may interface directly with links 246 and 254, respectively; network devices 250 may provide interface 230 with access to (or copies of) packets traversing one or more of links 246 and 254; packet-filtering system 200 may provision tap device 248 with one or more of rules 212 configured to cause tap device 248 to identify packets traversing link 246 that correspond to specified criteria and route (or forward) the packets (or copies thereof) to interface 228; and packet-filtering system 200 may provision tap device 252 with one or more of rules 212 configured to cause tap device 252 to identify packets traversing link 254 that correspond to specified criteria and route (or forward) the packets (or copies thereof) to interface 232. In some embodiments, packet-filtering system 200 may comprise one or more of tap devices 238, 242, 248, and 252 or network devices 240 and 250.

FIGS. 3A-C, 4A-C, 5A-B, and 6A-B depict illustrative event sequences for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure. The depicted steps are merely illustrative and may be omitted, combined, or performed in an order other than that depicted; the numbering of the steps is merely for ease of reference and does not imply any particular ordering is necessary or preferred.

Referring to FIG. 3A, at step #1, threat-intelligence providers 140 may communicate one or more threat-intelligence reports to rule providers 138. The threat-intelligence

4

reports may include one or more network-threat indicators, for example, domain names (e.g., fully qualified domain names (FQDNs)), URIs, network addresses, or the like. At step #2, rule providers 138 may utilize the threat-intelligence reports to generate one or more packet-filtering rules configured to identify packets comprising data corresponding to the network-threat indicators. At step #3, rule providers 138 may communicate the packet-filtering rules to rule gate 120. As indicated by the crosshatched boxes over the lines extending downward from network 104, rule gate 128, and gateway 134, the packet-filtering rules may traverse network 104, rule gate 128, and gateway 134. For example, network 104 and gateway 134 may interface rule providers 138 and rule gate 120, and rule gate 128 may interface a communication link interfacing network 104 and gateway 134. Rule gate 120 may receive the packet-filtering rules generated by rule providers 138 and, at step #4, may utilize the received packet-filtering rules to configure rules 212 to cause packet-filtering system 200 to identify packets comprising data corresponding to at least one of the plurality of network-threat indicators.

At step #5, host 106 may generate a request. For example, host 106 may execute a web browser, and the web browser may generate a request in response to user input (e.g., navigation of the web browser to a URI). The request may comprise a domain name, and host 106 may generate a DNS query comprising the domain name and, at step #6, may communicate the DNS query toward DNS 130. Rule gate 126 may interface a communication link interfacing host 106 and DNS 130, the domain name included in the request may correspond to one or more of the network-threat indicators, and rules 212 may be configured to cause rule gate 126 to one or more of identify one or more packets comprising the DNS query, determine that the packets comprise the domain name corresponding to the network-threat indicators, and responsive to one or more of identifying the packets or determining that the packets comprise the domain name corresponding to the network-threat indicators, one or more of log (as indicated by the diamond-patterned box over the line extending downward from rule gate 126) or drop the packets. Rule gate 126 may generate log data (e.g., one or more entries in logs 214) for the packets. For example, the packets may comprise a network address of host 106 (e.g., as a source address in their network-layer headers), and rule gate 126 may generate log data indicating the network address of host 106. As depicted by step #6A, the packets may be communicated to DNS 130. In some embodiments, rules 212 may be configured to cause rule gate 126 to, responsive to one or more of identifying the packets or determining that the packets comprise the domain name corresponding to the network-threat indicators, drop the packets, preventing them from reaching DNS 130, as depicted by step #6B.

DNS 130 may generate a reply to the DNS query and, at step #7, may communicate the reply toward host 106. The reply may comprise the domain name corresponding to the network-threat indicators, and rules 212 may be configured to cause rule gate 126 to one or more of identify one or more packets comprising the reply, determine that the packets comprise the domain name corresponding to the network-threat indicators, and responsive to one or more of identifying the packets or determining that the packets comprise the domain name corresponding to the network-threat indicators, one or more of log or drop the packets. Rule gate 126 may generate log data (e.g., one or more entries in logs 214) for the packets. For example, the packets may comprise the network address of host 106 (e.g., as a destination address in

their network-layer headers), and rule gate **126** may generate log data indicating the network address of host **106**. Similarly, the domain name may correspond to host **142**, the packets may comprise a network address of host **142** (e.g., DNS **130** may have resolved the domain name included in the query to the network address of host **142**), and rule gate **126** may generate log data indicating the network address of host **142**. As depicted by step #7A, the packets may be communicated to host **106**. In some embodiments, rules **212** may be configured to cause rule gate **126** to, responsive to determining that the packets comprise the domain name corresponding to the network-threat indicators, drop the packets, preventing them from reaching host **106**, as depicted by step #7B.

Packet-filtering system **200** may be configured to correlate packets identified by packet-filtering system **200** (e.g., the packets comprising the reply to the DNS query) with packets previously identified by packet-filtering system **200** (e.g., the packets comprising the DNS query). For example, packet-filtering system **200** may be configured to determine that packets identified by packet-filtering system **200** (e.g., the packets comprising the reply to the DNS query) are one or more of associated with, related to, or the product of packets previously identified by packet-filtering system **200** (e.g., the packets comprising the DNS query). Packet-filtering system **200** may be configured to correlate packets identified by packet-filtering system **200** with packets previously identified by packet-filtering system **200** based on data stored in logs **214** (e.g., the log data generated by rule gate **126** in steps #6 and #7).

For example, for one or more packets logged by packet-filtering system **200** (e.g., the packets comprising the DNS query or the packets comprising the reply to the DNS query), logs **214** may comprise one or more entries indicating one or more of network-layer information (e.g., information derived from one or more network-layer header fields of the packets, such as a protocol type, a destination network address, a source network address, a signature or authentication information, information from an Internet protocol security (IPsec) encapsulating security payload (ESP)), or the like), transport-layer information (e.g., a destination port, a source port, a checksum or similar data (e.g., error detection or correction values, such as those utilized by the transmission control protocol (TCP) or the user datagram protocol (UDP)), or the like), application-layer information (e.g., information derived from one or more application-layer header fields of the packets, such as a domain name, a uniform resource locator (URL), a uniform resource identifier (URI), an extension, a method, state information, media-type information, a signature, a key, a timestamp, an application identifier, a session identifier, a flow identifier, sequence information, authentication information, or the like), other data in the packets (e.g., payload data), or one or more environmental variables (e.g., information associated with but not solely derived from the packets themselves, such as one or more arrival (or receipt) or departure (or transmission) times of the packets (e.g., at or from one or more of rule gates **120**, **122**, **124**, **126**, or **128**, tap devices **238**, **242**, **248**, or **252**, or network devices **240** or **250**), one or more ingress or egress identifiers (e.g., associated with one or more physical or logical network interfaces, ports, or communication-media types of one or more of rule gates **120**, **122**, **124**, **126**, or **128**, tap devices **238**, **242**, **248**, or **252**, or network devices **240** or **250** via which the packets were one or more of received or transmitted), one or more device identifiers (e.g., associated with one or more of rule gates **120**, **122**, **124**, **126**, or **128**, tap devices **238**, **242**, **248**,

or **252**, or network devices **240** or **250** via which the packets were one or more of received or transmitted), or the like), and packet-filtering system **200** may utilize such entries to correlate one or more packets identified by packet-filtering system **200** with one or more packets previously identified by packet-filtering system **200**.

In some embodiments, packet-filtering system **200** may implement one or more aspects of the technology described in U.S. patent application Ser. No. 14/618,967, filed Feb. 10, 2015, and entitled "CORRELATING PACKETS IN COMMUNICATIONS NETWORKS," the disclosure of which is incorporated by reference herein in its entirety and made part hereof, or similar technology (e.g., to correlate one or more packets identified by packet-filtering system **200** with one or more packets previously identified by packet-filtering system **200**).

Host **106** may generate one or more packets destined for host **142** comprising data (e.g., a TCP:SYN handshake message) configured to establish a connection (e.g., a TCP connection or tunnel) between hosts **106** and **142** and, at step #8, may communicate the packets toward host **142**. Rule gate **120** may interface a communication link interfacing hosts **106** and **142**, and rules **212** may be configured to cause rule gate **120** to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs **214** (e.g., the log data generated by rule gate **126** in one or more of steps #6 or #7).

At step #9, rule gate **120** may route the packets comprising the data configured to establish the connection between hosts **106** and **142** to proxy device **112** and, at step #10, may communicate the packets to proxy device **112**. For example, rules **212** may be configured to cause rule gate **120** to route the packets to proxy device **112** based on data in the packets, for example, one or more ports (e.g., port **443**) indicated by transport-layer headers in the packets, indicating the connection between hosts **106** and **142** will be utilized to establish an encrypted communication session or tunnel (e.g., a session established in accordance with the transport layer security (TLS) protocol, secure sockets layer (SSL) protocol, secure shell (SSH) protocol, or the like). In some embodiments, rules **212** may be configured to cause rule gate **120** to route the packets to proxy device **112** based on a determination that one or more of hosts **106** or **142** is associated with a network address for which rules **212** indicate encrypted communications should be established via one or more of proxy devices **112**, **114**, or **116**. For example, proxy devices **112**, **114**, and **116** may be part of a proxy system (e.g., a SSL/TLS proxy system) that enables packet-filtering system **200** to filter packets comprising encrypted data based on information within the encrypted data, and rules **212** may be configured to cause rule gate **120** to route the packets to proxy device **112** based on a determination that host **142** is associated with a network address of a domain corresponding to the network-threat indicators.

Additionally or alternatively, network **102** may include one or more hosts for which rules **212** indicate connections utilized to establish encrypted communication sessions (e.g., connections with hosts corresponding to network-threat indicators) should be established via one or more of proxy devices **112**, **114**, or **116**, as well as one or more hosts for which rules **212** indicate connections utilized to establish encrypted communication sessions should not be established

IPR2022-00182 Page 00020

via one or more of proxy devices **112**, **114**, and **116**, for example, hosts that generate sensitive data (e.g., personally identifiable information (PII)), inspection of which may present privacy or regulatory concerns (e.g., data subject to the health insurance portability and accountability act (HIPAA), or the like), and rules **212** may be configured to cause rule gate **120** to route the packets to proxy device **112** based on a determination that host **106** is associated with a network address for which rules **212** indicate encrypted communications should be established via one or more of proxy devices **112**, **114**, or **116**.

For example, link **236** may interface host **106** with rule gate **120**, link **244** may interface rule gate **120** with host **142**, link **246** may interface rule gate **120** with proxy device **112**, link **254** may interface proxy devices **112** and **114** and may comprise a communication link internal to a proxy system comprising proxy devices **112** and **114**, and rules **212** may be configured to cause rule gate **120** to route (or redirect) packets received from host **106** via one or more of interfaces **216**, **218**, or **220** and destined for host **142** (or a portion thereof (e.g., packets comprising data configured to establish a connection between hosts **106** and **142** and indicating the connection will be utilized to establish an encrypted communication session) to host **142** via interface **226**. Additionally or alternatively, rules **212** may be configured to cause rule gate **120** to forward copies of (or mirror) packets received from host **106** via one or more of interfaces **216**, **218**, **220**, or **222** and destined for host **142** (or a portion thereof (e.g., packets comprising data configured to establish a connection between hosts **106** and **142** and indicating the connection will be utilized to establish an encrypted communication session)) to proxy device **112** via interface **226**.

At step #**11**, proxy devices **112** and **114** may exchange one or more parameters determined from the packets comprising the data configured to establish the connection between hosts **106** and **142**, for example, one or more network addresses in network-layer headers of the packets (e.g., network addresses of hosts **106** and **142**) or ports indicated by transport-layer headers in the packets (e.g., indicating the type of encrypted communication session the connection will be utilized to establish). Proxy device **112** may utilize the parameters to generate packets comprising data configured to establish a connection between proxy device **112** and host **106** (e.g., a TCP:SYN-ACK handshake message) and, at step #**12**, may communicate the packets to host **106**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs **214** (e.g., the log data generated by rule gate **126** in one or more of steps #**6** or #**7**), and one or more of log or drop the packets.

Similarly, proxy device **114** may utilize the parameters to generate packets comprising data configured to establish a connection between proxy device **114** and host **142** (e.g., a TCP:SYN handshake message) and, at step #**13**, may communicate the packets to host **142**. Rule gate **128** may interface a communication link interfacing proxy device **114** and host **142**, and rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previ-

ously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of steps #**6**, #**7**, or #**12**), and one or more of log or drop the packets.

Responsive to receiving the packets from proxy device **112**, host **106** may generate packets comprising data configured to establish the connection between proxy device **112** and host **106** (e.g., a TCP:ACK handshake message) and, at step #**14**, may communicate the packets to proxy device **112**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of steps #**6**, #**7**, #**12**, or #**13**), and one or more of log or drop the packets.

Responsive to receiving the packets from proxy device **114**, host **142** may generate packets comprising data configured to establish the connection between proxy device **114** and host **142** (e.g., a TCP:SYN-ACK handshake message) and, at step #**15**, may communicate the packets to proxy device **114**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-14**), and one or more of log or drop the packets.

Responsive to receiving the packets from host **142**, proxy device **114** may generate packets comprising data configured to establish the connection between proxy device **114** and host **142** (e.g., a TCP:ACK handshake message) and, at step #**16**, may communicate the packets to host **142**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-15**), and one or more of log or drop the packets.

Referring to FIG. 3B, proxy device **112** may receive the packets comprising data configured to establish the connection between proxy device **112** and host **106** communicated by host **106** in step #**14**, and connection **302** (e.g., a TCP connection) between proxy device **112** and host **106** may be established. Similarly, host **142** may receive the packets comprising data configured to establish the connection between proxy device **114** and host **142** communicated by proxy device **114** in step #**16**, and connection **304** (e.g., a TCP connection) between proxy device **114** and host **142** may be established.

At step #**17**, proxy device **112** and host **106** may communicate packets comprising data configured to establish encrypted communication session **306** (e.g., a SSL/TLS

9

session) between proxy device **112** and host **106** via connection **302**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-16**), and one or more of log or drop the packets. Additionally or alternatively, rules **212** may be configured to cause rule gate **120** to one or more of identify the packets or determine that the packets comprise data corresponding to the network-threat indicators based on data included in the packets. For example, in some embodiments, host **106** may comprise a client (e.g., web browser), host **142** may comprise a server (e.g., web server), the packets may comprise one or more handshake messages configured to establish session **306** that comprise unencrypted data including a domain name corresponding to the network-threat indicators, for example, a hello message generated by the client (e.g., including the domain name in the server name indication extension, or the like) or a certificate message generated by the server (e.g., including the domain name in one or more of the subject common name field or the extension subjectAltName (of type dNSName), or the like), and rules **212** may be configured to cause rule gate **120** to one or more of identify the packets or determine that the packets comprise data corresponding to the network-threat indicators based on data included in the one or more handshake messages configured to establish session **306**. In such embodiments, rules **212** may be configured to cause packet-filtering system **200** to one or more of identify the packets or determine that the packets comprise data corresponding to the network-threat indicators based on the certificate message comprising other data (e.g., in addition to or in lieu of the domain name) corresponding to one or more of the network-threat indicators, for example, data indicating at least one of a serial number (or type thereof) indicated by rules **212**, an issuer (or type thereof) indicated by rules **212**, a validity time-range (or type thereof) indicated by rules **212**, a key (or type thereof) indicated by rules **212**, a digital signature (e.g., fingerprint) (or type thereof) indicated by rules **212**, or a signing authority (or type thereof) indicated by rules **212**.

Similarly, at step **#18**, proxy device **114** and host **142** may communicate packets comprising data configured to establish encrypted communication session **308** (e.g., a SSL/TLS session) between proxy device **114** and host **142** via connection **304**, and rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-17**) or the packets comprising one or more handshake messages configured to establish session **308** that comprise unencrypted data (e.g., including the domain name) corresponding to the network-threat indicators, and one or more of log or drop the packets.

Host **106** may generate packets comprising data encrypted in accordance with one or more parameters of session **306**

10

and, at step **#19**, may communicate the packets to proxy device **112** via session **306**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-18**), and one or more of log (as indicated by the triangles over the line extending downward from rule gate **120**) or drop the packets.

Proxy device **112** may receive the packets and decrypt the data in accordance with the parameters of session **306**. The packets may comprise a request (e.g., a hypertext transfer protocol (HTTP) request), and proxy device **112** may comprise an ICAP client, which, at step **#20**, may communicate the packets to ICAP server **132**. Rule gate **126** may interface a communication link interfacing proxy device **112** and ICAP server **132**, and rules **212** may be configured to cause rule gate **126** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-19**), and one or more of log or drop the packets.

ICAP server **132** may generate packets comprising data responsive to the request (e.g., a response, modified request, or the like) and, at step **#21**, may communicate the packets to proxy device **112**. Rules **212** may be configured to cause rule gate **126** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-20**), and one or more of log or drop the packets. Additionally or alternatively, rules **212** may be configured to cause rule gate **126** to one or more of identify the packets or determine that the packets comprise data corresponding to the network-threat indicators based on data included in the packets, for example, the data responsive to the request (e.g., a modified request) may comprise data (e.g., a domain name, URI, or the like) corresponding to the network-threat indicators.

Proxy device **112** may generate packets (e.g., based on the data generated by ICAP server **132**) and, at step **#22**, may communicate the packets to proxy device **114**. Rule gate **124** may interface a communication link internal to the proxy system comprising proxy devices **112** and **114**, and thus packets traversing the communication link may comprise unencrypted data (e.g., rule gate **124** may be "the man in the middle" of proxy devices **112** and **114**), and rules **212** may be configured to cause rule gate **124** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-

IPR2022-00182 Page 00022

11

12

threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-21**), and one or more of log or drop the packets.

Additionally or alternatively, rules **212** may be configured to cause rule gate **124** to one or more of identify the packets or determine that the packets comprise data corresponding to the network-threat indicators based on data included in the packets, for example, unencrypted data in the packets corresponding to one or more of the network-threat indicators. For example, in some embodiments, packet-filtering system **200** may implement one or more aspects of the technology described in U.S. patent application Ser. No. 13/795,822, filed Mar. 12, 2013, and entitled "FILTERING NETWORK DATA TRANSFERS," the disclosure of which is incorporated by reference herein in its entirety and made part hereof, or similar technology, and rules **212** may be configured to cause rule gate **124** to one or more of identify the packets or determine that the packets comprise data corresponding to the network-threat indicators based on the packets comprising one or more of a URI specified by rules **212**, data indicating a protocol version specified by rules **212**, data indicating a method specified by rules **212**, data indicating a request specified by rules **212**, or data indicating a command specified by rules **212**. Additionally or alternatively, rules **212** may be configured to cause rule gate **124** to one or more of identify the packets or determine that the packets comprise data corresponding to the one or more network-threat indicators based on unencrypted data in the packets comprising a URI meeting or exceeding a threshold size specified by rules **212** (e.g., a URI likely being utilized to exfiltrate data).

Proxy device **114** may receive the packets and generate one or more corresponding packets comprising data encrypted in accordance with one or more parameters of session **308** and, at step #**23**, may communicate the packets to host **142**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-22**), and one or more of log or drop the packets.

Host **142** may generate one or more packets comprising data encrypted in accordance with one or more parameters of session **308** and, at step #**24**, may communicate the packets to proxy device **114**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-23**), and one or more of log or drop the packets.

Proxy device **114** may receive the packets and generate one or more corresponding packets comprising unencrypted data and, at step #**25**, may communicate the packets to proxy device **112**. Rules **212** may be configured to cause rule gate **124** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-24**), and one or more of log or drop the packets.

Proxy device **112** may receive the packets and generate one or more corresponding packets comprising data encrypted in accordance with one or more parameters of session **306** and, at step #**26**, may communicate the packets to host **106**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-25**), and one or more of log or drop the packets.

Host **106** may generate one or more packets comprising data encrypted in accordance with one or more parameters of session **306** and, at step #**27**, may communicate the packets toward proxy device **112**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-26**), and one or more of log or drop the packets.

Proxy device **112** may receive one or more of the packets and generate one or more corresponding packets comprising unencrypted data and, at step #**28**, may communicate the packets toward proxy device **114**. Rules **212** may be configured to cause rule gate **124** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-27**), and one or more of log or drop the packets.

Proxy device **114** may receive one or more of the packets and generate one or more corresponding packets comprising data encrypted in accordance with one or more parameters of session **308** and, at step #**29**, may communicate the packets toward host **142**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or

IPR2022-00182 Page 00023

more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-28**), and one or more of log or drop the packets.

Host **142** may generate one or more packets comprising data encrypted in accordance with one or more parameters of session **308** and, at step #**30**, may communicate the packets toward proxy device **114**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-29**), and one or more of log or drop the packets.

Proxy device **114** may receive one or more of the packets and generate one or more corresponding packets comprising unencrypted data and, at step #**31**, may communicate the packets toward proxy device **112**. Rules **212** may be configured to cause rule gate **124** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-30**), and one or more of log or drop the packets.

Proxy device **112** may receive one or more of the packets and generate one or more corresponding packets comprising data encrypted in accordance with one or more parameters of session **306** and, at step #**32**, may communicate the packets toward host **106**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-31**), and one or more of log or drop the packets.

Referring to FIG. **3C**, at step #**33**, rule gate **120** may one or more of update a console (or interface) associated with packet-filtering system **200** running on host **108** or receive one or more updates to rules **212** via the console. For example, the console may provide data regarding one or more threats to network **102** corresponding to the network-threat indicators, and rule gate **120** may update the console based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-32**). In some embodiments, the console may provide data identifying network threats associated with one or more of hosts **106**, **108**, **110**, **142**, **144**, or **146**, and rule gate **120** may update data associated with one or more of hosts **106** or **142**

based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-32**).

At step #**34**, rule gate **120** may reconfigure rules **212** based on one or more of updates received via the console or data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-32**). For example, packet-filtering system **200** may implement one or more aspects of the technology described in U.S. patent application Ser. No. 14/690,302, filed Apr. 17, 2015, and entitled "RULE-BASED NETWORK-THREAT DETECTION," the disclosure of which is incorporated by reference herein in its entirety and made part hereof, or similar technology, and rule gate **120** may reconfigure rules **212** based on one or more risk scores updated to reflect data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-32**).

Host **106** may generate one or more packets comprising data encrypted in accordance with one or more parameters of session **306** and, at step #**35**, may communicate the packets toward proxy device **112**. Rules **212** (e.g., one or more of rules **212** reconfigured in step #**34**) may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, or **12-32**), and one or more of log or drop the packets.

Proxy device **112** may receive one or more of the packets and generate one or more corresponding packets comprising unencrypted data and, at step #**36**, may communicate the packets toward proxy device **114**. Rules **212** (e.g., one or more of rules **212** reconfigured in step #**34**) may be configured to cause rule gate **124** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, **12-32**, or **35**), and one or more of log or drop the packets.

Proxy device **114** may receive one or more of the packets and generate one or more corresponding packets comprising data encrypted in accordance with one or more parameters of session **308** and, at step #**37**, may communicate the packets toward host **142**. Rules **212** (e.g., one or more of rules **212** reconfigured in step #**34**) may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**, **7**, **12-32**, **35**, or **36**), and one or more of log or drop the packets.

Host **142** may generate one or more packets comprising data encrypted in accordance with one or more parameters of session **308** and, at step **#38**, may communicate the packets toward proxy device **114**. Rules **212** (e.g., one or more of rules **212** reconfigured in step **#34**) may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6, 7, 12-32**, or **35-37**), and one or more of log or drop the packets.

Proxy device **114** may receive one or more of the packets and generate one or more corresponding packets comprising unencrypted data and, at step **#39**, may communicate the packets toward proxy device **112**. Rules **212** (e.g., one or more of rules **212** reconfigured in step **#34**) may be configured to cause rule gate **124** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6, 7, 12-32**, or **35-38**), and one or more of log or drop the packets.

Proxy device **112** may receive one or more of the packets and generate one or more corresponding packets comprising data encrypted in accordance with one or more parameters of session **306** and, at step **#40**, may communicate the packets toward host **106**. Rules **212** (e.g., one or more of rules **212** reconfigured in step **#34**) may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6, 7, 12-32**, or **35-39**), and one or more of log or drop the packets.

Host **142** may generate one or more packets destined for one or more of hosts **106, 108,** or **110** and, at step **#41**, may communicate the packets toward gateway **134**. Rules **212** (e.g., one or more of rules **212** reconfigured in step **#34**) may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6, 7, 12-32**, or **35-40**), and one or more of log or drop the packets.

Host **108** may generate one or more packets and, at step **#42**, may communicate the packets to host **142**. Rules **212** (e.g., one or more of rules **212** reconfigured in step **#34**) may

be configured to cause rule gates **120** and **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6, 7, 12-32**, or **35-41**), and one or more of log or drop the packets.

Host **106** may generate one or more packets destined for hosts **108, 142, 144,** and **146** and, at step **#43**, may communicate the packets toward hosts **108, 142, 144,** and **146**. Rules **212** (e.g., one or more of rules **212** reconfigured in step **#34**) may be configured to cause rule gate **120** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6, 7, 12-32**, or **35-42**), and one or more of log or drop the packets.

Referring to FIG. 4A, step #s **1-5** substantially correspond to step #s **1-5** of FIG. 3A.

Host **106** (e.g., the web browser) may be configured to utilize web proxy **118** and responsive to the request, may generate packets comprising data configured to establish a connection between host **106** and web proxy **118** (e.g., a TCP:SYN handshake message) and, at step **#6**, may communicate the packets to web proxy **118**. Rule gate **120** may interface a communication link interfacing host **106** and web proxy **118**, and rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, for example, based on one or more network addresses included in their network-layer headers (e.g., a network address of web proxy **118**) or one or more ports (e.g., port **80**) indicated by transport-layer headers in the packets, and one or more of log or drop the packets.

Responsive to receiving the packets from host **106**, web proxy **118** may generate packets comprising data configured to establish the connection between host **106** and web proxy **118** (e.g., a TCP:SYN-ACK handshake message) and, at step **#7**, may communicate the packets to host **106**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, for example, based on one or more network addresses included in their network-layer headers (e.g., a network address of web proxy **118**) or one or more ports (e.g., port **80**) indicated by transport-layer headers in the packets, and one or more of log or drop the packets.

Responsive to receiving the packets from web proxy **118**, host **106** may generate packets comprising data configured to establish the connection between host **106** and web proxy **118** (e.g., a TCP:ACK handshake message) and, at step **#8**, may communicate the packets to web proxy **118**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, for example, based on one or more network addresses included in their network-layer headers (e.g., a network address of web proxy **118**) or one or more ports (e.g., port **80**) indicated by transport-layer headers in the packets, and one or more of log or drop the packets.

Web proxy **118** may receive the packets from host **106**, and connection **402** (e.g., a TCP connection) between host **106** and web proxy **118** may be established. Host **106** may

generate packets comprising a request (e.g., an HTTP CONNECT request), and, at step #**9**, may communicate the packets to web proxy **118** via connection **402**. Rules **212** may be configured to cause rule gate **120** to one or more of identify the packets, for example, based on one or more network addresses included in their network-layer headers (e.g., a network address of web proxy **118**) or one or more ports (e.g., port **80**) indicated by transport-layer headers in the packets, determine the packets comprise data corresponding to the network-threat indicators, for example, a domain name (e.g., FQDN) in the request, and one or more of log or drop the packets.

Web proxy **118** may generate a DNS query comprising the domain name and, at step #**10**, may communicate the DNS query toward DNS **130**. The domain name included in the request may correspond to one or more of the network-threat indicators, and rules **212** may be configured to cause rule gate **126** to one or more of identify one or more packets comprising the DNS query, determine that the packets comprise the domain name corresponding to the network-threat indicators, and one or more of log or drop the packets. For example, the packets may comprise a network address of web proxy **118** (e.g., as a source address in their network-layer headers), and rule gate **126** may generate log data indicating the network address of web proxy **118**. As depicted by step #**10**A, the packets may be communicated to DNS **130**. In some embodiments, rules **212** may be configured to cause rule gate **126** to, responsive to determining that the packets comprise the domain name corresponding to the network-threat indicators, drop the packets, preventing them from reaching DNS **130**, as depicted by step #**10**B.

DNS **130** may generate a reply to the DNS query and, at step #**11**, may communicate the reply toward web proxy **118**. The reply may comprise the domain name corresponding to the network-threat indicators, and rules **212** may be configured to cause rule gate **126** to one or more of identify one or more packets comprising the reply, determine that the packets comprise the domain name corresponding to the network-threat indicators, and one or more of log or drop the packets. For example, the packets may comprise the network address of web proxy **118** (e.g., as a destination address in their network-layer headers), and rule gate **126** may generate log data indicating the network address of web proxy **118**. Similarly, the domain name may correspond to host **142**, the packets may comprise a network address of host **142** (e.g., DNS **130** may have resolved the domain name included in the query to the network address of host **142**), and rule gate **126** may generate log data indicating the network address of host **142**. As depicted by step #**11**A, the packets may be communicated to web proxy **118**. In some embodiments, rules **212** may be configured to cause rule gate **126** to, responsive to determining that the packets comprise the domain name corresponding to the network-threat indicators, drop the packets, preventing them from reaching web proxy **118**, as depicted by step #**11**B.

Web proxy **118** may generate one or more packets destined for host **142** comprising data (e.g., a TCP:SYN handshake message) configured to establish a connection (e.g., a TCP connection or tunnel) between web proxy **118** and host **142** and, at step #**12**, may communicate the packets toward host **142**. Rule gate **122** may interface a communication link interfacing web proxy **118** and host **142**, and rules **212** may be configured to cause rule gate **122** to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the request, the DNS query, or the reply to the DNS query based on data stored in logs **214** (e.g., the log data generated by rule gates **120** and **126** in one or more of step #s **6**-**11**).

At step #**13**, rule gate **122** may route the packets comprising the data configured to establish the connection between web proxy **118** and host **142** to proxy device **112** and, at step #**14**, may communicate the packets to proxy device **112**. For example, rules **212** may be configured to cause rule gate **122** to route the packets to proxy device **112** based on data in the packets, for example, one or more ports (e.g., port **443**) indicated by transport-layer headers in the packets, indicating the connection between web proxy **118** and host **142** will be utilized to establish an encrypted communication session or tunnel (e.g., a session established in accordance with the transport layer security (TLS) protocol, secure sockets layer (SSL) protocol, secure shell (SSH) protocol, or the like).

Referring to FIG. **4**B, at step #**15**, proxy devices **112** and **114** may exchange one or more parameters determined from the packets comprising the data configured to establish the connection between web proxy **118** and host **142**, for example, one or more network addresses in network-layer headers of the packets (e.g., network addresses of web proxy **118** and host **142**) or ports indicated by transport-layer headers in the packets (e.g., indicating the type of encrypted communication session the connection will be utilized to establish). Proxy device **112** may utilize the parameters to generate packets comprising data configured to establish a connection between proxy device **112** and web proxy **118** (e.g., a TCP:SYN-ACK handshake message) and, at step #**16**, may communicate the packets to web proxy **118**. Rules **212** may be configured to cause rule gate **122** to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the request, the DNS query, or the reply to the DNS query based on data stored in logs **214** (e.g., the log data generated by rule gates **120** and **126** in one or more of step #s **6**-**11**).

Similarly, proxy device **114** may utilize the parameters to generate packets comprising data configured to establish a connection between proxy device **114** and host **142** (e.g., a TCP:SYN handshake message) and, at step #**17**, may communicate the packets to host **142**. Rules **212** may be configured to cause rule gate **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6**-**11** or **16**), and one or more of log or drop the packets.

Responsive to receiving the packets from proxy device **112**, web proxy **118** may generate packets comprising data configured to establish the connection between proxy device **112** and web proxy **118** (e.g., a TCP:ACK handshake message) and, at step #**18**, may communicate the packets to proxy device **112**. Rules **212** may be configured to cause rule gate **122** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example,

by correlating the packets with one or more packets previously determined by packet-filtering system 200 to comprise data corresponding to the network-threat indicators based on data stored in logs 214 (e.g., log data generated by packet-filtering system 200 in one or more of step #s 6-11, 16, or 17), and one or more of log or drop the packets.

Responsive to receiving the packets from proxy device 114, host 142 may generate packets comprising data configured to establish the connection between proxy device 114 and host 142 (e.g., a TCP:SYN-ACK handshake message) and, at step #19, may communicate the packets to proxy device 114. Rules 212 may be configured to cause rule gate 128 to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system 200 to comprise data corresponding to the network-threat indicators based on data stored in logs 214 (e.g., log data generated by packet-filtering system 200 in one or more of step #s 6-11 or 16-18), and one or more of log or drop the packets.

Responsive to receiving the packets from host 142, proxy device 114 may generate packets comprising data configured to establish the connection between proxy device 114 and host 142 (e.g., a TCP:ACK handshake message) and, at step #20, may communicate the packets to host 142. Rules 212 may be configured to cause rule gate 128 to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system 200 to comprise data corresponding to the network-threat indicators based on data stored in logs 214 (e.g., log data generated by packet-filtering system 200 in one or more of step #s 6-11 or 16-19), and one or more of log or drop the packets.

Proxy device 112 may receive the packets comprising data configured to establish the connection between proxy device 112 and web proxy 118 communicated by web proxy 118 in step #18, and connection 404 (e.g., a TCP connection) between proxy device 112 and web proxy 118 may be established. Similarly, host 142 may receive the packets comprising data configured to establish the connection between proxy device 114 and host 142 communicated by proxy device 114 in step #20, and connection 406 (e.g., a TCP connection) between proxy device 114 and host 142 may be established.

At step #21, proxy device 112 and host 106 may communicate packets comprising data configured to establish encrypted communication session 408 (e.g., a SSL/TLS session) between proxy device 112 and host 106 via connections 402 and 404. Rules 212 may be configured to cause one or more of rule gates 120 or 122 to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system 200 to comprise data corresponding to the network-threat indicators based on data stored in logs 214 (e.g., log data generated by packet-filtering system 200 in one or more of step #s 6-11 or 16-20) or the packets comprising one or more handshake messages configured to establish session 408 that comprise unencrypted data (e.g.,

including the domain name) corresponding to the network-threat indicators, and one or more of log or drop the packets.

Similarly, at step #22, proxy device 114 and host 142 may communicate packets comprising data configured to establish encrypted communication session 410 (e.g., a SSL/TLS session) between proxy device 114 and host 142 via connection 406, and rules 212 may be configured to cause rule gate 128 to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system 200 to comprise data corresponding to the network-threat indicators based on data stored in logs 214 (e.g., log data generated by packet-filtering system 200 in one or more of step #s 6-11 or 16-21) or the packets comprising one or more handshake messages configured to establish session 410 that comprise unencrypted data (e.g., including the domain name) corresponding to the network-threat indicators, and one or more of log or drop the packets.

Referring to FIGS. 4B-C, step #s 23-47 substantially correspond to step #s 19-43 of FIGS. 3B-C; however, rules 212 may be configured to cause one or more of rule gates 120 or 122 to one or more of identify, drop, or log the packets communicated in one or more of step #s 23, 30, 31, 36, 39, or 44 of FIGS. 4B-C.

Referring to FIG. 5A, step #s 1-7 substantially correspond to step #s 1-7 of FIG. 3A.

Host 106 may generate one or more packets destined for host 142 comprising data (e.g., a TCP:SYN handshake message) configured to establish a connection (e.g., a TCP connection or tunnel) between hosts 106 and 142 and, at step #8, may communicate the packets to host 142. Rules 212 may be configured to cause one or more of rule gates 120 or 128 to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs 214 (e.g., the log data generated by rule gate 126 in one or more of steps #6 or #7).

Responsive to receiving the packets from host 106, host 142 may generate packets comprising data configured to establish the connection between hosts 106 and 142 (e.g., a TCP:SYN-ACK handshake message) and, at step #9, may communicate the packets to host 106. Rules 212 may be configured to cause one or more of rule gates 120 or 128 to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs 214 (e.g., the log data generated by rule gate 126 in one or more of steps #6 or #7).

Responsive to receiving the packets from host 142, host 106 may generate packets comprising data configured to establish the connection between hosts 106 and 142 (e.g., a TCP:ACK handshake message) and, at step #10, may communicate the packets to host 142. Rules 212 may be configured to cause one or more of rule gates 120 or 128 to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating

21

the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs **214** (e.g., the log data generated by rule gate **126** in one or more of steps #**6** or #**7**).

Host **142** may receive the packets comprising data configured to establish the connection between hosts **106** and **142** communicated by host **106** in step #**10**, and connection **502** (e.g., a TCP connection) between hosts **106** and **142** may be established.

At step #**11**, hosts **106** and **142** may communicate packets comprising data configured to establish encrypted communication session **504** (e.g., a SSL/TLS session) between hosts **106** and **142** via connection **502**. Rules **212** may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #**6-10**) or the packets comprising one or more handshake messages configured to establish session **504** that comprise unencrypted data (e.g., including the domain name) corresponding to the network-threat indicators, and one or more of log or drop the packets.

Host **106** may generate packets comprising data encrypted in accordance with one or more parameters of session **504** and, at step #**12**, may communicate the packets to host **142**. Rules **212** may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #**6-11**), and one or more of log or drop the packets.

Host **142** may generate packets comprising data encrypted in accordance with one or more parameters of session **504** and, at step #**13**, may communicate the packets to host **106**. Rules **212** may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #**6-12**), and one or more of log or drop the packets.

Host **106** may generate packets comprising data encrypted in accordance with one or more parameters of session **504** and, at step #**14**, may communicate the packets toward host **142**. Rules **212** may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log

22

data generated by packet-filtering system **200** in one or more of step #s **6-13**), and one or more of log or drop the packets.

Host **142** may generate packets comprising data encrypted in accordance with one or more parameters of session **504** and, at step #**15**, may communicate the packets toward host **106**. Rules **212** may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6-14**), and one or more of log or drop the packets.

Referring to FIG. **5B**, steps #**16** and #**17** substantially correspond to steps #**33** and #**34** of FIG. **3C**.

Host **106** may generate packets comprising data encrypted in accordance with one or more parameters of session **504** and, at step #**18**, may communicate the packets toward host **142**. Rules **212** (e.g., one or more of rules **212** reconfigured in step #**17**) may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6-15**), and one or more of log or drop the packets.

Host **142** may generate packets comprising data encrypted in accordance with on or more parameters of session **504** and, at step #**19**, may communicate the packets toward host **106**. Rules **212** (e.g., one or more of rules **212** reconfigured in step #**17**) may be configured to cause one or more of rule gates **120** or **128** to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system **200** to comprise data corresponding to the network-threat indicators based on data stored in logs **214** (e.g., log data generated by packet-filtering system **200** in one or more of step #s **6-15** and **18**), and one or more of log or drop the packets.

Step #s **20-22** substantially correspond to step #s **41-43** of FIG. **3C**.

Referring to FIG. **6A**, step #s **1-11** substantially correspond to step #s **1-11** of FIG. **4A**.

Web proxy **118** may generate one or more packets destined for host **142** comprising data (e.g., a TCP:SYN handshake message) configured to establish a connection (e.g., a TCP connection or tunnel) between web proxy **118** and host **142** and, at step #**12**, may communicate the packets to host **142**. Rules **212** may be configured to cause one or more of rule gates **122** or **128** to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply

Appx0113

23

to the DNS query based on data stored in logs 214 (e.g., the log data generated by rule gate 126 in one or more of steps #10 or #11).

Responsive to receiving the packets from web proxy 118, host 142 may generate packets comprising data configured to establish the connection between web proxy 118 and host 142 (e.g., a TCP:SYN-ACK handshake message) and, at step #13, may communicate the packets to web proxy 118. Rules 212 may be configured to cause one or more of rule gates 122 or 128 to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs 214 (e.g., the log data generated by rule gate 126 in one or more of steps #10 or #11).

Responsive to receiving the packets from host 142, web proxy 118 may generate packets comprising data configured to establish the connection between web proxy 118 and host 142 (e.g., a TCP:ACK handshake message) and, at step #14, may communicate the packets to host 142. Rules 212 may be configured to cause one or more of rule gates 122 or 128 to one or more of identify the packets or determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more of the packets comprising the DNS query or the reply to the DNS query based on data stored in logs 214 (e.g., the log data generated by rule gate 126 in one or more of steps #10 or #11).

Referring to FIG. 6B, host 142 may receive the packets comprising data configured to establish the connection between web proxy 118 and host 142 communicated by web proxy 118 in step #14, and connection 604 (e.g., a TCP connection) between web proxy 118 and host 142 may be established.

At step #15, hosts 106 and 142 may communicate packets comprising data configured to establish encrypted communication session 606 (e.g., a SSL/TLS session) between hosts 106 and 142 via connections 602 and 604. Rules 212 may be configured to cause one or more of rule gates 120, 122, or 128 to one or more of identify the packets, determine (e.g., based on one or more network addresses included in their network-layer headers) that the packets comprise data corresponding to the network-threat indicators, for example, by correlating the packets with one or more packets previously determined by packet-filtering system 200 to comprise data corresponding to the network-threat indicators based on data stored in logs 214 (e.g., log data generated by packet-filtering system 200 in one or more of step #s 6-15) or the packets comprising one or more handshake messages configured to establish session 606 that comprise unencrypted data (e.g., including the domain name) corresponding to the network-threat indicators, and one or more of log or drop the packets.

Step #s 16-26 substantially correspond to step #s 12-22 of FIGS. 5A-B; however, rules 212 may be configured to cause one or more of rule gates 120, 122, or 128 to one or more of identify, drop, or log the packets communicated in one or more of step #s 16-19, 22, or 23 of FIG. 6B.

FIG. 7 depicts an illustrative method for rule-based network-threat detection for encrypted communications in accordance with one or more aspects of the disclosure. Referring to FIG. 7, in step 702, a packet-filtering system may receive data indicating network-threat indicators. For

24

example, packet-filtering system 200 may receive packet-filtering rules generated by rule provides 138 based on network-threat indicators provided by threat-intelligence providers 140. In step 704, the packet-filtering system may configure packet-filtering rules in accordance with which it is configured to filter packets. For example, packet-filtering system 200 may configure rules 212.

In step 706, the packet-filtering system may identify packets comprising unencrypted data. For example, packet-filtering system 200 may identify packets comprising a DNS query, a reply to a DNS query, or a handshake message configured to establish an encrypted communication session. In step 708, the packet-filtering system may identify packets comprising encrypted data. For example, packet-filtering system 200 may identify packets encrypted in accordance with one or more parameters of sessions 306, 308, 408, 410, 504, or 606.

In step 710, the packet-filtering system may determine based on a portion of the unencrypted data corresponding to the network-threat indicators that the packets comprising encrypted data correspond to the network-threat indicators. For example, packet-filtering system 200 may determine that a domain name included in the DNS query, the reply to the DNS query, or the handshake message corresponds to the network-threat indicators, and packet-filtering system 200 may determine that one or more of the packets encrypted in accordance with the parameters of sessions 306, 308, 408, 410, 504, or 606 correlate to one or more packets comprising the DNS query, the reply to the DNS query, or the one or more handshake messages.

The functions and steps described herein may be embodied in computer-usable data or computer-executable instructions, such as in one or more program modules, executed by one or more computers or other devices to perform one or more functions described herein. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types when executed by one or more processors in a computer or other data-processing device. The computer-executable instructions may be stored on a computer-readable medium such as a hard disk, optical disk, removable storage media, solid-state memory, RAM, etc. As will be appreciated, the functionality of the program modules may be combined or distributed as desired. In addition, the functionality may be embodied in whole or in part in firmware or hardware equivalents, such as integrated circuits, application-specific integrated circuits (ASICs), field-programmable gate arrays (FPGA), and the like. Particular data structures may be used to more effectively implement one or more aspects of the disclosure, and such data structures are contemplated to be within the scope of computer-executable instructions and computer-usable data described herein.

Although not required, one of ordinary skill in the art will appreciate that various aspects described herein may be embodied as a method, system, apparatus, or one or more computer-readable media storing computer-executable instructions. Accordingly, aspects may take the form of an entirely hardware embodiment, an entirely software embodiment, an entirely firmware embodiment, or an embodiment combining software, hardware, and firmware aspects in any combination.

As described herein, the various methods and acts may be operative across one or more computing devices and networks. The functionality may be distributed in any manner or may be located in a single computing device (e.g., a server, client computer, or the like).

IPR2022-00182 Page 00029

25

Aspects of the disclosure have been described in terms of illustrative embodiments thereof. Numerous other embodiments, modifications, and variations within the scope and spirit of the appended claims will occur to persons of ordinary skill in the art from a review of this disclosure. For example, one of ordinary skill in the art will appreciate that the steps illustrated in the illustrative figures may be performed in other than the recited order and that one or more illustrated steps may be optional. Any and all features in the following claims may be combined or rearranged in any way possible.

What is claimed is:

1. A method comprising:
receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;
identifying packets comprising unencrypted data;
identifying packets comprising encrypted data;
determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;
filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a domain specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:
packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and
the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and
routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

2. The method of claim 1, wherein:
the packets comprising unencrypted data comprise one or more packets comprising at least one of a domain name system (DNS) query or a reply to the DNS query, the method further comprising:
determining that the at least one of the DNS query or the reply to the DNS query comprises the domain name identified as the network threat.

3. The method of claim 2, wherein the portion of the unencrypted data comprises one or more network addresses included in the at least one of the DNS query or the reply to the DNS query, the method further comprising:
determining that the packets comprising encrypted data comprise one or more packet headers comprising at least one of the one or more network addresses.

4. The method of claim 2, wherein the portion of the unencrypted data comprises one or more network addresses included in one or more headers of the one or more packets

26

comprising the at least one of the DNS query or the reply to the DNS query, the method further comprising:
determining that the packets comprising encrypted data comprise one or more packet headers comprising at least one of the one or more network addresses.

5. The method of claim 4, wherein the one or more network addresses comprise a network address of a web proxy that generated the DNS query in response to a request received from a host, the method further comprising:
identifying one or more packets comprising the request.

6. The method of claim 1, wherein one or more packets, of the packets comprising unencrypted data, comprise data configured to establish an encrypted communication session between a first host and a second host, the method further comprising:
routing the one or more packets comprising data configured to establish the encrypted communication session between the first host and the second host to the proxy system.

7. The method of claim 6, the method further comprising:
routing the one or more packets to the proxy system based on a determination that at least one of the first host or the second host corresponds to the domain name identified as the network threat.

8. The method of claim 6, wherein:
the plurality of packet-filtering rules indicate:
one or more network addresses for which encrypted communications are to be established via the proxy system, and
one or more network addresses for which encrypted communications are to not be established via the proxy system, the method further comprising:
routing the one or more packets to the proxy system based on a determination that at least one of the first host or the second host corresponds to the one or more network addresses for which encrypted communications are to be established via the proxy system.

9. The method of claim 6, wherein:
the packet-filtering system comprises:
one or more interfaces interfacing the packet-filtering system with one or more communication links interfacing the first host and the second host, and
one or more interfaces interfacing the packet-filtering system with the proxy system, the method further comprising:
redirecting packets received via the one or more interfaces interfacing the packet-filtering system with the one or more communication links interfacing the first host and the second host to the one or more interfaces interfacing the packet-filtering system with the proxy system.

10. The method of claim 6, wherein:
the packet-filtering system comprises:
one or more interfaces interfacing the packet-filtering system with one or more communication links interfacing the first host and the second host, and
one or more interfaces interfacing the packet-filtering system with the proxy system, the method further comprising:
forwarding copies of packets received via the one or more interfaces interfacing the packet-filtering system with the one or more communication links interfacing the first host and the second host to the one or more interfaces interfacing the packet-filtering system with the proxy system.

IPR2022-00182 Page 00030

**11**. The method of claim **6**, the method further comprising:

identifying, via a communication link interfacing the first host and the proxy system, the packets comprising encrypted data; and

identifying, via an internal communication link of the proxy system, packets corresponding to the packets comprising encrypted data.

**12**. The method of claim **11**, the method further comprising: identifying, via a communication link interfacing the proxy system and the second host, packets generated by the proxy system based on the packets corresponding to the packets comprising encrypted data.

**13**. The method of claim **6**, the method further comprising:

generating, by the proxy system, one or more packets based on the filtered packets, comprising encrypted data, routed to the proxy system by the packet-filtering system;

responsive to determining that one or more packets generated by the proxy system correspond to one or more criteria specified by the plurality of packet-filtering rules, at least one of:

dropping the one or more packets generated by the proxy system;

logging the one or more packets generated by the proxy system;

dropping one or more other packets generated by the proxy system;

logging one or more other packets generated by the proxy system;

dropping one or more other packets comprising encrypted data; or

logging one or more other packets comprising encrypted data.

**14**. The method of claim **13**, wherein the determining that one or more packets generated by the proxy system based on one or more of the packets comprising encrypted data correspond to one or more criteria specified by the plurality of packet-filtering rules comprises determining that the one or more packets generated by the proxy system comprise at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules.

**15**. The method of claim **13**, wherein the determining comprises determining that the one or more packets generated by the proxy system comprise a uniform resource identifier (URI) meeting a threshold size specified by the plurality of packet-filtering rules.

**16**. The method of claim **6**, the method further comprising: identifying, via a communication link interfacing the proxy system and an Internet content adaptation protocol (ICAP) server, one or more packets comprising at least one of an ICAP request, a response generated by the ICAP server, or a modified request generated by the ICAP server.

**17**. The method of claim **1**, wherein the packets comprising encrypted data comprise packets received from a first host and destined for a second host, the method further comprising at least one of dropping or logging packets other than the packets comprising encrypted data based on a determination that the packets other than the packets comprising encrypted data were at least one of received from the second host or destined for the first host.

**18**. The method of claim **1**, wherein:

the packets comprising unencrypted data comprise one or more packets comprising one or more handshake messages configured to establish an encrypted communication session between a client and a server, the method further comprising:

determining that the one or more handshake messages comprise the domain name identified as the network threat.

**19**. The method of claim **18**, the method further comprising: responsive to determining that the one or more handshake messages comprise the domain name identified as the network threat, at least one of dropping or logging the packets comprising encrypted data.

**20**. The method of claim **18**, wherein:

the one or more handshake messages comprise at least one of a hello message generated by the client or a certificate message generated by the server; and

the determining that the one or more handshake messages comprise the domain name identified as the network threat comprises determining the at least one of the hello message generated by the client or the certificate message generated by the server comprises the domain name identified as the network threat.

**21**. The method of claim **18**, wherein the portion of the unencrypted data comprises one or more network addresses included in one or more headers of the one or more packets comprising the one or more handshake messages, the method further comprising

determining that the packets comprising encrypted data comprise one or more packet headers comprising at least one of the one or more network addresses.

**22**. The method of claim **21**, wherein the one or more network addresses comprise a network address of the server and a network address of a web proxy, the method further comprising:

identifying one or more packets comprising one or more packet headers comprising the network address of the web proxy and a network address of the client; and

determining that the packets comprising encrypted data comprise one or more packet headers comprising the network address of the server and the network address of the client.

**23**. The method of claim **1**, wherein the packets comprising unencrypted data comprise a certificate message for an encrypted communication session, the method further comprising:

at least one of dropping or logging one or more of the packets comprising encrypted data based on a determination that the certificate message comprises data indicating at least one of a serial number indicated by the plurality of packet-filtering rules, an issuer indicated by the plurality of packet-filtering rules, a validity time-range indicated by the plurality of packet-filtering rules, a key indicated by the plurality of packet-filtering rules, or a signing authority indicated by the plurality of packet-filtering rules.

**24**. A packet-filtering system comprising:

at least one hardware processor; and

memory storing instructions that when executed by the at least one hardware processor cause the packet-filtering system to:

receive data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprise a domain name identified as a network threat;

identify packets comprising unencrypted data;

identify packets comprising encrypted data;

determine, based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filter, based on at least one of a uniform resource identifier (URI) specified by a plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

    packets comprising the portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators; and

    the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

route, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

**25**. One or more non-transitory computer-readable media comprising instructions that when executed by at least one hardware processor of a packet-filtering system cause the packet-filtering system to:

receive data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprise a domain name identified as a network threat;

identify packets comprising unencrypted data;

identify packets comprising encrypted data;

determine, based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filter, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by a plurality of packet-filtering rules indicating one or more of the plurality of network-threat indicators, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

packets comprising the portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators; and

the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

route, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to one or more network-threat indicators.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

PALO ALTO NETWORKS, INC.,
Petitioner,

v.

CENTRIPETAL NETWORKS, INC.,
Patent Owner.
_____

IPR2022-00182
Patent 9,917,856 B2
_____

Before BRIAN J. McNAMARA, AARON W. MOORE, and
STEVEN M. AMUNDSON, *Administrative Patent Judges.*

AMUNDSON, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

## I. INTRODUCTION

Palo Alto Networks, Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 24, and 25 in U.S. Patent No. 9,917,856 B2 (Ex. 1001, "the '856 patent") under 35 U.S.C. §§ 311–319. Paper 2 ("Pet."). Centripetal Networks, Inc. ("Patent Owner") filed a Preliminary Response. Paper 6 ("Prelim. Resp."). Further, after receiving Board authorization, Petitioner filed a Preliminary Reply, and Patent Owner filed a Preliminary Sur-reply. Paper 9 ("Prelim. Reply"); Paper 10 ("Prelim. Sur-reply").

Under 37 C.F.R. § 42.4(a), we have authority to determine whether to institute an *inter partes* review. We may institute an *inter partes* review only if "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a) (2018). The "reasonable likelihood" standard is "a higher standard than mere notice pleading" but "lower than the 'preponderance' standard to prevail in a final written decision." *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 13 (PTAB Dec. 20, 2019) (precedential).

Based on the current record and for the reasons explained below, Petitioner has shown that there is a reasonable likelihood that it would prevail with respect to at least one of the challenged claims. Thus, we institute an *inter partes* review of claims 1, 24, and 25 in the '856 patent on all challenges included in the Petition.

## II. BACKGROUND

### A. Real Parties in Interest

Petitioner identifies itself as the real party in interest. Pet. 5. Patent Owner identifies itself as the real party in interest. Paper 4, 1. The parties do not raise any issue about real parties in interest.

### B. Related Matters

Petitioner and Patent Owner identify the following civil action where Patent Owner has asserted the '856 patent against an alleged infringer: *Centripetal Networks, Inc. v. Cisco Systems, Inc.*, No. 2:18-cv-00094 (E.D. Va. filed February 13, 2018), Appeal No. 21-1888 (Fed. Cir. filed April 7, 2021). Pet. 5; Paper 4, 1.

Petitioner identifies the following civil action where Patent Owner has asserted the '856 patent against another alleged infringer: *Centripetal Networks, Inc. v. Keysight Technologies, Inc. et al.*, No. 2:17-cv-00383 (E.D. Va. filed July 20, 2017). Pet. 5.

### C. The '856 Patent (Exhibit 1001)

The '856 patent, titled "Rule-Based Network-Threat Detection for Encrypted Communications," issued on March 13, 2018, from an application filed on December 23, 2015. Ex. 1001, codes (22), (45), (54). The patent discloses systems and methods for rule-based network-threat detection for encrypted communications. *See, e.g.*, *id.* at 1:31–32, 1:57–63, 2:1–3, 2:20–3:56, 23:63–24:30, code (57), Figs. 1–2, 7.

The '856 patent states that network threats may "take a variety of forms (e.g., unauthorized requests or data transfers, viruses, malware, large volumes of traffic designed to overwhelm resources, and the like)." Ex. 1001, 1:8–11. The patent also states that network-threat services may

"provide information associated with network threats, for example, reports that include listings of network-threat indicators (e.g., network addresses, domain names, uniform resource identifiers (URIs), and the like)." *Id.* at 1:11–15; *see id.* at 4:1–3, 4:30–32, 10:54–55. The patent explains that encrypted communications may "obfuscate data corresponding to network threats." *Id.* at 1:17–18. The patent then identifies "a need for rule-based network-threat detection for encrypted communications." *Id.* at 1:18–20.

To address that need, the '856 patent describes "a packet-filtering system configured to filter packets in accordance with packet-filtering rules" that receives "data indicating network-threat indicators." Ex. 1001, 1:32–36, code (57). The packet-filtering rules may "cause the packet-filtering system to identify packets comprising unencrypted data, and packets comprising encrypted data." *Id.* at 1:36–39, code (57). In the packets processed by the packet-filtering system, a "portion of the unencrypted data may correspond to one or more of the network-threat indicators." *Id.* at 1:39–40, code (57). Hence, the packet-filtering rules may "cause the packet-filtering system to determine, based on the portion of the unencrypted data, that the packets comprising encrypted data correspond to the one or more network-threat indicators." *Id.* at 1:41–45, code (57); *see id.* at 11:8–13.

The packet-filtering rules may cause the packet-filtering system to identify packets or "determine that the packets comprise data corresponding to the network-threat indicators based on the packets comprising one or more of" the following:

(i)     "a URI specified by [the] rules";

(ii)    "data indicating a protocol version specified by [the] rules";

    (iii)   "data indicating a method specified by [the] rules";

    (iv)   "data indicating a request specified by [the] rules"; or

    (v)   "data indicating a command specified by [the] rules."

Ex. 1001, 11:20–28.

Figure 1 in the '856 patent (reproduced below) depicts an environment for rule-based network-threat detection for encrypted communications:



FIG. 1

Figure 1 illustrates environment 100 including networks 102 and 104 with network 102 "associated with one or more individuals or entities (e.g., governments, corporations, service providers, or other organizations)" and network 104 comprising "the Internet, a similar network, or portions thereof." Ex. 1001, 2:20–34, Fig. 1; *see id.* at 1:57–59.

5

As shown in Figure 1, network 102 includes "hosts 106, 108, and 110, proxy devices 112, 114, and 116, web proxy 118, rule gates 120, 122, 124, 126, and 128, domain name system (DNS) 130, Internet content adaptation protocol (ICAP) server 132, and gateway 134." Ex. 1001, 2:39–43, Fig. 1. As also shown in Figure 1, network 104 includes "one or more rule providers 138, one or more threat-intelligence providers 140, and hosts 142, 144, and 146." *Id.* at 2:53–56, Fig. 1. Gateway 134 resides at the border between networks 102 and 104 and serves as an interface between nodes in the respective networks. *Id.* at 2:50–60, Fig. 1; *see id.* at 2:43–49.

Figure 2 in the '856 patent (reproduced below) depicts a packet-filtering system for rule-based network-threat detection for encrypted communications:



FIG. 2

Figure 2 illustrates packet-filtering system 200 comprising "one or more processors 202, memory 204, one or more communication interfaces 206, and data bus 208." Ex. 1001, 2:64–3:2, Fig. 2; *see id.* at 1:60–63. As shown in Figure 2, memory 204 includes the following:

(1)     program module(s) 210 comprising "instructions that when executed by processors 202 cause packet-filtering system 200 to perform" certain functions;

(2)     rule(s) 212 comprising "one or more packet-filtering rules in accordance with which packet-filtering system 200 is configured to filter packets received via communication interfaces 206"; and

(3)     log(s) 214 comprising "one or more entries generated by processors 202 in accordance with rules 212 for packets received by packet-filtering system 200 via communication interfaces 206."

*Id.* at 3:4–14, Fig. 2

Communication interfaces 206 may "interface packet-filtering system 200 with one or more communication links" in networks 102 and 104 either directly, e.g., via links 236 and 244, or indirectly, e.g., via network device 240 or tap devices 238 and 242. Ex. 1001, 3:15–31. For example, "packet-filtering system 200 may provision tap device 238 with one or more of rules 212 configured to cause tap device 238 to identify packets traversing link 236 that correspond to specified criteria and route (or forward) the packets (or copies thereof) to interface 218" in communication interfaces 206. *Id.* at 3:31–36.

7

Figure 7 in the '856 patent (reproduced below) depicts steps in a method for rule-based network-threat detection for encrypted communications:



FIG. 7

Figure 7 is a flowchart with steps 702 through 710 in a "method for rule-based network-threat detection for encrypted communications." Ex. 1001, 23:63–65, Fig. 7; *see id.* at 2:1–3.

8

In step 702, "a packet-filtering system may receive data indicating network-threat indicators," e.g., rules generated by rule providers 138 based on "network-threat indicators provided by threat-intelligence providers 140." Ex. 1001, 23:66–24:4, Fig. 7. In step 704, "the packet-filtering system may configure packet-filtering rules in accordance with which it is configured to filter packets." *Id.* at 24:4–6, Fig. 7. In step 706, "the packet-filtering system may identify packets comprising unencrypted data," e.g., "a DNS query, a reply to a DNS query, or a handshake message configured to establish an encrypted communication session." *Id.* at 24:8–12, Fig. 7; *see id.* at 9:16–28. In step 708, "the packet-filtering system may identify packets comprising encrypted data," e.g., packets encrypted according to a secure sockets layer (SSL) protocol or a transport layer security (TLS) protocol. *Id.* at 24:13–17, Fig. 7; *see id.* at 8:65–9:2, 9:47–51, 19:51–55, 20:3–7, 21:10–13, 23:39–42.

In step 710, "the packet-filtering system may determine based on a portion of the unencrypted data corresponding to the network-threat indicators that the packets comprising encrypted data correspond to the network-threat indicators." Ex. 1001, 24:18–21, Fig. 7. For instance, "packet-filtering system 200 may determine that a domain name included in the DNS query, the reply to the DNS query, or the handshake message corresponds to the network-threat indicators, and packet-filtering system 200 may determine that one or more of the packets" encrypted according to an SSL/TLS protocol "correlate to one or more packets comprising the DNS query, the reply to the DNS query, or the one or more handshake messages." *Id.* at 24:22–30; *see id.* at 8:65–9:2, 9:47–51, 19:51–55, 20:3–7, 21:10–13, 23:39–42.

9

*D. The Challenged Claims*

Petitioner challenges independent claims 1, 24, and 25. Pet. 8, 18–50. Claim 1 recites a method for filtering and routing packets comprising several steps. Ex. 1001, 25:14–49. Claim 24 recites a system comprising a hardware processor and a memory storing instructions for performing the steps in claim 1. *Id.* at 28:59–29:28. Claim 25 recites a computer-readable medium comprising instructions for performing the steps in claim 1. *Id.* at 29:29–30:31.

Claim 1 exemplifies the challenged claims and reads as follows (with formatting added for clarity and with numbers and letters added for reference purposes)[1]:

> 1. [1.pre] A method comprising:
>
> [1.a] receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;
>
> [1.b] identifying packets comprising unencrypted data;
>
> [1.c] identifying packets comprising encrypted data;
>
> [1.d] determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;
>
> [1.e] filtering, by the packet-filtering system and based on at least one of

---

[1] We use the same numbers and letters that Petitioner uses to identify the claim limitations.

a uniform resource identifier (URI) specified by the plurality of packet-filtering rules,

data indicating a protocol version specified by the plurality of packet-filtering rules,

data indicating a method specified by the plurality of packet-filtering rules,

data indicating a request specified by the plurality of packet-filtering rules, or

data indicating a command specified by the plurality of packet-filtering rules:

[1.f] packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and

[1.g] the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

[1.h] routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Ex. 1001, 25:14–49.

### E. The Asserted References

For its challenges, Petitioner relies on the following references:

| Name | Reference | Exhibit |
|------|-----------|---------|
| Buruganahalli | US 9,680,795 B2, issued June 13, 2017 (based on an application filed June 30, 2016)[2] | 1004 |
| Baehr | US 5,878,231, issued March 2, 1999 (based on an application filed February 4, 1997) | 1005 |

---

[2] Buruganahalli claims priority to an application filed on June 5, 2013. Ex. 1004, 1:7–15, codes (60), (63); *see* Pet. 7 n.4.

Pet. 7. Petitioner asserts that Buruganahalli qualifies as prior art under
§ 102(a)(2) and that Baehr qualifies as prior art under § 102(a)(1) and
§ 102(a)(2). *Id.*; *see* 35 U.S.C. § 102(a)(1)–(2).

At this stage of the proceeding, Patent Owner does not dispute that the
references qualify as prior art. *See, e.g.*, Prelim. Resp. 45–52.

### F.  The Asserted Challenges to Patentability

Petitioner asserts the following challenges to patentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 24, 25 | 103 | Buruganahalli |
| 1, 24, 25 | 103 | Buruganahalli, Baehr |

Pet. 8, 18–50.

### G.  Testimonial Evidence

To support its challenges, Petitioner relies on the declaration of Jon
Weissman, Ph.D. (Exhibit 1003, "Weissman Decl."). Dr. Weissman states,
"I have been retained by counsel for Petitioner Palo Alto Networks Inc.
('PAN' or 'Petitioner') as an expert witness to provide assistance regarding
U.S. Patent No. 9,917,856." Ex. 1003 ¶ 1.

### III.  DISCRETIONARY DENIAL

Patent Owner argues that we should exercise our discretion under
§ 314(a) or § 325(d) to deny institution. *See* Prelim. Resp. 24–45; Prelim.
Sur-reply 1–5; 35 U.S.C. §§ 314(a), 325(d). Petitioner argues that we should
decline to exercise our discretion to deny institution. *See* Pet. 8–10; Prelim.
Reply 1–5. For the reasons explained below, we decline to exercise our
discretion under § 314(a) or § 325(d) to deny institution.

*A. Request for Denial Under § 314(a)*

Under § 314(a), the Director possesses "broad discretion" in deciding whether to institute an *inter partes* review. *See* 35 U.S.C. § 314(a); *Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*, 896 F.3d 1322, 1327 (Fed. Cir. 2018). The Board decides whether to institute an *inter partes* review on the Director's behalf. 37 C.F.R. § 42.4(a) (2021).

1. Background: The Cisco Case

In February 2018, Patent Owner filed a complaint against Cisco Systems, Inc. ("Cisco") in the Eastern District of Virginia ("the Cisco case") alleging infringement of several patents, including the '856 patent. Ex. 1027, 1–2; *see* Ex. 1028, 11.[3]

In May and June 2020, the district court conducted a bench trial. Ex. 1027, 3, 22. At trial, Patent Owner asserted infringement of ten claims in five patents, including claims 24 and 25 in the '856 patent. *Id.* at 1–2, 22.

In October 2020, the district court issued an opinion with findings of fact and conclusions of law. Ex. 1027, 1. Among other things, the court found that various combinations of Cisco products infringed the asserted claims in four patents, including the '856 patent, but not the asserted claims in the fifth patent. *Id.* at 22–23, 29, 41, 57, 78–79, 95, 107, 110, 123, 160, 166. Additionally, the court determined that Cisco failed to demonstrate invalidity of the infringed patents with clear and convincing evidence. *Id.* at 23, 67, 83, 96–98, 112–13, 160.

---

[3] For Exhibit 1028 (Cisco's Non-Confidential Opening Brief in the Appeal to the Federal Circuit), we cite to the page numbers appearing in the brief rather than the page numbers that Petitioner applied to the exhibit.

As compensation for the infringement, the district court awarded past damages of about $756 million. Ex. 1027, 149, 166. The court decided that Cisco willfully infringed and enhanced the past damages by a multiple of 2.5 to "award lump sum past damages" of about $1.9 billion. *Id.* at 161, 166; *see id.* at 162. Additionally, the court declined to enjoin Cisco from future infringement. *Id.* at 162–64. Instead, the court determined that Patent Owner should receive an ongoing royalty (1) for a first three-year term between about $168 million and about $300 million per year and (2) for a second three-year term between about $84 million and about $150 million per year. *Id.* at 165–66. Hence, over six years the ongoing royalty should exceed $754 million. *Id.* at 166; *see* Ex. 1028, 13. Based on the judgment in the Cisco case, Patent Owner should receive at least $2.6 billion. *See* Ex. 1027, 149, 161, 166.

Cisco appealed to the Federal Circuit. Ex. 1028, 4–5. The appeal is pending.

### 2. BACKGROUND: THE PAN CASE

In March 2021, Patent Owner filed a complaint against Petitioner in the Eastern District of Virginia ("the PAN case") alleging infringement of twelve patents. Ex. 3002 ¶¶ 13–37, 61–418. In its complaint, Patent Owner did not assert against Petitioner any of the four patents that Cisco infringed. *See, e.g.*, *id.* ¶¶ 61–418.

In July 2021, Patent Owner filed an amended complaint against Petitioner in the PAN case alleging infringement of thirteen patents, i.e., the twelve previously asserted patents and a newly asserted patent. Ex. 3003 ¶¶ 13–39, 78–468. In its amended complaint, Patent Owner did not assert

14

against Petitioner any of the four patents that Cisco infringed. *See, e.g.*, *id.* ¶¶ 78–468.

In March 2022, the district court granted Petitioner's motion to stay the PAN case pending resolution of the Office proceedings discussed in the next section. Ex. 3004, 3, 11, 23.

### 3. BACKGROUND: OFFICE PROCEEDINGS

In July and August 2021, Petitioner filed petitions requesting *inter partes* reviews or a post-grant review of all claims in each of the thirteen patents asserted by Patent Owner in the PAN case. Ex. 3004, 3.

In September and November 2021, Petitioner filed petitions requesting *inter partes* reviews of various claims in three of the four patents that Cisco infringed as follows:

- IPR2021-01520 requesting review of claims 1, 2, 4, 9–11, 13, 18, and 19 in U.S. Patent No. 9,686,193 B2 ("the '193 patent");

- IPR2021-01521 requesting review of claims 1, 9–11, 19–21, and 29–30 in U.S. Patent No. 9,560,176 B2 ("the '176 patent"); and

- IPR2022-00182 (this proceeding) requesting review of claims 1, 24, and 25 in the '856 patent.[4]

Pet. 8, 18–50; IPR2021-01520, Paper 2 at 7, 26–68 (PTAB Sept. 15, 2021); IPR2021-01521, Paper 2 at 6, 16–56 (PTAB Sept. 15, 2021).

Previously, Cisco sought Board review of the '193 and '176 patents but not the '856 patent. *See* IPR2018-01559, Paper 1 (PTAB Aug. 21, 2018) (challenging claims in the '193 patent); IPR2018-01654, Paper 1 (PTAB

---

[4] As with the '856 patent, the district court in the Cisco case found that various combinations of Cisco products infringed the asserted claims the '193 and '176 patents. Ex. 1027, 22–23, 29, 41, 57, 78–79, 95, 160, 166.

Sept. 17, 2018) (challenging claims in the '176 patent). The Board denied
Cisco's petitions. *See* IPR2018-01559, Paper 7 at 13 (PTAB Apr. 2, 2019);
IPR2018-01654, Paper 7 at 22 (PTAB May 6, 2019). No one other than
Petitioner has sought Board review of the '856 patent.

As for the other Petitioner-initiated proceedings, the Board instituted
review in about half of the proceedings involving the thirteen patents
asserted by Patent Owner in the PAN case. Ex. 3004, 3. In IPR2021-01520
for the '193 patent, the Board denied the petition under 35 U.S.C. § 325(d).
IPR2021-01520, Paper 23 at 27 (PTAB Mar. 22, 2022). In IPR2021-01521
for the '176 patent, the Board denied the petition on the merits. IPR2021-
01521, Paper 23 at 19 (PTAB Mar. 24, 2022).

<div align="center">

4. REQUEST FOR DENIAL BASED ON
ALLEGED HARASSMENT AND GAMESMANSHIP
</div>

(a)   The Contentions of the Parties

Citing *General Plastic Industrial Co. v. Canon Kabushiki Kaisha*,
IPR2016-01357, Paper 19 at 17 (PTAB Sept. 6, 2017) (precedential as to
§ II.B.4.i) ("*General Plastic*"), Patent Owner asserts that "the Board can
take 'undue inequities and prejudices to Patent Owner into account'" when
deciding whether to exercise discretion under § 314(a). Prelim. Resp. 34.
Patent Owner asserts that "Petitioner has no reasonable basis to maintain this
challenge other than harassment" because the '856 patent "has never been
asserted, or threatened to be asserted, against Petitioner." *Id.* at 35; *see*
Prelim. Sur-reply 2. Patent Owner also asserts that "Petitioner seeks to
leverage this IPR against Patent Owner in unrelated litigation" because the
'856 patent "underlies a significant damages award based on" Cisco's
infringement. Prelim. Resp. 35; *see id.* at 45; Prelim. Sur-reply 2.

<div align="center">

16
</div>

Additionally, Patent Owner contends that deficiencies in the Petition evidence "Petitioner's sole purpose for filing this petition," i.e., "harassment and leverage." Prelim. Resp. 35. Specifically, Patent Owner criticizes the Petition for:

(1)    containing a "haphazard" claim chart for the ground based on Buruganahalli alone that cites (a) "piecemeal disclosures from the references" and (b) "conclusory allegations" about what an ordinarily skilled artisan would have known;

(2)    failing to specify for the ground based on Buruganahalli and Baehr "where each claim element is found in the combination"; and

(3)    giving "short shrift" to the "validity finding and known evidence of objective indicia of nonobviousness (secondary considerations)" from the Cisco case.

*Id.* at 35–36. Patent Owner contends that Petitioner's challenge to "only the claims underlying the Cisco verdict" also evidences improper conduct. *Id.* at 35 (emphasis omitted); *see* Prelim. Sur-reply 2.

Patent Owner asserts that the '856 patent "has already withstood a validity challenge" in the Cisco case based on prior art like Buruganahalli that "taught filtering decrypted data," rather than "filtering encrypted packets" as required by the '856 patent's claims. Prelim. Resp. 37–38, 46–47; *see id.* at 39, 41–42; Prelim. Sur-reply 4. According to Patent Owner, Petitioner "raises substantially the same arguments already rejected by the district court" in the Cisco case. Prelim. Sur-reply 1.

Further, Patent Owner argues that "Congress recognized the serious concerns that IPRs 'not to be used as tools for harassment or a means to prevent market entry through repeated litigation and administrative attacks on the validity of a patent.'" Prelim. Resp. 37 (quoting H.R. Rep. No. 112-

17

98, pt. 1, at 48 (2011)); *see* Prelim. Sur-reply 2, 5. Patent Owner also argues that allowing "Petitioner's gamesmanship here will only encourage bad actors to harass patent owners by filing IPRs any time a meaningful judgment is entered against third-party defendants, in hopes of extracting some form of advantage (monetary or otherwise)." Prelim. Resp. 37; *see* Prelim. Sur-reply 2.

Petitioner asserts that it has a "legitimate interest" in "pursuing this IPR because the '856 patent is part of a set of patents that have been asserted against others in the industry." Prelim. Reply 1. Petitioner asserts that (1) Patent Owner has accused Petitioner of "infringing numerous patents" in the PAN case and (2) Petitioner "is under widespread threat of assertion from" Patent Owner. *Id.* at 2. Additionally, Petitioner contends that Patent Owner's expert testified during the trial in the Cisco case that Petitioner has "sought to imitate the Cisco solutions that are described as infringing the patents in this suit," including the '856 patent. *Id.* at 1–2 (emphases omitted).

Further, Petitioner asserts that Cisco's prior art for the '856 patent differs from Buruganahalli. Prelim. Reply 2 n.2. Petitioner also asserts that Patent Owner's criticisms of the Petition lack merit. *See id.*

Patent Owner responds by asserting that its expert "did not make infringement accusations against Petitioner" during the trial in the Cisco case. Prelim. Sur-reply 3 (emphasis omitted).

(b) <u>Analysis</u>

The patent statute provides that "a person who is not the owner of a patent may file with the Office a petition to institute an inter partes review of the patent." 35 U.S.C. § 311(a). In contrast to a covered business method

patent review, neither the statute nor our rules require an infringement assertion against a person before that person may file a petition for an *inter partes* review. *See* 35 U.S.C. § 311; AIA § 18(a)(1)(B)[5]; 37 C.F.R. §§ 42.101, 42.302; *see also Coalition for Affordable Drugs VI, LLC v. Celgene Corp.*, IPR2015-01092, Paper 19 at 3–4 (PTAB Sept. 25, 2015) (denying motion for sanctions).

As the PTAB Consolidated Trial Practice Guide ("CTPG") explains, however, the Board will "take into account whether various considerations . . . warrant the exercise of the Director's discretion to decline to institute review." CTPG 55.[6] Among other things, the AIA requires "the Director to 'consider the effect of any such regulation [under this section] on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter.'" *Id.* at 56 (alteration in original) (quoting 35 U.S.C. §§ 316(b), 326(b)).

The Board has exercised discretion under § 314(a) to deny institution in various situations. As an example, the Board has exercised discretion to deny institution due to the advanced state of a civil action where a patent owner has asserted a challenged patent against a petitioner. *See, e.g.*, *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 (PTAB May 13, 2020) (informative). As another example, the Board has exercised discretion to deny institution of a later-filed petition after having considered an earlier-filed petition challenging the same patent. *See, e.g.*, *Valve Corp. v. Elec.*

---

[5] Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011).
[6] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

*Scripting Prods., Inc.*, IPR2019-00062, Paper 11 (PTAB Apr. 2, 2019) (precedential). As further examples, the Board has exercised discretion to deny institution when a petition demonstrates a reasonable likelihood of prevailing as to only some, not all, challenged claims (*see, e.g.*, *Chevron Oronite Co. v. Infineum USA L.P.*, IPR2018-00923, Paper 9 (PTAB Nov. 7, 2018) (informative)), and when a petition suffers from a lack of particularity that results in voluminous and excessive grounds (*see, e.g.*, *Adaptics Ltd. v. Perfect Co.*, IPR2018-01596, Paper 20 (PTAB Mar. 6, 2019) (informative)).

This case differs from other situations where the Board has exercised discretion under § 314(a) to deny institution. For example, we are not presented with a later-filed petition after having considered an earlier-filed petition challenging the same patent. Instead, Patent Owner asks us to deny institution because Petitioner challenges claims in a patent not asserted against Petitioner in an infringement action, arguing that Petitioner's challenge conflicts with the AIA's purposes. *See* Prelim. Resp. 37–38; Prelim. Sur-reply 2.

Patent Owner's arguments fail to persuade us to exercise our discretion to deny institution based on harassment and gamesmanship. Under the circumstances here, we do not view Petitioner's challenge to the '856 patent as contrary to the AIA's purposes. *See, e.g.*, *Halliburton Energy Servs., Inc. v. U.S. Well Servs., LLC*, IPR2021-01316, Paper 9 at 9 (PTAB Feb. 22, 2022) (deciding that a petition challenging an unasserted patent was not "contrary to the purposes of the AIA"). "The AIA was designed to encourage the filing of meritorious patentability challenges, by any person who is not the patent owner, in an effort to further improve patent quality." *Coalition*, IPR2015-01092, Paper 19 at 4.

Based on the current record and for the reasons explained below, the merits of Petitioner's challenge to the '856 patent seem "particularly strong." *See infra* §§ III.A.5(f), IV.D.2–IV.D.3, IV.E.2–IV.E.3. Further, Petitioner expresses reasonable concern that Patent Owner may initiate additional litigation involving the '856 patent. *See* Prelim. Reply 1–2.

Additionally, contrary to Patent Owner's contention, Petitioner has not challenged "only the claims underlying the Cisco verdict." *See* Pet. 8, 18–50; Prelim. Resp. 35; Ex. 1027, 41, 57. Also, Petitioner has challenged only three of the four patents that Cisco infringed, and the Board has denied institution in two of the three proceedings. *See supra* § III.A.3. No one other than Petitioner has sought Board review of the '856 patent.

As for Patent Owner's assertion that "Petitioner seeks to leverage this IPR against Patent Owner in unrelated litigation," Patent Owner has not substantiated that assertion. *See* Prelim. Resp. 35–39.

As for Patent Owner's assertion that the '856 patent "has already withstood a validity challenge" in the Cisco case based on prior art like Buruganahalli, we disagree. *See* Prelim. Resp. 37–38. According to Patent Owner, the prior art for the '856 patent in the Cisco case "taught filtering decrypted data," rather than "filtering encrypted packets" as required by the '856 patent's claims. Prelim. Resp. 37–38, 46–47; *see id.* at 15, 41–42; Ex. 1027, 57–58 (finding that the prior art for the '856 patent in the Cisco case "did not possess the functionality" to "differentiate between unencrypted and encrypted traffic" or "determine what portion of the packets are unencrypted or encrypted"). For the reasons explained below in our patentability analysis, Petitioner establishes persuasively on the current record that Buruganahalli teaches "filtering encrypted packets"

21

as required by the '856 patent's claims. *See infra* § IV.D.2(h); Ex. 1003 ¶¶ 120, 134–135; Ex. 1004, 8:55–60, 11:47–51, 14:21–33, 14:50–55. Among other things, Buruganahalli explains that by "parsing the handshake traffic," e.g., "parsing a client hello message to extract a hostname that identifies the destination domain," a security device may "apply one or more firewall policies/rules . . . related to destination domains" without "having to decrypt" encrypted communications. Ex. 1004, 11:7–19; *see id.* at 5:24–27, 5:35–42, 7:1–9; Ex. 1003 ¶¶ 94, 108, 113.

As for Patent Owner's criticisms of the Petition, we agree with Petitioner that the criticisms lack merit. *See* Prelim. Resp. 35–36; Prelim. Reply 2 n.2. For the ground based on Buruganahalli alone, the claim chart in the Petition (1) explains how Buruganahalli teaches the limitations in claims 1, 24, and 25 and (2) cites Dr. Weissman's testimony to support assertions about what an ordinarily skilled artisan would have known. Pet. 28–42; *see* Ex. 1003 ¶¶ 101–146; *infra* §§ IV.D.2–IV.D.3. For the ground based on Buruganahalli and Baehr, the Petition explains how Buruganahalli teaches most of the limitations in claims 1, 24, and 25 and how Baehr teaches limitation [1.h] and the similar limitations in claims 24 and 25, e.g., "[1.h] routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators." Pet. 42–50; *see* Ex. 1003 ¶¶ 147–158; *infra* §§ IV.D.2(b)–(h), IV.D.3, IV.E.2; *see also* Pet. 28–39; Ex. 1003 ¶¶ 101–135.

As for the "validity finding and known evidence of objective indicia of nonobviousness (secondary considerations)" from the Cisco case, Buruganahalli differs materially from the prior art for the '856 patent in the

Cisco case for the reasons discussed above and in our patentability analysis below. *See infra* § IV.D.2(h). Additionally, Petitioner addresses objective indicia of nonobviousness by asserting that "[f]rom what little can be discerned from the public record, the evidence fails to show nexus." Pet. 50. Based on the current record and for the reasons explained below, Patent Owner has not shown sufficiently that a presumption of nexus should apply or that a nexus exists between the asserted objective evidence and the merits of the claimed invention. *See infra* § IV.D.2(j).

For the reasons discussed above, Patent Owner's arguments about harassment and gamesmanship do not warrant the exercise of discretion to deny institution.

### 5. REQUEST FOR DENIAL BASED ON PARALLEL LITIGATION

When deciding whether to exercise discretion under § 314(a) to deny institution, the Board has considered the status of litigation involving the parties in light of the AIA's objective "to provide an effective and efficient alternative to district court litigation." *NHK Spring Co. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 at 12, 19–20 (PTAB Sept. 12, 2018) (precedential) (quoting *Gen. Plastic*, IPR2016-01357, Paper 19 at 16–17).

The Board has set forth the following nonexclusive factors to consider when determining whether to exercise discretion under § 314(a) to deny institution due to the advanced state of parallel litigation:

(1) whether the court granted a stay or evidence exists that one may be granted if the Board institutes a trial;

(2) the proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

(3) the investment in the parallel litigation by the court and the parties;

    (4)    the overlap in the issues raised by the petition and the issues in the parallel litigation;

    (5)    whether the petitioner and the defendant in the parallel litigation are the same party; and

    (6)    other circumstances that impact the Board's exercise of discretion, including the merits.

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 5–6 (PTAB Mar. 20, 2020) (precedential) ("*Fintiv*"). These factors "relate to whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in the parallel proceeding." *Id.* at 6. Further, *Fintiv* instructs that the Board should take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Id.* (citing CTPG 58).

(a)    <u>Factor (1): Stay of Parallel Litigation</u>

    Patent Owner asserts that factor (1) "strongly" favors discretionary denial because "there can be no debate that no stay is possible" in the Cisco case. Prelim. Resp. 40. Patent Owner does not address a stay in the PAN case. *Id.*

    Patent Owner misplaces its reliance on the Cisco case. When considering parallel litigation in light of *Fintiv*, the Board seeks to, among other things, minimize "inefficiency and duplication of efforts" when another tribunal may resolve "the same or substantially the same issues." *Fintiv*, IPR2020-00019, Paper 11 at 5 n.7, 6, 14; *see Intel Corp. v. VLSI Tech. LLC*, IPR2019-01192, Paper 15 at 11 (PTAB Jan. 9, 2020). A stay of parallel litigation pending resolution of a Board proceeding "allays concerns about inefficiency and duplication of efforts." *Fintiv*, IPR2020-00019, Paper 11 at 6.

<div align="center">24</div>

This proceeding also will involve no "duplication of efforts" with the Cisco case. There, the district court did not consider the invalidity of claims 1, 24, and 25 in light of Buruganahalli alone or combined with Baehr. *See* Ex. 1027, 57–67. And for the reasons discussed above and in our patentability analysis below, Buruganahalli differs materially from the prior art for the '856 patent in the Cisco case. *See supra* § III.A.4(b); *infra* § IV.D.2(h).

This proceeding will involve no "duplication of efforts" with the PAN case. There, Patent Owner did not assert the '856 patent against Petitioner. *See* Ex. 3002 ¶¶ 61–418; Ex. 3003 ¶¶ 78–468. But even if Patent Owner had asserted the '856 patent against Petitioner, the district court has stayed the PAN case, and the stay "allays concerns about inefficiency and duplication of efforts." *See Fintiv*, IPR2020-00019, Paper 11 at 6; Ex. 3004, 3, 11, 23.

For these reasons, factor (1) weighs against discretionary denial.

(b)     Factor (2): Trial Date in Parallel Litigation

Patent Owner asserts that factor (2) "strongly" favors discretionary denial because the trial in the Cisco case "has already completed long before the Board's statutory deadline." Prelim. Resp. 40. Patent Owner does not address the trial date in the PAN case. *Id.*

For the reasons discussed for factor (1), Patent Owner misplaces its reliance on the Cisco case. *See supra* § III.A.5(a). The district court has stayed the PAN case and has set no trial date, and the PAN case does not involve the '856 patent. *See* Ex. 3002 ¶¶ 13–37, 61–418; Ex. 3003 ¶¶ 13–39, 78–468; Ex. 3004, 3, 11, 23. Thus, factor (2) weighs against discretionary denial.

(c)     Factor (3): Investment in Parallel Litigation

Patent Owner asserts that factor (3) "strongly" favors discretionary denial because "there have been massive investments" in the Cisco case. Prelim. Resp. 40. Patent Owner does not address the investments in the PAN case. *Id.*

Patent Owner again misplaces its reliance on the Cisco case. There, the district court did not consider the invalidity of claims 1, 24, and 25 in light of Buruganahalli alone or combined with Baehr. *See* Ex. 1027, 57–67. Further, the record before us does not indicate that the parties in the Cisco case expended any effort addressing the invalidity of claims 1, 24, and 25 in light of Buruganahalli alone or combined with Baehr.

In the PAN case, the parties and the court have not expended any effort addressing the invalidity of claims 1, 24, and 25 in light of Buruganahalli alone or combined with Baehr. *See* Exs. 3002–3004.

For these reasons, factor (3) weighs against discretionary denial.

(d)     Factor (4): Overlapping Issues

Patent Owner asserts that factor (4) "strongly" favors discretionary denial because Buruganahalli is "substantially similar to" the prior art for the '856 patent in the Cisco case. Prelim. Resp. 41–42. Patent Owner does not identify any overlapping issues in the PAN case. *Id.* at 40–42.

We disagree that Buruganahalli is "substantially similar to" the prior art for the '856 patent in the Cisco case. *See* Prelim. Resp. 41. For the reasons discussed above and in our patentability analysis below, Buruganahalli differs materially from the prior art for the '856 patent in the Cisco case. *See supra* § III.A.4(b); *infra* § IV.D.2(h).

26

In the PAN case, Patent Owner did not assert the '856 patent against Petitioner. *See* Ex. 3002 ¶¶ 61–418; Ex. 3003 ¶¶ 78–468. Thus, there are no overlapping issues.

For these reasons, factor (4) weighs against discretionary denial.

(e)     Factor (5): Petitioner's Status in Parallel Litigation

"If a petitioner is unrelated to a defendant in an earlier court proceeding, the Board has weighed this fact against exercising discretion to deny institution." *Fintiv*, IPR2020-00019, Paper 11 at 13–14. But "even if the petition is brought by a different party," we should consider whether another proceeding presents "the same or substantially the same issues" to avoid "redoing the work of another tribunal." *Id.* at 14.

Patent Owner asserts that factor (5) favors discretionary denial due to Petitioner's relationship with Cisco. *See* Prelim. Resp. 43–44; Prelim. Sur-reply 5. In particular, Patent Owner contends that Petitioner collaborates with Cisco by deploying Petitioner's "Next-Generation Firewall" with Cisco's "Application Centric Infrastructure." Prelim. Resp. 43–44. According to Patent Owner, Petitioner "explicitly touts the integration of its products" with Cisco's products. Prelim. Sur-reply 5 (citing Ex. 2009, 1). Patent Owner also contends that Petitioner and Cisco are "charter members" of an organization for cybersecurity providers called the Cyber Threat Alliance that "encourages members to share information about threats." Prelim. Resp. 44 (citing Ex. 2008, 1); Prelim. Sur-reply 5.

Petitioner asserts that "[h]elping customers to improve their existing Cisco-based infrastructure" by using Petitioner's products instead of Cisco's products is "competition, not partnership." Prelim. Reply 3. Petitioner also asserts that the Cyber Threat Alliance is "an industry-wide non-profit

27

membership organization with 34 private-sector members" where most members "are competitors." *Id.* According to Petitioner, Patent Owner's "argument is analogous to treating members of the same standard setting organization as the same party." *Id.* at 3–4.

For factor (5), Petitioner's relationship with Cisco, if any, does not matter because the Cisco case does not involve "the same or substantially the same issues" as this proceeding. *See supra* §§ III.A.5(a), III.A.5(d). For the reasons discussed above and in our patentability analysis below, Buruganahalli differs materially from the prior art for the '856 patent in the Cisco case. *See supra* § III.A.4(b); *infra* § IV.D.2(h). Additionally, Petitioner was not a defendant in the Cisco case. *See supra* § III.A.1.

Petitioner is the defendant in the PAN case. But the PAN case does not involve "the same or substantially the same issues" as this proceeding because the PAN case does not involve the '856 patent. *See supra* §§ III.A.5(a), III.A.5(d).

Because the Cisco and PAN cases do not involve "the same or substantially the same issues" as this proceeding, there is no chance of an inconsistent outcome with a court decision.

For these reasons, factor (5) weighs against discretionary denial.

(f)     Factor (6): Other Circumstances

Factor (6) concerns other circumstances and recognizes that a decision whether to exercise discretion under § 314(a) to deny institution should rest on "a balanced assessment of all relevant circumstances in the case, including the merits." *Fintiv*, IPR2020-00019, Paper 11 at 14; *see* CTPG 58. For example, "if the merits of a ground raised in the petition seem

28

particularly strong on the preliminary record, this fact has favored institution." *Fintiv*, IPR2020-00019, Paper 11 at 14–15.

Patent Owner contends that factor (6) "strongly" favors discretionary denial for three reasons. *See* Prelim. Resp. 44–45; Prelim. Sur-reply 5. First, Patent Owner asserts that Petitioner's "challenge is a transparent and harassing attempt to gain leverage against Patent Owner in unrelated litigation." Prelim. Resp. 45; *see* Prelim. Sur-reply 5. Second, Patent Owner asserts that Petitioner (a) "presents art that is duplicative and cumulative to art previously considered by the Office" and (b) "has not identified any error in the Office's evaluation." Prelim. Resp. 44. Third, Patent Owner asserts that Petitioner is "unlikely to succeed on the merits." *Id.*

For the reasons discussed above, Patent Owner's assertion that Petitioner's "challenge is a transparent and harassing attempt to gain leverage against Patent Owner in unrelated litigation" is unpersuasive under the circumstances presented and does not warrant the exercise of discretion to deny institution. *See supra* § III.A.4(b); Prelim. Resp. 45.

For the reasons explained below in our discussion of Patent Owner's arguments under 35 U.S.C. § 325(d), we disagree with Patent Owner's assertion that Petitioner "presents art that is duplicative and cumulative to art previously considered by the Office." *See infra* § III.B.5(a); Prelim. Resp. 44.

For the reasons explained below in our patentability analysis, we disagree with Patent Owner's assertion that Petitioner is "unlikely to succeed on the merits." *See infra* §§ IV.D.2–IV.D.3, IV.E.2–IV.E.3; Prelim. Resp. 44. Rather, based on the current record and for the reasons explained

29

below, the merits of Petitioner's challenge to the '856 patent seem "particularly strong." *See infra* §§ IV.D.2–IV.D.3, IV.E.2–IV.E.3.

For these reasons, factor (6) weighs against discretionary denial. *See Fintiv*, IPR2020-00019, Paper 11 at 14–15.

(g)    Conclusion Concerning Denial Based on Parallel Litigation

After analyzing the *Fintiv* factors with a holistic view of whether the efficiency and integrity of the system are best served by denying or instituting review, we determine that, on balance, the factors do not favor denying an *inter partes* review. Hence, we decline to exercise our discretion under § 314(a) to deny institution.

*B.  Request for Denial Under § 325(d)*

Section 325(d) provides that "[i]n determining whether to institute" an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d). The Director "is permitted, but never compelled, to institute" an *inter partes* review. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016).

1. THE *ADVANCED BIONICS* FRAMEWORK

When deciding whether to exercise our discretion under § 325(d), we follow the two-part framework set forth in *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020) (precedential) ("*Advanced Bionics*"). Specifically, we must first determine "whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same

30

arguments previously were presented to the Office." *Advanced Bionics*, Paper 6 at 8. That determination involves "two separate issues" as follows:

(1)   "whether the petition presents to the Office the same or substantially the same art previously presented to the Office"; and

(2)   "whether the petition presents to the Office the same or substantially the same arguments previously presented to the Office."

*Id.* at 7.

If "either condition of first part of the framework is satisfied," we must then determine "whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims." *Advanced Bionics*, Paper 6 at 8. "An example of a material error may include misapprehending or overlooking specific teachings of the relevant prior art where those teachings impact patentability of the challenged claims." *Id.* at 8 n.9.

When deciding whether to exercise our discretion under § 325(d) in view of the *Advanced Bionics* framework, we weigh the following nonexclusive factors:

(a)   the similarities and material differences between the asserted references and the prior art involved during prosecution;

(b)   the cumulative nature of the asserted references and the prior art evaluated during prosecution;

(c)   the extent to which the asserted references were evaluated during prosecution, including whether a rejection rested on any reference;

(d)   the extent of overlap between the arguments made during prosecution and Petitioner's reliance on the asserted

                references or Patent Owner's contentions concerning
                them;

(e)      whether Petitioner has pointed out sufficiently how the
           Examiner erred in analyzing the asserted references; and

(f)       the extent to which additional evidence and facts
           presented in the petition warrant reconsideration
           of the asserted references or arguments.

*See Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential as to § III.C.5, first paragraph) ("*Becton*").

## 2. SUMMARY OF THE '856 PATENT'S PROSECUTION

The following summary of the '856 patent's prosecution provides background that will assist in explaining our analysis.

In December 2015, Patent Owner filed application no. 14/757,638 ("the '638 application") that issued as the '856 patent. *See* Ex. 1001, codes (10), (21), (22); Ex. 1002, 1–64, 70. The '638 application included independent method claim 1, independent system claim 24, and independent computer-readable-medium claim 25 that issued as patent claims 1, 24, and 25, respectively, after various amendments. Ex. 1002, 43, 49–50; *see id.* at 1352, 1359–61, 1379–81, 1384–86, 1414, 1420–22; Ex. 1001, 25:14–49, 28:59–30:31.

In April 2017, the Examiner rejected claims 1, 24, and 25 under § 101 as directed to patent-ineligible subject matter and under § 112(b) due to an "antecedent basis error." Ex. 1002, 1064–69. The Examiner also rejected claims 1, 24, and 25 under § 103 as unpatentable over Spies and Sorensen.[7]

---

[7] *See* U.S. Patent Application Publication No. 2005/0138353 A1, titled "Identity-Based-Encryption Message Management System," to Spies et al.

*Id.* at 1069–72. The Examiner cited Spies for teaching most of the claimed subject matter and Sorensen for teaching network-threat indicators. *Id.* at 1070–72.

In July 2017, Patent Owner submitted an information-disclosure statement listing about 50 documents, including an International Search Report for a foreign counterpart to the '638 application and Martini.[8] Ex. 1002, 1127–34; *see id.* at 1338–50 (International Search Report). The International Search Report described Martini as a "document of particular relevance" such that "the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone." *Id.* at 1340 (citing Ex. 2005 ¶¶ 24–27). Moreover, the International Search Report mapped Martini's disclosures to the limitations in a claim identical to claim 1 in the '638 application as filed. *Id.* at 1346–47 (citing Ex. 2005 ¶¶ 18, 24, Fig. 1); *compare id.* at 43 (claim 1 in the '638 application as filed), *with id.* at 1346–47 (quoting claim 1 in a foreign counterpart to the '638 application).

In October 2017, Patent Owner amended claim 1 to, among other things, require (1) "filtering . . . packets comprising the portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators" and (2) "filtering . . . the determined packets comprising the encrypted data that corresponds to the

---

("Spies") (Ex. 2001); U.S. Patent Application Publication No. 2012/0023576 A1, titled "Insider Threat Correlation Tool," to Sorensen et al. ("Sorensen") (Ex. 2002).

[8] *See* U.S. Patent Application Publication No. 2014/0317397 A1, titled "Selectively Performing Man in the Middle Decryption," to Martini ("Martini") (Ex. 2005).

one or more network-threat indicators." Ex. 1002, 1352. Patent Owner similarly amended claims 24 and 25. *Id.* at 1359–61. Also, Patent Owner argued against the rejections. *Id.* at 1362–67.

For the § 103 rejection, Patent Owner argued that Spies "fails to teach or suggest 'determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising the encrypted data that corresponds to the one or more network-threat indicators'" as "recited in amended independent claim 1." Ex. 1002, 1365. Specifically, Patent Owner asserted that Spies discloses (1) filtering "a scanned and unencrypted version" of an encrypted message and (2) further "processing operations such as virus scanning, spam filtering, notifications, archiving, or security policy enforcement" performed on "the decrypted message." *Id.* (citing Ex. 2001 ¶¶ 130–131, 143–144, 155, 162–164); *see id.* at 1366. Patent Owner also asserted that Spies "does not discuss any determination regarding any encrypted data based on any unencrypted data corresponding to one or more network-threat indicators." *Id.* at 1365. Further, Patent Owner argued that Spies "fails to teach or suggest network-threat indicators" and "also fails to teach or suggest encrypted data that corresponds to the one or more network-threat indicators." *Id.*

Additionally, Patent Owner argued that Sorensen "whether taken alone or in combination with Spies" does not "teach or suggest 'determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising the encrypted data that

34

corresponds to the one or more network-threat indicators'" as "recited in amended independent claim 1." Ex. 1002, 1366. Further, Patent Owner argued that Sorensen "also fails to teach or suggest encrypted data that corresponds to the one or more network-threat indicators." *Id.*

In December 2017, Patent Owner's attorney interviewed the Examiner. Ex. 1002, 1391. During the interview, the Examiner "confirmed authorization from Attorney of record . . . to implement Examiner's Amendment based on Applicant's proposed examiner's amendment submitted by email on 12/06/2017." *Id.*; *see id.* at 1379. The record in this proceeding does not include the email with the proposed amendment.

About two weeks later in December 2017, the Examiner amended claim 1 to, among other things, require (1) "at least one of the one or more network-threat indicators comprise a domain name identified as a network threat"; (2) "filtering . . . based on at least one of" (i) "a uniform resource identifier (URI) specified by the plurality of packet-filtering rules," (ii) "data indicating a protocol version specified by the plurality of packet-filtering rules," (iii) "data indicating a method specified by the plurality of packet-filtering rules," (iv) "data indicating a request specified by the plurality of packet-filtering rules," or (v) "data indicating a command specified by the plurality of packet-filtering rules"; and (3) "routing . . . filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators." Ex. 1002, 1379–81. The Examiner similarly amended claims 24 and 25. *Id.* at 1384–86.

After amending claims 1, 24, and 25, the Examiner allowed the claims. Ex. 1002, 1378–79, 1386–89. In a statement of reasons for

allowance, the Examiner said, "Newly amended independent claim 1 is allowed in view of the (examiner's) amendment and for reasons argued" in the October 2017 amendment. *Id.* at 1388 (citing *id.* at 1364–67). The Examiner also said, "Independent claims 24 and 25 recite similar limitations to those found in claim 1" and "are considered to be allowable for the same reasons as discussed with claim 1." *Id.* at 1389. The Examiner explained that an "additional search does not yield other specific references that reasonably, either singularly or in combination with cited references, would result a proper rejection that would have anticipated or made obvious all the steps disclosed in the independent claims 1, 24 and 25 with proper motivation" to combine the references. *Id.*

In December 2017, the Examiner initialed as considered the documents listed in the July 2017 information-disclosure statement. Ex. 1002, 1393–1400. The initialed documents include the International Search Report for a foreign counterpart to the '638 application and Martini. *Id.* at 1395, 1398. The Examiner did not rely on Martini to reject any claims. *See, e.g.*, *id.* at 1062–85, 1378–92.

In January 2018, Patent Owner amended claims 1, 24, and 25 after allowance to make minor changes, e.g., to revise the language "at least one of the one or more network-threat indicators comprise a domain name identified as a network threat" to read "at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat." Ex. 1002, 1414, 1420–22. Patent Owner amended claim 25 to require that the URI specified by the packet-filtering rules "indicat[e] one or more of the plurality of network-threat indicators" but did not similarly amend claims 1 and 24. *Id.* at 1414, 1420–22.

IPR2022-00182
Patent 9,917,856 B2

In March 2018, the '856 patent issued. Ex. 1001, code (45).

### 3. PATENT OWNER'S CONTENTIONS

Patent Owner contends that during the '856 patent's prosecution the Examiner considered Martini and that Buruganahalli is "in all relevant aspects" the "same as" Martini. Prelim. Resp. 25 (citing Ex. 1002, 1398). Specifically, Patent Owner asserts that Buruganahalli discloses a firewall implemented as a gateway that has "the ability to create a secure connection." *Id.* at 26 (citing Ex. 1004, 1:28–31, 2:55–60, 5:24–35, 10:39–46, 15:11–13). Patent Owner asserts that Buruganahalli's firewall:

(1)     permits communications between a client and a remote server "with no filtering" if the destination domain is on a "whitelist";

(2)     decrypts encrypted communications between a client and a remote server if the destination domain is on a "blacklist"; and

(3)     "uses 'man-in-the-middle decryption techniques' to monitor the encrypted communications" such that the firewall "can present itself as server of the session to the client and can present itself as the client of the session to the server."

*Id.* (citing Ex. 1004, 6:22–39, 7:52–59, 8:36–38, 8:48–50, 12:59–61, 15:35–37).

Further, Patent Owner asserts that "[l]ike Buruganahalli, Martini describes a gateway that has the ability to create a secure connection." Prelim. Resp. 27 (citing Ex. 2005 ¶¶ 20, 24, Fig. 1). Patent Owner asserts that Martini describes (1) "comparing the extracted domain name to a policy and/or list of domain names" and (2) "determining whether to decrypt and monitor based on whether a domain name is specified for decryption and inspection." *Id.* at 27–28 (citing Ex. 2005 ¶¶ 24, 38). Patent Owner asserts

37

that Martini "further describes 'man in the middle' decryption that is just like the 'man-in-the-middle decryption techniques' of Buruganahalli." *Id.* at 28 (citing Ex. 2005 ¶ 25).

According to Patent Owner, "Buruganahalli is substantially similar to art already presented to the Office" given Buruganahalli's "identity to Martini on all relevant points." Prelim. Resp. 29; *see id.* at 39.

Additionally, Patent Owner contends that the Examiner applied Spies "to reject claims during prosecution" and that Buruganahalli is "cumulative" to Spies. Prelim. Resp. 29 (citing Ex. 1002, 1069–81; Ex. 2001); *see id.* at 31. Specifically, Patent Owner asserts that "[l]ike Buruganahalli, Spies describes a firewall that filters IP packets based on port and destination address information, communications that include encrypted data, decryption of the encrypted data from those communications, and inspection of that data after it has been decrypted." *Id.* (emphasis omitted) (citing Ex. 2001 ¶¶ 84, 94, 130–131, 147, 160–161).

Regarding patentability, Patent Owner contends that Buruganahalli and the references considered by the Examiner fail to teach "filtering . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators" as required by limitation [1.g] and the similar limitations in claims 24 and 25. Prelim. Resp. 3–4, 31–32, 39; *see id.* at 46–54.

4. PETITIONER'S CONTENTIONS

Petitioner contends that during prosecution Patent Owner argued "that the cited reference (Spies) taught filtering only 'a scanned and unencrypted version of a message' and performing 'processing operations such as virus scanning, spam filtering, notifications, archiving, or security policy

enforcement' on the decrypted message." Pet. 9 (quoting Ex. 1002, 1365). Petitioner contends that Patent Owner also argued "that Spies 'does not discuss any determination regarding any encrypted data based on any unencrypted data corresponding to one or more network-threat indicators.'" *Id.* (quoting Ex. 1002, 1365).

Further, Petitioner asserts that, unlike Spies, Buruganahalli "discloses a packet-filtering system that determines that packets with unencrypted data (e.g., in a session-initiating handshake message) correspond to a network-threat indicator, and further determines that subsequent packets with encrypted data also correspond to that network-threat indicator based on unencrypted data." Pet. 9–10 (emphasis omitted). Petitioner asserts that Buruganahalli "further discloses network-threat indicators comprising a domain name that Applicant also argued to be missing in prior art." *Id.* at 10.

## 5. ANALYSIS

As explained below, we have analyzed the *Becton* factors in view of the *Advanced Bionics* framework and the record before us, and we determine that, on balance, the factors do not favor denying an *inter partes* review.

(a)   The First Part of the *Advanced Bionics* Framework

Under the *Advanced Bionics* framework, we initially consider *Becton* factors (a), (b), and (d) in determining "whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office." *Advanced Bionics*, IPR2019-01469, Paper 6 at 8, 10. *Becton* factors (a) and (b) "broadly provide guidance as to whether the art presented in the petition is the 'same or substantially the same' as the prior art previously

presented to the Office during *any* proceeding." *Id.* at 10 (emphasis in the original). "Previously presented art includes art made of record by the Examiner, and art provided to the Office by an applicant," e.g., with an information-disclosure statement. *Id.* at 7–8.

(i)    The Same or Substantially the Same Art

For "the same or substantially the same art" inquiry under the *Advanced Bionics* framework, we disagree with Patent Owner that Buruganahalli is "in all relevant aspects" the "same as" Martini and "cumulative" to Spies. *See* Prelim. Resp. 25, 29. Buruganahalli is closer and more pertinent prior art than Martini or Spies because, for the reasons explained below, Petitioner establishes persuasively on the current record that Buruganahalli teaches "filtering . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators" as required by limitation [1.g] and the similar limitations in claims 24 and 25. *See infra* § IV.D.2(h); Ex. 1003 ¶¶ 120, 134–135; Ex. 1004, 8:55–60, 11:47–51, 14:21–33, 14:50–55; Pet. 38–39; Prelim. Resp. 3–4, 32, 39.

Specifically, Buruganahalli discloses that when a client attempts to access a remote server "using an encrypted session protocol," a security device intercepts "the initial unencrypted/clear text data communications," e.g., a TLS hello message, "exchanged as part of an initial handshake to setup a secure connection for a new session." Ex. 1004, 4:37–40, 5:27–42, 14:21–25, 15:7–11, Figs. 6–7; *see id.* at 4:59–61, 6:39–41, 7:19–25, 11:24–51, code (57); Ex. 1003 ¶¶ 103, 111–113. The security device processes the unencrypted data communications to "extract a hostname" that identifies the destination domain the client wants to connect with. Ex. 1004,

5:6–10, 9:50–57, 11:47–51, 14:21–25, 14:28–31, 14:50–55, 15:11–18, code (57), Fig. 7; *see* Ex. 1003 ¶¶ 91, 111–112.

Based on the extracted hostname (destination domain), the security device "identifies the packets as being part of a new session and creates a new session flow." Ex. 1004, 5:7, 5:35–36, 14:25–33; *see* Ex. 1003 ¶¶ 111, 115, 133. Then, the security device inspects the session traffic including "encrypted data communications associated with the session" and identifies packets "as belonging to the session based on a flow lookup." Ex. 1004, 8:55–60, 14:26–28; *see* Ex. 1003 ¶¶ 111, 115. The security device uses the extracted hostname (destination domain) to "apply firewall policies or take responsive actions." Ex. 1004, 5:35–42; *see id.* at 7:39–67, 16:26–48; Ex. 1003 ¶ 108.

By inspecting the session traffic including "encrypted data communications associated with the session" and identifying packets "as belonging to the session based on a flow lookup," the security device "filter[s] . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators" according to limitation [1.g] and the similar limitations in claims 24 and 25. *See* Ex. 1003 ¶¶ 120, 135; Ex. 1004, 8:55–60, 11:47–51, 14:21–33, 14:50–55.

Buruganahalli explains that by "parsing the handshake traffic," e.g., "parsing a client hello message to extract a hostname that identifies the destination domain," the security device may "apply one or more firewall policies/rules . . . related to destination domains" without "having to decrypt" encrypted communications. Ex. 1004, 11:7–19; *see id.* at 5:24–27, 5:35–42, 7:1–9; Ex. 1003 ¶¶ 94, 108, 113. Like Buruganahalli, the '856 patent discloses using the handshake traffic to identify destination

41

domains corresponding to network-threat indicators. Ex. 1001, 9:28–33, 24:22–30; *see* Ex. 1003 ¶ 121.

In contrast to Buruganahalli, Martini discloses decrypting encrypted communications and then inspecting and filtering the decrypted communications. *See* Ex. 2005 ¶¶ 21, 24–28, 37–38; Prelim. Resp. 39 (stating that "during prosecution" the Examiner considered "art that requires decrypting encrypted packets to detect threats"). Specifically, Martini explains that a network gateway intercepts a plaintext domain name service (DNS) request from a client, e.g., a browser device. Ex. 2005 ¶¶ 20–21, 24, 37–38. For traffic that will remain unencrypted, the network gateway inspects "the plaintext messages and, optionally, modif[ies] or drop[s] a message," e.g., a message that matches "viral signatures, malware black-lists, etc." *Id.* ¶¶ 27–28. For traffic that will become encrypted, however, the network gateway responds to the client "with the address or addresses of one or more man in the middle (MitM) gateways." *Id.* ¶¶ 21, 24, 40.

After a client receives the address of an MitM gateway, the client initializes a cryptographic connection with the MitM gateway. Ex. 2005 ¶ 25. Then, the MitM gateway initializes a cryptographic connection with the server hosting the resource sought by the client. *Id.* After the cryptographic connections have been established, the MitM gateway (1) receives an encrypted message from the client; (2) decrypts the message; (3) inspects the decrypted message; (4) optionally alters or drops the decrypted message; (5) encrypts the possibly altered message into a second encrypted form; and (6) passes the encrypted message to the server. *Id.* ¶ 26. The MitM gateway performs "the same type of reception, decryption,

Appx0159

inspection, alteration or drop, encryption, and passage" for messages from the server to the client. *Id.*

Hence, we agree with Patent Owner that Martini fails to teach "filtering . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators" as required by limitation [1.g] and the similar limitations in claims 24 and 25. *See* Prelim. Resp. 32; *see also id.* at 39. Spies also fails to teach those limitations.

Like Martini, Spies discloses decrypting encrypted communications and then inspecting and filtering the decrypted communications. *See, e.g.*, Ex. 2001 ¶¶ 10–16, 56, 84, 94, 130–131, 147, 156–164, code (57), Fig. 12; Prelim. Resp. 29. Specifically, Spies discloses systems and methods for managing email encrypted "using identity-based-encryption (IBE) techniques." Ex. 2001 ¶¶ 10–13, code (57). To manage email encrypted using IBE techniques, a gateway may connect an organization's internal network to an external network. *Id.* ¶ 14; *see id.* ¶ 84. An IBE-private-key generator on the internal network may "provide IBE private keys to the gateway." *Id.* ¶ 14; *see id.* ¶ 56. When the gateway receives an IBE-encrypted message, the gateway may "request an appropriate IBE private key" from the IBE-private-key generator. *Id.* ¶ 15, code (57). Message processing applications on the gateway may "use an IBE decryption engine and the IBE private key to decrypt the IBE-encrypted message." *Id.* ¶ 16, code (57); *see id.* ¶¶ 56, 94, 130, 160, Fig. 12. After decrypting the IBE-encrypted message, the applications may "process the unencrypted version of the message," e.g., "for virus scanning, spam blocking, policy enforcement, etc.," and then "provide the processed version of the message

to an appropriate recipient within the organization." *Id.* ¶ 16, code (57); *see id.* ¶¶ 94, 130–131, 147, 161, Fig. 12.

For the reasons discussed above and in our patentability analysis below, Buruganahalli is closer and more pertinent prior art than the references Patent Owner identifies as the closest prior art considered by the Examiner, i.e., Martini and Spies. *See* Prelim. Resp. 25, 29–30; *infra* §§ IV.D.2(a)–(i). The International Search Report cited during the '856 patent's prosecution does not suggest otherwise. The International Search Report mapped Martini's disclosures to the limitations in a claim identical to claim 1 in the '638 application as filed. *See* Ex. 1002, 43, 1346–47. After submitting the International Search Report and Martini to the Office, Patent Owner amended claim 1 to, among other things, require "filtering . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators." *Id.* at 1127–34, 1338–50, 1352. Patent Owner similarly amended claims 24 and 25. *Id.* at 1359–61. Hence, the International Search Report does not indicate how, if at all, Martini's disclosures relate to the limitations added by amendment to claims 1, 24, and 25.

Because Buruganahalli is closer and more pertinent prior art than the references Patent Owner identifies as the closest prior art considered by the Examiner, "the same or substantially the same art" was not previously considered by the Examiner under the *Advanced Bionics* framework.

(ii)    The Same or Substantially the Same Arguments

For "the same or substantially the same arguments" inquiry under the *Advanced Bionics* framework, the arguments about Spies and Sorensen during prosecution do not resemble the arguments about Buruganahalli and

Baehr here. *See, e.g.*, Pet. 28–50; Ex. 1002, 1365–66. During prosecution, the arguments about Spies and Sorensen centered on whether the references teach "determining . . . packets comprising encrypted data that corresponds to the one or more network-threat indicators." *See* Ex. 1002, 1365–66; Pet. 9 (citing Ex. 1002, 1365); Prelim. Resp. 11–12 (citing Ex. 1002, 1365–66). Here, the arguments about Buruganahalli and Baehr center on whether the references teach "filtering . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators." *See* Pet. 38–39; Prelim. Resp. 3–4, 21, 32, 45–52. At this stage of the proceeding, Patent Owner does not dispute that Buruganahalli teaches "determining . . . packets comprising encrypted data that corresponds to the one or more network-threat indicators." *See* Prelim. Resp. 45–52; *infra* § IV.D.2(e).

(b)     The Second Part of the *Advanced Bionics* Framework

Because neither condition of the first part of the *Advanced Bionics* framework is satisfied, we do not reach the second part of the framework. *See Advanced Bionics*, Paper 6 at 8.

6. CONCLUSION CONCERNING DENIAL UNDER § 325(d)

After analyzing the *Becton* factors in view of the *Advanced Bionics* framework and the record before us, we determine that, on balance, the factors do not favor denying an *inter partes* review. Hence, we decline to exercise our discretion under § 325(d) to deny institution.

IV. PATENTABILITY ANALYSIS

*A. Legal Principles: Obviousness*

A patent may not be obtained "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole

45

would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. An obviousness analysis involves underlying factual inquiries including (1) the scope and content of the prior art; (2) differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) where in evidence, objective indicia of nonobviousness, such as commercial success, long-felt but unsolved need, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 35–36 (1966); *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48 (Fed. Cir. 2016) (en banc). When evaluating a combination of references, an obviousness analysis should address "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

We analyze the obviousness issues according to these principles.

### B. Level of Ordinary Skill in the Art

Factors pertinent to determining the level of ordinary skill in the art include (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior-art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the educational level of workers active in the field. *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983). Not all factors may exist in every case, and one or more of these or other factors may predominate in a particular case. *Id.* These factors are not exhaustive, but merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir.

2007). Moreover, the prior art itself may reflect an appropriate skill level. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Petitioner asserts that a person of ordinary skill in the art "would have had a bachelor's degree in computer science, computer engineering, or an equivalent, and four years of professional experience." Pet. 16. Petitioner also asserts that "[l]ack of work experience could be remedied by additional education, and vice versa." *Id.* Dr. Weissman's testimony supports Petitioner's assertions. *See* Ex. 1003 ¶¶ 29–30.

At this stage of the proceeding, Patent Owner "has applied" Petitioner's description of an ordinarily skilled artisan "without conceding it is correct." Prelim. Resp. 24.

Based on the current record and for purposes of institution, we accept Petitioner's description of an ordinarily skilled artisan as consistent with the '856 patent and the asserted prior art.

## C. Claim Construction

Because Petitioner filed the Petition after November 13, 2018, we construe claim terms "using the same claim construction standard" that district courts use to construe claim terms in civil actions under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). Under that standard, claim terms "are given their ordinary and customary meaning, which is the meaning the term would have to a person of ordinary skill in the art at the time of the invention." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 971 (Fed. Cir. 2018) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)). The meaning of claim terms may be determined by "look[ing] principally to the intrinsic evidence of record, examining the claim language itself, the written description, and

47

the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Petitioner proposes a construction for one claim term, i.e., "network-threat indicators." Pet. 17.

Patent Owner does not propose a construction for any claim term. *See* Prelim. Resp. 4–23, 45–52.

Based on the current record, we determine that no claim term requires an explicit construction to decide whether Petitioner satisfies the "reasonable likelihood" standard for instituting trial. "[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### D. Alleged Obviousness over Buruganahalli: Claims 1, 24, and 25

Petitioner contends that claims 1, 24, and 25 are unpatentable under § 103 as obvious over Buruganahalli. *See* Pet. 8, 18–42. Below, we provide an overview of Buruganahalli, and then we consider the obviousness issues. As explained below, Patent Owner primarily disputes that Buruganahalli teaches one limitation in each claim, i.e., limitation [1.g] and the similar limitations in claims 24 and 25. As also explained below, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches the subject matter of each claim.

### 1. OVERVIEW OF BURUGANAHALLI (EXHIBIT 1004)

Buruganahalli is a U.S. patent titled "Destination Domain Extraction for Secure Protocols," issued on June 13, 2017, from an application filed on

48

June 30, 2016, as a continuation of an application filed on July 25, 2013.
Ex. 1004, codes (22), (45), (54), (63). Buruganahalli discloses "techniques
for destination domain extraction for secure protocols," e.g., "secure sockets
layer (SSL), transport layer security (TLS), and/or other secure protocols."
*Id.* at 4:47–50.

Buruganahalli's Figure 1 (reproduced below) depicts the architecture
of a security device for implementing destination domain extraction for
secure protocols:



**FIG. 1**

Figure 1 illustrates security device or firewall 100 with the following
components:

(1)    "IP address and port engine 104" that "determines an IP
       address and port number for a monitored traffic flow
       (e.g., a session) based on packet analysis";

(2)     "policy check engine 106" that "determines whether any policies can be applied based on the IP address and port number";

(3)     "application signature check engine 108" that (a) "identifies an application," e.g., by "using various application signatures," and (b) "determine[s] what type of traffic the session involves, such as HTTP traffic, HTTPS traffic, SSL/TLS traffic, SSH traffic, DNS requests, FTP traffic, unknown traffic, and various other types of traffic";

(4)     "known protocol decoder engine 112" that (a) "decodes and analyzes traffic flows using known protocols," e.g., by "applying various signatures for the known protocol," and (b) "provide[s] destination domain extraction for such secure protocols," e.g., by "parsing a client hello message to extract a hostname that identifies the destination domain being requested by the client to the remote server";

(5)     "[i]dentified traffic (no decoding required) engine 114" that "reports the identified traffic";

(6)     "unknown protocol decoder engine 116" that (a) "decodes and analyzes traffic flows," e.g., by "applying various heuristics," and (b) "reports the monitored traffic analysis";

(7)     "report and enforce policy engine 120" that receives information, e.g., from identified traffic engine 114 and unknown protocol decoder engine 116; and

(8)     "content-ID engine 122" that provides to report and enforce policy engine 120 "URL/category filtering, possibly in various combinations with other information, such as application, user, and/or other information, to enforce various security/firewall policies/rules."

Ex. 1004, 9:26–60, 10:21–28, Fig. 1; *see id.* at 4:33–44, 5:37–40, 11:7–12, 11:47–51, 14:28–33, 14:50–55.

50

Buruganahalli discloses that a security device may apply "a policy (e.g., a security policy) based on the destination domain" to filter inbound traffic or outbound traffic (or both). Ex. 1004, 1:33–38, 2:62–3:4, 7:25–29, code (57); *see id.* at 5:35–51, 7:8–9, 7:35–42, 7:51–67, 14:28–33, 14:61–63. The security policy may include (1) "a malware detection policy," (2) "a whitelist/blacklist policy," and/or (3) "a uniform resource locator (URL)/category filtering policy." *Id.* at 7:42–51, 16:26–48; *see id.* at 7:52–67, 10:21–28.

Buruganahalli discloses that when a client attempts to access a remote server "using an encrypted session protocol," a security device intercepts "the initial unencrypted/clear text data communications," e.g., a TLS hello message, "exchanged as part of an initial handshake to setup a secure connection for a new session." Ex. 1004, 4:37–40, 5:27–42, 14:21–25, 15:7–11, Figs. 6–7; *see id.* at 4:59–61, 6:39–41, 7:19–25, 11:24–51, code (57). The security device processes the unencrypted data communications to "extract a hostname" that identifies the destination domain the client wants to connect with. *Id.* at 5:6–10, 9:50–57, 11:47–51, 14:21–25, 14:28–31, 14:50–55, 15:11–18, code (57), Fig. 7.

Based on the extracted hostname (destination domain), the security device "identifies the packets as being part of a new session and creates a new session flow." Ex. 1004, 5:7, 5:35–36, 14:25–33. Then, the security device inspects the session traffic including "encrypted data communications associated with the session" and identifies packets "as belonging to the session based on a flow lookup." *Id.* at 8:55–60, 14:26–28. The security device uses the extracted hostname (destination domain) to "apply firewall

policies or take responsive actions." *Id.* at 5:35–42; *see id.* at 7:39–67, 16:26–48.

Buruganahalli's Figure 3A (reproduced below) depicts a functional block diagram of a firewall for implementing destination domain extraction for secure protocols:



**FIG. 3A**

Figure 3A shows client 302, firewall 304, remote server 306, and network service 308 with "an SSL/TLS session passing through" firewall 304. Ex. 1004, 1:53–56, 10:54–57, 10:61–11:2, Fig. 3A. "As shown, a client 302 establishes a secure tunnel session (e.g., creates an SSL tunnel) with a remote server 306." *Id.* at 10:61–63, Fig. 3A. "The client 302 can use the secure tunnel with the server 306 to access a network service 308, which can be a network service activity that is in violation of one or more firewall policies/rules implemented by the firewall device 304," e.g., "a policy that includes requirements or rules related to destination domains that may be used for secure protocol communications." *Id.* at 10:63–11:2.

According to Buruganahalli, "the secure tunnel session traffic is encrypted," and "the firewall 304 typically cannot decrypt the encrypted secure tunnel session traffic and, thus, cannot detect such firewall policy/rule violation(s)." Ex. 1004, 11:2–6. To address that deficiency, Buruganahalli

52

discloses "various techniques" for "destination domain extraction for secure protocols" that permit a security device to "apply one or more firewall policies/rules . . . related to destination domains" without "having to decrypt" encrypted communications. *Id.* at 11:7–19; *see id.* at 5:24–27, 5:35–42, 7:1–9, 11:20–58.

In particular, Buruganahalli explains that the server name indication (SNI) extension to the TLS protocol "indicates what hostname (e.g., destination domain)" a client wants to connect with "at the start of the handshaking process for setting a secure TLS communication channel/ session between a client and a remote server." Ex. 1004, 4:64–5:1, 5:6–10. Buruganahalli discloses using the SNI extension "to facilitate destination domain extraction for secure protocols without requiring decryption." *Id.* at 5:24–27; *see id.* at 11:24–28.

For instance, a security device may "intercept and monitor data communications from a client and a remote server in order to extract the hostname data" from the "server name field of the SNI extension" in "an unencrypted data communication" from the client to the remote server "at the start of the handshaking process for setting up a secure TLS communication channel/session." Ex. 1004, 5:27–35; *see id.* at 11:30–51. The security device may use the "extracted hostname data (e.g., destination domain)" to "apply firewall policies or take responsive actions based on this information without having to wait for data to be decrypted." *Id.* at 5:35–42; *see id.* at 11:47–51. Avoiding decryption "result[s] in less state to track thereby enhancing performance (e.g., of the security device, such as a firewall)." *Id.* at 5:43–51.

Buruganahalli's Figure 3B (reproduced below) depicts another functional block diagram of a firewall for implementing destination domain extraction for secure protocols:



**FIG. 3B**

Figure 3B shows client 312, firewall 314, remote server 316, and network service 318 with Session A between client 312 and firewall 314 and Session B between firewall 314 and server 316. Ex. 1004, 12:4–28, Fig. 3B; *see id.* at 1:57–59. "As shown, a client 312 attempts to establish an SSL session with a remote server 316" and "can attempt to use, for example, a secure tunnel with the server 316 to access a network service 318, which can be a network service activity that is in violation of one or more firewall policies/rules implemented by a firewall device 314." *Id.* at 12:6–12, Fig. 3B.

In contrast to Figure 3A's embodiment, in Figure 3B's embodiment "the SSL session request is intercepted and detected by the firewall 314." Ex. 1004, 12:12–14, Fig. 3B. Specifically, "the firewall 314 performs a trusted man-in-the-middle technique by effectively splitting the SSL session between the client 312 and the remote server 316 into two half sessions shown as Session A and Session B in" Figure 3B. *Id.* at 12:14–18, Fig. 3B. In Session A, "the firewall 314 acts as the remote server 316 such that it is

54

transparent to the client 312" and encrypts Session A traffic "using the session key S1." *Id.* at 12:18–22. In Session B, "the firewall 314 acts as the client 312 such that it is transparent to the remote server 316" and encrypts Session B traffic "using the session key S2." *Id.* at 12:22–28.

After "the session set-up handshaking is completed for each of Session A and Session B, any data that is communicated from the client 312 to the firewall 314 is decrypted using a session key S1 and is then inspected by the firewall 314," e.g., "to monitor the session traffic for firewall policy/rule compliance." Ex. 1004, 12:29–32, 12:42–44. If "the traffic is determined to be authorized SSL remote-access traffic, the firewall 314 encrypts the tunneled traffic using a session key S2 and forwards the encrypted traffic to the remote server 316." *Id.* at 12:48–51. Similarly, "traffic coming from the server is decrypted with the session key S2, inspected by the firewall 314, and then encrypted using the session key S1 and forwarded to the client 312." *Id.* at 12:52–55.

Buruganahalli discloses using "decryption techniques" according to Figure 3B's embodiment "in addition to and/or in combination with the various techniques described herein for destination domain extraction for secure protocols," e.g., techniques according to Figure 3A's embodiment. Ex. 1004, 11:59–12:3; *see id.* at 11:7–58.

## 2. INDEPENDENT CLAIM 1

(a)    Preamble [1.pre]

Claim 1's preamble recites "[a] method." Ex. 1001, 25:14.

Petitioner contends that Buruganahalli teaches claim 1's preamble because Buruganahalli "discloses a method for filtering packets in

communications between a client and a remote server." Pet. 28 (citing Ex. 1004, 4:31–40).

Patent Owner makes no arguments specific to claim 1's preamble. *See, e.g.*, Prelim. Resp. 45–52. Nonetheless, the burden remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

Generally, a preamble does not limit a claim. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). We need not decide whether claim 1's preamble limits the claim because Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches claim 1's preamble. *See* Pet. 28; Ex. 1003 ¶¶ 101–104. As Petitioner contends, Buruganahalli "discloses a method for filtering packets in communications between a client and a remote server." Ex. 1004, 4:31–44, 7:12–8:10, 9:4–10:9, code (57), Fig. 1; *see* Ex. 1003 ¶ 103; Pet. 28.

(b)   Limitation [1.a]

Claim 1 recites "receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat." Ex. 1001, 25:15–21.

Petitioner contends that Buruganahalli teaches this limitation because Buruganahalli "discloses that its method is implemented using a 'security device' such as a 'packet-filtering firewall' comprising 'a processor configured to execute instructions stored on and/or provided by a memory coupled to the processor.'" Pet. 29 (quoting Ex. 1004, 2:18–19, 3:16–20).

56

Petitioner also contends that Buruganahalli discloses that packet-filtering firewalls were known to perform the following actions:

(1)   "deny or permit network transmission based on a set of rules" often referred to as "policies (e.g., network policies or network security policies)";

(2)   filter "inbound traffic by applying a set of rules or policies to prevent unwanted outside traffic from reaching protected devices"; and

(3)   filter "outbound traffic by applying a set of rules or policies."

*Id.* (citing Ex. 1003 ¶ 107; Ex. 1004, 1:32–36, 2:55–66, 14:58–60).

Further, Petitioner asserts that Buruganahalli discloses extracting from a packet a destination domain that "can then be used to apply firewall policies or take responsive actions." Pet. 29–30 (citing Ex. 1004, 5:35–43, 14:60–67). Petitioner also asserts that Buruganahalli discloses listing certain destination domains "in a 'blacklist policy' that is part of the 'security policy.'" *Id.* at 30 (citing Ex. 1004, 7:42–67).

Patent Owner makes no arguments specific to limitation [1.a]. *See, e.g.*, Prelim. Resp. 45–52.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.a]. *See* Pet. 29–30; Ex. 1003 ¶¶ 105–109. As Petitioner asserts, Buruganahalli "discloses that its method is implemented using a 'security device' such as a 'packet-filtering firewall' comprising 'a processor configured to execute instructions stored on and/or provided by a memory coupled to the processor.'" Ex. 1004, 2:18–19, 3:16–20; *see* Ex. 1003 ¶ 106; Pet. 29.

Buruganahalli also discloses using the security device "for destination domain extraction for secure protocols." Ex. 1004, 1:46–48, 9:4–6, Fig. 1;

57

*see* Ex. 1003 ¶ 93. Specifically, the security device monitors network traffic by "inspecting individual packets," for example "using pass through (e.g., in line) monitoring techniques." Ex. 1004, 3:16–18, 9:6–15, Fig. 1; *see id.* at 3:20–21, 3:40–44, 9:25–28, 9:32–36, 14:22–28; Ex. 1003 ¶ 93.

To monitor network traffic, the security device may include the following components:

(1) "IP address and port engine 104" that "determines an IP address and port number for a monitored traffic flow (e.g., a session) based on packet analysis";

(2) "policy check engine 106" that "determines whether any policies can be applied based on the IP address and port number";

(3) "application signature check engine 108" that (a) "identifies an application," e.g., by "using various application signatures," and (b) "determine[s] what type of traffic the session involves, such as HTTP traffic, HTTPS traffic, SSL/TLS traffic, SSH traffic, DNS requests, FTP traffic, unknown traffic, and various other types of traffic";

(4) "known protocol decoder engine 112" that (a) "decodes and analyzes traffic flows using known protocols," e.g., by "applying various signatures for the known protocol," and (b) "provide[s] destination domain extraction for such secure protocols," e.g., by "parsing a client hello message to extract a hostname that identifies the destination domain being requested by the client to the remote server";

(5) "[i]dentified traffic (no decoding required) engine 114" that "reports the identified traffic";

(6) "unknown protocol decoder engine 116" that (a) "decodes and analyzes traffic flows," e.g., by "applying various heuristics," and (b) "reports the monitored traffic analysis";

58

     (7)     "report and enforce policy engine 120" that receives information, e.g., from identified traffic engine 114 and unknown protocol decoder engine 116; and

     (8)     "content-ID engine 122" that provides to report and enforce policy engine 120 "URL/category filtering, possibly in various combinations with other information, such as application, user, and/or other information, to enforce various security/firewall policies/rules."

Ex. 1004, 9:26–60, 10:21–28, Fig. 1; *see id.* at 4:33–44, 5:37–40, 11:7–12, 11:47–51, 14:28–33, 14:50–55; *see* Ex. 1003 ¶ 119.

The security device may apply "a policy (e.g., a security policy) based on the destination domain" to filter inbound traffic or outbound traffic (or both). Ex. 1004, 1:33–38, 2:62–3:4, 7:25–29, code (57); *see id.* at 5:35–51, 7:8–9, 7:35–42, 7:51–67, 14:28–33, 14:61–63; Ex. 1003 ¶ 108. The security policy may include (1) "a malware detection policy," (2) "a whitelist/ blacklist policy," and/or (3) "a uniform resource locator (URL)/category filtering policy." Ex. 1004, 7:42–51, 16:26–48; *see id.* at 7:52–67, 10:21–28; Ex. 1003 ¶¶ 90, 109.

As an example, a security policy may specify that "the network communications between the client and the remote server are not decrypted if the destination domain is included in a whitelist of the whitelist/blacklist policy." Ex. 1004, 7:55–59, 16:36–42; *see id.* at 7:42–49; Ex. 1003 ¶ 90. As another example, a security policy may specify that "the network communications between the client and the remote server are decrypted if the destination domain is included in a blacklist of the whitelist/blacklist policy." Ex. 1004, 7:63–67, 16:43–48; *see id.* at 7:42–49; Ex. 1003 ¶ 90. As yet another example, a security policy may specify that the network communications with "an unknown site," e.g., a domain not included in a

whitelist or a blacklist of the whitelist/blacklist policy, may occur subject to further monitoring "to determine whether or not further action(s) should be performed." Ex. 1004, 6:22–38.

Additionally, the security device may report to a security cloud service the "detection of security policy violations and/or vulnerabilities based on destination domain extraction for secure protocols." Ex. 1004, 13:40–43; *see* Ex. 1003 ¶ 109. That reporting may "facilitate identification of new, zero-day threats, new vulnerabilities, prevent false positives, and/or provide a feedback loop for any of such activities or trends aggregated and correlated using the security cloud service." Ex. 1004, 13:43–51; *see* Ex. 1003 ¶ 109.

Thus, Buruganahalli "discloses packet-filtering rules (e.g., policies or rules) that are based on whether certain data (e.g., a destination domain) is identified as a network threat (e.g., by matching the data on a blacklist)." Ex. 1003 ¶ 109 (emphases omitted).

(c)     Limitation [1.b]

Claim 1 recites "identifying packets comprising unencrypted data." Ex. 1001, 25:22.

Petitioner contends that Buruganahalli teaches this limitation because Buruganahalli's security device "identifies the packets as being part of a new session and creates a new session flow." Pet. 30–31 (citing Ex. 1004, 14:25–28). Petitioner contends that Buruganahalli "discloses 'monitor[ing] the initial unencrypted/clear text data communications exchanged as part of an initial handshake to setup a secure connection for a new session between a client and a remote server . . . .'" *Id.* at 31 (alterations by Petitioner) (quoting Ex. 1004, 4:37–40).

Patent Owner makes no arguments specific to limitation [1.b]. *See, e.g.*, Prelim. Resp. 45–52.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.b]. *See* Pet. 30–31; Ex. 1003 ¶¶ 110–113. Specifically, Buruganahalli discloses that when a client attempts to access a remote server "using an encrypted session protocol," the security device intercepts "the initial unencrypted/clear text data communications," e.g., a TLS hello message, "exchanged as part of an initial handshake to setup a secure connection for a new session." Ex. 1004, 4:37–40, 5:27–42, 14:21–25, 15:7–11, Figs. 6–7; *see id.* at 4:59–61, 6:39–41, 7:19–25, 11:24–51, code (57); Ex. 1003 ¶¶ 103, 111–113.

The security device processes the unencrypted data communications to "extract a hostname" that identifies the destination domain the client wants to connect with. Ex. 1004, 5:6–10, 9:50–57, 11:47–51, 14:21–25, 14:28–31, 14:50–55, 15:11–18, code (57), Fig. 7; *see* Ex. 1003 ¶¶ 91, 111–112. For instance, the security device may analyze "an initial TLS handshake exchange" to "extract a hostname to facilitate destination domain extraction for secure protocols." Ex. 1004, 11:47–51, 14:28–31, 14:50–55, 15:13–18; *see id.* at 5:6–10, 11:24–47; Ex. 1003 ¶ 111. Based on the extracted hostname (destination domain), the security device "identifies the packets as being part of a new session and creates a new session flow." Ex. 1004, 5:7, 5:35–36, 14:25–33; *see* Ex. 1003 ¶ 111. Hence, the security device "identifies unencrypted packet data within the initial handshake" to "set up a new session." Ex. 1003 ¶ 113.

(d)    Limitation [1.c]

Claim 1 recites "identifying packets comprising encrypted data."
Ex. 1001, 25:23.

Petitioner contends that Buruganahalli teaches this limitation because
Buruganahalli's security device "identifies the packets as being part of a new
session and creates a new session flow" and "[s]ubsequent packets will be
identified as belonging to the session based on a flow lookup." Pet. 32
(citing Ex. 1004, 14:25–28). Petitioner also contends that a session using a
secure protocol involves "encrypted data communication" comprising data
packets. *Id.* (citing Ex. 1004, 3:16–24, 3:40–50, 4:31–44, 5:43–52,
5:62–6:38, 8:11–44, 8:55–60, 9:25–30, 12:33–48).

Patent Owner makes no arguments specific to limitation [1.c]. *See,
e.g.*, Prelim. Resp. 45–52.

Based on the current record, Petitioner establishes sufficiently for
purposes of institution that Buruganahalli teaches limitation [1.c]. *See*
Pet. 32; Ex. 1003 ¶¶ 114–115. Specifically, Buruganahalli's security device
"identifies the packets as being part of a new session and creates a new
session flow" based on a hostname (destination domain) extracted from
unencrypted data communications, e.g., the handshake traffic. Ex. 1004,
5:7, 5:35–36, 14:25–33; *see id.* at 4:37–40, 9:50–57, 11:24–51, 14:21–25;
Ex. 1003 ¶¶ 111, 115. Then, the security device inspects the session traffic
including "encrypted data communications associated with the session" and
identifies packets "as belonging to the session based on a flow lookup."
Ex. 1004, 8:55–60, 14:26–28; *see* Ex. 1003 ¶¶ 111, 115. Hence, the security
device "identif[ies] data packets comprising encrypted data during set up of
a new session, and during the session." Ex. 1003 ¶ 115.

62

(e)     Limitation [1.d]

Claim 1 recites "determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators." Ex. 1001, 25:24–29.

Petitioner contends that Buruganahalli teaches this limitation because Buruganahalli's security device (1) "determines an IP address and port number for a monitored traffic flow (e.g., a session) based on packet analysis" and (2) includes "a table that stores 'destination domains[] and associated IP addresses and possibly other information for clients and/or remote servers identified as external sites that are monitored for implementing policies using destination domain extraction for secure protocols.'" Pet. 33–34 (alteration by Petitioner) (quoting Ex. 1004, 9:26–28, 13:64–14:1). Petitioner contends that "IP addresses (*e.g.*, source, destination) and TCP session data associated with a packet were typically unencrypted and could be inspected without decrypting the packet information." *Id.* at 33.

Further, Petitioner asserts that unencrypted packets and encrypted packets "related to a session" are correlated "using at least address information associated with the destination domain" in "a hello message in TLS handshake traffic." Pet. 33–34 (citing Ex. 1003 ¶¶ 119–120; Ex. 1004, 9:25–28). According to Petitioner, unencrypted packets in "the hello message" and encrypted packets in "the encrypted session" would be "associated with the same destination IP address of the remote server." *Id.* at 34.

Patent Owner makes no arguments specific to limitation [1.d]. *See, e.g.*, Prelim. Resp. 45–52.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.d]. *See* Pet. 32–34; Ex. 1003 ¶¶ 116–121. Specifically, Buruganahalli's security device "determines an IP address and port number for a monitored traffic flow (e.g., a session) based on packet analysis." Ex. 1004, 9:25–28, Fig. 1; *see* Ex. 1003 ¶ 119. The security device "stores tables that include host names/identifiers (e.g., destination domains) and associated IP addresses and possibly other information for clients and/or remote servers identified as external sites that are monitored for implementing policies using destination domain extraction for secure protocols." Ex. 1004, 13:62–14:1, Fig. 5; *see* Ex. 1003 ¶ 119.

An ordinarily skilled artisan would have understood that "IP addresses for source and destination associated with a packet, or other TCP session data, would be located in an unencrypted portion of a packet (e.g., a clear header) that can be inspected without decrypting the packet so that the packet can be routed using the IP addresses." Ex. 1003 ¶ 119 (emphasis omitted); *see id.* ¶¶ 64, 94; Ex. 1040 ¶ 36. Also, an ordinarily skilled artisan would have understood that unencrypted packets and encrypted packets "related to a session" are correlated "based on data included in the hello message (e.g., destination domain and associated IP address) configured to establish the encrypted session, because both the encrypted session and the hello message would be associated with the same destination IP address of the remote server." Ex. 1003 ¶ 120.

64

(f)     Limitation [1.e]

Claim 1 recites as follows:

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules.

Ex. 1001, 25:30–38.

Petitioner contends that Buruganahalli teaches this limitation because Buruganahalli discloses filtering packets based on each of the following: (1) "a uniform resource identifier (URI) specified by the plurality of packet-filtering rules"; (2) "data indicating a protocol version specified by the plurality of packet-filtering rules"; and (3) "data indicating a request specified by the plurality of packet-filtering rules." *See* Pet. 34–37. For instance, Petitioner asserts that Buruganahalli's security device may filter packets based on "a uniform resource identifier (URI) specified by the plurality of packet-filtering rules" because the security device may use "a uniform resource locator (URL)/category filtering policy." *Id.* at 35 (citing Ex. 1004, 7:39–51, 10:21–28, 15:37–45). Petitioner also asserts that an ordinarily skilled artisan "would have understood, as was well-known and conventional, that URLs are examples of uniform resource identifiers." *Id.* (citing Ex. 1037, 12:25–27).

Patent Owner makes no arguments specific to limitation [1.e]. *See, e.g.*, Prelim. Resp. 45–52.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.e]. *See* Pet. 34–37; Ex. 1003 ¶¶ 122–131. As Petitioner asserts, Buruganahalli's security device may filter packets based on "a uniform resource identifier (URI) specified by the plurality of packet-filtering rules" because the security device may use "a uniform resource locator (URL)/category filtering policy." Ex. 1004, 7:39–51, 10:21–28; *see* Ex. 1003 ¶¶ 125–127; Pet. 35. As Petitioner also asserts, an ordinarily skilled artisan "would have understood, as was well-known and conventional, that URLs are examples of uniform resource identifiers." *See* Ex. 1003 ¶ 127; Ex. 1037, 12:25–27; Pet. 35. Additionally, Buruganahalli discloses that the security device may "recognize a GET request in the received data." Ex. 1004, 14:40–43.

(g)     Limitation [1.f]

Claim 1 recites "filtering . . . packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators." Ex. 1001, 25:30, 25:39–41.

Petitioner contends that Buruganahalli teaches this limitation because Buruganahalli discloses (1) "intercepting a request to establish an encrypted session from a client to a remote server" and (2) "filtering unencrypted packets in the initial handshake based on the determination of whether 'the destination domain is included in the blacklist.'" Pet. 37–38 (quoting Ex. 1004, 7:49–50).

Patent Owner makes no arguments specific to limitation [1.f]. *See, e.g.*, Prelim. Resp. 45–52.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.f]. *See*

Pet. 37–38; Ex. 1003 ¶¶ 103, 111–113, 132–133. Specifically, as discussed above, Buruganahalli discloses that when a client attempts to access a remote server "using an encrypted session protocol," the security device intercepts "the initial unencrypted/clear text data communications," e.g., a TLS hello message, "exchanged as part of an initial handshake to setup a secure connection for a new session." Ex. 1004, 4:37–40, 5:27–42, 14:21–25, 15:7–11, Figs. 6–7; *see id.* at 4:59–61, 6:39–41, 7:19–25, 11:24–51, code (57); Ex. 1003 ¶¶ 103, 111–113; *supra* § IV.D.2(c). The security device processes the unencrypted data communications to "extract a hostname" that identifies the destination domain the client wants to connect with. Ex. 1004, 5:6–10, 9:50–57, 11:47–51, 14:21–25, 14:28–31, 14:50–55, 15:11–18, code (57), Fig. 7; *see* Ex. 1003 ¶¶ 91, 111–112. For instance, the security device may analyze "an initial TLS handshake exchange" to "extract a hostname to facilitate destination domain extraction for secure protocols." Ex. 1004, 11:47–51, 14:28–31, 14:50–55, 15:13–18; *see id.* at 5:6–10, 11:24–47; Ex. 1003 ¶ 111.

Based on the extracted hostname (destination domain), the security device "identifies the packets as being part of a new session and creates a new session flow." Ex. 1004, 5:7, 5:35–36, 14:25–33; *see* Ex. 1003 ¶¶ 111, 115, 133. The security device uses the extracted hostname (destination domain) to "apply firewall policies or take responsive actions." Ex. 1004, 5:35–42; *see* Ex. 1003 ¶ 108. For instance, the security device may use the extracted hostname (destination domain) to implement a whitelist/blacklist policy where blacklisted items correspond to network-threat indicators. Ex. 1004, 7:39–67, 16:32–48; *see* Ex. 1003 ¶¶ 90–91, 105, 109, 116, 120, 124, 128, 132.

67

(h)    Limitation [1.g]

Claim 1 recites "filtering . . . the determined packets comprising
the encrypted data that corresponds to the one or more network-threat
indicators."  Ex. 1001, 25:30, 25:43–45.

Petitioner contends that Buruganahalli teaches this limitation because
Buruganahalli's security device "filters encrypted data communications after
a determination that the handshake traffic corresponds to a network-threat
indicator (*e.g.*, whether the extracted destination domain is on a blacklist)."
Pet. 38 (citing Ex. 1004, 4:31–44, 6:12–39, 6:62–7:9, 7:12–29, 7:39–51,
7:60–67).  Petitioner also contends that "the handshake message comprises
data (*e.g.*, destination domain) that also applies to the encrypted data of the
session, such that the security risks associated with the handshake message
and encrypted data are correlated."  *Id.*  According to Petitioner, "packets
identified as being part of the secure session" after the handshake traffic
correspond to "filtered encrypted packets."  *Id.* at 25.

Patent Owner disputes that Buruganahalli teaches limitation [1.g].
*See* Prelim. Resp. 46–52.  Specifically, Patent Owner asserts that Petitioner
"equates Buruganahalli's firewall policies/rules including the blacklist
policy to the claimed 'plurality of packet-filtering rules.'"  *Id.* at 47 (citing
Pet. 29–30).  Patent Owner asserts that "when encrypted packets are
received by Buruganahalli's security device," the security device "performs
decryption before filtering any traffic with those policies."  *Id.* (citing
Ex. 1004, 12:29–32, 14:8–15:3, Fig. 6).  According to Patent Owner,
Buruganahalli explains "with respect to Fig. 3B" that "after setting up
Sessions A and B, '[A]ny data that is communicated from the client 312 to
the firewall 314 is decrypted using a session key S1 and is then inspected by

the firewall 314.'" *Id.* (alteration by Patent Owner) (quoting Ex. 1004, 12:30–32). Patent Owner further asserts that "Buruganahalli's policy-based filtering approach is performed on decrypted data, not 'packets comprising encrypted data' as claimed." *Id.*

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.g]. *See* Pet. 38–39; Ex. 1003 ¶¶ 134–135. Specifically, as discussed above, Buruganahalli's security device "identifies the packets as being part of a new session and creates a new session flow" based on a hostname (destination domain) extracted from unencrypted data communications, e.g., the handshake traffic. Ex. 1004, 5:7, 5:35–36, 14:25–33; *see id.* at 4:37–40, 9:50–57, 11:24–51, 14:21–25; Ex. 1003 ¶¶ 111, 115; *supra* § IV.D.2(d). Then, the security device inspects the session traffic including "encrypted data communications associated with the session" and identifies packets "as belonging to the session based on a flow lookup." Ex. 1004, 8:55–60, 14:26–28; *see* Ex. 1003 ¶¶ 111, 115. Hence, the "encrypted data communications are filtered after it is determined that information extracted from the handshake traffic matches with those on a blacklist, and thus corresponds to a network-threat indicator." Ex. 1003 ¶ 135.

By inspecting the session traffic including "encrypted data communications associated with the session" and identifying packets "as belonging to the session based on a flow lookup," Buruganahalli's security device "filter[s] . . . the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators" according to limitation [1.g]. *See* Ex. 1003 ¶¶ 120, 135; Ex. 1004, 8:55–60, 11:47–51, 14:21–33, 14:50–55. Hence, for each session packets comprising

69

unencrypted data and packets comprising encrypted data are correlated and filtered based on the hostname (destination domain) extracted from the handshake traffic, and then the correlated and filtered packets are processed separately from packets destined for other domains. *See* Ex. 1003 ¶¶ 120–121, 133, 135; Ex. 1004, 8:55–60, 11:47–51, 14:21–33, 14:50–55.

Patent Owner's assertion that "when encrypted packets are received by Buruganahalli's security device," the security device performs decryption before filtering any traffic with those policies" relates to Figure 3B's embodiment in Buruganahalli. *See* Prelim. Resp. 47 (citing Ex. 12:29–32, Fig. 3B); Ex. 1004, 12:4–13:4, Fig. 3B. But Figure 3B's embodiment differs from Figure 3A's embodiment as indicated by the following side-by-side comparison:



In this side-by-side comparison, Figure 3A on the left shows "an SSL/TLS session passing through" firewall 304, whereas Figure 3B on the right shows firewall 314 performing "a trusted man-in-the-middle technique by effectively splitting the SSL session between" client 312 and remote server 316 "into two half sessions shown as Session A and Session B." *See* Ex. 1004, 1:53–56, 10:54–57, 12:12–18, Figs. 3A–3B.

For Figure 3B's embodiment, Buruganahalli explains that "any data that is communicated from the client 312 to the firewall 314 is decrypted using a session key S1 and is then inspected by the firewall 314," e.g., "to

70

monitor the session traffic for firewall policy/rule compliance." Ex. 1004, 12:29–32, 12:42–44; *see* Ex. 1003 ¶ 92. For Figure 3A's embodiment, however, Buruganahalli explains that by "parsing the handshake traffic," e.g., "parsing a client hello message to extract a hostname that identifies the destination domain," firewall 304 may "apply one or more firewall policies/rules . . . related to destination domains" without "having to decrypt" encrypted communications. Ex. 1004, 11:7–19; *see id.* at 5:24–27, 5:35–42, 7:1–9; Ex. 1003 ¶¶ 94, 108, 113. Buruganahalli discloses using techniques according to Figure 3A's embodiment separately or together with techniques according to Figure 3B's embodiment. *See* Ex. 1004, 11:7–12:3; *see* Ex. 1003 ¶ 93. Hence, we disagree with Patent Owner that "Buruganahalli's policy-based filtering approach is performed on decrypted data, not 'packets comprising encrypted data' as claimed." *See* Prelim. Resp. 47.

(i)     Limitation [1.h]

Claim 1 recites "routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators." Ex. 1001, 25:46–49.

Petitioner contends that Buruganahalli teaches this limitation because Buruganahalli discloses sending "the encrypted data communications" to a firewall with a decrypt engine that "applies 'trusted man-in-the-middle techniques using a self-signed certificate.'" Pet. 39–40 (quoting Ex. 1004, 9:66–67). Petitioner asserts that in such an arrangement the firewall includes "functionality acting as a proxy for both the remote server and the client by standing in line of their communications in a 'transparent' manner, as was known in the art." *Id.* at 40–41 (citing Ex. 1005, 4:50–63, 8:36–47,

8:65–9:7; Ex. 1034, 8:12–19; Ex. 1036, 14). Petitioner asserts that Buruganahalli "further discloses that it was known that a firewall may be implemented in a security device that includes other functions, such as a routing function that may be based on source and destination information, and a 'proxy' function that is one of the 'security functions.'" *Id.* at 41 (citing Ex. 1004, 1:36–38, 3:5–15).

Patent Owner makes no arguments specific to limitation [1.h]. *See, e.g.*, Prelim. Resp. 45–52.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Weissman's testimony, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches limitation [1.h]. *See* Pet. 39–42; Ex. 1003 ¶¶ 136–145.

(j)   Alleged Objective Indicia of Nonobviousness

    (i)   Background

Before reaching a conclusion about obviousness, we consider evidence concerning objective indicia of nonobviousness. *See Apple*, 839 F.3d at 1048. For such evidence to have substantial weight, "its proponent must establish a nexus between the evidence and the merits of the claimed invention." *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013)). The patentee "bears the burden of showing that a nexus exists." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

A rebuttable presumption of nexus arises "when the patentee shows that the asserted objective evidence is tied to a specific product and that

product 'embodies the claimed features, and is coextensive with them.'"
*Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019)
(quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072
(Fed. Cir. 2018)).  Whether a rebuttable presumption of nexus arises "turns
on the nature of the claims and the specific facts."  *Teva Pharm. Int'l GmbH
v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021).  The presumption
analysis should consider the unclaimed features in the product tied to
the objective evidence to assess their significance and impact on the
correspondence between the patented invention and the product.  *Quanergy
Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1418 (Fed. Cir. 2022).
When, "for example, the patented invention is only a small component of the
product tied to the objective evidence, there is no presumption of nexus."
*Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333 (Fed. Cir.
2019).  Absent a presumption of nexus, the patentee may prove nexus by
showing that the asserted objective evidence resulted directly from "the
unique characteristics of the claimed invention."  *Fox Factory*, 944 F.3d at
1373–74; *see In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

Thus, the Board employs a two-step analysis in evaluating whether a
patentee has established a nexus between the evidence concerning objective
indicia of nonobviousness and the merits of the claimed invention.  *See
Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 32–33
(PTAB Jan. 24, 2020) (precedential).  Initially, the Board considers whether
the patentee has demonstrated that the "products are coextensive (or nearly
coextensive) with the challenged claims," resulting in a rebuttable
presumption of nexus.  *Id.* at 33.  Absent a presumption of nexus, the Board
considers whether the patentee has demonstrated "a legally and factually

73

sufficient connection" between the asserted objective evidence and the claimed invention. *See Henny Penny*, 938 F.3d at 1332; *Lectrosonics*, IPR2018-01129, Paper 33 at 33.

Patent Owner asserts that the district court in the Cisco case found "substantial objective evidence of nonobviousness," i.e., "objective evidence of long-felt need, industry praise, and copying." Prelim. Resp. 2, 4; *see id.* at 16, 54–56. Patent Owner also asserts that Petitioner gives "short shrift" to the "known evidence of objective indicia of nonobviousness (secondary considerations)" from the Cisco case. *Id.* at 36.

Petitioner asserts that the trial transcript in the Cisco case "references purported secondary considerations for the '856 patent" but "the underlying evidence is not publicly available and Petitioner does not have access to such evidence." Pet. 50. Petitioner also asserts that "[f]rom what little can be discerned from the public record, the evidence fails to show nexus." *Id.*

Based on the current record and for the reasons explained below, Patent Owner has not shown sufficiently that a presumption of nexus should apply or that a nexus exists between the asserted objective evidence and the merits of the claimed invention. *See infra* § IV.D.2(j)(ii)–(iii).

(ii)    Presumption of Nexus

At this stage of the proceeding, Patent Owner does not identify information allowing us to evaluate whether Patent Owner shows sufficiently "that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *See* Prelim. Resp. 54–56; *Fox Factory*, 944 F.3d at 1373. Nor does Patent Owner direct us to where the district court in the Cisco case analyzed

whether a specific product "embodies the claimed features, and is coextensive with them." *See* Prelim. Resp. 54–56.

Hence, based on the current record, Patent Owner has not shown sufficiently that a specific product is "coextensive (or nearly coextensive) with the challenged claims" and that a presumption of nexus should apply to the challenged claims. *See* Prelim. Resp. 54–56; *Lectrosonics*, IPR2018-01129, Paper 33 at 33.

    (iii)   Proof of Nexus: Long-Felt Need and Industry Praise

For long-felt need and industry praise, Patent Owner notes that Petitioner submitted as Exhibit 1027 the district court's opinion in the Cisco case that "twice reproduces a Cisco press release from 2017." Prelim. Resp. 54 (citing Ex. 1027, 63–64, 138). Patent Owner asserts that the 2017 Cisco press release evidences "long-felt need and industry recognition for the technology claimed in the '856 patent." *Id.*

The 2017 Cisco press release states that "[t]oday Cisco is introducing a suite of" Cisco Digital Network Architecture (DNA) "technologies and services designed to work together as a single system," including Encrypted Traffic Analytics (ETA) that uses "cyber intelligence to detect known attack signatures even in encrypted traffic." Ex. 1027, 64, 138. "ETA deals with the ability to track and analyze encrypted traffic in the network without decrypting said traffic." *Id.* at 19. The press release does not mention Patent Owner, its products, or its patents, e.g., the '856 patent. *Id.* at 64, 138.

The 2017 Cisco press release notes that ETA "automat[es] the edge of the network and embed[s] machine learning and analytics at a foundational level." Ex. 1027, 64, 138. Consistent with that press release, a 2019 Cisco technical white paper states that Cisco's Stealthwatch with ETA technology

uses "machine learning algorithms to pinpoint malicious patterns in encrypted traffic." Ex.1027, 45; *see id.* at 46 (reproducing PTX-570 at 593). In contrast to Cisco's Stealthwatch with ETA technology, the '856 patent does not disclose or claim using "machine learning algorithms to pinpoint malicious patterns in encrypted traffic." *See, e.g.*, Ex. 1001, 2:5–16:26, 25:14–30:31, Figs. 3A–3C.

Additionally, according to the district court, "Cisco's documents describe the four main elements of information" extracted "from packets by the ETA technology" as follows:

(1) Sequence of Packet Lengths and Times (SPLT): "SPLT conveys the length (number of bytes) of each packet's application payload for the first several packets of a flow, along with the interarrival times of those packets";

(2) Initial Data Packet (IDP): "IDP is used to obtain packet data from the first packet of a flow" and "allows extraction of interesting data such as an HTTP URL, DNS hostname and address, and other data elements";

(3) Byte Distribution: "[t]he byte distribution represents the probability that a specific byte value appears in the payload of a packet within a flow"; and

(4) TLS Specific Features: "[t]he TLS handshake is composed of several messages that contain interesting, unencrypted metadata used to extract data elements, such as cipher suite, TLS version, and the client's public key length."

Ex. 1027, 33; *see id.* at 19–20, 62.

At this stage of the proceeding, Patent Owner does not explain how the claimed invention relates to any of "the four main elements of information" extracted "from packets by the ETA technology" or the use of machine-learning algorithms. *See* Prelim. Resp. 54–56. Nor does Patent

Owner direct us to where the district court in the Cisco case analyzed
how the claimed invention relates to any of "the four main elements of
information" extracted "from packets by the ETA technology" or the use of
machine-learning algorithms. *Id.* at 4, 54–56. Hence, based on the current
record, Patent Owner has not shown sufficiently that any industry praise
resulted directly from "the unique characteristics of the claimed invention"
rather than other factors "unrelated to the quality of the patented subject
matter." *See id.* at 4, 54–56; *Huang*, 100 F.3d at 140.

Further, a long-felt need "is analyzed as of the date of an articulated
identified problem and evidence of efforts to solve that problem." *Tex.
Instrs. Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993);
*see WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1334 (Fed. Cir. 2016)
(discussing efforts to solve an "articulated identified problem" by an alleged
infringer before the invention); *Apple Inc. v. Samsung Elecs. Co.*, 816 F.3d
788, 804–05 (Fed. Cir. 2016) (requiring evidence of unsuccessful efforts to
solve an "articulated identified problem" before the invention), *vacated in
part on other grounds*, 839 F.3d 1034 (Fed. Cir. 2016). The analysis should
consider "the filing date of the challenged invention to assess the presence of
a long-felt and unmet need." *Procter & Gamble Co. v. Teva Pharm. USA,
Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

At this stage of the proceeding, Patent Owner does not identify "the
date of an articulated identified problem" solved by the claimed invention or
"evidence of efforts to solve that problem." Prelim. Resp. 54–56. Nor does
Patent Owner direct us to where the district court in the Cisco case analyzed
"the date of an articulated identified problem" solved by the claimed
invention or "evidence of efforts to solve that problem." *Id.* at 4, 54–56.

Hence, based on the current record, Patent Owner does not show sufficiently that the claimed invention satisfied a long-felt need or received industry praise.

(iv)    Proof of Nexus: Copying

Patent Owner asserts that the district court in the Cisco case found that "Cisco copied the claimed inventions of the four infringed patents, including the '856 Patent, and further found Cisco's infringement to be willful." Prelim. Resp. 16 (citing Ex. 1027, 160); *see id.* at 55 (citing Ex. 1027, 57, 160–61).

At this stage of the proceeding, however, Patent Owner does not identify information allowing us to evaluate whether copying occurred. *See* Prelim. Resp. 16, 54–56. Further, for the asserted objective evidence "to have substantial weight, there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011). Based on the current record, Petitioner establishes sufficiently for purposes of institution that Buruganahalli teaches claim 1's subject matter. *See supra* §§ IV.D.2(a)–(i). Based on the current record, Patent Owner does not show sufficiently "a nexus to some aspect of the claim not already in the prior art." *See* Prelim. Resp. 16, 54–56. Hence, for purposes of institution, we accord little weight to the evidence of copying.

(v)    Summary for Objective Indicia of Nonobviousness

For the reasons discussed above, Patent Owner has not shown sufficiently that a specific product "embodies the claimed features, and is coextensive with them." *See* Prelim. Resp. 54–56; *supra* § IV.D.2(j)(ii); *Fox Factory*, 944 F.3d at 1373. For long-felt need and industry praise, Patent Owner has not shown sufficiently that there is a nexus between the asserted

objective evidence and the merits of the claimed invention. *See* Prelim. Resp. 54–56; *supra* § IV.D.2(j)(iii). For copying, we accord little weight to the evidence of copying. *See supra* § IV.D.2(j)(iv).

(k)     Conclusion About Obviousness/Nonobviousness of Claim 1

As discussed above, Petitioner's analysis addresses every limitation in claim 1. *See supra* §§ IV.D.2(b)–(i). In addition, Patent Owner's evidence of objective indicia of nonobviousness is insufficient at this stage of the proceeding. *See supra* § IV.D.2(j). Hence, Petitioner demonstrates a reasonable likelihood of prevailing in proving claim 1 unpatentable under § 103 as obvious over Buruganahalli.

3. INDEPENDENT CLAIMS 24 AND 25

Petitioner contends that claims 24 and 25 are unpatentable under § 103 as obvious over Buruganahalli for essentially the same reasons as claim 1. *See* Pet. 28–42; Ex. 1003 ¶¶ 101–146.

Claim 25 requires that the URI specified by the packet-filtering rules "indicat[e] one or more of the plurality of network-threat indicators," while claims 1 and 25 lack a similar requirement. Ex. 1001, 25:14–49, 28:59–30:31. For claim 25's requirement linking the URI to a network-threat indicator, Petitioner contends that Buruganahalli "discloses packet-filtering rules" implemented for "security purposes" that (1) "indicate network-threat indicators" and (2) "include 'requirements or rules related to destination domains'" listed "on a blacklist if they present a security risk." Pet. 35–36 (quoting Ex. 1004, 11:1). Further, Petitioner asserts that Buruganahalli's security device may filter packets based on the URI specified by the plurality of packet-filtering rules because the security device

may use "a uniform resource locator (URL)/category filtering policy." *Id.*
at 35 (citing Ex. 1004, 7:39–51, 10:21–28, 15:37–45).

Patent Owner contends that claims 24 and 25 are patentable over
Buruganahalli for the same reasons as claim 1. *See* Prelim. Resp. 3–4,
45–56.

Based on the current record and for the reasons advanced by
Petitioner and supported by Dr. Weissman's testimony as well as the reasons
discussed above for claim 1, Petitioner establishes sufficiently for purposes
of institution that Buruganahalli teaches the subject matter of claims 24
and 25. *See* Pet. 28–42; Ex. 1003 ¶¶ 101–146; *supra* §§ IV.D.2(a)–(i).
Also, we accord little weight at this stage of the proceeding to Patent
Owner's evidence concerning objective indicia of nonobviousness. *See*
*supra* § IV.D.2(j). Hence, Petitioner demonstrates a reasonable likelihood of
prevailing in proving claims 24 and 25 unpatentable under § 103 as obvious
over Buruganahalli.

### E. Alleged Obviousness over Buruganahalli and Baehr: Claims 1, 24, and 25

Petitioner contends that claims 1, 24, and 25 are unpatentable under
§ 103 as obvious over Buruganahalli and Baehr. *See* Pet. 8, 42–50. Above,
we provided an overview of Buruganahalli. Below, we provide an overview
of Baehr, and then we consider the obviousness issues. As explained below,
Petitioner establishes sufficiently for purposes of institution that the
combined disclosures in Buruganahalli and Baehr teach the subject matter
of claims 1, 24, and 25.

Appx0197

1. OVERVIEW OF BAEHR (EXHIBIT 1005)

Baehr is a U.S. patent titled "System for Packet Filtering of Data Packets at a Computer Network Interface," issued on March 2, 1999, from an application filed on February 4, 1997. Ex. 1005, codes (22), (45), (54). Baehr states that the invention "relates to screening of data packets sent from one computer network to another," e.g., "data packets transmitted between a network to be protected, such as a private network, and another network, such as a public network." *Id.* at 1:9–10, code (57).

Baehr describes a problem with "conventional computer firewalls," in particular, "they participate in IP (Internet Protocol) transactions, and in doing so generate information identifying them as IP machines, which makes them visible for targeting by intruders." Ex. 1005, 1:39–44. Baehr explains that a "firewall and packet filtering system should ideally be invisible to intruders so as to help minimize the number of ways in which it can be targeted, while nonetheless filling functions that are appropriate." *Id.* at 1:50–53.

Baehr identifies a need for "a system that can respond to data packets from outside a network without revealing IP address information about either the filtering system or about hosts within the network." Ex. 1005, 2:3–7. Baehr addresses that need by disclosing "a screening system that acts as both a firewall in the conventional sense and a signatureless packet filtering system." *Id.* at 2:10–12.

Baehr's Figure 5 (reproduced below) depicts a packet-screening system:



## Figure 5

Figure 5 "is a logical block diagram" of packet-screening system 340 implemented on network 320. Ex. 1005, 3:51–54, Fig. 5; *see id.* at 2:63–65. Network 320 includes private network 330 and public network 350. *Id.* at 3:59–63, Fig. 5. Packet-screening system 340 includes network interface 410 coupled to private network 330, network interface 420 coupled to proxy network 430, and network interface 425 coupled to public network 350. *Id.* at 3:59–64, Fig. 5. Packet-screening system 340 performs "all of the conventional firewall functions" as well as "screening functions." *Id.* at 3:56–58.

Baehr's Figure 6 (reproduced below) shows in greater detail the packet-screening system depicted in Figure 5:



Figure 6

Figure 6 "is a functional block diagram" of packet-screening system 340 implemented on network 320. Ex. 1005, 2:66–67, 4:12, Fig. 6. As Figure 6 shows, packet-screening system 340 includes processor 390 and memory 400 along with network interfaces 410, 420, and 425. *Id.* at 4:12–19, Fig. 6. As Figure 6 also shows, private network 330 includes "a mail host 360; an ftp (file transfer protocol) host 370 for governing ftp connections; and other hosts 380 for other services, such as a WWW (World-Wide Web) server." *Id.* at 4:20–25, Fig. 6.

Baehr explains that proxy network 430 preferably includes "proxy (or virtual) hosts 435" with the proxy hosts "mirroring (or acting as proxy for) each of a subset (or all) of the hosts found on" private network 330. Ex. 1005, 4:26–32, code (57). In Figure 6, for example, proxy network 430 includes "a proxy mail server 440, a proxy ftp server 450, and other virtual hosts 460, with a virtual (proxy) host for each actual host desired to be duplicated." *Id.* at 4:33–37, Fig. 6. The proxy hosts in proxy network 430 "represent actual hardware and/or software in the proxy network" and "mimic the behavior" of the actual hosts in private network 330. *Id.* at 4:37–40. While Figure 6 depicts the proxy hosts in proxy network 430 as "separate computer systems" from packet-screening system 340, Baehr also discloses using "separate logical entities, but not separate physical entities," for proxy network 430 and packet-screening system 340. *Id.* at 4:26–37, 4:64–5:11, Figs. 6–7.

"[T]he private network 330 and the proxy network 430 together form a single logical or apparent network 345, i.e. a single apparent domain from the point of view of outsiders, such as users on the public network 350." Ex. 1005, 4:53–56. Hence, "when a user attempts to access a service or host of the private network, the request may be shunted aside to the proxy network" without "any indication being given to the user that this has occurred." *Id.* at 4:57–61.

To perform firewall and screening functions, packet-screening system 340 intercepts a data packet from public network 350 addressed to a service or host in private network 330. Ex. 1005, 6:30–32, 10:4–6, Fig. 6. Based on "a predetermined set of criteria" and "other information," such as "the time of day the packet was sent or is received" or "the state of the

84

connection between the public and private networks," packet-screening system 340 takes "one or several predefined actions [on] each data packet." *Id.* at 6:37–50, 7:8–10, code (57). For example, packet-screening system 340 may drop a data packet from or to any source "not cleared in advance" or "pass the packet through to its destination, with or without some alteration based upon predetermined criteria." *Id.* at 7:16–22, 7:30–40, 10:46–49, code (57). Further, packet-screening system 340 may send a data packet to proxy network 430 for "security purposes," and a proxy host in proxy network 430 may execute operations on the packet instead of the actual, intended host in private network 330. *Id.* at 8:13–17, code (57); *see id.* at 10:46–49.

Baehr explains that the "proxy network has the additional advantage of preventing outsiders from ever actually entering the private network" because "once a user has been allowed access or a connection to [the] private network, it is much more difficult to restrict his/her actions than if no access at all is allowed." Ex. 1005, 8:36–40. By providing "duplicate or mirrored proxy functionality of some of the services of the private network in the proxy network," an "outside user's requests are met while invisibly preventing him/her from ever actually accessing the private network." *Id.* at 8:40–47; *see id.* at 8:65–9:7.

### 2. Differences Between the Claimed Invention and the Prior Art

For the ground based on Buruganahalli and Baehr, Petitioner cites Buruganahalli as teaching most of the limitations in claims 1, 24, and 25 and Baehr as teaching limitation [1.h] and the similar limitations in claims 24 and 25, e.g., "[1.h] routing, by the packet-filtering system, filtered packets to

a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators." *See* Pet. 42–50; Ex. 1003 ¶¶ 147–158; *see also* Pet. 28–39; Ex. 1003 ¶¶ 101–135.

In particular, Petitioner contends that Baehr discloses a packet-screening system that acts as a firewall and uses (1) a "screen" positioned between a public network and a private network and (2) a "proxy network" to protect the private network from attacks. Pet. 44–45 (citing Ex. 1003 ¶ 151; Ex. 1005, 2:10–23, 2:66–67, 6:37–7:7, 9:63–67, 10:2–5, code (57), Fig. 6). Petitioner also contends that Baehr discloses that when a packet "is sent by a host on, for instance, [the] public network," the packet "is received at [a] port (interface)" of the screen. *Id.* at 45 (citing Ex. 1005, 9:63–67, 10:2–5).

Further, Petitioner asserts that the screen (1) filters packets using a set of predetermined screening criteria and (2) takes "one or several predefined actions" after screening, including "sending packets aside to the proxy network" for "security purposes" even if their intended destination is the private network. Pet. 45–46 (citing Ex. 1005, 2:25–30, 6:37–7:25, 8:12–18, 10:43–49). Petitioner also asserts that the proxy network may be "a separate computer system" or "a separate logical entity, but not physically separate," from the screen, e.g., when "implemented entirely in the program instructions" stored in the packet-screening system's memory. *Id.* at 47 (citing Ex. 1003 ¶ 154; Ex. 1005, 4:26–31, 4:64–5:8, Fig. 6).

Patent Owner asserts that Petitioner fails "to specify where each claim element is found in the combination" as required under 37 C.F.R.

§ 42.104(b)(4). Prelim. Resp. 36; *see id.* at 35. According to Patent Owner, "[t]his is yet another basis for denial." *Id.* at 36.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Baehr teaches limitation [1.h] and the similar limitations in claims 24 and 25. *See* Pet. 44–47; Ex. 1003 ¶¶ 151–154. Specifically, Baehr discloses that a packet-screening system intercepts a data packet from a public network addressed to a service or host in a private network. Ex. 1005, 6:30–32, 10:4–6, Fig. 6; *see* Ex. 1003 ¶ 151. Based on "a predetermined set of criteria" and "other information," such as "the time of day the packet was sent or is received" or "the state of the connection between the public and private networks," the packet-screening system takes "one or several predefined actions [on] each data packet." Ex. 1005, 6:37–50, 7:8–10; *see* Ex. 1003 ¶¶ 151–152.

For example, the packet-screening system may send a data packet to a proxy network for "security purposes," and a proxy host in the proxy network may execute operations on the packet instead of the actual, intended host in the private network. Ex. 1005, 8:13–17; *see id.* at 10:46–49; Ex. 1003 ¶¶ 152–153. Further, Baehr's Figure 6 depicts the proxy hosts in the proxy network as "separate computer systems" from the packet-screening system. Ex. 1005, 4:26–37, Fig. 6; *see* Ex. 1003 ¶ 154.

We disagree with Patent Owner's assertion that Petitioner fails "to specify where each claim element is found in the combination." *See* Prelim. Resp. 36. For the ground based on Buruganahalli and Baehr, Petitioner explains how Buruganahalli teaches most of the limitations in claims 1, 24, and 25 and how Baehr teaches limitation [1.h] and the similar limitations in claims 24 and 25. Pet. 42–50; *see* Ex. 1003 ¶¶ 147–158; *supra*

§§ IV.D.2(b)–(h), IV.D.3; *see also* Pet. 28–39; Ex. 1003 ¶¶ 101–135. Contrary to Patent Owner's contention, there is no "basis for denial" under 37 C.F.R. § 42.104(b)(4). *See* Prelim. Resp. 36.

### 3. ALLEGED REASONS FOR COMBINING THE TEACHINGS OF THE REFERENCES

Petitioner identifies reasons that would have prompted an ordinarily skilled artisan to combine Baehr's teachings about routing filtered packets to a proxy network with Buruganahalli's teachings to implement "a proxy system separate from and external to" a security device. *See* Pet. 46–48. Further, Petitioner asserts that an ordinarily skilled artisan "would have had a reasonable expectation of success" in combining the teachings of Buruganahalli and Baehr. *See id.* at 49. Dr. Weissman's testimony supports Petitioner's positions. *See* Ex. 1003 ¶¶ 155–158.

For instance, Dr. Weissman testifies that an ordinarily skilled artisan would have been motivated to combine Baehr's teachings about routing filtered packets to a proxy network with Buruganahalli's teachings to achieve the following advantages:

(1) "preserv[e] computing resources";

(2) "achiev[e] load balancing";

(3) "maximiz[e] performance";

(4) "isolate a private network from an outsider" and "strengthen security"; and

(5) "limit any potential security vulnerability to only one component of a larger system."

Ex. 1003 ¶¶ 155–156 (citing Ex. 1004, 3:16–24, 4:7–15; Ex. 1005, 8:36–47, code (57); Ex. 1036, 14).

Dr. Weissman explains that "having a dedicated function separate from other functions allows the proxy function to manage its own resources efficiently without having to share resources with another function" and that "this approach also increases the overall system performance by allowing each function to focus on performing its own specialized tasks." Ex. 1003 ¶ 155. Dr. Weissman also explains that "having a separate proxy external to a firewall helps isolate the proxy from the private network by positioning the screen/firewall between the two networks." *Id.* ¶ 156.

Patent Owner makes no arguments against combining the teachings of Buruganahalli and Baehr. *See, e.g.*, Prelim. Resp. 21–24, 45–52.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had reasons, e.g., as articulated by Dr. Weissman, to combine the teachings of Buruganahalli and Baehr in the way Petitioner proposes. *See* Ex. 1003 ¶¶ 155–156. Petitioner also establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had a reasonable expectation of success in combining the teachings of Buruganahalli and Baehr. *Id.* ¶¶ 157–158.

4. Conclusion About Obviousness/Nonobviousness

As discussed above, Petitioner's analysis addresses every limitation in claims 1, 24, and 25. *See supra* §§ IV.D.2(b)–(h), IV.D.3, IV.E.2. Additionally, Petitioner provides a reason with rational underpinning as to why an ordinarily skilled artisan would have been motivated to combine the teachings of Buruganahalli and Baehr in the way Petitioner proposes and would have had a reasonable expectation of success. *See supra* § IV.E.3. Also, we accord little weight at this stage of the proceeding to Patent

89

Owner's evidence concerning objective indicia of nonobviousness. *See supra* § IV.D.2(j). Thus, based on the current record, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Buruganahalli and Baehr teach the subject matter of claims 1, 24, and 25. Hence, Petitioner demonstrates a reasonable likelihood of prevailing in proving claims 1, 24, and 25 unpatentable under § 103 as obvious over Buruganahalli and Baehr.

## V. CONCLUSION

Based on the arguments and evidence presented in the Petition, the Preliminary Response, the Preliminary Reply, and the Preliminary Sur-reply along with the accompanying exhibits, we determine that there is a reasonable likelihood Petitioner would prevail with respect to at least one claim challenged in the Petition. Hence, we institute an *inter partes* review of all challenged claims on all challenges included in the Petition. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (noting that the language of 35 U.S.C. § 314(b) "indicates a binary choice—either institute review or don't"); *see also PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (interpreting the statute as requiring "a simple yes-or-no institution choice respecting a petition, embracing all challenges included in the petition"). Additionally, we decline to exercise our discretion under § 314(a) and § 325(d) to deny institution.

At this preliminary stage, we have not made a final determination about the patentability of any challenged claim, the construction of any claim term, phrase, or limitation, or any other legal or factual issue.

## VI. ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1, 24, and 25 in the '856 patent is instituted on all challenges included in the Petition; and

FURTHER ORDERED that, according to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial that commences on the entry date of this Decision.

PETITIONER:

Scott A. McKeown
Mark Rowland
James Batchelder
Andrew Radsch
Keyna Chow
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
mark.rowland@ropesgray.com
james.batchelder@ropesgray.com
andrew.radsch@ropesgray.com
keyna.chow@ropesgray.com

PATENT OWNER:

James Hannah
Jeffrey H. Price
Jenna Fuller
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com
jprice@kramerlevin.com
jfuller@kramerlevin.com
svdocketing@kramerlevin.com

Bradley C. Wright
Scott M. Kelly
Blair A. Silver
BANNER & WITCOFF, LTD.
bwright@bannerwitcoff.com
skelly@bannerwitcoff.com
bsilver@bannerwitcoff.com

# PART 2635—STANDARDS OF ETH-ICAL CONDUCT FOR EMPLOYEES OF THE EXECUTIVE BRANCH

## Subpart A—General Provisions

Sec.
2635.101  Basic obligation of public service.
2635.102  Definitions.
2635.103  Applicability to members of the uniformed services.
2635.104  Applicability to employees on detail.
2635.105  Supplemental agency regulations.
2635.106  Disciplinary and corrective action.
2635.107  Ethics advice.

## Subpart B—Gifts From Outside Sources

2635.201  Overview and considerations for declining otherwise permissible gifts.
2635.202  General prohibition on solicitation or acceptance of gifts.
2635.203  Definitions.
2635.204  Exceptions to the prohibition for acceptance of certain gifts.
2635.205  Limitations on use of exceptions.
2635.206  Proper disposition of prohibited gifts.

## Subpart C—Gifts Between Employees

2635.301  Overview.
2635.302  General standards.
2635.303  Definitions.
2635.304  Exceptions.

## Subpart D—Conflicting Financial Interests

2635.401  Overview.
2635.402  Disqualifying financial interests.
2635.403  Prohibited financial interests.

## Subpart E—Impartiality in Performing Official Duties

2635.501  Overview.
2635.502  Personal and business relationships.
2635.503  Extraordinary payments from former employers.

## Subpart F—Seeking Other Employment

2635.601  Overview.
2635.602  Applicability and related considerations.
2635.603  Definitions.
2635.604  Recusal while seeking employment.
2635.605  Waiver or authorization permitting participation while seeking employment.
2635.606  Recusal based on an arrangement concerning prospective employment or otherwise after negotiations.
2635.607  Notification requirements for public financial disclosure report filers regarding negotiations for or agreement of future employment or compensation.

## Subpart G—Misuse of Position

2635.701  Overview.
2635.702  Use of public office for private gain.
2635.703  Use of nonpublic information.
2635.704  Use of Government property.
2635.705  Use of official time.

## Subpart H—Outside Activities

2635.801  Overview.
2635.802  Conflicting outside employment and activities.
2635.803  Prior approval for outside employment and activities.
2635.804  Outside earned income limitations applicable to certain Presidential appointees and other noncareer employees.
2635.805  Service as an expert witness.
2635.806  Participation in professional associations. [Reserved]
2635.807  Teaching, speaking and writing.
2635.808  Fundraising activities.
2635.809  Just financial obligations.

## Subpart I—Related Statutory Authorities

2635.901  General.
2635.902  Related statutes.

AUTHORITY: 5 U.S.C. 7301, 7351, 7353; 5 U.S.C. App. (Ethics in Government Act of 1978); E.O. 12674, 54 FR 15159, 3 CFR, 1989 Comp., p. 215, as modified by E.O. 12731, 55 FR 42547, 3 CFR, 1990 Comp., p. 306.

SOURCE: 57 FR 35042, Aug. 7, 1992, unless otherwise noted.

## Subpart A—General Provisions

### § 2635.101  Basic obligation of public service.

(a) *Public service is a public trust.* Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the implementing standards contained in this part and in supplemental agency regulations.

(b) *General principles.* The following general principles apply to every employee and may form the basis for the standards contained in this part. Where

a situation is not covered by the standards set forth in this part, employees shall apply the principles set forth in this section in determining whether their conduct is proper.

(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.

(2) Employees shall not hold financial interests that conflict with the conscientious performance of duty.

(3) Employees shall not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interest.

(4) An employee shall not, except as permitted by subpart B of this part, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.

(5) Employees shall put forth honest effort in the performance of their duties.

(6) Employees shall not knowingly make unauthorized commitments or promises of any kind purporting to bind the Government.

(7) Employees shall not use public office for private gain.

(8) Employees shall act impartially and not give preferential treatment to any private organization or individual.

(9) Employees shall protect and conserve Federal property and shall not use it for other than authorized activities.

(10) Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

(11) Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities.

(12) Employees shall satisfy in good faith their obligations as citizens, including all just financial obligations, especially those—such as Federal, State, or local taxes—that are imposed by law.

(13) Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

(14) Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

(c) *Related statutes.* In addition to the standards of ethical conduct set forth in this part, there are conflict of interest statutes that prohibit certain conduct. Criminal conflict of interest statutes of general applicability to all employees, 18 U.S.C. 201, 203, 205, 208, and 209, are summarized in the appropriate subparts of this part and must be taken into consideration in determining whether conduct is proper. Citations to other generally applicable statutes relating to employee conduct are set forth in subpart I and employees are further cautioned that there may be additional statutory and regulatory restrictions applicable to them generally or as employees of their specific agencies. Because an employee is considered to be on notice of the requirements of any statute, an employee should not rely upon any description or synopsis of a statutory restriction, but should refer to the statute itself and obtain the advice of an agency ethics official as needed.

### §2635.102 Definitions.

The definitions listed below are used throughout this part. Additional definitions appear in the subparts or sections of subparts to which they apply. For purposes of this part:

(a) *Agency* means an executive agency as defined in 5 U.S.C. 105 and the Postal Service and the Postal Rate Commission. It does not include the General Accounting Office or the Government of the District of Columbia.

(b) *Agency designee* refers to any employee who, by agency regulation, instruction, or other issuance, has been delegated authority to make any determination, give any approval, or take

611

B0002

U.S.C. 208(a), perform these significant duties of the position while retaining his stock in the company. The agency can require the employee to sell his stock as a condition of being selected for the position rather than allowing him to disqualify himself in particular matters.

(c) *Definition of financial interest.* For purposes of this section:

(1) Except as provided in paragraph (c)(2) of this section, the term financial interest is limited to financial interests that are owned by the employee or by the employee's spouse or minor children. However, the term is not limited to only those financial interests that would be disqualifying under 18 U.S.C. 208(a) and § 2635.402. The term includes any current or contingent ownership, equity, or security interest in real or personal property or a business and may include an indebtedness or compensated employment relationship. It thus includes, for example, interests in the nature of stocks, bonds, partnership interests, fee and leasehold interests, mineral and other property rights, deeds of trust, and liens, and extends to any right to purchase or acquire any such interest, such as a stock option or commodity future. It does not include a future interest created by someone other than the employee, his spouse, or dependent child or any right as a beneficiary of an estate that has not been settled.

*Example 1:* A regulatory agency has concluded that ownership by its employees of stock in entities regulated by the agency would significantly diminish public confidence in the agency's performance of its regulatory functions and thereby interfere with the accomplishment of its mission. In its supplemental agency regulations, the agency may prohibit its employees from acquiring or continuing to hold stock in regulated entities.

*Example 2:* An agency that insures bank deposits may, by supplemental agency regulation, prohibit its employees who are bank examiners from obtaining loans from banks they examine. Examination of a member bank could have no effect on an employee's fixed obligation to repay a loan from that bank and, thus, would not affect an employee's financial interests so as to require disqualification under § 2635.402. Nevertheless, a loan from a member bank is a discrete financial interest within the meaning of § 2635.403(c) that may, when appropriate, be prohibited by supplemental agency regulation.

(2) The term financial interest includes service, with or without compensation, as an officer, director, trustee, general partner or employee of any person, including a nonprofit entity, whose financial interests are imputed to the employee under § 2635.402(b)(2)(iii) or (iv).

*Example 1.* The Foundation for the Preservation of Wild Horses maintains herds of horses that graze on public and private lands. Because its costs are affected by Federal policies regarding grazing permits, the Foundation routinely comments on all proposed rules governing use of Federal grasslands issued by the Bureau of Land Management. BLM may require an employee to resign his uncompensated position as Vice President of the Foundation as a condition of his promotion to a policy-level position within the Bureau rather than allowing him to rely on disqualification in particular cases.

(d) *Reasonable period to divest or terminate.* Whenever an agency directs divestiture of a financial interest under paragraph (a) or (b) of this section, the employee shall be given a reasonable period of time, considering the nature of his particular duties and the nature and marketability of the interest, within which to comply with the agency's direction. Except in cases of unusual hardship, as determined by the agency, a reasonable period shall not exceed 90 days from the date divestiture is first directed. However, as long as the employee continues to hold the financial interest, he remains subject to any restrictions imposed by this subpart.

(e) *Eligibility for special tax treatment.* An employee required to sell or otherwise divest a financial interest may be eligible to defer the tax consequences of divestiture under subpart J of part 2634 of this chapter.

[57 FR 35042, Aug. 7, 1992, as amended at 59 FR 4780, Feb. 2, 1994; 60 FR 6391, Feb. 2, 1995; 60 FR 66858, Dec. 27, 1995; 61 FR 40951, Aug. 7, 1996; 62 FR 48748, Sept. 17, 1996]

## Subpart E—Impartiality in Performing Official Duties

### § 2635.501  Overview.

(a) This subpart contains two provisions intended to ensure that an employee takes appropriate steps to avoid

an appearance of loss of impartiality in the performance of his official duties. Under §2635.502, unless he receives prior authorization, an employee should not participate in a particular matter involving specific parties which he knows is likely to affect the financial interests of a member of his household, or in which he knows a person with whom he has a covered relationship is or represents a party, if he determines that a reasonable person with knowledge of the relevant facts would question his impartiality in the matter. An employee who is concerned that other circumstances would raise a question regarding his impartiality should use the process described in §2635.502 to determine whether he should or should not participate in a particular matter.

(b) Under §2635.503, an employee who has received an extraordinary severance or other payment from a former employer prior to entering Government service is subject, in the absence of a waiver, to a two-year period of disqualification from participation in particular matters in which that former employer is or represents a party.

NOTE: Questions regarding impartiality necessarily arise when an employee's official duties impact upon the employee's own financial interests or those of certain other persons, such as the employee's spouse or minor child. An employee is prohibited by criminal statute, 18 U.S.C. 208(a), from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he, his spouse, general partner or minor child has a financial interest, if the particular matter will have a direct and predictable effect on that interest. The statutory prohibition also extends to an employee's participation in a particular matter in which, to his knowledge, an organization in which the employee is serving as officer, director, trustee, general partner or employee, or with whom he is negotiating or has an arrangement concerning prospective employment has a financial interest. Where the employee's participation in a particular matter would affect any one of these financial interests, the standards set forth in subparts D or F of this part apply and only a statutory waiver or exemption, as described in §§2635.402(d) and 2635.605(a), will enable the employee to participate in that matter. The authorization procedures in §2635.502(d) may not be used to authorize an employee's participation in any such matter. Where the employee complies with all terms of the waiver,

the granting of a statutory waiver will be deemed to constitute a determination that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of agency programs and operations. Similarly, where the employee meets all prerequisites for the application of one of the exemptions set forth in subpart B of part 2640 of this chapter, that also constitutes a determination that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of agency programs and operations.

[57 FR 35042, Aug. 7, 1992, as amended at 62 FR 48748, Sept. 17, 1997]

§2635.502 Personal and business relationships.

(a) *Consideration of appearances by the employee.* Where an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agency designee of the appearance problem and received authorization from the agency designee in accordance with paragraph (d) of this section.

(1) In considering whether a relationship would cause a reasonable person to question his impartiality, an employee may seek the assistance of his supervisor, an agency ethics official or the agency designee.

(2) An employee who is concerned that circumstances other than those specifically described in this section would raise a question regarding his impartiality should use the process described in this section to determine whether he should or should not participate in a particular matter.

(b) *Definitions.* For purposes of this section:

(1) An employee has a *covered relationship* with:

(i) A person, other than a prospective employer described in §2635.603(c), with whom the employee has or seeks a

637

B0004

promoting and monitoring ethical conduct, the executive branch ethics program requires more than transparency. This program seeks to ensure the integrity of governmental decision making and to promote public confidence by preventing conflicts of interest. Taken together, the systems in place to identify and address conflicts of interest establish a foundation on which to build and sustain an ethical culture in the executive branch.

### § 2638.102  Government ethics responsibilities of employees.

Consistent with the fundamental principle that public service is a public trust, every employee in the executive branch plays a critical role in the executive branch ethics program. As provided in the Standards of Conduct at part 2635 of this chapter, employees must endeavor to act at all times in the public's interest, avoid losing impartiality or appearing to lose impartiality in carrying out official duties, refrain from misusing their offices for private gain, serve as good stewards of public resources, and comply with the requirements of government ethics laws and regulations, including any applicable financial disclosure requirements. Employees must refrain from participating in particular matters in which they have financial interests and, pursuant to § 2635.402(f) of this chapter, should notify their supervisors or ethics officials when their official duties create the substantial likelihood of such conflicts of interest. Collectively, the charge of employees is to make ethical conduct the hallmark of government service.

### § 2638.103  Government ethics responsibilities of supervisors.

Every supervisor in the executive branch has a heightened personal responsibility for advancing government ethics. It is imperative that supervisors serve as models of ethical behavior for subordinates. Supervisors have a responsibility to help ensure that subordinates are aware of their ethical obligations under the Standards of Conduct and that subordinates know how to contact agency ethics officials. Supervisors are also responsible for working with agency ethics officials to

help resolve conflicts of interest and enforce government ethics laws and regulations, including those requiring certain employees to file financial disclosure reports. In addition, supervisors are responsible, when requested, for assisting agency ethics officials in evaluating potential conflicts of interest and identifying positions subject to financial disclosure requirements.

### § 2638.104  Government ethics responsibilities of agency ethics officials.

(a) *Appointment of a Designated Agency Ethics Official.* Each agency head must appoint a Designated Agency Ethics Official (DAEO). The DAEO is the employee with primary responsibility for directing the daily activities of the agency's ethics program and coordinating with the Office of Government Ethics.

(b) *Qualifications necessary to serve as DAEO.* The following are necessary qualifications of an agency's DAEO:

(1) The DAEO must be an employee at an appropriate level in the organization, such that the DAEO is able to coordinate effectively with officials in relevant agency components and gain access to the agency head when necessary to discuss important matters related to the agency's ethics program.

(2) The DAEO must be an employee who has demonstrated the knowledge, skills, and abilities necessary to manage a significant agency program, to understand and apply complex legal requirements, and to generate support for building and sustaining an ethical culture in the organization.

(3) On an ongoing basis, the DAEO must demonstrate the capacity to serve as an effective advocate for the executive branch ethics program, show support for the mission of the executive branch ethics program, prove responsive to the Director's requests for documents and information related to the ethics program, and serve as an effective liaison with the Office of Government Ethics.

(4) In any agency with 1,000 or more employees, any DAEO appointed after the effective date of this regulation must be an employee at the senior executive level or higher, unless the agency has fewer than 10 positions at that level.





**Office of Government Ethics** §2640.201

exists between the financial interest and the employee's duties or accomplishment of the agency's mission.

(3) *Eligibility for special tax treatment.* An employee who is directed to divest an interest may be eligible to defer the tax consequences of divestiture under subpart J of part 2634 of this chapter. An employee who divests before obtaining a certificate of divestiture will not be eligible for this special tax treatment.

(f) *Official duties that give rise to potential conflicts.* Where an employee's official duties create a substantial likelihood that the employee may be assigned to a particular matter from which he is disqualified, the employee should advise his supervisor or other person responsible for his assignments of that potential so that conflicting assignments can be avoided, consistent with the agency's needs.

[61 FR 66841, Dec. 18, 1996, as amended at 67 FR 12445, Mar. 19, 2002]

## Subpart B—Exemptions Pursuant to 18 U.S.C. 208(b)(2)

### §2640.201 Exemptions for interests in mutual funds, unit investment trusts, and employee benefit plans.

(a) *Diversified mutual funds and unit investment trusts.* An employee may participate in any particular matter affecting one or more holdings of a diversified mutual fund or a diversified unit investment trust where the disqualifying financial interest in the matter arises because of the ownership of an interest in the fund or trust.

*Example 1 to paragraph (a):* An employee owns shares worth $100,000 in several mutual funds whose portfolios contain stock in a small computer company. Each mutual fund prospectus describes the fund as a ''management company,'' but does not characterize the fund as having a policy of concentrating its investments in any particular industry, business, single country (other than the U.S.) or bonds of a single State. The employee may participate in agency matters affecting the computer company.

*Example 2 to paragraph (a):* A non-supervisory employee of the Department of Energy owns shares valued at $75,000 in a mutual fund that expressly concentrates its holdings in the stock of utility companies. The employee may not rely on the exemption in paragraph (a) of this section to act in

matters affecting a utility company whose stock is a part of the mutual fund's portfolio because the fund is not a diversified fund as defined in §2640.102(a). The employee may, however, seek an individual waiver under 18 U.S.C. 208(b)(1) permitting him to act.

(b) *Sector mutual funds.* (1) An employee may participate in any particular matter affecting one or more holdings of a sector mutual fund or a sector unit investment trust where the affected holding is not invested in the sector in which the fund or trust concentrates, and where the disqualifying financial interest in the matter arises because of ownership of an interest in the fund or unit investment trust.

(2)(i) An employee may participate in a particular matter affecting one or more holdings of a sector mutual fund or a sector unit investment trust where the disqualifying financial interest in the matter arises because of ownership of an interest in the fund or the unit investment trust and the aggregate market value of interests in any sector fund or funds and any sector unit investment trust or trusts does not exceed $50,000.

(ii) For purposes of calculating the $50,000 de minimis amount in paragraph (b)(2)(i) of this section, an employee must aggregate the market value of all sector mutual funds and sector unit investment trusts in which he has a disqualifying financial interest and that concentrate in the same sector and have one or more holdings that may be affected by the particular matter.

*Example 1 to paragraph (b):* An employee of the Federal Reserve owns shares in the mutual fund described in the preceding example. In addition to holdings in utility companies, the mutual fund contains stock in certain regional banks and bank holding companies whose financial interests would be affected by an investigation in which the Federal Reserve employee would participate. The employee is not disqualified from participating in the investigation because the banks that would be affected are not part of the sector in which the fund concentrates.

*Example 2 to paragraph (b):* A health scientist administrator employed in the Public Health Service at the Department of Health and Human Services is assigned to serve on a Departmentwide task force that will recommend changes in how Medicare reimbursements will be made to health care providers. The employee owns $35,000 worth of

703

B0006

shares in the XYZ Health Sciences Fund, a sector mutual fund invested primarily in health-related companies such as pharmaceuticals, developers of medical instruments and devices, managed care health organizations, and acute care hospitals. The health scientist administrator may participate in the recommendations.

*Example 3 to paragraph (b):* The spouse of the employee in the previous Example owns $40,000 worth of shares in ABC Specialized Portfolios: Healthcare, a sector mutual fund that also concentrates its investments in health-related companies. The two funds focus on the same sector and both contain holdings that may be affected by the particular matter. Because the aggregated value of the two funds exceeds $50,000, the employee may not rely on the exemption.

(c) *Employee benefit plans.* An employee may participate in:

(1) Any particular matter affecting one or more holdings of an employee benefit plan, where the disqualifying financial interest in the matter arises from membership in:

(i) The Thrift Savings Plan for Federal employees described in 5 U.S.C. 8437;

(ii) A pension plan established or maintained by a State government or any political subdivision of a State government for its employees; or

(iii) A diversified employee benefit plan, *provided:*

(A) The investments of the plan are administered by an independent trustee, and the employee, or other person specified in section 208(a) does not participate in the selection of the plan's investments or designate specific plan investments (except for directing that contributions be divided among several different categories of investments, such as stocks, bonds or mutual funds, which are available to plan participants); and

(B) The plan is not a profit-sharing or stock bonus plan.

NOTE TO PARAGRAPH (c)(1): Employee benefit plans that are tax deferred under 26 U.S.C. 401(k) are not considered profit-sharing plans for purposes of this section. However, for the exemption to apply, 401(k) plans must meet the requirements of paragraph (c)(1)(iii)(A) of this section.

(2) Particular matters of general applicability, such as rulemaking, affecting the State or local government sponsor of a State or local government pension plan described in paragraph (c)(1)(ii) of this section where the disqualifying financial interest in the matter arises because of participation in the plan.

*Example 1:* An attorney terminates his position with a law firm to take a position with the Department of Justice. As a result of his employment with the firm, the employee has interests in a 401(k) plan, the assets of which are invested primarily in stocks chosen by an independent financial management firm. He also participates in a defined contribution pension plan maintained by the firm, the assets of which are stocks, bonds, and financial instruments. The plan is managed by an independent trustee. Assuming that the manager of the pension plan has a written policy of diversifying plan investments, the employee may act in matters affecting the plan's holdings. The employee may also participate in matters affecting the holdings of his 401(k) plan if the individual financial management firm that selects the plan's investments has a written policy of diversifying the plan's assets. Employee benefit plans that are tax deferred under 26 U.S.C. 401(k) are not considered profit-sharing or stock bonus plans for purposes of this part.

*Example 2:* An employee of the Department of Agriculture who is a former New York State employee has a vested interest in a pension plan established by the State of New York for its employees. She may participate in an agency matter that would affect a company whose stock is in the pension plan's portfolio. She also may participate in a matter of general applicability affecting all States, including the State of New York, such as the drafting and promulgation of a rule requiring States to expend additional resources implementing the Food Stamp program. Unless she obtains an individual waiver under 18 U.S.C. 208(b)(1), she may not participate in a matter involving the State of New York as a party, such as an application by the State for additional Federal funding for administrative support services, if that matter would affect the State's ability or willingness to honor its obligation to pay her pension benefits.

(d) *Matters affecting mutual funds and unit investment trusts.* In addition to participation in the particular matters affecting the holdings of mutual funds and unit investment trusts as permitted under paragraphs (a) and (b) of this section, an employee may participate in any particular matter of general applicability affecting a mutual fund or unit investment trust where the disqualifying financial interest arises because of the ownership of an

704

interest in the mutual fund or unit investment trust.

[61 FR 66841, Dec. 18, 1996; 62 FR 1361, Jan. 9, 1997, as amended at 67 FR 12445, Mar. 19, 2002; 70 FR 69043, Nov. 14, 2005; 78 FR 14442, Mar. 6, 2013]

### § 2640.202  Exemptions for interests in securities.

(a) *De minimis exemption for matters involving parties.* An employee may participate in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership by the employee, his spouse or minor children of securities issued by one or more entities affected by the matter, if:

(1) The securities are publicly traded, or are long-term Federal Government, or are municipal securities; and

(2) The aggregate market value of the holdings of the employee, his spouse, and his minor children in the securities of all entities does not exceed $15,000.

*Example 1 to paragraph (a):* An employee owns 100 shares of publicly traded stock valued at $3,000 in XYZ Corporation. As part of his official duties, the employee is evaluating bids for performing computer maintenance services at his agency and discovers that XYZ Corporation is one of the companies that has submitted a bid. The employee is not required to recuse himself from continuing to evaluate the bids.

*Example 2 to paragraph (a):* In the preceding example, the employee and his spouse each own $8,000 worth of stock in XYZ Corporation, resulting in ownership of $16,000 worth of stock by the employee and his spouse. The exemption in paragraph (a) of this section would not permit the employee to participate in the evaluation of bids because the aggregate market value of the holdings of the employee, spouse and minor children in XYZ Corporation exceeds $15,000. The employee could, however, seek an individual waiver under 18 U.S.C. 208(b)(1) in order to participate in the evaluation of bids.

*Example 3 to paragraph (a):* An employee is assigned to monitor XYZ Corporation's performance of a contract to provide computer maintenance services at the employee's agency. At the time the employee is first assigned these duties, he owns publicly traded stock in XYZ Corporation valued at less than $15,000. During the time the contract is being performed, however, the value of the employee's stock increases to $17,500. When the employee knows that the value of his stock exceeds $15,000, he must disqualify himself from any further participation in matters affecting XYZ Corporation or seek

an individual waiver under 18 U.S.C. 208(b)(1). Alternatively, the employee may divest the portion of his XYZ stock that exceeds $15,000. This can be accomplished through a standing order with his broker to sell when the value of the stock exceeds $15,000.

(b) *De minimis exemption for matters affecting nonparties.* An employee may participate in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership by the employee, his spouse, or minor children of securities issued by one or more entities that are not parties to the matter but that are affected by the matter, if:

(1) The securities are publicly traded, or are long-term Federal Government or municipal securities; and

(2) The aggregate market value of the holdings of the employee, his spouse and minor children in the securities of all affected entities (including securities exempted under paragraph (a) of this section) does not exceed $25,000.

*Example 1 to paragraph (b):* A Food and Drug Administration advisory committee is asked to review a new drug application from Alpha Drug Co. for a new lung cancer drug. A member of the advisory committee owns $20,000 worth of stock in Mega Drug Co., which manufactures the only similar lung cancer drug on the market. If approved, the Alpha Drug Co.'s drug would directly compete with the drug sold by the Mega Drug Co., resulting in decreased sales of its lung cancer drug. The committee member may participate in the review of the new drug.

(c) *De minimis exemption for matters of general applicability.* (1) An employee may participate in any particular matter of general applicability, such as rulemaking, in which the disqualifying financial interest arises from the ownership by the employee, his spouse or minor children of securities issued by one or more entities affected by the matter, if:

(i) The securities are publicly traded, or are municipal securities, the market value of which does not exceed:

(A) $25,000 in any one such entity; and

(B) $50,000 in all affected entities; or

(ii) The securities are long-term Federal Government securities, the market value of which does not exceed $50,000.

(2) For purposes of this paragraph (b), the value of securities owned by the