# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

CENTRIPETAL NETWORKS, LLC,

*Appellant*,

*v.*

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
KEYSIGHT TECHNOLOGIES, INC.,

*Appellees*,

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office,

*Intervenor.*

Appeal from the United States Patent and Trademark Office, Patent Trial and
Appeal Board in Nos. IPR2022-00182, IPR2022-001151, and IPR2022-01199

## CORRECTED BRIEF FOR APPELLEES

DOUGLAS H. HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC  20006
(202) 508-4600

*Attorneys for Appellee Palo Alto
Networks, Inc.*

GERARD M. DONOVAN
REED SMITH LLP
1301 K Street NW
Suite 1100-East Tower
Washington, DC  20005
(202) 414-9200

*Attorneys for Appellee
Keysight Technologies,
Inc.*

MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Appellee Cisco
Systems, Inc.*

*ADDITIONAL ATTORNEYS LISTED ON INSIDE COVER*

January 30, 2024

ANDREW T. RADSCH
JAMES R. BATCHELDER
ROPES & GRAY LLP
1900 University Avenue
East Palo Alto, CA 94303
(650) 617-4000

*Attorneys for Appellee Palo Alto Networks, Inc.*

JONAH D. MITCHELL
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105
(415) 659-5917

*Attorneys for Appellee Keysight Technologies, Inc.*

THEODORE M. FOSTER
DAVID L. MCCOMBS
DEBRA J. MCCOMAS
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219
(972) 739-8649

ANGELA M. OLIVER
HAYNES AND BOONE, LLP
800 17th Street NW, Suite 500
Washington, DC 20006
(202) 654-4552

HEATH A. BROOKS
GARY M. FOX
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

*Attorneys for Appellee Cisco Systems, Inc.*

# PATENT CLAIMS AT ISSUE

Claim 1 of U.S. Patent No. 9,917,856 is representative:

1. A method comprising:

receiving, by a packet-filtering system comprising a hardware processor and a memory and configured to filter packets in accordance with a plurality of packet-filtering rules, data indicating a plurality of network-threat indicators, wherein at least one of the plurality of network-threat indicators comprises a domain name identified as a network threat;

identifying packets comprising unencrypted data;

identifying packets comprising encrypted data;

determining, by the packet-filtering system and based on a portion of the unencrypted data corresponding to one or more network-threat indicators of the plurality of network-threat indicators, packets comprising encrypted data that corresponds to the one or more network-threat indicators;

filtering, by the packet-filtering system and based on at least one of a uniform resource identifier (URI) specified by the plurality of packet-filtering rules, data indicating a protocol version specified by the plurality of packet-filtering rules, data indicating a method specified by the plurality of packet-filtering rules, data indicating a request specified by the plurality of packet-filtering rules, or data indicating a command specified by the plurality of packet-filtering rules:

   packets comprising the portion of the unencrypted data that corresponds to one or more network-threat indicators of the plurality of network-threat indicators; and

   the determined packets comprising the encrypted data that corresponds to the one or more network-threat indicators; and

routing, by the packet-filtering system, filtered packets to a proxy system based on a determination that the filtered packets comprise data that corresponds to the one or more network-threat indicators.

Appx115(25:14-49); *see also* Appx24-25; Appx55; Centripetal Br. 16.

# CERTIFICATE OF INTEREST

Counsel for Appellee Palo Alto Networks, Inc. certifies the following:

**1.     Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Palo Alto Networks, Inc.

**2.     Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.     Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.     Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

ROPES & GRAY LLP:  Keyna Chow, Mark Rowland

**5.** **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below)     [ ] No     [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6.** **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated:  January 30, 2024          /s/ Douglas H. Hallward-Driemeier
                                  DOUGLAS H. HALLWARD-DRIEMEIER
                                  ROPES & GRAY LLP
                                  2099 Pennsylvania Avenue NW
                                  Washington, DC  20006
                                  (202) 508-4600

# CERTIFICATE OF INTEREST

Counsel for Appellee Keysight Technologies, Inc. certifies the following:

**1.     Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Keysight Technologies, Inc.

**2.     Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.     Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.     Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

REED SMITH LLP:  Peter J. Chassman, Jonathan I. Detrixhe, Sidharth Kapoor

**5.** **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below)    [ ] No    [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6.** **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: January 30, 2024       /s/ Gerard M. Donovan
                                      GERARD M. DONOVAN
                                      REED SMITH LLP
                                      1301 K Street NW
                                      Suite 1100-East Tower
                                      Washington, DC 20005
                                      (202) 414-9200

# CERTIFICATE OF INTEREST

Counsel for Appellee Cisco Systems, Inc. certifies the following:

**1. Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Cisco Systems, Inc.

**2. Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3. Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4. Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

HAYNES AND BOONE, LLP:  Gregory Huh

**5.** **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below)  [ ] No  [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6.** **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: January 30, 2024

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

# TABLE OF CONTENTS

Page

PATENT CLAIMS AT ISSUE

CERTIFICATES OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ...................................................................... x

STATEMENT OF RELATED CASES ...................................................... xiv

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT .............................................................. 3

STATEMENT OF ISSUES ON APPEAL ...................................................... 3

STATEMENT OF THE CASE .................................................................... 4

    A.    Background ..................................................................... 4

        1.    Technology overview................................................ 4

        2.    Buruganahalli ...................................................... 5

        3.    '856 Patent ........................................................... 7

            a.    Specification and claims................................... 7

            b.    File history ................................................. 11

            c.    Centripetal's application of the claims in its
                infringement accusations ................................ 11

    B.    Proceedings Before The Board ........................................ 13

        1.    IPR institution and motions for joinder ..................... 13

        2.    Centripetal's untimely and inflammatory
            accusations against the Board ................................ 14

3.    Institution of IPR on Cisco's and Keysight's petitions ........................................................17

4.    The Board's denial of Centripetal's "frivolous" recusal motion ..........................................................18

5.    The Board's denial of Centripetal's *pro hac vice* motion based on multiple instances of misconduct by Centripetal's counsel............................................20

6.    Centripetal's failed petition for a writ of mandamus ................................................................22

7.    The Board's final written decision.............................................23

SUMMARY OF THE ARGUMENT ........................................................26

STANDARD OF REVIEW ........................................................29

ARGUMENT ........................................................30

I.    CENTRIPETAL'S OBJECTIONS TO THE BOARD PANEL'S MEMBERSHIP ARE PROCEDURALLY BARRED AND LACK MERIT ...................30

    A.    Centripetal Has Not Shown Any Error In The Board's Untimeliness Finding ..........................................30

    B.    Centripetal Has Not Shown Any Abuse Of Discretion In The Board's Evaluation Of Centripetal's Recusal Motion .................34

    C.    The Board Did Not Abuse Its Discretion In Denying Centripetal's *Pro Hac Vice* Motion.....................................40

    D.    Centripetal's Complaints About The Board's Language Are Unfounded And Irrelevant ...........................................43

    E.    The Court Should Not Vacate The Board's Institution Decisions ........................................................44

II.    THE BOARD MADE NO "WRITTEN DESCRIPTION" FINDING ...........................50

III.  SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S
      DETERMINATION THAT THE CHALLENGED CLAIMS ARE
      UNPATENTABLE AS OBVIOUS OVER BURUGANAHALLI ................................. 56

      A.    Buruganahalli Discloses Rule-Based Filtering Of
            Encrypted Packets, As Recited In The Challenged Claims ............... 56

            1.    The Board's "filtering" analysis properly applied
                  the claims' plain language ........................................ 56

            2.    Substantial evidence supports the Board's finding
                  that Buruganahalli discloses filtering by "Uniform
                  Resource Identifier" .............................................. 57

                  a.    Forfeiture ...................................................... 57

                  b.    Buruganahalli filters by "URI" ........................ 61

            3.    The Board did not ignore evidence relevant to the
                  challenged claims .................................................. 63

      B.    The Board Properly Weighed Objective Indicia ................................. 64

            1.    Copying ............................................................... 64

            2.    Long-felt need ...................................................... 65

CONCLUSION ......................................................................................... 66

STATEMENT OF COUNSEL

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

## CASES

Page(s)

*Baldwin Hardware Corp. v. FrankSu Enterprise Corp.*,
    78 F.3d 550 (Fed. Cir. 1996) ....................................................29, 42

*Bayer CropScience AG v. Dow AgroSciences LLC*,
    851 F.3d 1302 (Fed. Cir. 2017) .......................................................29

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
    38 F.4th 1025 (Fed. Cir. 2022) ................................................xiv, 29

*Columbia Insurance Co. v. Simpson Strong-Tie Co.*,
    No. 2021-2145, 2023 WL 2733427 (Fed. Cir. Mar. 31, 2023)
    (nonprecedential) ...........................................................................58

*Consolidated Edison Co. of New York v. NLRB*,
    305 U.S. 197 (1938).........................................................................29

*Cuozzo Speed Technologies, LLC v. Lee*,
    579 U.S. 261 (2016).................................................................45, 46

*Driessen v. Best Buy Co.*,
    No. 2022-1907, 2023 WL 2422441 (Fed. Cir. Mar. 9, 2023)
    (nonprecedential) ...........................................................................58

*Finjan, Inc. v. Cisco Systems, Inc.*,
    837 F. App'x 799 (Fed. Cir. 2020) (nonprecedential)................58, 60

*Finjan, Inc. v. Juniper Networks, Inc.*,
    No. 17-cv-5659-WHA, 2021 WL 3140716 (N.D. Cal. July 26,
    2021) .......................................................................................21, 41

*Freshub, Inc. v. Amazon.com Inc.*,
    576 F. Supp. 3d 458 (W.D. Tex. 2021) ......................................21, 41

*In re Centripetal Networks, LLC*,
    No. 2023-127, 2023 WL 3477282 (Fed. Cir. May 16, 2023)
    (nonprecedential) ....................................................................xiv, 22

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ........................................................60

*In re United Shoe Machinery Corp.*,
276 F.2d 77 (1st Cir. 1960).................................................................32

*Incept LLC v. Palette Life Sciences, Inc.*,
77 F.4th 1366 (Fed. Cir. 2023) ....................................................29, 32

*KSR International Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..............................................................................29

*Liljeberg v. Health Services Acquisition Corp.*,
486 U.S. 847 (1988)........................................................................47, 48

*Maier v. Orr*,
758 F.2d 1578 (Fed. Cir. 1985) ..........................................................19

*Securities & Exchange Commission v. Chenery Corp.*,
318 U.S. 80 (1943)...............................................................................61

*SkyHawke Technologies, LLC v. Deca International Corp.*,
828 F.3d 1373 (Fed. Cir. 2016) ..........................................................44

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ..........................................................42

*Thryv, Inc. v. Click-to-Call Technologies, LP*,
140 S. Ct. 1367 (2020)..........................................................................44

*United States v. Great American Insurance Co. of New York*,
738 F.3d 1320 (Fed. Cir. 2013) ..........................................................29

*United States v. Kelley*,
712 F.2d 884 (1st Cir. 1983).................................................................33

*United States v. Owens*,
902 F.2d 1154 (4th Cir. 1990) ......................................................32, 33

*VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*,
778 F. App'x 897 (Fed. Cir. 2019) (nonprecedential)........................47

*Williams v. Pennsylvania*,
  579 U.S. 1 (2016) .............................................................................47

## STATUTES AND REGULATIONS

18 U.S.C.
  § 208 .............................................................................................35

28 U.S.C.
  § 455(b) ...........................................................................19, 20, 49
  § 1295(a)(4)(A) ................................................................................3

35 U.S.C.
  § 112 ...................................................................................25, 27, 50
  § 311(b) .....................................................................................25, 50
  § 314 ...................................................................1, 3, 16, 33, 44, 45
  § 316(a) ...........................................................................................45
  § 319 ...............................................................................................44

5 C.F.R.
  § 2635.101(b) ..................................................................................37
  § 2635.402 .................................................................................35, 37
  § 2635.501 .......................................................................................38
  § 2635.502 .......................................................................................38
  § 2638.102 .................................................................................36, 37
  § 2640.101 .................................................................................35, 36
  § 2640.202 .........................................................................15, 34, 35

37 C.F.R.
  § 42.4(a) ..........................................................................................45
  § 42.10(c) ........................................................................................42

## OTHER AUTHORITIES

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
  No. 2:18-cv-94, Order Granting Cisco's Motion to Sever and Stay
  (E.D. Va. June 7, 2023), Dkt. 715 ..................................................xiv

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
  No. 2:18-cv-94, Memorandum Opinion and Order (E.D. Va. Dec.
  11, 2023), Dkt. 780 ........................................................................xiv

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
No. 2:18-cv-94, Clerk's Partial Judgment (E.D. Va. Dec. 11,
2023), Dkt. 781 .........................................................................................xiv

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
No. 2021-1888, Non-Confidential Joint Appendix, Volume II (Fed.
Cir. Feb. 2, 2022), Dkt. 40-2..............................................................12

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
No. 2021-1888, Centripetal's Supplemental Brief (Fed. Cir. Apr.
29, 2022), Dkt. 64 .................................................................................49

*In re Centripetal Networks, LLC*,
No. 23-127, Respondents' Response to Petition for a Writ of
Mandamus (Fed. Cir. Apr. 21, 2023), Dkt. 19 .............................41, 46

Patent Trial and Appeal Board Consolidated Trial Practice Guide
(Nov. 2019) ...........................................................................................58

Vidal, Katherine K., *Memo to Members of the Patent Trial and
Appeal Board and the Trademark Trial and Appeal Board* (Sept.
22, 2023) ...............................................................................................39

## STATEMENT OF RELATED CASES

The inter partes review ("IPR") underlying this appeal involves U.S. Patent No. 9,917,856 (the "'856 patent"). Appellant Centripetal Networks, LLC ("Centripetal") previously filed a petition for a writ of mandamus asking this Court to vacate all of the Board's decisions in the IPR. This Court denied Centripetal's mandamus petition in a nonprecedential order. *In re Centripetal Networks, LLC*, No. 2023-127, 2023 WL 3477282 (Fed. Cir. May 16, 2023) (Wallach, J., joined by Lourie & Prost, JJ.).

In *Centripetal Networks, Inc. v. Cisco Systems, Inc.*, No. 2:18-cv-94 (E.D. Va.) ("*Cisco*"), Centripetal sued Appellee Cisco Systems, Inc. ("Cisco") for alleged infringement of the '856 patent and other patents. Appx7219. On appeal, this Court vacated the district court's judgment, including the liability judgment as to the '856 patent, and remanded for further proceedings. *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, No. 2021-1888, 38 F.4th 1025 (Fed. Cir. 2022) (Dyk, J., joined by Taranto & Cunningham, JJ.), *cert. denied*, 143 S. Ct. 487 (Dec. 5, 2022). Proceedings regarding the '856 patent have been severed and stayed pending the outcome of this appeal. No. 2:18-cv-94 (E.D. Va. June 7, 2023), Dkt. 715. The district court issued findings of fact and conclusions of law and entered partial final judgment of noninfringement for the remaining asserted patents. *Id.*, Dkt. 780, 781 (E.D. Va. Dec. 11, 2023). Centripetal's post-judgment motion is pending.

In *Centripetal Networks, Inc. v. Keysight Technologies, Inc.*, No. 2:17-cv-383 (E.D. Va.), Centripetal similarly sued Appellee Keysight Technologies, Inc. ("Keysight") for alleged infringement of the '856 patent and other patents. Appx9222. That case settled during trial in October 2018. *Id.*

Counsel for Appellees Palo Alto Networks, Inc. ("PAN"), Keysight, and Cisco (together, "Appellees") are not aware of any other case pending in this Court or any other tribunal that will directly affect or be directly affected by this Court's decision in this appeal.

# INTRODUCTION

In a 58-page decision, the Board carefully considered and rejected all of Centripetal's patentability arguments. In particular, the Board found that the prior art Buruganahalli reference filtered encrypted data in precisely the same way as taught in the '856 patent: by applying a packet-filtering rule to a domain name found in the unencrypted handshake message at the beginning of a packet flow, and filtering encrypted packets in the same flow by correlating them with the filtered handshake packets. On appeal, Centripetal does not offer any good reason to disturb any of the Board's findings.

Centripetal's lead argument is a recusal argument directed not to the Board panel that issued the final written decision, but to the panel that instituted the PAN IPR. But Centripetal does not directly challenge the Board's finding that Centripetal unduly delayed in bringing its recusal motion—an adequate and independent basis for the Board's ruling, as to which Centripetal shows no abuse of discretion. And even on the merits, the applicable regulations make plain that Centripetal's recusal argument is meritless. Moreover, 35 U.S.C. § 314(d) deprives this Court of jurisdiction to give Centripetal the remedy it seeks, namely vacatur of the Board's decisions instituting IPR.

Centripetal's challenges on the patent merits fare no better. Centripetal's primary argument rests on the fictional premise that the Board held the claims

unpatentable on written-description grounds, despite the Board's explicit contrary statement. Appx24 n.7 ("We ***do not consider*** whether these issues might give rise to a problem under 35 U.S.C. § 112[.]").[1]  In fact, the Board's discussion of the specification was part of its analysis of the claims' scope, which Centripetal tried to confuse by suggesting that Appellees were required to show that the prior art disclosed applying packet-filtering rules ***directly*** to encrypted packets. But Centripetal now admits (at 49) that "[t]he claims ***do not require*** the rules to analyze the encrypted payload portion of the encrypted packets," and does not point to any substantive error in the Board's understanding of the claims. Because the Board's obviousness determination rested on the claims' scope and the prior art's disclosure of their limitations—not any nonexistent "written description" finding—Centripetal shows no error in the Board's decision.

Centripetal also challenges the Board's factual finding that Buruganahalli taught filtering encrypted packets "based on … a uniform resource identifier (URI)" by applying its blacklist policy to the "destination domain" in the handshake message. But as the Board found, Centripetal forfeited this argument by not raising it in Centripetal's written submissions, instead raising the issue for the first time at the oral hearing. Centripetal attempts to blame PAN and the Board

---

[1] Emphases are added unless otherwise noted.

for its forfeiture, but the responsibility is Centripetal's alone. Notably, when seeking to prove infringement in the *Cisco* litigation, Centripetal made the very argument it now criticizes—i.e., that filtering by domain name qualifies as filtering by URI. The Board certainly did not abuse its discretion in finding forfeiture under these circumstances. In any event, the Board's finding that Buruganahalli taught the URI limitation is amply supported by substantial evidence. The same goes for the Board's rejection of Centripetal's cursory and unsupported objective-indicia arguments.

The Court should affirm the Board's final written decision.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the Board's final written decision under 28 U.S.C. § 1295(a)(4)(A). The Court lacks jurisdiction to review the Board's decisions instituting IPR. 35 U.S.C. § 314(d); *see infra* pp. 46-48.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the Board acted within its discretion in denying Centripetal's motion for recusal and vacatur as untimely and meritless.

2. Whether the Board somehow held the challenged claims unpatentable for lack of adequate written description, even though it explicitly disclaimed any such finding.

3.     Whether substantial evidence supports the Board's determination that Buruganahalli renders the challenged claims unpatentable for obviousness.

## STATEMENT OF THE CASE

### A.     Background

#### 1.     Technology overview

Before the '856 patent's priority date, it was known that data was transmitted over the Internet in individual data "packets," which could be encrypted or unencrypted.  Appx3811(¶0029); Appx1904-1905(¶66); Appx2019(4:23-44).  Encryption preserved the privacy and confidentiality of a packet's contents, although encryption also could be used for nefarious purposes, such as to hide malware.  Appx2019(4:16-19).

Establishment of an encrypted communication session typically began with the exchange of a few unencrypted "hello" packets, in a process known as a "handshake."  This exchange allowed the sender (often called the server or providing device) and the recipient (often called the client or requesting device) to establish the secure connection's parameters.  After this handshake negotiation was complete, the rest of the communication flow would consist of encrypted packets.  Appx2019(4:31-44); Appx2020(5:24-51); Appx2023(11:20-54).

The prior art also used firewalls to protect communication networks from unauthorized access, while permitting authorized communications to pass through.

Appx2018(1:20-25). Firewalls could filter inbound or outbound traffic by applying a set of rules or policies. Appx2018(1:33-39). These rules or policies could be based on, for example, network-threat indicators received from a third-party reporting service. Appx3788(¶¶0024-0025); Appx3795(¶0099); Appx3784(Fig.4); Appx1900-1902(¶¶61-62). The network-threat indicators could include potentially harmful domain names, and the firewall could employ a rule or policy to block or further scrutinize traffic to or from those domains. Appx3788(¶¶0024-0025); Appx3795(¶0099); Appx3784(Fig.4); Appx1900-1902(¶¶61-62). If the firewall determined that further analysis of a transmission was appropriate, it could use a "man in the middle" technique, whereby the firewall would act as a proxy for the client or destination server to intercept the transmitted packets. Appx2023-2024(12:4-13:4); Appx2012(Fig.3B). The firewall would then decrypt and analyze the intercepted packets and send them to their intended destination only if the firewall determined they were safe. Appx2023-2024(12:4-13:4); Appx2012(Fig.3B).

### 2. Buruganahalli

Prior art U.S. Patent No. 9,680,795 ("Buruganahalli") disclosed a firewall that "protect[ed] networks from unauthorized access while permitting authorized communications to pass through the firewall." Appx2018(2:48-50). The firewall "den[ied] or permit[ted] network transmission based on a set of rules" or

"policies." Appx2018(2:61-63). The firewall filtered packets by "inspect[ing] the individual packets themselves and apply[ing] rules based on the inspected packets." Appx2019(3:16-24). The firewall received threat intelligence, such as identification of suspicious domain names, which it used to create a "blacklist"—a rule or policy whereby packets to or from listed domains were blocked or routed for further analysis. Appx2020-2021(5:62-6:1, 6:12-38, 7:39-51, 7:60-67).

Buruganahalli also described an initial "handshake" or "hello" message between client and server. Appx2022-2023(10:54-11:54); Appx2012(Fig.3A). This handshake communication set the parameters for a subsequent secure connection. Appx2019(4:31-44). Because the handshake packets were unencrypted, Appx2020-2021(5:27-35, 7:19-25); Appx2025(16:2-3), the firewall could extract the destination domain name from the handshake and apply firewall rules/policies, such as the blacklist policy, to the unencrypted domain name, Appx2023(11:7-19); Appx2021(7:39-51). As a result, the firewall could determine that the entire "session" (including the encrypted packets associated with the unencrypted handshake packets) should be subject to further monitoring. Appx2020(6:12-16) (Buruganahalli's firewall could "be used to determine whether a new session using a secure protocol should be *initially allowed* based on a policy (e.g., security policy, such as a firewall policy), and then to *further monitor* encrypted data communications associated with the session"). In this way,

Buruganahalli's firewall could filter the encrypted and unencrypted packets in a session by applying a rule/policy to the extracted domain name that the two sets of packets had in common. Appx2018-2019(2:61-3:4); Appx2021(8:55-60).

Buruganahalli also described a "man-in-the-middle technique" to decrypt and "further monitor" these filtered packets. Appx2023(11:59-65). This technique was "used in addition to and/or in combination with" the "destination domain extraction" protocol described above. Appx2023(11:61-12:3). With the man-in-the-middle technique, the firewall placed itself between the client and remote server, thereby splitting the secure session into two half sessions, one in which the firewall acted as a client/recipient and one in which it acted as a server/sender. The firewall decrypted the secure traffic, inspected it, and responded by, for example, "deny[ing] … the entire session" (if the traffic was deemed unsafe) or re-encrypting and forwarding the traffic (if it was deemed safe). Appx2023(12:14-55).

### 3. '856 Patent

#### a. *Specification and claims*

Centripetal's '856 patent recites a "packet-filtering system" indistinguishable from Buruganahalli's, which can be summarized with reference to the patent's Figure 7:



FIG. 7

Appx102(Fig.7). In step 702, the packet-filtering system receives "network-threat indicators," which can include "domain names." Appx114(23:66-67);

Appx103(1:11-15); Appx104(3:65-4:3). In step 704, the system may use network-threat indicators to configure packet-filtering rules for use in filtering packets. Appx114(24:4-6); Appx104(4:3-7, 4:18-21); Appx1914-1916(¶77).

In step 706, the packet-filtering system "may identify packets comprising unencrypted data," including, for example, "a handshake message configured to establish an encrypted communication session." Appx114(24:8-12); Appx107(9:16-46); Appx106(8:9); Appx106(8:57-58) (TCP handshake connection 302). In step 708, the system "may identify packets comprising encrypted data," such as packets from the same encrypted session referenced in step 706. Appx114(24:13-17); Appx105(6:42-45); Appx106-107(8:65-9:2) (encrypted session 306 via handshake connection 302).

In step 710, the packet-filtering system "may determine based on a portion of the unencrypted data corresponding to the network-threat indicators that the packets comprising encrypted data correspond to the network-threat indicators." Appx114(24:18-21). For example, the system "may determine that a domain name included in … the [unencrypted] handshake message corresponds to the network-threat indicators," and thus "may determine that one or more of the packets encrypted" in an encrypted session (e.g., session 306) "correlate to" the packets comprising the handshake message. Appx114(24:22-30); Appx107(9:16-46) (describing correlation of network-threat indicators to the domain name in

unencrypted handshake packets used to establish encrypted session 306). In this way, the '856 patent's technique of filtering ***encrypted*** packets based on the domain name in the associated ***unencrypted*** handshake message is the same as Buruganahalli's filtering technique. *See supra* pp. 7-8.

Based on this determination that certain unencrypted packets—and the encrypted packets to which they correlate—correspond to network-threat indicators, the '856 patent recites routing these filtered packets to a proxy system for further analysis. Appx105(6:45-59); Appx106-107(8:65-9:46) (unencrypted handshake packets routed to proxy device 112 via connection 302); Appx107(9:66-10:14) (encrypted packets from session 306, established via unencrypted connection 302, routed to proxy device 112). The proxy system can employ, for example, "man in the middle" techniques whereby it decrypts packets, analyzes them, and then either forwards them to their intended destination or drops them altogether. Appx107(10:15-16) ("Proxy device 112 may receive the packets and decrypt the data in accordance with the parameters of session 306."); Appx107-108(10:56-11:7) (rule gate 124 serves as "'the man in the middle' of proxy devices 112 and 114" and determines whether "the packets comprise data corresponding to the network-threat indicators … and one or more of log or drop the packets"). Thus, the '856 patent's proxy system functions in the same way as Buruganahalli's man-in-the-middle technique. *See supra* pp. 8-9.

### b. File history

As a final step before the claims issued, an examiner's amendment added

five packet-filtering criteria to the claims, any one of which would satisfy this

claim requirement (see underlined language below):

> filtering, by the packet-filtering system <u>and based on at least one of</u>
> <u>[1] a **uniform resource identifier (URI)** specified by the plurality of</u>
> <u>packet-filtering rules, [2] data indicating a **protocol version** specified</u>
> <u>by the plurality of packet-filtering rules, [3] data indicating a **method**</u>
> <u>specified by the plurality of packet-filtering rules, [4] data indicating a</u>
> <u>**request** specified by the plurality of packet-filtering rules, or [5] data</u>
> <u>indicating a **command** specified by the plurality of packet-filtering</u>
> <u>rules</u>[.]

Appx1791-1793 (bracketed numerals added). These five packet-filtering criteria

are mentioned only once in the specification, at step 22, where the system is acting

on **unencrypted** packets. Appx107-108(10:56-11:28) ("at step #22 … packets

traversing the communication link may comprise unencrypted data"); Appx16-17

(describing step 22 as "acting on unencrypted packets").

### c. Centripetal's application of the claims in its infringement accusations

In the *Cisco* litigation, Centripetal asserted that Cisco infringed challenged

claims 24 and 25 of the '856 patent. Centripetal did not argue that the claims were

limited to applying packet-filtering rules directly to **encrypted** packets. Instead,

Centripetal argued that Cisco practiced the filtering requirement by applying one or

more rules to NetFlow records, which are logs that summarize the **unencrypted**

information collected during a specified time period for each packet flow passing through a network device, and which Centripetal and the district court referred to as mere "representations" of packets. Appx3266 ("This information from the unencrypted packets is sent up to [accused Cisco product] Stealthwatch using Cisco's proprietary logging framework known as NetFlow."); Appx3267 ("Stealthwatch filters the representation of packets in the form of NetFlow."); Appx3288 (describing filtering based on "the representation of … the unencrypted portion of the packet").

Separately, although Centripetal now argues (Br. 50-53) that filtering by domain name differs from filtering by uniform resource identifier (URI), it repeatedly argued the opposite when asserting infringement in the district court. Centripetal's technical expert asserted that the Cisco system filtered packets based on a URI because the system determined that a ***domain name*** from a packet flow summarized in NetFlow records was potentially threatening, and because a domain name is a component of a URI. *See Cisco*, No. 2021-1888 (Fed. Cir.), Dkt. 40-2 at Appx1948-1949(948:20-949:25) ("we'll focus on the Uniform Resource Identifier, which includes a domain name"); *id.* at Appx1955-1956(955:14-956:2) ("One of the things that's included in a Uniform Resource Identifier is a domain name. So a domain name is one of the key Universal Resource Identifiers that we utilize."); *id.* at Appx1956(956:10-15) (Stealthwatch "can filter on domain names"); *id.* at

Appx1957(957:9-21) (Centripetal's expert explaining "how this informs [his] opinion as to filtering based on the URI" because "domain name is a component of the [URI]"); *id.* at Appx1957-1958(957:22-958:8) ("the system can clearly filter based on a [URI], specifically the domain name").

## B. Proceedings Before The Board

### 1. IPR institution and motions for joinder

PAN was the subject of a widespread patent-litigation campaign by Centripetal. Appx131. One of Centripetal's experts in the *Cisco* litigation alleged that PAN "sought to imitate the Cisco solutions that are described as infringing the patents in [the *Cisco*] suit." Appx135.

In November 2021, PAN petitioned for IPR of claims 1, 24, and 25 of the '856 patent. Appx367. As PAN later verified, "no individuals acting for or on behalf of *any* other entity participated or assisted in any way with the financing, preparation, editing, review, approval, or filing" of PAN's IPR petition. Appx4146; *see also* Appx6669. The PAN IPR was assigned to Administrative Patent Judges ("APJs") McNamara, Moore, and Amundson. Appx4136.

On May 25, 2022, the Board instituted review. Appx208. The Board noted that PAN "expresse[d] reasonable concern that [Centripetal] may initiate additional litigation involving the '856 patent," and that the merits of PAN's patentability challenges seemed "particularly strong." Appx138; Appx147. It is this institution

decision—issued before Cisco or Keysight even asked to join the proceeding—that Centripetal now attacks before this Court.

On June 8, 2022, Centripetal requested rehearing of the Board's institution decision, arguing that PAN's petition "collaterally attack[ed] a district court judgment." Appx4510; *see also* Appx4512-4519. Centripetal also requested review by the Board's Precedential Opinion Panel ("POP"). Appx4510; *see also* Appx4538-4539.

On June 24, 2022, Cisco and Keysight filed substantively identical IPR petitions and motions for joinder with the PAN IPR. Appx7091-7167; Appx8809-8871; Appx7215-7228; Appx9218-9234.[2] Cisco and Keysight made clear that they sought to join the IPR only as PAN's "understudy," such that they would assume an active role only if PAN were to drop out of the proceedings. Appx7217; Appx9221.

### 2. Centripetal's untimely and inflammatory accusations against the Board

APJ McNamara's ownership of less than $15,000 of Cisco stock was a matter of public record for ten years. Appx6652; *see also* Appx6372-6373 (2014 public financial disclosure report). Centripetal admitted learning of APJ McNamara's stock ownership no later than September 29, 2022. Appx81 (citing

---

[2] Because the three petitions are substantively identical, this brief generally cites PAN's petition.

Appx6367).  Yet Centripetal waited over three months before raising this matter with the Board on December 30, 2022.  Appx81.

Centripetal's delay appears to have been strategic.  When Centripetal learned of APJ McNamara's stock ownership, its petition for certiorari seeking review of this Court's *Cisco* decision was pending before the Supreme Court.  In its reply brief supporting its petition for certiorari, dated November 9, 2022, Centripetal characterized APJ McNamara's stock ownership as **permitted** by applicable regulations:

> Federal regulations permit government employees to participate in matters involving parties in which they possess a financial interest if (1) "[t]he securities are publicly traded" (or are long-term government bonds) and (2) the value of the interest "does not exceed $15,000." 5 C.F.R. §2640.202(a).  This rule by its terms *applies to the PTAB and its APJs*.  If it is acceptable for APJs to have triple the amount of stock in Cisco (a publicly traded company) that Judge Morgan's wife held without even triggering a recusal obligation, how can it be harmful error to use a blind trust in lieu of an outright sale for a spousal holding worth less than $5,000?  Moreover, if the ultimate concern is the public's perception of fair justice, how can it be acceptable for an APJ to rule in favor of a company in which he holds $14,999 in stock, but irrelevant that Judge Morgan ruled *against* his *much smaller* financial interest?

> This problem is not hypothetical, let alone "rare."  BIO.2, 20.  Centripetal recently discovered that an APJ *in this case* held a financial interest in Cisco—but failed to notify the parties of the interest, let alone divest or recuse.  And that APJ repeatedly ruled in Cisco's favor and against Centripetal's patents, including a patent at issue in this very case.

Appx6692-6693 (emphases and alteration Centripetal's). The Supreme Court denied certiorari on December 5, 2022, and the POP denied Centripetal's request for review the next day, stating that "the original panel maintain[ed] authority over all matters," including Centripetal's pending request for rehearing of the institution decision. Appx6273.

Only after those twin denials did Centripetal raise its recusal concerns with the Board. On December 30, 2022—over three months after Centripetal admittedly learned of the relevant facts—Centripetal moved for recusal and vacatur. Appx6363. The timing of Centripetal's motion, just before the New Year's holiday, gave the Board only four business days to act on the motion before the statutory deadlines for decisions on institution and joinder of the Keysight and Cisco IPRs (January 6 and 7, 2023). 35 U.S.C. § 314(b).

Reversing the position it took in its Supreme Court brief, Centripetal called APJ McNamara's stock ownership "egregious" (Appx6358) and asserted that it "cast a shadow over the entire panel of" APJs (Appx6360). Centripetal also criticized APJ McNamara's receipt of retirement payments from his prior law firm—an argument Centripetal has abandoned on appeal. Appx6352. In a subsequent brief, Centripetal accused APJ McNamara of maintaining "secret knowledge" of the Cisco stock identified on his public financial disclosure reports. Appx6772. Centripetal stated that APJ McNamara "flout[ed] established law,"

that his conduct was "shocking[]" and "gratuitous," and that the allegedly tainted panel "carried water for Cisco." Appx6775.

### 3. Institution of IPR on Cisco's and Keysight's petitions

On January 4, 2023, the Board denied Centripetal's request for rehearing of its decision instituting the PAN IPR because that request "lack[ed] merit." Appx6629.

The same day, the Board instituted IPR on Cisco's and Keysight's petitions. Appx210-275; Appx276-342. Because Cisco's and Keysight's petitions were substantively identical to PAN's petition, did not raise any new issues, and would not disrupt the trial schedule for the PAN IPR, the Board also granted the joinder motions. Appx263-271; Appx331-338. PAN maintained total control of the proceedings for all three petitioners.

The following day, January 5, 2023, APJ McNamara issued an order withdrawing from the panel. Although no law or regulation required his withdrawal, he withdrew "to reduce the number of issues and simplify the briefing." Appx6652.

Two weeks later, on January 18, 2023, APJ Amundson also withdrew. Appx6700. APJ Amundson denied that APJ McNamara "improperly influenced" either APJ Moore or himself, but APJ Amundson still withdrew "to further 'reduce the number of issues' presented by" Centripetal's recusal motion. Appx6702.

The Board replaced APJs McNamara and Amundson with APJs Wormmeester and Khan. Appx6754. APJ Moore, whose impartiality Centripetal never directly questioned, remained on the panel. *See id.*

### 4. The Board's denial of Centripetal's "frivolous" recusal motion

On January 18, 2023, the same day that APJ Amundson withdrew from the panel, Centripetal requested rehearing of the Board's decisions instituting the Cisco and Keysight IPRs. Appx6705-6722; Appx6723-6741. Centripetal asserted that APJ McNamara "shockingly signed" the decisions instituting the Cisco and Keysight IPRs. Appx6708; Appx6726. Although those decisions logically followed from the Board's earlier institution of PAN's substantively identical IPR, Centripetal referred to them as "substantive ruling[s] in favor of Cisco" that were APJ McNamara's "parting toast" to Cisco before withdrawal. Appx6708; Appx6726. According to Centripetal, APJ McNamara included "self-serving opinions about the merits" of Centripetal's recusal motion in his order explaining his withdrawal. Appx6711; Appx6729. Centripetal also accused the Board of engaging in "litigation on behalf of" Cisco and Keysight. Appx6709; Appx6727.

On February 3, 2023, the new Board panel denied Centripetal's recusal motion. Appx61-85. It concluded that APJ McNamara's actions were "fully compliant with the applicable ethical regulations." Appx62. Analyzing the text of the regulations, the Board concluded that APJ McNamara's "Cisco stock is plainly

not disqualifying." Appx68-71. Because Centripetal was undisputedly aware of the regulations (as quoted in its Supreme Court reply brief), and because there is "no competent, good faith argument that the Cisco stock does not fall into [the] exemptions," the Board concluded that Centripetal's argument was "frivolous." Appx73. Overall, Centripetal's arguments about APJ McNamara's alleged conflict were "so lacking in substance" that the Board found them "concerning." Appx74.

The Board also rejected Centripetal's argument that APJ McNamara's stock holding raised due-process concerns, concluding that the holding is not "substantial." Appx74-77. To the extent Centripetal argued that APJ McNamara's conduct demonstrated actual bias, the Board rejected that argument. Appx77-80. Centripetal also "pivoted" from arguing about APJ McNamara's alleged bias in Cisco's favor to arguing that "he became biased against [Centripetal] for some personal reason." Appx78 (emphasis omitted). In the Board's view, Centripetal's argument about APJ McNamara's purported bias was "just another 'reckless' attack based on 'unsupported rumor, conjecture, and speculation.'" Appx80 (quoting *Maier v. Orr*, 758 F.2d 1578, 1583-1584 (Fed. Cir. 1985)).

The Board found no inconsistency between its decision on Centripetal's recusal motion and this Court's decision in the *Cisco* appeal, because this Court's decision turned on a statute governing disqualification of Article III judges, 28 U.S.C. § 455(b), which does not apply to APJs. Appx80-81.

As an independent ground for denying Centripetal's recusal motion, the Board held that it was untimely. Appx81-82. The Board reasoned that the procedural history "strongly suggests" that Centripetal was "waiting to see" whether the POP or the Supreme Court "would issue a favorable decision." Appx82. The Board found Centripetal's gamesmanship "highly inappropriate" because issues relating to disqualification should be raised as soon as possible. *Id.*

Finally, the Board denied Centripetal's pending requests for rehearing of the decisions instituting the Cisco and Keysight IPRs to the extent that Centripetal's arguments overlapped with its arguments on the recusal motion. Appx83.

### 5. The Board's denial of Centripetal's *pro hac vice* motion based on multiple instances of misconduct by Centripetal's counsel

Centripetal discusses (at 32-33), though it does not provide the full context of, the Board's denial of Centripetal's motion for the *pro hac vice* admission of one of its attorneys, Paul Andre, Esq. Appx6780.

At the time, Centripetal was already represented before the Board by six other attorneys, including three from Mr. Andre's firm, and Mr. Andre was seeking admission only as backup counsel. Appx6783.

The Board found that Mr. Andre had engaged in several episodes of "quite troubling" misconduct. Appx6783.

- Mr. Andre's first action in the PAN IPR was to violate the Board's rules by filing Centripetal's recusal motion without authorization and without meeting and conferring with PAN.  Appx6782.

- The recusal motion that Mr. Andre signed made "frivolous" allegations that amounted to a "'reckless' attack" against APJ McNamara "based on nothing more than 'unsupported rumor, conjecture, and speculation.'"  Appx6783 (quoting Appx73-74; Appx78-80).

- A federal district court sanctioned Mr. Andre for making "inflammatory allegations" that were "nothing but baseless attacks on the integrity" of the district court and the reputation of opposing counsel, including "invok[ing] baseless allegations of racism and anti-Semitism to request a new trial," which was "shocking" and "offensive." *Freshub, Inc. v. Amazon.com Inc.*, 576 F. Supp. 3d 458, 466-467 (W.D. Tex. 2021); *see also* Appx6781.

- A different district court found that Mr. Andre engaged in "reckless" conduct by misrepresenting a judicial decision. *Finjan, Inc. v. Juniper Networks, Inc.*, No. 17-cv-5659-WHA, 2021 WL 3140716, at *4 (N.D. Cal. July 26, 2021); *see also* Appx6782.

The Board determined that Mr. Andre's misconduct was a "sufficient reason to deny" his *pro hac vice* motion, but it denied the motion without prejudice. Appx6783. Centripetal never renewed its request for Mr. Andre's admission.

### 6. Centripetal's failed petition for a writ of mandamus

Although the Board denied Centripetal's recusal motion on February 3, 2023, Centripetal did not immediately seek relief from this Court. Centripetal waited until over a month after the Board conducted an oral hearing on the merits of the IPR on February 15, 2023, before filing a mandamus petition on March 23, 2023. Appx6763; Appx6913. In denying Centripetal's request to stay IPR proceedings pending disposition of the mandamus petition, the Board further explained its basis for denying Centripetal's recusal motion. Appx7010-7019.

This Court determined that Centripetal "failed to satisfy" the "demanding standard" for mandamus relief. *Centripetal Networks*, 2023 WL 3477282, at *1. Although the Court did not reach a "definitive conclusion[]" on the substantive issues, it could not "say that Centripetal ha[d] shown a clear and indisputable right to vacatur, particularly given" (1) "the lack of any evidence that Cisco was involved in the proceedings at the time of institution," (2) Cisco's role as an understudy in the PAN IPR, and (3) "the fact that APJ McNamara [would] not be a member of the panel" who would "decide[] the ultimate merits in the IPR." *Id.*

### 7. The Board's final written decision

On May 23, 2023, the Board issued a final written decision determining that claims 1, 24, and 25 of the '856 patent are unpatentable as obvious over Buruganahalli. Appx1-60. The Board found that Buruganahalli disclosed all the claim elements, including:

- receiving network-threat indicators including a domain name (*Buruganahalli's "blacklist"*);

- identifying packets that comprise unencrypted and encrypted data (*identifying unencrypted packets in Buruganahalli's handshake message, and identifying encrypted packets as part of that same flow/session*);

- determining, based on unencrypted data corresponding to a threat indicator (*Buruganahalli's handshake message domain name*), packets with encrypted data that correspond to the threat indicators (*encrypted packets in the same flow/session as the packet with the handshake message domain name*);

- filtering both types of packets (*Buruganahalli's entire flow/session*) based on a URI (*domain name*); and

- routing both types of packets to a proxy system (*Buruganahalli's man-in-the-middle technique to further analyze and potentially drop packets*).

Appx3.

Centripetal's primary argument in favor of patentability was that Buruganahalli "does not disclose applying filtering rules to encrypted packets." Appx4660; *see also* Appx4648; Appx4651; Appx4655; Appx43. In rejecting that argument, the Board reasoned that the claims do not require that packet-filtering

- 23 -

rules be applied *directly* to encrypted packets; they require merely filtering encrypted packets "based on" at least one of the five listed packet-filtering rules. Appx44 ("[T]he claims that issued cover Buruganahalli's method of determining that a session should be filtered *based on* a domain name in unencrypted handshake data."). The Board found that Buruganahalli disclosed exactly that, as it "describes 'filtering' packets *based on* their status as part of a flow" identified by a domain name. Appx49; *see also* Appx56-57 ("Buruganahalli thus describes filtering flows *based on* the presence of the domain name"). This filtering can include applying a listed rule to unencrypted packets, correlating the unencrypted packets with encrypted packets in the same packet flow, and filtering the encrypted packets based on applying the rule to the unencrypted packets. Appx19-20; Appx23; Appx42-44.

As further support for rejecting Centripetal's effort to narrow its claims to avoid obviousness, the Board noted that the '856 patent specification does not describe applying the listed packet-filtering rules directly to encrypted packets. Appx23-24. The specification instead describes filtering encrypted packets by either (a) applying the rules to unencrypted packets, which are then correlated with encrypted packets in the same packet flow, or (b) decrypting the packets via the proxy system and applying the rules to the decrypted packets. *Id.* The Board found that Buruganahalli satisfies the "filtering" requirement in the first way, by

applying the packet-filtering rules to the unencrypted handshake packets and correlating them with the encrypted packets in the same flow/session, just like the '856 patent. Appx44; Appx49; Appx56-57. The Board expressly stated that it reached no conclusion regarding the patent's compliance with 35 U.S.C. § 112. Appx24 n.7 ("We do not consider whether these issues might give rise to a problem under 35 U.S.C. § 112 because this proceeding is limited to grounds 'that could be raised under section 102 or 103.' *See* 35 U.S.C. § 311(b).").

The Board also found that Centripetal failed to establish objective indicia of non-obviousness. Appx50-54. The Board found Centripetal's assertions of long-felt need and industry praise unsupported, and separately that Centripetal failed to show the required nexus to the claimed invention. Appx51-54. The Board also rejected Centripetal's copying argument, which was based entirely on findings in the vacated district court opinion in *Cisco*; Centripetal had not provided evidence or argument for the Board to make its own factual findings regarding copying. Appx54. The Board also noted that, even had objective indicia of non-obviousness been proven, it still would have held the challenged claims unpatentable because "Buruganahalli presents a strong case of obviousness and, in fact, is essentially anticipatory." Appx50.

## SUMMARY OF THE ARGUMENT

Centripetal's challenges to the Board's decisions are meritless, and many of them are forfeited. This Court should reject them all.

***First***, the Board did not abuse its discretion in denying Centripetal's recusal motion. The Board appropriately determined that Centripetal unacceptably delayed in filing that motion while it waited to see if the POP or Supreme Court would rule in Centripetal's favor. Because Centripetal shows no abuse of discretion in the untimeliness finding (and, indeed, barely discusses it), this Court need go no further. In any event, Centripetal's challenge to the Board panel's composition fails given ethics regulations specifically permitting an Executive Branch employee (including an APJ) who holds less than $15,000 in a party's publicly traded stock to participate in a matter involving that party. Centripetal gets nowhere by citing other, inapposite regulations or by complaining about the language that the Board used in its decisions, which was far more temperate and measured than the language Centripetal used in its own advocacy.

Separately, there is no valid basis for this Court to vacate the Board's institution decisions, which this Court lacks jurisdiction to review. That remedy would be entirely unwarranted anyway, given that Cisco had ***nothing*** to do with the PAN IPR when it was instituted. Centripetal has not shown, and cannot show,

that allowing the Board's decisions to stand would prejudice Centripetal, produce injustice in other cases, or diminish the public's confidence in IPRs.

*Second*, the Board did not invalidate the challenged claims on written-description grounds. The Board explicitly stated that it did not consider Section 112, but rather based its patentability analysis on obviousness. To that end, the Board analyzed the specification to determine the scope of the "filtering" limitation, concluded that the claims encompassed filtering encrypted packets by correlation with unencrypted packets, and found that Buruganahalli taught just that. Centripetal's manufactured written-description complaint should not distract the Court from the fact that Centripetal does not dispute, and indeed *admits*, that the claims encompass indirect filtering of encrypted packets by correlation with unencrypted packets, as Buruganahalli taught. Because this undisputed point—not some fictional written-description finding—was the basis for the Board's decision, there is no reason to disturb it.

*Third*, substantial evidence supports the Board's conclusion that the challenged claims are unpatentable as obvious over Buruganahalli.

Centripetal inexplicably argues that the Board ignored the claims' plain language. In fact, the Board properly determined that the claim language does not require applying packet-filtering rules directly to encrypted packets—a point that even Centripetal endorses.

Although Centripetal now argues that Buruganahalli's application of packet-filtering rules to the destination domain in the unencrypted handshake message does not constitute filtering by "uniform resource identifier (URI)," Centripetal forfeited this argument by not raising it sooner than the oral hearing, and also forfeited its related claim construction argument by not raising it before the Board at all. Centripetal now seeks to blame PAN and the Board for its forfeiture, but the IPR petition indisputably relied on filtering by the extracted domain name in the unencrypted handshake message—including the URI—to satisfy the filtering requirement. Centripetal has not shown any abuse of discretion in the Board's forfeiture finding. In any event, the Board's finding that Buruganahalli taught the URI limitation is supported by substantial evidence as well.

Lastly, the Board was well justified in rejecting Centripetal's objective-indicia contentions. As to copying, the Board correctly ruled that it could not simply defer to findings in a vacated district court opinion, and Centripetal failed to provide the Board with sufficient evidence or argument from which the Board could find copying on its own. As to long-felt need, the Board found that, to the extent any such need existed, it had already been satisfied by Buruganahalli—another finding supported by more than substantial evidence.

The Court should affirm the Board's final written decision.

## STANDARD OF REVIEW

This Court reviews the "denial of a motion for recusal for abuse of discretion." *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1030 (Fed. Cir. 2022). This Court similarly reviews denials of *pro hac vice* admission for abuse of discretion. *See Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 561-562 (Fed. Cir. 1996). The Court also reviews a determination of forfeiture for an abuse of discretion. *See United States v. Great American Ins. Co. of N.Y.*, 738 F.3d 1320, 1326 (Fed. Cir. 2013). "Abuse of discretion is a highly deferential standard of appellate review." *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017).

"Obviousness is a question of law based on underlying factual determinations." *Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1371 (Fed. Cir. 2023) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007)). This Court reviews the Board's ultimate obviousness determination de novo and underlying factual findings for substantial evidence. *Id.* "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's findings from being supported by substantial evidence." *Id.*

# ARGUMENT

## I. CENTRIPETAL'S OBJECTIONS TO THE BOARD PANEL'S MEMBERSHIP ARE PROCEDURALLY BARRED AND LACK MERIT

### A. Centripetal Has Not Shown Any Error In The Board's Untimeliness Finding

Centripetal largely glosses over an independent ground supporting the Board's denial of Centripetal's recusal motion:  Centripetal unduly and strategically delayed filing the motion, which the Board found untimely.  The Board acted well within its discretion in determining that Centripetal's "unjustified delay in raising the [recusal] issue would bar the relief … being sought."  Appx82.

Centripetal concedes that it became aware of the facts underlying its recusal motion by September 29, 2022.  Appx81 (citing Appx6367).  Yet Centripetal did not file its recusal motion until December 30, 2022.  Appx6363.  Centripetal has not demonstrated any error—let alone an abuse of discretion—in the Board's determination that Centripetal's recusal motion was untimely because Centripetal "sat on" the relevant information "for more than *three months*."  Appx81 (emphasis in original).

Centripetal's discussion of its delay is unavailing.  In its mandamus petition, Centripetal asserted that it had a hard time accessing APJ McNamara's financial disclosures.  Appx6951.  But any difficulty in obtaining the information does not explain Centripetal's delay ***after*** September 29, 2022, when Centripetal admits

having the information it needed.  And it certainly does not explain the delay after November 9, 2022, when Centripetal made statements about APJ McNamara's stock holding in its Supreme Court reply brief, which recognized that the stock holding was ***permissible***.  Appx6692.

Centripetal now tells this Court (at 37) that it spent the three months "researching the conflict and requesting additional financial disclosures" and that it needed time to "complete[] its due diligence."  But Centripetal has never identified any ***specific*** information that it supposedly needed and sought after September 29, 2022.  And Centripetal clearly completed enough "due diligence" by November 9, 2022, when its Supreme Court reply brief relied on APJ McNamara's stock holding.  *See* Appx6692-6693.  Centripetal has never explained why it was comfortable referencing APJ McNamara's stock holding before the Nation's highest court in early November, yet waited over ***seven more weeks*** before raising it before the Board.  The answer is readily apparent, as the Board noted: Centripetal acted strategically, allowing the Board to continue its work while waiting to see whether the Supreme Court would grant certiorari in the *Cisco* litigation or whether institution of the PAN IPR might be reconsidered.  *See* Appx82.  In other words, Centripetal lay in wait to determine if it could prevail on other grounds, and it pursued the recusal motion—with arguments contradicting its

arguments before the Supreme Court—only after its other efforts failed.  As the Board determined, Centripetal's approach was "highly inappropriate."  *Id.*

Centripetal unpersuasively dismisses case law holding that recusal motions must be filed promptly.  *See* Br. 37; Appx82 (citing *United States v. Owens*, 902 F.2d 1154, 1155 (4th Cir. 1990); *In re United Shoe Mach. Corp.*, 276 F.2d 77, 79 (1st Cir. 1960)).  According to Centripetal (at 37), those cases "involve[d] litigants … waiting for the adjudicator to issue its decision before seeking recusal."  But Centripetal *did* wait until after the Supreme Court and the POP issued adverse decisions before Centripetal sought recusal.  Further, given that the POP is part of the Board, Centripetal's contention (at 37) that it "filed its motion before the Board issued any further rulings or orders in the IPR" is incorrect.

Moreover, Centripetal shows no reason why strategic delay in raising a purported conflict should be countenanced when the strategy depends on awaiting the decision of *another* tribunal as opposed to a decision of the *same* tribunal.  Parties should request recusal as soon as the basis for the request is known, so that the affected tribunal can consider the matter and, if necessary, stop work on the case.  *Any* strategic delay in raising the issue is unacceptable.

Nor does case law suggest that a recusal motion can be held untimely only if a party "sit[s] on disqualifying information for years."  Br. 37.  What matters is whether, in the context of the case, the delay was unacceptably long.  *See United*

*Shoe*, 276 F.2d at 79; *Owens*, 902 F.2d at 1156. In context, three months can be unacceptably long. *E.g.*, *United States v. Kelley*, 712 F.2d 884, 887-888 (1st Cir. 1983) (holding that three-month delay in filing recusal motion "would be sufficient reason to dismiss th[e] appeal"). Likewise here, the Board found that Centripetal's delay was unacceptable given the circumstances in this case, including Centripetal's ongoing litigation during the three-month period between September 29 (when Centripetal learned of the information) and December 30, when Centripetal filed its motion.

The abbreviated timeline for IPRs underscores why Centripetal cannot identify any infirmity, let alone an abuse of discretion, in the Board's untimeliness determination. When an IPR petition is filed, the Board must issue its institution decision within three months of the patent owner's preliminary response. 35 U.S.C. § 314(b). After the Board instituted the PAN IPR, and after Cisco and Keysight filed their substantively identical IPR petitions, Centripetal filed preliminary responses on October 6 and 7, 2022. Appx8657; Appx9524. Accordingly, the Board was statutorily obligated to issue its institution decisions (and the associated rulings on the joinder motions) no later than January 6 and 7, 2023. By waiting to file the recusal motion on a Friday before the New Year's holiday weekend, Centripetal squeezed the Board by presenting it with new issues to consider as it was finalizing its institution decisions before their statutory

deadlines.  The Board was well within its discretion not to countenance such

gamesmanship.

Because the Board's untimeliness ruling provided an independent basis for

denying Centripetal's recusal motion, this Court need not reach the merits of

Centripetal's challenge to the Board panel's composition.  In the interests of

completeness, however, Appellees address Centripetal's remaining arguments.

**B.      Centripetal Has Not Shown Any Abuse Of Discretion In The Board's Evaluation Of Centripetal's Recusal Motion**

In its certiorari reply before the Supreme Court, Centripetal conceded that

APJs who own less than $15,000 in a party's publicly traded stock are free to hear

a case involving that party.  Appx6692.  Centripetal now changes its tune (at 30-

31), suggesting that *any* stock holding in a party raises an appearance of bias

requiring recusal.  Centripetal's new position is meritless.

The relevant regulation unambiguously states:

> An employee *may participate* in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership by the employee … of securities issued by one or more entities affected by the matter, if:
>
> > (1) The securities are publicly traded … and
> >
> > (2) The aggregate market value of the holdings of the employee … in the securities of all entities does not exceed $15,000.

5 C.F.R. § 2640.202(a).  There is no dispute that APJ McNamara's stock holding

satisfied these criteria.  *E.g.*, Appx6372-6373.  Thus, even after Cisco sought to

join the PAN IPR, APJ McNamara's "Cisco stock is plainly not disqualifying under the rules." Appx71.

Other regulations incorporate Section 2640.202 by reference and reinforce that APJ McNamara's participation was permissible. Notably, 5 C.F.R. § 2635.402(d) states that "[a]n employee who would otherwise be disqualified by 18 U.S.C. 208(a) may be ***permitted to participate*** in a particular matter where the otherwise disqualifying financial interest is the subject of a regulatory exemption," and identifies the exemptions as located in "subpart B of part 2640," which includes Section 2640.202. The regulation also notes that the exemptions in Part 2640, including Section 2640.202, reflect the Office of Government Ethics's determination "that particular interests are too remote or too inconsequential to affect the integrity of the services of employees." 5 C.F.R. § 2635.402(d)(1).

Centripetal wrongly tries to write off Section 2640.202 as only a "safe harbor" from criminal liability. Br. 29-30. But the regulation does not merely shield employees from criminal liability; it affirmatively states that the employee "***may participate***" in the matter if the regulation's conditions are met. 5 C.F.R. § 2640.202(a). And although the regulation appears in Part 2640, the title of which refers back to 18 U.S.C. § 208, that statute is intended "to protect governmental processes from actual ***or apparent*** conflicts of interests." 5 C.F.R. § 2640.101. The Office of Government Ethics thus designed the exemptions in Part 2640 to

delineate financial interests that are "too remote or too inconsequential" to give rise to any actual—or even apparent—conflicts. *Id.*; *see also* Appx69. Section 2640.202 is thus not just a safe harbor from criminal liability, but a bright line that makes clear the ethical obligations for Executive Branch employees.

Centripetal gets nowhere by citing overarching principles, such as the following:

> As provided in the Standards of Conduct at part 2635 of this chapter, employees must endeavor to act at all times in the public's interest, avoid losing impartiality or appearing to lose impartiality in carrying out official duties, refrain from misusing their offices for private gain, serve as good stewards of public resources, and comply with the requirements of government ethics laws and regulations, including any applicable financial disclosure requirements.

5 C.F.R. § 2638.102. Of course, institution of the PAN IPR did not violate this principle, because Cisco was not a party to the PAN IPR when it was instituted. No reasonable observer would believe that APJ McNamara instituted the PAN IPR to increase the value of his *de minimis* stock holding in what was, at the time, an unrelated third party. Contrary to Centripetal's assertion (at 19), it does not matter that Centripetal had accused Cisco of infringing the '856 patent, because a separate regulation expressly states that an Executive Branch employee who holds stock in a publicly traded ***nonparty*** may make decisions affecting that nonparty as long as the stock is worth less than $25,000. 5 C.F.R. § 2640.202(b). There is no question that APJ McNamara's stock holding fell below that threshold.

Moreover, as the Board explained, Section 2638.102's cross-reference to "part 2635" shows that Executive Branch employees meet their obligations by complying with that part's more specific requirements. Appx7013-7014. Those requirements include the disqualification obligation in Section 2635.402(c), which in turn incorporates the $15,000 exemption in Section 2640.202. The Board explained this proper reading of Section 2638.102 to Centripetal in denying its motion for a stay pending its failed mandamus petition. *Id.* On appeal, Centripetal merely repeats its failed argument without addressing the Board's reasoning.

Centripetal cites (at 30) another regulation with a similarly broad scope: "Employees shall not hold financial interests that conflict with the conscientious performance of duty." 5 C.F.R. § 2635.101(b)(2). But this regulation is merely a "general principle[]" that applies only "[w]here a situation is not covered by the standards set forth" in Part 2635. *Id.* § 2635.101(b). Given that Section 2635.402(c) addresses the situation presented here, and given that neighboring Section 2635.402(d) then incorporates the exemptions in Section 2640.202, Section 2635.101 does not apply by its own terms. Again, the Board pointed this out to Centripetal, Appx7014, but Centripetal simply ignores the Board's reasoning.

Adding to its jumble of citations, Centripetal invokes (at 30) yet another regulation:

This subpart contains two provisions intended to ensure that an employee takes appropriate steps to avoid an appearance of loss of impartiality in the performance of his official duties. Under § 2635.502, unless he receives prior authorization, an employee should not participate in a particular matter involving specific parties which he knows is likely to affect the financial interests of a member of his household … if he determines that a reasonable person with knowledge of the relevant facts would question his impartiality in the matter.

5 C.F.R. § 2635.501. But as the Board explained, the associated examples for this regulation make clear that it "generally addresses situations in which an executive branch employee is dealing with a matter, such as work on legislation or a lease, that may affect someone with whom the employee has a personal or business relationship." Appx7015 (citing Appx69). It does not make sense to look to this regulation about legislation and leases when Section 2640.202 specifically addresses ownership of publicly traded stock. And although Centripetal claims (at 31) that all it received from the Board was a "casual dismissal of all these regulations," Centripetal in fact received two Board decisions with extensive discussion of the regulations that Centripetal cited. *See* Appx68-77; Appx7010-7019.

Centripetal insists that APJs are just different, even though other Executive Branch employees—such as administrative law judges and immigration judges— also oversee adversarial processes that "decide legal questions." Br. 32. And even if there were something special about APJs, Centripetal never explains how that

difference is ***legally relevant*** under the applicable ethics regulations.  Indeed,

Centripetal previously admitted that the ethics regulations apply to APJs just as

they apply to all other Executive Branch employees.  Appx6692.

Despite Centripetal's protestations (at 34), the Director's recent guidance

does not support Centripetal.  If anything, the guidance supports the Board's

decision, as the Director reads the ethics regulations in the same way as the Board

panel in this case:  "The executive branch ethics regulations … deem certain

financial interests too small to undermine public trust in the integrity of

government decision-making and accordingly provide exemptions to permit an

employee to hold *de minimis* financial interests and still work on matters that could

affect those interests."  Vidal, *Memo to Members of the Patent Trial and Appeal

Board and the Trademark Trial and Appeal Board* 1 (Sept. 22, 2023) ("PTO

Mem.").  The guidance reiterates that "PTAB … judges ***may hear a case*** if their

aggregate holdings in publicly traded stocks in the parties before them do not

exceed $15,000."  *Id.* at 2 (citing 5 C.F.R. § 2640.202).  According to the PTO, this

exemption "has been in force for decades."  *Id.*  Centripetal has not even tried to

explain how the PTO could have misunderstood its ethical obligations for decades.

*See* Appx76-77 (rejecting Centripetal's arguments that essentially asked the Board

to hold the longstanding ethics regulations unconstitutional).

Regardless, the PTO guidance does not apply here, as it states that the PTO "will not revisit any prior decisions … in which [its] judges complied with the applicable ethics rules." PTO Mem. 4. Moreover, the guidance goes above and beyond what is required by law. *Id.* at 3 (the guidance "does not in any way alter the ethics standards" and "is intended to avoid paneling judges in a way that might elicit concern, even if they are in full compliance with all ethics statutes and regulations"). The PTO is well within its authority in taking steps to shield itself from ***future*** meritless ethics challenges, and does not thereby acknowledge that ***past*** meritless challenges like Centripetal's are anything other than meritless.

### C. The Board Did Not Abuse Its Discretion In Denying Centripetal's *Pro Hac Vice* Motion

Although Centripetal does not specifically appeal the Board's denial of Mr. Andre's *pro hac vice* motion, Centripetal intimates that the Board somehow acted unfairly in addressing the issue. Br. 32 (the Board "gratuitously denied [the] unopposed *pro hac vice* motion by Centripetal's lead trial lawyer"). Even a cursory review of the order reveals that it was not "gratuitous," but amply justified, and that Centripetal was permitted to (but chose not to) refile its motion if Mr. Andre's admission was "critical" to the case. Appx6783.

As a preliminary matter, Centripetal is incorrect (at 32) in calling the motion "unopposed." To be sure, PAN did not oppose the motion when Centripetal first filed it. *See* Appx6288. But after Mr. Andre repeatedly flouted the Board's rules,

PAN withdrew its consent.  Appx6781; Appx6785-6786.  Thus, when the Board ruled on the motion, it was opposed.  Appellees pointed this out in opposing Centripetal's mandamus petition, yet Centripetal inexplicably continues to mischaracterize their position.  No. 2023-127 (Fed. Cir.), Dkt. 19 at 30 n.6.

The Board's denial of Mr. Andre's *pro hac vice* motion was also amply justified by his pattern of misconduct.  As the Board explained, a district court sanctioned Mr. Andre for leveling "baseless attacks on the integrity" of the court and "the reputation of … counsel," including "accusing … counsel of engaging in [misconduct], without any evidentiary support."  Appx6781-6782 (quoting *Freshub*, 576 F. Supp. 3d at 466).  Not long before that, another district court reprimanded Mr. Andre because his "conduct was improper and frustrated the fairness of the proceedings."  Appx6782 (quoting *Finjan*, 2021 WL 3140716, at *4).  In his declaration supporting the *pro hac vice* motion, Mr. Andre identified the sanctions imposed against him in *Freshub* but concealed the court's criticism of his behavior in *Finjan*.  *See* Appx6294-6295.

The Board also relied on Mr. Andre's misconduct in the PAN IPR itself.  Despite attesting under penalty of perjury that he had read the Board's rules and would abide by them, Appx6295-6296, Mr. Andre filed Centripetal's recusal motion "without authorization … and without the meet and confer that is required before bringing matters to the Board," Appx6782.  Moreover, Mr. Andre signed

the motion and the reply "without being admitted to practice before the Board," and "corresponded with the Board" to seek a stay of proceedings "without being admitted." Appx6782-6783.

After cataloguing these ample bases for its decision, the Board explained that denying Mr. Andre's admission *pro hac vice* would not cause Centripetal significant prejudice "given the advanced stage of th[e] proceeding, the fact that Mr. Andre [was] seeking admission as backup counsel only, and the fact that [Centripetal was] still represented by six other attorneys, including three from Mr. Andre's firm." Appx6783. The Board also gave Centripetal the option to renew its motion. *Id.* Centripetal did not, and it fails to identify any prejudice from Mr. Andre's non-participation in the IPR.

Centripetal does not contest that the Board has discretion to decide whether an attorney not admitted to the PTAB bar should be permitted to appear *pro hac vice. See* 37 C.F.R. § 42.10(c); *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 561-562 (Fed. Cir. 1996) (upholding district judge's order permanently banning attorney from appearing before him *pro hac vice*). Centripetal should not be permitted to develop any arguments regarding the *pro hac vice* denial for the first time in reply. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

**D.    Centripetal's Complaints About The Board's Language Are Unfounded And Irrelevant**

Contrary to Centripetal's inflamed rhetoric, the Board did not punish Centripetal for raising a recusal issue. *See* Br. 20 (the Board was "[t]hreatening [r]eprisals"), Br. 28 (the Board was "[a]ttacking Centripetal"), Br. 31-32 (the Board "gratuitously denied" Mr. Andre's *pro hac vice* motion), Br. 37 n.3 (the Board made a "veiled threat of criminal repercussions").[3]  Nor did the Board sanction Centripetal.  Although the Board criticized Centripetal's advocacy, it was not because Centripetal had the "temerity" to file a recusal motion, *see* Br. 29, but because the ***arguments*** Centripetal raised were "frivolous," Appx73.

Notably, Centripetal's advocacy uses extreme language that goes far beyond anything in the Board's decisions.  *E.g.*, Br. 1 (the Board gave Centripetal "a tongue-lashing for … raising the [recusal] issue"), Br. 21 (the Board "responded … with defensiveness and vitriol"), Br. 28 (Centripetal's motion was "lambasted"), Br. 29 (the Board issued an "intemperate decision" and "chastised Centripetal"), Br. 31 (Centripetal "deserve[d] a respectful hearing, rather than a scolding"), Br. 37 (the Board "denounced" Centripetal's approach).  In fact, the Board's decisions were comprehensive, measured, and well-reasoned—especially considering that Centripetal's arguments were "frivolous."  Appx73.  In any event, even if

---

[3] *See also* Appx6921 (Centripetal "was punished"); Appx6936 (the "message to Centripetal" was "unmistakable"); Appx6952 ("fear of retribution").

Centripetal's mischaracterizations of the Board's prose were accurate, they would

not warrant vacatur.  This Court, like all appellate courts, reviews judgments, not

opinions.  *See, e.g.*, *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373,

1377 (Fed. Cir. 2016).

### E.    The Court Should Not Vacate The Board's Institution Decisions

Centripetal's request (at 35-39) that this Court vacate the Board's decisions

instituting IPR ignores that the Court lacks jurisdiction to do so.  35 U.S.C.

§ 314(d) ("The determination … whether to institute an inter partes review … shall

be final and nonappealable."); *Thryv, Inc. v. Click-to-Call Techs., LP*, 140 S. Ct.

1367, 1373 (2020) ("a party generally cannot contend on appeal that the agency

should have refused to institute an inter partes review" (quotation marks omitted)).

A patent owner is therefore entitled to only one appeal from a final written

decision by the Board, typically focused on patentability.  35 U.S.C. § 319; *see*

*also Thryv*, 140 S. Ct. at 1376 (Congress sought "to avoid the significant costs …

of nullifying a thoroughgoing determination about a patent's validity" based on an

alleged defect in the institution decision).  While Centripetal can seek this Court's

review of the unpatentability of its claims, it cannot relitigate the Board's

preliminary decisions to begin the IPR proceedings in the first place.

Section 314(d)'s jurisdictional bar "applies where the grounds for attacking

the decision to institute inter partes review consist of questions that are closely tied

to the application and interpretation of statutes related to the Patent Office's decision to initiate inter partes review." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 274-275 (2016). Centripetal's challenge here is "closely tied" to the application of statutory provisions regarding the institution of IPRs. Indeed, rather than seeking mere vacatur of the final written decision, Centripetal takes direct aim at the Board's ***institution*** decisions, which Centripetal believes were "tainted." Br. 35-36. Centripetal's argument is essentially that the Director never should have permitted APJ McNamara to be empaneled on this IPR. That is an attack on the Director's delegation to the Board of her authority to institute IPR, implicating numerous institution-related statutory provisions and regulations. 35 U.S.C. §§ 314(a)-(b), 316(a)(2), (4); 37 C.F.R. § 42.4(a). That is precisely the type of discretionary decision that Congress intended Section 314(d) to bar from judicial review.

The Supreme Court has left open the possibility—but has not conclusively decided—that an institution decision might be reviewable if it "implicate[s] constitutional questions," "depend[s] on other less closely related statutes," or "present[s] other questions of interpretation that reach … well beyond" Section 314(d). *Cuozzo*, 579 U.S. at 275. The Court need not probe the contours of this potential exception, as Centripetal has not even bothered to explain how its challenge could fall within it. Indeed, Centripetal does not address jurisdiction at

all, even though Centripetal's mandamus petition acknowledged the potential

exception explained in *Cuozzo*, Appx6947, and Appellees raised the jurisdictional

issue in opposing mandamus, No. 2023-127 (Fed. Cir.), Dkt. 19 at 22.

In any event, vacatur of the Board's institution decisions would be improper

even if there were jurisdiction. PAN filed its IPR petition without input from any

third party (including Cisco), following Centripetal's sponsoring of testimony

suggesting PAN's infringement. Appx4143-4144; Appx4146; Appx6669. The

Board instituted review before Cisco ever became involved. Under Centripetal's

theory, the earliest point at which APJ McNamara possibly could have had some

type of conflict (though he had none) was when Cisco filed its substantively

identical IPR petition and motion for joinder on June 24, 2022, but that would not

justify vacating the prior institution decision for the PAN IPR, which was issued

on May 25, 2022.

There is also no good reason to vacate the Board's decisions granting

Cisco's and Keysight's joinder motions. Because Cisco and Keysight filed

substantively identical IPR petitions, the Board's decisions on the joinder motions

were just logical extensions of the Board's decision instituting the PAN IPR. *See

supra* p. 19. Regardless, Centripetal suffered no prejudice from the joinder

decisions, as Centripetal has no right to choose its adversaries in a properly

instituted IPR brought by a non-time-barred petitioner, where other petitioners

merely stand by as understudies.  *See VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*, 778 F. App'x 897, 901-902 (Fed. Cir. 2019) (finding no prejudice to patent owner where joined IPR petition "did not add any issues to the proceedings" and involved "the same challenges" as the original petition), *pet. for cert. filed*, No. 23-315 (U.S.).

Centripetal cites *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), yet even Centripetal acknowledges (at 35) that *Liljeberg*'s factors are for "'consider[ing] … whether to vacate a ***judgment***,'" not an interlocutory decision like an institution decision.  In any event, Centripetal has not shown any "risk of injustice."  *Liljeberg*, 486 U.S. at 864.  Centripetal received a final written decision on the patent merits from three neutral APJs.  Centripetal suffered no cognizable prejudice from APJ McNamara's participation at the institution stage, especially because the Board instituted the PAN IPR before Cisco was ever involved.  Centripetal's citation (at 36) to *Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016), is self-defeating, as the Supreme Court held that even a ***constitutional*** violation could be remedied by rehearing the case before the disqualified judge's colleagues, notwithstanding the state's argument that the other judges "may still be influenced by their colleagues' views."  Centripetal received even more than that here: a full hearing on the merits by three APJs, two of whom (APJs Wormmeester and Khan) were never on the panel with APJ McNamara.  By contrast, Appellees

would certainly suffer prejudice if they had to expend resources proving the claims' unpatentability *again*, where there is no basis to question the impartiality of the panel that has already held them unpatentable.

Centripetal also cannot show that the denial of its requested relief "will produce injustice in other cases." *Liljeberg*, 486 U.S. at 864. Contrary to Centripetal's argument, this case is nothing like the situation faced in this Court's *Cisco* decision, where the stock holding violated a statutory mandate when the relevant decisions and judgment were issued. Here, the decision instituting the PAN IPR was issued before Cisco had even filed its petition or joinder request, so there was not even an arguable appearance of bias.

Allowing the Board's final written decision to stand likewise poses no "risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. The public can rest assured that the Board has complied with all governing ethical regulations. In fact, as Centripetal points out (at 38), the PTO's guidance now goes even *further* than the ethics rules require.

Lastly, Centripetal once again seeks to relitigate the *Cisco* appeal. Centripetal plainly believes that this Court and the Supreme Court abdicated their judicial responsibility and inflicted a "painful experience" on Centripetal. Br. 1 (lamenting that Centripetal's "judgment was wiped out without even considering the merits" and that Centripetal was "subjected … to a wholly unjustified double

standard"). Centripetal's grievance in that case is no reason to grant it special treatment in this case.

Centripetal repeatedly insinuates that, because the district judge in *Cisco* was disqualified, APJ McNamara should have been disqualified as well. *E.g.*, Br. 1, 4, 25, 28, 38-39. But Centripetal does not and could not argue that the bright-line recusal obligation of 28 U.S.C. § 455(b) applied in *Cisco* somehow applies here; it clearly does not. Centripetal requests relief based on an "appearance" of partiality (*e.g.*, Br. 2, 25, 29), an accusation not raised in the *Cisco* appeal, as Centripetal itself insisted. *See Cisco*, No. 2021-1888 (Fed. Cir.), Dkt. 64 at 7 (arguing that Cisco "waived any claim of bias or even appearance of bias under § 455(a)"). *Cisco* therefore says ***nothing*** about whether an APJ should recuse based on a stock holding that falls below the applicable regulations' $15,000 threshold.

*Cisco* and this case are also different in how the relevant adjudicators approached the issue. The *Cisco* district judge retained the case after discovering the conflict—going so far as to enter judgment and deny post-judgment relief. 38 F.4th at 1037. Here, APJs McNamara and Amundson withdrew before any substantive ruling on the patentability merits. Even though there was not even an appearance of bias warranting their recusal, they exercised their discretion to withdraw to simplify the proceedings. Appx6652; Appx6702. As a result, the final written decision—the only decision on the patentability merits—was issued

by a panel whose impartiality cannot reasonably be questioned.  No legal principle requires a remand in this situation.

## II.  THE BOARD MADE NO "WRITTEN DESCRIPTION" FINDING

Centripetal's lead argument on the merits challenges a finding the Board never made, namely "that the '856 patent does not contain an adequate written description of 'applying the claimed rules to encrypted packets.'"  Br. 40. Centripetal is wrong for numerous reasons.

First and foremost, the Board made abundantly clear that it made no written-description finding:  "***We do not consider whether these issues might give rise to a problem under 35 U.S.C. § 112*** because this proceeding is limited to grounds 'that could be raised under section 102 or 103.'"  Appx24 n.7 (citing 35 U.S.C. § 311(b)).  This is the only mention of Section 112 in the Board's 58-page final written decision.  Centripetal tries (at 46) to explain away the Board's statement as an attempt to "fool[]" this Court, but provides no explanation for this baseless assertion.

The Board's decision makes clear that the discussion of the '856 patent's specification and the examiner's amendment in the file history was not to evaluate written-description support, but to determine the scope of the claimed "filtering" requirement and whether Buruganahalli already taught it.  The Board focused on the claim language, which does not require applying packet-filtering rules ***directly***

to encrypted packets, but merely filtering those packets "***based on***" one or more specified rules. Appx41; Appx44; Appx49; Appx56-57. As additional support, the Board noted that Centripetal's efforts to narrow the claims to implementations where packet-filtering rules were applied directly to encrypted packets were unsupported by the specification, which describes "filtering encrypted packets … by *correlation*" with unencrypted packets, "not by applying rules directly to encrypted packets." Appx24 (emphasis in original); *see also* Appx44 ("the '856 patent does not describe applying rules to encrypted [packets]"). The Board also noted that the examiner's amendment during prosecution added five specific packet-filtering rules that the specification described as applying only to decrypted (not encrypted) packets, thus confirming the Board's understanding that the claimed rules need not be applied ***directly*** to encrypted packets, but rather could be applied directly to unencrypted packets and, by correlation, to the associated encrypted packets. Appx23-24. Having found that the '856 patent's claim language, specification, and file history encompass filtering encrypted packets by correlating them with unencrypted data in other packets, the Board found that Buruganahalli's hello-message technique filtered encrypted packets in exactly the same way. Appx34; Appx43; Appx49. Thus, the Board's ultimate unpatentability analysis rested on its finding that Buruganahalli disclosed the filtering limitation as that limitation is claimed in the '856 patent. No "written description" finding was

made or relied on; the finding is one of obviousness over Buruganahalli's similar disclosure.

Centripetal was not deprived of due process (Br. 40-44) because it could and did respond to the actual unpatentability contention, which was that Buruganahalli disclosed filtering encrypted packets by correlating them with unencrypted handshake packets in the same flow/session, where those unencrypted packets were flagged for further analysis based on their extracted domain name. Appx4656 (Centripetal acknowledging petitioner's argument that "the destination domain in the handshake message and encrypted data are correlated"); Appx4651-4652 (Centripetal acknowledging petitioner's argument that "Buruganahalli discloses filtering 'encrypted data communications after a determination that the handshake traffic corresponds to a network-threat indicator'"); Appx397 (petition arguing that Buruganahalli teaches filtering encrypted packets "because the handshake message comprises data (e.g., destination domain) that also applies to the encrypted data of the session, such that the security risks associated with the handshake message and encrypted data are correlated"); *see also* Appx4642-4655 (patent owner response repeatedly acknowledging petitioner's filtering arguments).

Centripetal suggests (at 41) that PAN never argued that the '856 patent did not disclose applying rules directly to encrypted packets, but PAN repeatedly emphasized that both Buruganahalli and the '856 patent disclose filtering

encrypted packets based on data from the unencrypted handshake. Appx6077 ("Like the '856 patent, Buruganahalli filters an unencrypted hello message of a handshake exchange to extract a destination domain, in order to determine (according to a security policy) whether to establish a secure session for the associated encrypted traffic and filter that encrypted traffic for routing to a proxy for further processing."); *see also* Appx6078-6079; Appx6081.

Tellingly, despite railing against the Board's discussion of the claim scope, Centripetal's appeal brief stops carefully short of arguing that the Board was *wrong* in stating that the claims are not limited to implementations where the packet-filtering rules are applied directly to encrypted packets. Indeed, Centripetal says the opposite:

> [T]he packet-filtering system *can assume* an encrypted packet has similar data to a related packet that was previously decrypted, and then apply the rules based on that data to filter the encrypted packet without decrypting it. *The claims do not require the rules to analyze the encrypted payload portion of the encrypted packets*; they require that the rules (1) specify the claimed data and (2) are *a basis* for filtering the encrypted packets.

Br. 49. Centripetal made a similar admission before the Board:

> This ['856 patent] *filtering includes correlating the encrypted packets with* previous packets (e.g., *previous unencrypted packets*) *determined to comprise data corresponding to network threat indicators* and then logging or dropping the encrypted packets.

Appx4631 (citing Appx5946-5947(¶¶64-66)).

Centripetal's admissions regarding the challenged claims' breadth are important, as they reinforce the correctness of the Board's rejection of Centripetal's assertion that Buruganahalli was required to disclose applying packet-filtering rules directly to encrypted packets—an implementation that the '856 patent does not disclose and to which it is not limited. Nonetheless, Centripetal tries to have it both ways, insisting that "the critical contested issue was whether Buruganahalli 'disclose[s] applying the claimed rule set to encrypted packets'"—and even asserting that "[t]he Board recognized as much," as though the Board agreed that the claims were limited to such an implementation. Br. 41 (citing Appx4). But the Board "recognized" no such thing. Rather, it stated that Centripetal's "***primary argument*** [was] that Buruganahalli does not disclose applying the claimed rule set to encrypted packets" and found that argument "unpersuasive" because—as Centripetal admits in the passages block-quoted above—the '856 patent itself is not so limited. Appx4.

Centripetal's failure to challenge the Board's actual understanding of the '856 patent claims and specification is not surprising, for two reasons. First, were the challenged claims limited to implementations where packet-filtering rules were applied directly to encrypted packets, that would defeat Centripetal's infringement contentions in the *Cisco* litigation, where Centripetal accuses rules that are applied not to encrypted packets, but to information in NetFlow records, which are not

even packets but merely logs that summarize the unencrypted information of entire packet flows. Appx3266-3268; Appx3288-3289. And second, the Board's understanding of the claim scope was plainly correct. The specification does not describe directly applying any of the five claimed packet-filtering rules to encrypted packets. To the extent Centripetal suggests otherwise (Br. 49), it is wrong: none of its citations to the '856 patent mentions the five packet-filtering rules, much less applying any of them directly to encrypted packets. *See* Appx93-94; Appx107; Appx109('856 patent Figures 3B and 3C, 9:66-10:14, 14:3-34). The only mention of these rules in the specification is in step 22, Appx108(11:23-28), which acts on ***unencrypted*** data, Appx107-108(10:56-11:28) ("at step #22 … packets traversing the communication link may comprise unencrypted data"); Appx16-17 (describing step 22 as "acting on unencrypted packets").

Thus, as the case now stands on appeal, Centripetal does not point to any actual substantive error in the Board's understanding of the claims' scope, and affirmatively agrees with the Board's bottom-line determination that the packet-filtering rules need not be applied ***directly*** to encrypted packets, but rather can be applied to unencrypted data that is then correlated with encrypted packets in the same flow. That undisputed point—not any unstated "written description" finding—was the basis of the Board's obviousness determination.

### III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S DETERMINATION THAT THE CHALLENGED CLAIMS ARE UNPATENTABLE AS OBVIOUS OVER BURUGANAHALLI

#### A. Buruganahalli Discloses Rule-Based Filtering Of Encrypted Packets, As Recited In The Challenged Claims

##### 1. The Board's "filtering" analysis properly applied the claims' plain language

Centripetal argues that the Board's analysis of the filtering limitation "disregarded the challenged claims' plain language," Br. 47, but the opposite is true.

The claimed filtering of encrypted packets "based on at least one" packet-filtering rule, on its face, does not require applying any rules directly to the encrypted packets; it requires using at least one of the rules, directly *or indirectly*, to filter encrypted packets.  As quoted above (p. 55), Centripetal seems to agree. Br. 49; Appx4631 (citing Appx5946-5947(¶¶64-66)).

Indeed, even Centripetal's discussion of the specification describes *indirect* application of packet-filtering rules to encrypted packets, consistent with the Board's understanding of the claims' scope.  Centripetal summarizes steps 19 and 35 as determining whether encrypted packets constitute threats by "*correlating* the

packets with one or more packets previously determined … to comprise data corresponding to the network-threat indicators."  Br. 48.[4]

The Board correctly found that Buruganahalli taught filtering encrypted packets by subjecting them to "further analysis" based on their correlation with unencrypted handshake packets containing suspicious domain names.  Appx46; Appx34; Appx42-44; Appx49; *supra* pp. 7-9.  Centripetal does not even attempt to analyze the claim language or explain why substantial evidence does not support the Board's finding that Buruganahalli satisfies it.  Br. 47-50.

> ### 2. Substantial evidence supports the Board's finding that Buruganahalli discloses filtering by "Uniform Resource Identifier"

Centripetal next argues that the Board erred "by equating the 'domain name' that Buruganahalli extracts from the handshake traffic with the URI that the '856 patent uses to filter encrypted packets."  Br. 50-53.  That argument is both forfeited and meritless.

> #### a. Forfeiture

The Board correctly found that Centripetal forfeited any challenge to Buruganahalli's disclosure of filtering based on a URI.  Appx44.  Despite the

---

[4] Centripetal's inclusion of "drop[ping] the packets" as supposedly part of the "filtering" limitation (Br. 48) is also contrary to its infringement allegations in the *Cisco* litigation, where Centripetal argued that the act of dropping suspicious packets satisfied the "rout[ing] to a proxy system" limitation, not the "filtering" limitation.  Appx3268; *see also* Appx3283-3287.

Board's warning that "any patentability arguments not raised in the [patent owner] response may be deemed waived," Appx4504, Centripetal did not raise such an argument in its preliminary response, patent owner response, or sur-reply, or in any of its requests for rehearing of any of the three institution decisions. Instead, Centripetal raised it for the first time at the very end of the oral hearing. Appx44; Appx7077-7080(58:24-61:8). *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 85-86 (Nov. 2019) ("During an oral hearing, a party … ***may only present arguments relied upon in the papers previously submitted***."); *Finjan, Inc. v. Cisco Sys., Inc.*, 837 F. App'x 799, 809 n.10 (Fed. Cir. 2020) (patentee forfeited argument by failing to include it in the patent owner response).

Centripetal's related argument that the Board misconstrued "URI" was also forfeited because, as the Board noted, neither party sought a construction of "URI," so the Board was left to apply the term's plain meaning. *See Columbia Ins. Co. v. Simpson Strong-Tie Co.*, 2023 WL 2733427, at *4 (Fed. Cir. Mar. 31, 2023) ("claim construction argument that [patent owner] did not raise before the Board in its patent owner response … is thus forfeited"); *Driessen v. Best Buy Co.*, 2023 WL 2422441, at *2 (Fed. Cir. Mar. 9, 2023) (similar). Centripetal is in no position to dispute the plain meaning applied by the Board (Br. 51-52) because, prior to the oral hearing, Centripetal had not disputed that Buruganahalli taught the URI limitation ***under any construction***.

Centripetal argues (tellingly, in a footnote) that its forfeiture should be excused because the petition supposedly relied on filtering *decrypted* packets by URIs/URLs.  Br. 51 n.5.  But the petition indisputably relied on filtering by the extracted domain name in the *unencrypted* handshake message to meet the filtering requirement.  *See* Appx394 ("Buruganahalli discloses a firewall that filters packets based on identifiers for a 'domain' (*e.g.*, 'uniform resource locator (URL)' specified in the firewall security policies or rules."); Appx1950-1951(¶127) (PAN's expert testifying that the URL/category filtering policy in Buruganahalli is "based on the destination domain"); Appx6077, Appx6079, Appx6081 (PAN's reply reiterating its contention that claimed filtering rules (including URI) are satisfied based on application to the destination domain extracted from the handshake message).  Thus, there could be no doubt that PAN was contending that the URI limitation read on the unencrypted destination domain from Buruganahalli's handshake message.  Appx393-395.  To the extent Centripetal wished to contend that the claimed packet-filtering rules (including the URI limitation) somehow did not read on filtering by the handshake message's domain name, it should have raised that argument long before the oral hearing.

Centripetal also asserts (again, in a footnote) that its *preliminary response* disputed that Buruganahalli taught the URI limitation.  Br. 51 n.5.  But the cited pages (Appx3948-3954) do not even mention URI.  And in any event, raising an

argument in the preliminary response but not the patent owner response does not preserve it. *See Finjan*, 837 F. App'x at 809 n.10 ("argument raised in a preliminary response, but omitted in the patent owner's response, despite the PTAB's 'warn[ing] … that this would result in waiver,' is 'abandoned'" (alterations in *Finjan*) (quoting *In re NuVasive, Inc.*, 842 F.3d 1376, 1381 (Fed. Cir. 2016)).

The likely reason Centripetal did not dispute that filtering by domain name is the same as filtering by URI is that this was the very infringement argument Centripetal advanced in the *Cisco* litigation. Centripetal's technical expert, Dr. Cole, testified repeatedly that filtering by domain name is filtering by URI. *See supra* pp. 14-15.

Notably, Centripetal's forfeiture affected the course of the proceedings. Centripetal's failure to raise a URI dispute led the Board to rely on Buruganahalli's filtering by URI in finding that Buruganahalli taught "at least one of" the claimed packet-filtering rules, but it could just as easily have relied on different rules that Centripetal also did not dispute were taught by Buruganahalli. For example, the petition showed that Buruganahalli taught "filtering … based on data indicating a request (*e.g.*, 'a request to create a secure connection') specified by the plurality of packet-filtering rules." Appx393 (emphasis omitted). Applying Buruganahalli's blacklist policy to the "destination domain" in Buruganahalli's handshake message

clearly constitutes filtering based on "data indicating a request," and Centripetal

never suggested otherwise.  The petition also showed that Buruganahalli filtered

based on "protocol version," Appx395-396, which Centripetal never disputed.

Thus, finding that Buruganahalli teaches filtering based on "at least one of" the

five claimed packet-filtering rules was the only reasonable conclusion the Board

could have reached due to these undisputed facts, and the final written decision

could also be affirmed on this basis.[5]

### b.     *Buruganahalli filters by "URI"*

Regardless of Centripetal's forfeiture, the Board's finding that

Buruganahalli's filtering by destination domain constitutes filtering by URI is

supported by substantial evidence.  Centripetal criticizes the Board's understanding

of a URI as "a 'uniform' way of 'identifying' a 'resource,'" arguing that a URI is

"a far more specific identifier."  Br. 51-52.  But as Centripetal admits, a URI is

broader than a URL—i.e., a URL is but one "example[]" of a URI.  Br. 51 n.5;

Appx394; Appx3762(12:25-27); Appx1950-1951(¶127); Appx7067(48:18-19).

---

[5] *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943), is no barrier to affirmance on
these bases, because Centripetal did not dispute the relevant factual issue
(Buruganahalli's teaching of the other packet-filtering rules).  Accordingly, the
Court may affirm without making "a determination of policy or judgment which
the agency alone is authorized to make and which it has not made."  *Id.*  Were this
Court to vacate the Board's decision based on Centripetal's forfeited URI
argument, it should remand for the Board to consider these alternative bases to find
that Buruganahalli teaches filtering based on other claimed packet-filtering rules.

And although Centripetal says there is "abundant record evidence indicating what a *URI* is and how it differs from a domain name," Br. 52, none of the sources cited in this section of Centripetal's brief defines a *URI* as opposed to the narrower *URL*, Br. 50-53. Accordingly, Centripetal has offered no basis to disturb the Board's reasonable, plain-meaning understanding of "uniform resource identifier (URI)" as "a 'uniform' way of 'identifying' a 'resource,'" and thus no basis to disturb the Board's factual finding that Buruganahalli disclosed filtering by URI.

But even if the claimed URI were limited to its URL subset, substantial evidence still supports the Board's finding. As Buruganahalli taught, the extracted domain name in an unencrypted handshake message is a component of the URL contained in the encrypted packets of the same session/flow. Appx2025(15:38-45) ("blocking the session traffic using the security device is performed if a violation … is determined, in which … the destination domain name extracted from a server name indication (SNI) matches the domain associated with a uniform resource locator (URL) for a session associated with the network communications between the client and the remote server"); Appx2017(Fig.8); Appx1921-1922(¶90); Appx1950-1951(¶127). Thus, when Buruganahalli applied its blacklist policy to the extracted domain name, it filtered based on a component of a URL, which is one way of filtering by URI. Appx1950-1951(¶127) (PAN's expert: "Buruganahalli discloses 'applying a security policy based on the destination

domain to filter traffic at the security device,' such as 'a uniform resource locator (URL)/category filtering policy.'").  This is also consistent with Centripetal's expert's testimony in the *Cisco* litigation that filtering by domain name is filtering by URI.  *See supra* pp. 14-15.

### 3. The Board did not ignore evidence relevant to the challenged claims

Centripetal also asserts that "the Board ignored several other ways that the challenged claims represent 'a significant advancement over the prior art.'"  Br. 53.  However, most of Centripetal's examples are not in the claims, and the Board properly rejected the rest.

Centripetal asserts that "the challenged claims … disclose a method for *ongoing* rule-based filtering of encrypted packets, without decryption, *during* a secure session."  Br. 53 (emphases in original).  Centripetal also contends that its rule-based filtering at step 35 "can account[] for possible rule updates that are received after a secure session is initiated," thus providing "added flexibility."  Br. 54.  But none of this is in the claims, and Centripetal does not attempt to explain otherwise.  Centripetal's patent citations are to the specification, Br. 53-54, and Centripetal did not seek a claim construction on these points.

Centripetal also argues that "Buruganahalli's threshold routing determination rests solely on a top-level domain name," whereas "[t]he challenged claims … apply rules based on multiple different criteria."  Br. 54.  But the Board

found, and substantial evidence shows, that Buruganahalli's routing satisfied the URI packet-filtering rule and "routing" limitations.  Appx43-46; Appx48-50.

Centripetal's reference to "multiple different criteria" for filtering is of no moment, since the claims require using only "at least one of" the five rules, not "multiple" rules.  Likewise, Centripetal's assertions that the '856 patent allows a secure session to be ended after a time or data limit is exceeded, and allows rules to be reconfigured based on log data, Br. 54, recite unclaimed features.

## B.    The Board Properly Weighed Objective Indicia

Finally, Centripetal argues without merit that the Board failed to "meaningfully consider" evidence of supposed objective indicia of non-obviousness.  Br. 55-59.

### 1.    Copying

Centripetal's patent owner response devoted only two paragraphs to its copying argument, relied largely on the factual findings in the vacated *Cisco* district court opinion, and cited fewer than 10 pages from a more-than-3,000-page trial transcript.  Appx4680-4681.  Centripetal did not submit *any* of the exhibits cited by the district court, even after Cisco's petition challenged Centripetal to do so.  Appx7163 ("Centripetal's suppression of what should be its best evidence speaks for itself.  If Centripetal submits that evidence, the PTAB will see that Centripetal's allegations of 'copying' are wholly unsupported.").

The Board properly ruled that it could not simply defer to factual findings in a vacated district court opinion. Appx54. The Board also rightly refused to sift through a 3,000-page transcript—most of which Centripetal had not submitted—without most of the underlying trial exhibits, in order to make factual findings of its own. *Id.* This was especially justified given the scantness of Centripetal's analysis in the patent owner response. Appx4680-4681. Moreover, because the district court found copying in the context of ***willfulness***, Appx3384, it did not analyze the nexus required for objective indicia or tie any supposed copying evidence to any limitation of the '856 patent claims, Appx3388-3389; nor did Centripetal provide such evidence or argument to the Board, Appx4680-4681. In sum, if Centripetal wanted the Board to find copying, it needed to provide evidence and develop argument on that point, rather than cite a vacated and legally insufficient district court opinion.

## 2. Long-felt need

Although Centripetal recounts evidence of supposed long-felt need, Br. 58-59, it fails to establish any error on the Board's part. As Centripetal admits, the Board found that Buruganahalli had already solved the alleged problem, and no nexus to the claimed invention because, in light of Buruganahalli, overcoming any long-felt need could not be tied to any ***novel*** feature in the '856 patent claims. Br. 59; Appx50-54. Because the Board's finding that Buruganahalli disclosed every

feature of the '856 patent claims is supported by substantial evidence, *see supra* pp. 63-65, there is no basis to disturb the Board's finding that Buruganahalli forecloses any finding of long-felt need.

## CONCLUSION

The Court should affirm the Board's final written decision.

Respectfully submitted,

| | |
|---|---|
| /s/ Douglas H. Hallward-Driemeier | /s/ Mark C. Fleming |
| DOUGLAS H. HALLWARD-DRIEMEIER | MARK C. FLEMING |
| ROPES & GRAY LLP | WILMER CUTLER PICKERING |
| 2099 Pennsylvania Avenue NW | HALE AND DORR LLP |
| Washington, DC 20006 | 60 State Street |
| (202) 508-4600 | Boston, MA 02109 |
| | (617) 526-6000 |

ANDREW T. RADSCH
JAMES R. BATCHELDER
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
(650) 617-4000

*Attorneys for Respondent Palo Alto
Networks, Inc.*

/s/ Gerard M. Donovan
GERARD M. DONOVAN
REED SMITH LLP
1301 K Street NW, Suite 1000
Washington, DC 20005
(202) 414-9200

JONAH D. MITCHELL
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

*Attorneys for Respondent Keysight
Technologies, Inc.*

HEATH A. BROOKS
GARY M. FOX
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

THEODORE M. FOSTER
DAVID L. MCCOMBS
DEBRA J. MCCOMAS
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219
(972) 739-8649

ANGELA M. OLIVER
HAYNES AND BOONE, LLP
800 17th Street NW, Suite 500
Washington, DC 20006
(202) 654-4552

*Attorneys for Appellee
Cisco Systems, Inc.*

January 30, 2024

**STATEMENT OF CONSENT**

Pursuant to Federal Circuit Rule 32(g)(3)(B), the undersigned represents that counsel for Appellees Cisco Systems, Inc. and Keysight Technologies, Inc. have consented to their signatures on this brief.

Dated:  January 30, 2024

/s/ Douglas H. Hallward-Driemeier
DOUGLAS H. HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC  20006
(202) 508-4600

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 30th day of January, 2024, I filed the foregoing

Corrected Brief for Appellees with the Clerk of the United States Court of Appeals

for the Federal Circuit via the CM/ECF system, which will send notice of such

filing to all registered CM/ECF users.

/s/ Douglas H. Hallward-Driemeier
DOUGLAS H. HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC 20006
(202) 508-4600

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.     The filing has been prepared using a proportionally spaced typeface and includes 13,998 words.

2.     The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

January 30, 2024

/s/ Douglas H. Hallward-Driemeier
DOUGLAS H. HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, DC  20006
(202) 508-4600