No. 2023-2027

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

CENTRIPETAL NETWORKS, LLC,

Appellant,

v.

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
KEYSIGHT TECHNOLOGIES, INC.,

Appellees,

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office,

Intervenor.

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00182,
IPR2022-01151, IPR2022-01199

---

## CORRECTED BRIEF FOR INTERVENOR

---

*Of Counsel:*

FARHEENA Y. RASHEED
*Acting Solicitor*

AMY J. NELSON
*Acting Deputy Solicitor*

ROBERT J. MCMANUS
*Senior IP Legal Counsel*

PETER AYERS
*Senior Counsel for Patent Law and Litigation*

KAKOLI CAPRIHAN
*Associate Solicitor*

*U.S. Patent and Trademark Office*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JOSHUA M. SALZMAN
BRIAN J. SPRINGER
*Attorneys, Appellate Staff
Civil Division, Room 7537
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 616-5446*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUE...........................................................................1

STATEMENT OF THE CASE...............................................................................2

      A.    Statutory and Regulatory Background...................................................2

      B.    Factual and Procedural History ....................................................7

SUMMARY OF ARGUMENT............................................................................ 12

ARGUMENT ..........................................................................................................14

I.      Standard of Review................................................................................... 14

II.     The Administrative Proceeding Before the Board Comported with Applicable Ethics Rules and Due Process............................................ 14

      A.    APJ McNamara's Participation in the Preliminary Stage of the Proceeding Does Not Provide a Basis for Vacating the Board's Decision.................................................................................................14

      B.    Centripetal's Position Is Contrary to the Plain Language of the Applicable Ethics Rules and Guidelines. ....................................18

III.   Vacatur of the Board's Final Written Decision Would Be Inappropriate......... 26

CONCLUSION ..................................................................................................... 30

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                              **Page(s)**

*Aetna Life Ins. Co. v. Lavoie*,
475 U.S. 813 (1986) ................................................................. 17

*Auer v. Robbins*,
519 U.S. 452 (1997) ................................................................. 25

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
38 F.4th 1025 (Fed. Cir.), *cert. denied*,
143 S. Ct. 487 (2022) ............................... 8, 9, 16, 23, 24, 25, 26, 28, 29

*Centripetal Networks, LLC, In re,* No. 2023-127,
2023 WL 3477282 (Fed. Cir. May 16, 2023) .......... 11, 12, 13, 18, 21, 24, 26

*Chianelli v. Environmental Prot. Agency*,
8 F. App'x 971 (Fed. Cir. 2001) .............................................. 23

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ................................................................. 25

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) ................................................................. 27

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) ............................................................. 26, 29

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
138 S. Ct. 1365 (2018) ............................................................. 27

*Patel v. Garland*,
596 U.S. 328 (2022) ................................................................. 25

*Shell Oil Co. v. United States*,
672 F.3d 1283 (Fed. Cir. 2012) ................................................ 14

*Thryv, Inc v. Click-To-Call Techs., LP*,
140 S. Ct. 1367 (2020) ............................................................. 27

*Tumey v. Ohio*,
273 U.S. 510 (1927) ................................................................. 17

*United Shoe Mach. Corp., In re*,
276 F.2d 77 (1st Cir. 1960) ...................................................... 28

*United States v. Arthrex, Inc.,*
    141 S. Ct. 1970 (2021) ................................................................. 23

*United States v. Safavian,*
    528 F.3d 957 (D.C. Cir. 2008) ..................................................... 18

**Statutes:**

5 U.S.C. § 706 .............................................................................. 26

5 U.S.C. § 7301 ............................................................................. 2

5 U.S.C. § 13122(a) ....................................................................... 2

18 U.S.C. § 208(a) ........................................................................ 2

18 U.S.C. § 208(b)(2) .................................................................... 2

28 U.S.C. § 451 ............................................................................. 23

28 U.S.C. § 455 ............................................................................. 8, 23

28 U.S.C. § 455(b)(4) .................................................................... 8

28 U.S.C. § 1295(a)(4)(A) ............................................................. 1

35 U.S.C. § 142 ............................................................................. 1

35 U.S.C. § 316(a)(11) .................................................................. 28

35 U.S.C. § 319 ............................................................................. 1

**Regulations:**

5 C.F.R. § 2635.106(c) ................................................................. 18

5 C.F.R. § 2635.101(a) ................................................................. 3, 16

5 C.F.R. § 2635.101(b) ................................................................. 3, 19

5 C.F.R. § 2635.102(h) ................................................................. 2, 15

5 C.F.R. § 2635.401 ..................................................................... 3

5 C.F.R. § 2635.402(a) ................................................................. 15

5 C.F.R. § 2635.402(d)(1) ........................................................ 3, 15, 19

5 C.F.R. § 2635.501(a) .......................................................................... 20

5 C.F.R. § 2635.501 note .................................................................. 6, 21

5 C.F.R. § 2635.502 ................................................................................ 20

5 C.F.R. § 2635.502(a) ....................................................................... 5, 21

5 C.F.R. § 2635.502(a)(1) .................................................................... 20

5 C.F.R. § 2635.502(b)(1) .................................................................... 20

5 C.F.R. § 2635.502(d) .......................................................................... 21

5 C.F.R. § 2638.102 ................................................................................ 20

5 C.F.R. § 2640.102(b) .......................................................................... 15

5 C.F.R. § 2640.102(*l*) ............................................................................. 4

5 C.F.R. § 2640.202(a) .................................................... 1, 4, 9, 13, 15, 19

5 C.F.R. § 2640.202(b) ....................................................... 1, 4, 13, 15, 19

37 C.F.R. § 90.3(a) ................................................................................... 1

Exec. Order No. 12,674,
   54 Fed. Reg. 15,159 (Apr. 12, 1989) ................................................ 2
      § 201(a), 54 Fed. Reg. at 15,160 .................................................... 2
      § 403, 54 Fed. Reg. at 15,161 ........................................................ 2

**Other Authorities:**

*Exemption Amendments Under 18 U.S.C. 208(b)(2)*,
   67 Fed. Reg. 12,443 (Mar. 19, 2002) ......................................... 3, 29

*Interpretation, Exemptions and Waiver Guidance Concerning*
   *18 U.S.C. 208 (Acts Affecting a Personal Financial Interest)*,
   61 Fed. Reg. 66,830 (Dec. 18, 1996) ........................... 3, 16, 21, 25

*Memorandum from Katherine K. Vidal, Under Sec'y of Commerce for*
*Intellectual Prop. & Dir. of the USPTO, to the Members of the*
*Patent Trial & Appeal Bd. & the Trademark Trial & Appeal Bd.*
(Sept. 22, 2023), https://perma.cc/4FJQ-B69C ................................................ 6, 7, 22

OGE, LA-22-04, *Legal Advisory to a Designated Agency Ethics*
*Official Application of the Securities & Mutual Fund Exemptions*
*to Cryptocurrency, Stablecoins, & Related Investments* (2022),
2022 WL 4016298 ................................................................................................ 5

Office of the Gen. Counsel, U.S. Dep't of Commerce,
*Investments by Patent Examiners* (2021),
https://perma.cc/8C4R-PTTX .......................................................................... 5, 16

Office of the Gen. Counsel, U.S. Dep't of Commerce,
U.S. Patent and Trademark Office, *Summary of Ethics Rules*
(2022), https://perma.cc/6M25-YWMK .......................................................... 5, 16

**STATEMENT OF RELATED CASES**

Patent owner Centripetal Networks, LLC (Centripetal) previously sought mandamus in this case, which this Court denied on May 16, 2023. *In re Centripetal Networks, LLC*, No. 2023-127, 2023 WL 3477282 (Fed. Cir. May 16, 2023) (Lourie, Prost, and Wallach, JJ.). Intervenor, the Director of the U.S. Patent and Trademark Office (USPTO), is not aware of any other appeal from the Patent Trial and Appeal Board (Board) in connection with the patent at issue that has previously been before this or any other court. The patent at issue in this case has also been asserted against Cisco Systems, Inc. (Cisco) in a case pending in the District Court for the Eastern District of Virginia, *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, No. 18-cv-94 (E.D. Va.).

## STATEMENT OF JURISDICTION

The Board issued its final written decision on May 23, 2023. Appx1-60.

Centripetal filed a timely notice of appeal on June 8, 2023. Appx7084-7086; *see*

35 U.S.C. § 142; 37 C.F.R. § 90.3(a). This Court has appellate jurisdiction under

35 U.S.C. § 319 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUE

The Board instituted inter partes review of a patent owned by Centripetal based

on a petition filed by Palo Alto Networks, Inc. (Palo Alto). One administrative patent

judge (APJ) on the panel, APJ McNamara, owned Cisco stock valued at all relevant

times below the $15,000 de minimis threshold prescribed in ethics regulations that

apply to all Executive Branch employees. *See* 5 C.F.R. § 2640.202(a)-(b). After Cisco

was joined to the proceeding as a backup party that could not raise new arguments or

unpatentability grounds, APJ McNamara promptly withdrew from the case. A

reconstituted Board panel denied a recusal motion filed by Centripetal, concluding

that APJ McNamara's participation "was fully compliant with the applicable ethical

regulations" and did "not give rise to due process concerns." Appx62. Following the

parties' submission of evidence and arguments in written briefs and at oral argument,

the reconstituted panel found the challenged claims to be unpatentable. The USPTO

Director intervened to address the following question presented:

Whether the administrative proceeding before the Board comported with

applicable ethics rules and due process.

# STATEMENT OF THE CASE

## A.     Statutory and Regulatory Background

The President is empowered to "prescribe regulations for the conduct of

employees in the executive branch." 5 U.S.C. § 7301.  In 1989, the President issued

an Executive Order to "establish fair and exacting standards of ethical conduct for all

executive branch employees."  Exec. Order No. 12,674, 54 Fed. Reg. 15,159, 15,159

(Apr. 12, 1989).  The Executive Order directed the Office of Government Ethics

(OGE)—the agency responsible for providing "overall direction of executive branch

policies related to preventing conflicts of interest on the part of officers and

employees of any executive agency," 5 U.S.C. § 13122(a)—to promulgate "regulations

that establish a single, comprehensive, and clear set of executive-branch standards of

conduct."  Exec. Order No. 12,674, §§ 201(a), 403, 54 Fed. Reg. at 15,160-61.  OGE

is also authorized to create generally applicable regulatory exemptions from the

statutory bar prohibiting federal employees from "participat[ing] personally and

substantially" in a "particular matter in which" they have "a financial interest" where

OGE finds that the interest is "too remote or too inconsequential to affect the

integrity of the[ir] services."  18 U.S.C. § 208(a), (b)(2).

Following notice-and-comment rulemaking, OGE issued government-wide

standards of conduct for executive employees, including APJs.  *See* 5 C.F.R.

§ 2635.102(h) (defining "employee" as "any officer or employee of an agency").  Part

2635 of the regulations prescribes "Standards of Ethical Conduct for Employees of

the Executive Branch." The regulations list general guiding principles, and "each employee shall respect and adhere to" those principles, "as well as the implementing standards contained in this part." 5 C.F.R. § 2635.101(a)-(b). Under the subpart concerning "Conflicting Financial Interests," while an employee may not "participat[e] in an official capacity in any particular matter" that "will have a direct and predictable effect on" his known financial interest, *id.* § 2635.401, OGE has exempted those interests that "are too remote or too inconsequential to affect the integrity of the services of employees," *id.* § 2635.402(d)(1). The regulations expressly cross-reference the exemptions in subpart B of part 2640.

That subpart in turn includes de minimis exemptions for stock ownership, with different thresholds based on the type of security involved, the owner of the security, and the type of matter involved. When OGE first set the monetary thresholds, it emphasized "the need for uniform exemptions for all executive branch employees." *Interpretation, Exemptions and Waiver Guidance Concerning 18 U.S.C. 208 (Acts Affecting a Personal Financial Interest)*, 61 Fed. Reg. 66,830, 66,835 (Dec. 18, 1996). Varying the amounts "based on the responsibilities of employees or on a particular agency's mission" could produce unwarranted distinctions between employees and "add to the rule's complexity." *Id.* OGE has revisited the threshold in the regulations in the intervening years. *See Exemption Amendments Under 18 U.S.C. 208(b)(2)*, 67 Fed. Reg. 12,443, 12,444 (Mar. 19, 2002).

In their present form, the regulations provide that "[a]n employee may participate in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership . . . of [publicly traded] securities issued by one or more entities affected by the matter" if the "aggregate market value . . . does not exceed $15,000." 5 C.F.R. § 2640.202(a).[1] The first example to that subsection explains that an employee may evaluate bids to perform services for his agency if he owns $15,000 or less in stock in a company that submitted a bid. *Id.* § 2640.202(a) ex. 1. The next subsection provides a higher threshold of $25,000 for matters involving "the ownership . . . of securities issued by one or more entities that are not parties to the matter but that are affected by the matter." *Id.* § 2640.202(b). As an example, the regulations note that an employee can review an application for a new drug that, if approved, would compete with a drug sold by another company in which the employee owns less than $25,000 in stock. *Id.* § 2640.202(b) ex. 1.

Under these provisions, "[e]mployees may participate in any particular matter in which they would otherwise have a disqualifying financial interest arising from ownership of 'publicly traded securities' that are below relevant *de minimis* thresholds," with different thresholds depending on whether "the entity in which the employee has

---

[1] A "particular matter involving specific parties" includes "any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." 5 C.F.R. § 2640.102(*l*). The proceeding in question meets the definition of a "particular matter involving specific parties."

a disqualifying ownership interest is party to the matter." OGE, LA-22-04, *Legal Advisory to a Designated Agency Ethics Official Application of the Securities & Mutual Fund Exemptions to Cryptocurrency, Stablecoins, & Related Investments* (2022), 2022 WL 4016298, at *1 & n.4. The Department of Commerce rules for USPTO employees, including APJs, are to the same effect. *See* Office of the Gen. Counsel, U.S. Dep't of Commerce, U.S. Patent and Trademark Office, *Summary of Ethics Rules* 3 (2022), https://perma.cc/6M25-YWMK (noting that employees have no financial conflict of interest if they hold $15,000 or less in stock of a publicly traded company); *see also* Office of the Gen. Counsel, U.S. Dep't of Commerce, *Investments by Patent Examiners* (2021), https://perma.cc/8C4R-PTTX (stating that patent examiners "may not invest . . . in publicly-traded securities of more than $15,000 in any one company and more than $25,000 total in stock in the industry sector in which [they] review patents").

OGE has established separate regulations addressing partiality concerns that deal with circumstances not covered by the financial conflict of interest regulations. These separate regulations direct an employee who "knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter" not to participate if he has determined that "the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality." 5 C.F.R. § 2635.502(a). An employee may participate, however, "where [he] meets all prerequisites for the

application of one of the exemptions set forth in subpart B of part 2640" (including the de minimis exemption) on the basis that "the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of agency programs and operations." *Id.* § 2635.501 note.

In September 2023, the USPTO Director issued guidance implementing a new Board panel assignment procedure that went into effect in late November 2023 and applies only on a prospective basis. *See Memorandum from Katherine K. Vidal, Under Sec'y of Commerce for Intellectual Prop. & Dir. of the USPTO, to the Members of the Patent Trial & Appeal Bd. & the Trademark Trial & Appeal Bd.* 4 (Sept. 22, 2023), https://perma.cc/4FJQ-B69C. While recognizing that the de minimis exemption in the OGE regulations has "been in force for decades" and has long "govern[ed] administrative judges in the executive branch," the USPTO Director elected to begin applying stricter criteria at the time cases are initially paneled in order "to avoid paneling judges in a way that might elicit concern, even if they are in full compliance with all ethics statutes and regulations." *Id.* at 2-3. Going forward, APJs will not be paneled on cases if they "hold stock or bonds (publicly traded or privately held) in any of the disclosed parties or real parties in interest, regardless of the dollar value." *Id.* at 2 (emphasis omitted). The guidance makes clear that this paneling-related change "is separate from existing ethics standards and does not in any way alter the ethics standards" for APJs. *Id.* at 3. The new paneling procedure is not a basis to "revisit any prior decisions" and in no way "suggest[s] that Board judges, in any past or

pending cases, have not been impartial, have created an appearance of impropriety, or have otherwise violated any obligations under existing federal ethics regulations and laws." *Id.* at 3-4.

### B. Factual and Procedural History

1. Appellant Centripetal owns U.S. Patent No. 9,917,856, which is titled "Rule-based network-threat detection for encrypted communications." Appx86. In November 2021, appellee Palo Alto petitioned for inter partes review of three claims of the '856 patent. Appx5. In May 2022, exercising authority delegated from the USPTO Director, a three-judge panel of the Board (APJs McNamara, Moore, and Amundson) instituted inter partes review of the challenged claims of the '856 patent. Appx118-209. At the time of institution, Cisco had not filed its own petition challenging the '856 patent or sought to be joined as a party to Palo Alto's proceeding, and Centripetal had described a pending district court suit against Cisco alleging infringement of the '856 patent as "unrelated litigation." Appx3937.

In early June 2022, Centripetal requested rehearing of the institution decision either by the Board panel or by the Precedential Opinion Panel, which had authority to issue decisions binding on all Board panels. Appx4510. Centripetal did not mention recusal but instead primarily claimed that Palo Alto was engaging in harassing behavior after Centripetal's favorable verdict in the "unrelated litigation" against Cisco. Appx4510; Appx4540-4541. In late June 2022, appellees Cisco and Keysight Technologies, Inc. (Keysight) filed petitions substantively identical to Palo Alto's and

sought to join the instituted inter partes review proceeding. Appx7228; Appx9233. Centripetal responded to Palo Alto's petition in August 2022, Palo Alto filed its reply in November 2022, and Centripetal filed its sur-reply in December 2022. *See* Appx5.

2. During the same period that the inter partes review petitions were being considered by the Board, developments continued in the district court litigation between Centripetal and Cisco. The district court determined that Cisco had infringed multiple Centripetal patents, including the '856 patent, and Cisco appealed to this Court. Specifically, Cisco challenged the district judge's decision not to recuse himself under 28 U.S.C. § 455, which governs disqualification of Article III judges. It was undisputed that the district judge's discovery that his wife owned Cisco stock meant that he knew that "his spouse . . . ha[d] a financial interest . . . in a party to the proceeding" within the terms of § 455(b)(4). *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1028, 1030 (Fed. Cir.), *cert. denied*, 143 S. Ct. 487 (2022). Rather, the central question on appeal was whether the judge's wife had "divested herself of that interest" pursuant to § 455(f). *Centripetal*, 38 F.4th at 1031. This Court determined that she had not and concluded that the appropriate remedy was to vacate the rulings issued after the district judge became aware of the disqualification ground. *Id.* at 1039.

Centripetal sought Supreme Court review of this Court's decision. In its Supreme Court filings, Centripetal questioned the propriety of vacating the district court's judgment when "[f]ederal regulations permit government employees to participate in matters involving parties in which they" own publicly traded stock if

"the value . . . 'does not exceed $15,000.'"  Reply Brief for Petitioner at 8, *Centripetal*, 143 S. Ct. 487 (2022) (No. 22-246), 2022 WL 16951289, at *8 (quoting 5 C.F.R. § 2640.202(a)).  Centripetal noted that an APJ could own that "amount of stock in Cisco (a publicly traded company) . . . without even triggering a recusal obligation" because the regulation "by its terms *applies to the [Board] and its APJs*." *Id.* at 8-9.  The Supreme Court denied certiorari on December 5, 2022.  *See Centripetal*, 143 S. Ct. 487.

3.  The day after the Supreme Court denied Centripetal's certiorari petition, the Precedential Opinion Panel issued an order declining to take up Centripetal's rehearing request and leaving all matters to the Board panel.  Appx6272-6273.  Only after the Supreme Court and the Precedential Opinion Panel had denied review did Centripetal file a motion with the Board raising recusal issues.  The motion, which was filed on December 30, 2022, was based on information that, by Centripetal's own account (Br. 36), it had known no later than September 29, 2022.  Appx6367.  Centripetal sought vacatur of the decision instituting Palo Alto's petition and recusal of the panel that issued the institution decision, claiming that the decision was tainted because, among other things, APJ McNamara owned between $1,001 and $15,000 in Cisco stock.  Appx6351.[2]  APJ McNamara's stock ownership and other purportedly

_____

[2] In addition to "APJ McNamara's ownership of a small amount of Cisco stock," Centripetal challenged his receipt of retirement payments from a law firm where he used to work as "conflicts that violate the applicable regulations and create a due process problem."  Appx66.  On appeal, Centripetal does not raise the argument that APJ McNamara was obligated to recuse based on his retirement plan.

9

disqualifying financial interests had been reported on his financial disclosure statements since at least 2015. *See* Appx6372-6373 (2015); Appx6383-6386 (2016); Appx6399-6402 (2017); Appx6418-6420 (2018); Appx6435-6438 (2019); Appx6452-6454 (2020).

On January 4, 2023, the Board panel denied Centripetal's June 2022 rehearing request and granted Cisco's and Keysight's June 2022 joinder requests (but did not rule on the recusal motion). Appx272-273; Appx339-340; Appx6640. As a condition of its joinder, Cisco agreed to "assume an understudy role" in which it would not "raise any new grounds not already instituted," "introduce any argument or discovery not already introduced," or "request any additional time to independently argue" at the oral hearing. Appx270-271 (quotation marks omitted). The Board's decision to allow joinder was expressly conditioned on Cisco's role "be[ing] limited as stated in" its joinder motion. Appx273.

On January 5, 2023, APJ McNamara withdrew from the Board panel. Appx6652. He explained that OGE regulations did not require recusal where, as here, he had no "interest exceeding $15,000." Appx6652. He noted that the financial disclosure information at issue "has been a matter of public record for ten years" and that OGE has annually "reviewed and approved those financial disclosures." Appx6652. Although Centripetal's recusal motion was "without merit," APJ McNamara nevertheless sought to "reduce the number of issues and simplify the briefing" on the motion by "withdraw[ing] from the panel effective immediately" and

declining to "further participate in th[e] proceeding." Appx6652. APJ Amundson followed the same course. Appx6702.

After full briefing, a reconstituted panel of the Board denied Centripetal's recusal motion, concluding that there is no basis to vacate the institution or joinder decisions because APJ McNamara's participation "was fully compliant with the applicable ethical regulations" and did "not give rise to due process concerns." Appx62. The Board explained that "[t]he Cisco stock is plainly not disqualifying under the [OGE] rules" because "the value of the holdings falls well below the $25,000 threshold [for] matters affecting nonparties, and even below the [$15,000] threshold for parties." Appx71. The Board further held that the ethical framework that was developed by "an impartial body with particular expertise in this area" and that "has been in place for the last twenty-seven years" did not raise a due process problem as applied to the facts of this case. Appx76-77.

Centripetal then petitioned this Court for a writ of mandamus directing the Board to vacate the institution and joinder decisions and to order a newly constituted panel to start anew. *In re Centripetal Networks, LLC*, No. 2023-127, 2023 WL 3477282, at *1 (Fed. Cir. May 16, 2023). This Court denied the petition, reasoning that Centripetal had not made a showing that it would "be unable to raise its arguments after a final written decision" or face irreparable harm in the meantime. *Id.* And the Court noted that Centripetal failed to show a clear and indisputable right to relief "given the lack of any evidence that Cisco was involved in the proceedings at the time

11

of institution, Cisco's backup capacity status, and the fact that APJ McNamara will not be a member of the panel that decides the ultimate merits in the [inter partes review] proceeding." *Id.*

4. The reconstituted Board panel completed the inter partes review and issued a thorough final written decision analyzing the patentability of the challenged claims. Appx1-60. Based on the arguments and evidence submitted by the parties in briefing and at oral argument, the Board determined that Palo Alto had demonstrated that the three claims at issue would have been obvious over the prior art. Appx55. The Board also denied Centripetal's pending requests for rehearing of the joinder decisions. Appx55-57. Centripetal appealed.

## SUMMARY OF ARGUMENT

The Board instituted inter partes review of a patent owned by Centripetal based on a petition filed by Palo Alto. Because Centripetal has separately sued Cisco for infringement of the same patent, Centripetal asserts that it was an ethical violation for one of the APJs on the Board panel, APJ McNamara, to own a small amount of Cisco stock, notwithstanding that Cisco was not involved at the institution phase, that Cisco was later joined to the proceeding in only a passive role, and that APJ McNamara removed himself from the case as soon as Cisco was joined.

The Board proceeding was conducted in accordance with applicable ethics rules and due process. The regulations applicable to Executive Branch employees like APJ McNamara include a de minimis exemption that permits an employee to

participate in a matter where he owns stock worth $25,000 or less in a non-party affected by the matter or worth $15,000 or less in a party to the matter. 5 C.F.R. § 2640.202(a)-(b). OGE set these bright-line thresholds based on its expert determination that financial interests falling within these limits are too remote or inconsequential to affect the integrity of a government proceeding. Here, there is no dispute that APJ McNamara's stock did not exceed the lower $15,000 threshold, and thus "[t]he Cisco stock is plainly not disqualifying under the rules," Appx71.

Centripetal offers no sound basis to depart from the plain text of the relevant ethics regulations. In lieu of the directly applicable regulations, Centripetal instead relies on general provisions that ultimately refer to the de minimis exemption or specific provisions about situations not relevant to this case. Nor do analogies to the recusal rules for Article III district judges supersede the comprehensive ethics framework that governs Executive Branch employees. In any event, Centripetal's arguments are flawed on their own terms because Centripetal never meaningfully grapples with several key details that put to rest any alleged appearance concerns, including "the lack of any evidence that Cisco was involved in the proceedings at the time of institution, Cisco's backup capacity status, and the fact that APJ McNamara [was not] a member of the panel that decide[d] the ultimate merits." *In re Centripetal Networks, LLC*, No. 2023-127, 2023 WL 3477282, at *1 (Fed. Cir. May 16, 2023).

Centripetal cannot justify the relief that it seeks—undoing the entire inter partes review and starting from scratch—by pointing to APJ McNamara's

13

membership on the panel that instituted review when Cisco was not a party. The only

decision involving APJ McNamara and Cisco narrowly related to joining Cisco as a

backup party to the already-instituted proceeding. APJ McNamara was not required

to recuse at any point during the proceeding, but he nonetheless promptly withdrew

to allow a reconstituted Board panel to consider the merits of the recusal issue and the

ultimate patentability challenge. Vacating the final written decision without

addressing the merits would have the perverse effect of leaving in place patent claims

that have been found invalid after a full trial-like proceeding by a panel of expert

administrative judges whose impartiality is unquestioned.

## ARGUMENT

### I. Standard of Review

The issue of recusal is reviewed for an abuse of discretion. *See Shell Oil Co. v. United States*, 672 F.3d 1283, 1288 (Fed. Cir. 2012).

### II. The Administrative Proceeding Before the Board Comported with Applicable Ethics Rules and Due Process.

#### A. APJ McNamara's Participation in the Preliminary Stage of the Proceeding Does Not Provide a Basis for Vacating the Board's Decision.

As the Board correctly explained, APJ McNamara acted in accordance with his

ethical obligations under the relevant OGE regulations that apply to all Executive

Branch employees. *See* Appx68-71. Those regulations instruct that while an

employee may not work on a "particular matter [that] will have a direct and

predictable effect" on his known financial interest, 5 C.F.R. § 2635.402(a), certain interests categorically do not qualify because OGE has determined that they "are too remote or too inconsequential to affect the integrity of the [government] services," *id.* § 2635.402(d)(1) (referring to the "regulatory exemptions of general applicability" in "subpart B of part 2640"). One such exemption provides that an employee "may participate in [a] particular matter involving specific parties" when he owns $25,000 or less in stock in a non-party who is affected by the matter or $15,000 or less in stock in a party to the matter. *Id.* § 2640.202(a)-(b).

Here, there is no dispute that, at all relevant times, the value of APJ McNamara's Cisco stock holdings always fell "below the $25,000 threshold [for] matters affecting nonparties, and even below the [$15,000] threshold for parties." Appx71. In fact, APJ McNamara's publicly available financial disclosure forms show that his Cisco stock—which comprises "less than 0.04% of the value of the assets reported," Appx6651 n.1—was $15,000 or less since at least 2015. *See, e.g.*, Appx6373; Appx6454. As such, "[t]he Cisco stock is plainly not disqualifying under the rules," Appx71, and APJ McNamara was not required to recuse at any point during the proceeding, including at the time of the institution and joinder decisions, regardless of whether Cisco is considered a party.

The de minimis exemption is applicable and dispositive. APJs employed by the USPTO are "officer[s] or employee[s] of an agency" who are covered under OGE's regulations. 5 C.F.R. §§ 2635.102(h), 2640.102(b). And the de minimis exemption is

part of this comprehensive framework of ethical standards designed "[t]o ensure that every citizen can have complete confidence in the integrity of the Federal Government." *Id.* § 2635.101(a). In a Supreme Court filing, Centripetal had no trouble recognizing that the de minimis exemption "by its terms *applies to the [Board] and its APJs*" and that an APJ can own $15,000 in stock in a party without "triggering a recusal obligation." Reply Brief for Petitioner at 8-9, *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 143 S. Ct. 487 (2022) (No. 22-246), 2022 WL 16951289, at *8-9.

It is no accident that the regulations adopt a straightforward test for determining whether stock ownership falls within the de minimis exemption. The ethical standards were developed by an impartial body with expertise in ethics and are the product of notice-and-comment rulemaking. Appx70-71. With respect to the de minimis exemption, OGE explained the need to provide a clear and uniform rule so that all employees can easily "determin[e] when a particular exemption applies," while calibrating the thresholds to be at a level that "can reasonably be considered remote or inconsequential." 61 Fed. Reg. at 66,835 (quotation marks omitted). This Court has recognized that "a bright-line rule" for disqualifying financial interests helps to avoid "difficult line-drawing decisions." *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1037 n.16 (Fed. Cir.) (quotation marks omitted), *cert. denied*, 143 S. Ct. 487 (2022). And the requirements and de minimis exemption in OGE's regulations are repeated in the ethics rules disseminated to USPTO employees by the Department of Commerce. *See Summary of Ethics Rules*, *supra*; *Investments by Patent Examiners*, *supra*.

In much the same way, "the remote and inconsequential interests falling within the de minimis exemptions of Section 2640.202 are *not* substantial interests that would give rise to the types of due process concerns" that Centripetal raises in passing on appeal (Br. 33-34). Appx76 (quotation marks omitted). The Supreme Court has left no doubt that due process does not mandate disqualification where, as here, the "[i]nterest is so remote, trifling, and insignificant that it may fairly be supposed to be incapable of affecting the judgment of or of influencing the conduct of an individual." *Tumey v. Ohio*, 273 U.S. 510, 531 (1927) (quotation marks omitted). The Court has applied that principle to reject a challenge to adjudicators ruling in a case where they "might conceivably have had a slight pecuniary interest." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825-26 (1986). As the Board properly recognized, the cases consistently teach that "not *every* financial interest demands recusal; instead, recusal is required where the financial interest is *substantial*." Appx75.

Over and above the relatively trivial amount of stock at issue, relevant context further dispels any appearance of impropriety. When APJ McNamara participated in the decision to institute inter partes review based on Palo Alto's petition, Cisco was not involved, and Centripetal never argued that Cisco was a real party in interest. *See* Appx364; Appx3889. Although Cisco was later joined to the proceeding, that joinder had no material effect on the case because institution had already been granted on Palo Alto's materially identical petition and Cisco assumed a backup role for the duration of the proceeding. Appx270-271. As soon as Cisco became a party, APJ

McNamara withdrew from the case and was not involved afterward. Appx6652. His withdrawal allowed a reconstituted three-judge panel whose impartiality is uncontested to reach its own independent judgment about the merits of Centripetal's recusal arguments and the merits of Palo Alto's patentability challenge based on the evidence and arguments submitted by the parties in written briefs and at oral argument. *See In re Centripetal Networks, LLC*, No. 2023-127, 2023 WL 3477282, at *1 (Fed. Cir. May 16, 2023) (discussing the same circumstances in denying mandamus). At bottom, the proceeding conformed to applicable ethics rules and due process.

> **B.** **Centripetal's Position Is Contrary to the Plain Language of the Applicable Ethics Rules and Guidelines.**

1. Centripetal's various contentions that APJ McNamara created an appearance of partiality by following the applicable ethics regulations lack merit. Centripetal does not identify the mechanism through which it seeks to enforce the ethics rules. *See* 5 C.F.R. § 2635.106(c) ("A violation of this part or of supplemental agency regulations, as such, does not create any right or benefit, substantive or procedural, enforceable at law by any person against the United States, its agencies, its officers or employees, or any other person."); *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008) (noting that "disciplinary action" is an available remedy "[i]f an employee violates a standard of conduct"). Regardless, APJ McNamara properly complied with those rules.

Centripetal seeks to cast aside (Br. 29) the de minimis exemption as bearing only on "the standard for criminal liability." *See* Appx71 n.8. But the exemption is phrased in the affirmative, providing that "[a]n employee may participate in any particular matter" when the otherwise disqualifying financial interest falls within the threshold. 5 C.F.R. § 2640.202(a), (b). The accompanying examples illustrate situations where an executive employee may work on a matter despite de minimis stock ownership. *See, e.g., id.* § 2640.202(a) ex. 1. Centripetal also ignores that the regulatory provisions pertaining to financial conflicts specifically point to the exemptions as instances where OGE has determined that the interests are too negligible to create a conflict. *See id.* § 2635.402(d)(1) (noting that OGE has issued relevant "regulatory exemptions of general applicability . . . in subpart B of part 2640 of this chapter").

Nor does Centripetal's resort (Br. 29-30) to broad regulatory language displace the de minimis exemption. One regulation recites a list of "general principles" that inform an employee's conduct "[w]here a situation is not covered by the standards set forth in this part." 5 C.F.R. § 2635.101(b). Centripetal fails to appreciate that those general principles are operationalized through the specific requirements in the remainder of the regulations, like the de minimis exemption in § 2640.202. Similarly, Centripetal notes (Br. 29-30) that employees must undertake to "avoid losing impartiality or appearing to lose impartiality in carrying out official duties" but overlooks the prefatory language in the same sentence indicating that employees'

19

obligations are spelled out "in the Standards of Conduct at part 2635 of this chapter." 5 C.F.R. § 2638.102. As explained, part 2635 specifies the rules governing financial conflicts that incorporate the de minimis exemption, which expressly permitted APJ McNamara to participate in the proceeding at issue here.

Centripetal also seeks to rely (Br. 30-31) on regulations directed to inapplicable circumstances. The cited regulations concern "Personal and business relationships," 5 C.F.R. § 2635.502, and address situations where an employee has a relationship with someone whose interest would be affected by a particular matter. That is evident from the regulations, which spell out the types of relationships that are covered, including a relationship with a relative, member of an employee's household, and business associate. *See id.* § 2635.502(a)(1), (b)(1); *id.* § 2635.501(a) (providing overview of § 2635.502). The regulatory examples likewise discuss how an employee's work might affect a corporation where his wife or sister-in-law is employed, a company with whom he has a pending business deal or recent former employment, and an organization in which he has active involvement. *Id.* § 2635.502 exs. 1-5. This case, by contrast, does not involve a personal or business relationship, but rather stock ownership in a publicly traded corporation, a scenario governed by § 2640.202, which articulates "Exemptions for interests in securities." *See* Appx69 n.7.

Even on their own terms, the regulations that Centripetal invokes (Br. 30-31) reaffirm that APJ McNamara complied with the applicable ethics standards. As Centripetal appears to acknowledge (Br. 30), OGE has made the judgment that in

certain circumstances "the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's programs and operations." 5 C.F.R. § 2635.502(d). One such circumstance is when the employee's stock ownership falls within the relevant de minimis threshold in § 2640.202, as the very regulatory note on which Centripetal relies (Br. 30-31) makes clear. *See* 5 C.F.R. § 2635.501 note (explaining that the impartiality concern is overcome "where the employee meets all prerequisites for the application of one of the exemptions set forth in subpart B of part 2640 of this chapter"); *see also* 61 Fed. Reg. at 66,831 (rejecting a commenter's "suggestion to add a provision clarifying that the impartiality provisions . . . may be applied even when a regulatory exemption is applicable under this regulation").

And in all events, even assuming that OGE's express validation of participation under circumstances like those at issue here is not dispositive, Centripetal relies on an incomplete set of facts to claim (Br. 31-32) that "a reasonable person with knowledge of the relevant facts [would] question [APJ McNamara's] impartiality." 5 C.F.R. § 2635.502(a). Centripetal largely ignores the inconsequential amount of stock owned and the factors recited in this Court's mandamus decision—namely, "the lack of any evidence that Cisco was involved in the proceedings at the time of institution, Cisco's backup capacity status, and the fact that APJ McNamara [was not] a member of the panel that decide[d] the ultimate merits." *In re Centripetal*, 2023 WL 3477282, at *1. It is Centripetal, not the Board, that (Br. 31) "misses the broader context of this case."

Centripetal again omits critical facts in suggesting that (Br. 30-31) other circumstances heighten appearance concerns. Even putting aside the undisputed fact that Centripetal delayed over three months in raising its recusal arguments, there was nothing untoward about the Board describing these arguments as frivolous, particularly when Centripetal itself acknowledged in a Supreme Court filing that § 2640.202's de minimis exemption applies to APJs and when Centripetal does not even renew on appeal a second recusal ground raised in Centripetal's motion. *See* Appx73-74 & n.10. And it was entirely proper for the Board to deny without prejudice the pro hac vice motion of one of Centripetal's attorneys who repeatedly violated Board rules. *See* Appx6781-6783.

Centripetal also errs in urging (Br. 34) this Court to draw a negative inference from the USPTO Director's recent guidance adopting a prospective policy that APJs will not be paneled on cases where they hold stock in a party. *See Memorandum*, *supra*, at 2. That guidance makes clear that it is not compelled by any applicable "ethics statutes and regulations." *Id.* at 3. To the contrary, it is "separate from existing ethics standards," "does not in any way alter [those] standards," and provides no basis to "revisit any prior decisions" where the APJs involved "complied with the applicable ethics rules." *Id.* at 3-4. Indeed, accepting Centripetal's argument that the new guidance, contrary to its express language, constitutes an implicit acknowledgement of impropriety in this case would have the perverse effect of disincentivizing agency

heads from adopting paneling guidance and policies that are more stringent than the OGE rules and that can minimize the likelihood of recusal disputes.

2.  This Court's decision in *Centripetal*, 38 F.4th 1025, involving Centripetal's district-court lawsuit against Cisco does not speak to APJ McNamara's responsibilities under the applicable ethics rules for Executive Branch employees. That case centered on the interpretation of 28 U.S.C. § 455, a statute that sets forth disqualifying grounds for Article III judges but "by its terms does not apply" to Executive Branch employees. *Chianelli v. Environmental Prot. Agency*, 8 F. App'x 971, 980 (Fed. Cir. 2001) (per curiam); *see* 28 U.S.C. § 451 (defining the relevant statutory term "judge of the United States" to include "judges of the courts of appeals, district courts, . . . and any court created by Act of Congress" who "are entitled to hold office during good behavior"); *cf. United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021) (recognizing that APJs are issuing decisions on behalf of the Executive Branch). In stark contrast to the OGE regulations, § 455 does not include a de minimis threshold but instead provides that "[a]ny interest, however small, is disqualifying." *Centripetal*, 38 F.4th at 1033 n.8 (quotation marks omitted).

The facts of this case differ from *Centripetal* both in general terms and in the particulars. There, the district judge presiding over the patent infringement dispute between Centripetal and Cisco discovered that his wife owned stock in defendant Cisco, put the stock in a blind trust, then proceeded to issue findings of fact and conclusions of law and to rule on post-trial motions. 38 F.4th at 1029. On appeal,

there was no dispute that the district judge had violated § 455(b)(4), which prohibits an Article III judge from participating in a case where "[h]e knows that . . . his spouse . . . has a financial interest . . . in a party." *Centripetal*, 38 F.4th at 1028, 1030. The pivotal issue was whether the act of placing the Cisco stock in the blind trust "divested [the district judge's wife] of that interest" to fall within § 455(f)'s exception allowing a judge to continue working on a case if he learns of the financial conflict "after substantial judicial time has been devoted to the matter." *Centripetal*, 38 F.4th at 1028, 1030-31 (emphasis omitted).

Here, the question is whether APJ McNamara acted in accordance with the ethics rules that apply to Executive Branch employees, not whether he took sufficient steps to cure a financial conflict based on the rules applicable to Article III judges. When he voted to institute inter partes review on the petition filed by Palo Alto, Cisco was not even a party. *See In re Centripetal*, 2023 WL 3477282, at *1 (denying mandamus in part due to "the lack of any evidence that Cisco was involved in the proceedings at the time of institution"). And once joined, Cisco participated in a passive role where it could not—and did not—raise new arguments because Palo Alto stayed in the case. *See id.* (highlighting "Cisco's backup capacity status"). Furthermore, unlike the district judge in *Centripetal*, APJ McNamara removed himself from the case immediately after Cisco was joined as a backup party, and he was not one of the decisionmakers who rendered final judgment.

Centripetal attempts to elide these distinctions by noting (Br. 32-33) similarities between civil litigation and inter partes review. Those policy arguments do not transform Executive Branch employees like APJ McNamara into Article III judges subject to the strictures of § 455. *See Patel v. Garland*, 596 U.S. 328, 346 (2022) ("'[P]olicy concerns cannot trump the best interpretation of the statutory text."); *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (recognizing that administrative actions may "take . . . 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the executive Power" (quotation marks omitted)). Centripetal would override Congress's deliberate legislative choice to entrust the Executive Branch with developing an appropriate framework for its employees, as well as OGE's considered expert judgment to adopt "uniform exemptions" for "all executive branch employees" because utilizing different thresholds "based on the responsibilities of employees or on a particular agency's mission" would be unworkable and produce its own disparities. 61 Fed. Reg. at 66,835; *Centripetal*, 38 F.4th at 1037 n.16 (recognizing the virtue of "a bright-line rule"). If Centripetal believes that OGE's regulations need updating, the "proper procedure" is to raise that grievance with "[OGE] itself," *Auer v. Robbins*, 519 U.S. 452, 459 (1997), not to ask a court to rewrite the regulations.

## III. Vacatur of the Board's Final Written Decision Would Be Inappropriate.

The factors that this Court and the Supreme Court have used to determine the appropriate remedy in the event of an ethical violation only underscore that vacatur of the Board's final written decision is not warranted here. Courts consider "the risk of injustice to the parties in the particular case," "the risk that the denial of relief will produce injustice in other cases," and "the risk of undermining the public's confidence in the judicial process." *Centripetal*, 38 F.4th at 1034 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)); *see also* 5 U.S.C. § 706 (instructing courts to take "due account . . . of the rule of prejudicial error" in administrative challenges). Each of these factors weighs against vacatur.

The alleged harm to Centripetal is difficult to credit when Centripetal does not even suggest that the Board panel that made the final decision on patentability included a judge with a conflict of interest. That three-judge panel considered the written briefs and evidence submitted during the proceeding, heard oral argument from the parties, and issued a detailed decision resolving the validity of the challenged claims. *See* Appx5-6; Appx38-55; *see also In re Centripetal*, 2023 WL 3477282, at *1 (denying mandamus in part because APJ McNamara would "not be a member of the panel that decides the ultimate merits"). Centripetal has little basis to object when it received a full and fair agency adjudication of the merits of the challenge to its patent

followed by the opportunity for "judicial review of patentability." *Thryv, Inc v. Click-To-Call Techs., LP*, 140 S. Ct. 1367, 1374 (2020).

By contrast, Palo Alto would be penalized merely because Centripetal has chosen to sue Cisco over the same patent and because Cisco sought to join the proceeding after institution. Vacatur would not only squander the time and resources spent in the proceeding but would also leave "enforceable" patent claims that have been found invalid by a panel of expert administrative judges whose impartiality is unquestioned. *Thryv*, 140 S. Ct. at 1374. That result would thwart the streamlined procedure that Congress established "to weed out" invalid patent claims, *id.*, and would undermine "the public's paramount interest in seeing that patent monopolies are kept within their legitimate scope" to avoid stifling competition and innovation, *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1374 (2018) (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 279-80 (2016)).

No prejudice resulted from APJ McNamara's membership on the panel at an earlier stage of the proceeding. The institution decision reached no final determinations about "the patentability of any challenged claim" or "any other legal or factual issue," Appx207, and the joinder decision directed that Cisco could not raise new evidence, arguments, or unpatentability grounds, Appx270-271; *cf. Cuozzo*, 579 U.S. at 272 (doubting that Congress "thought that the agency's final decision could be unwound under some minor statutory technicality related to its preliminary decision to institute inter partes review"). Furthermore, Centripetal sought rehearing of both

decisions before panels that did not include APJ McNamara, but neither the Precedential Opinion Panel nor the reconstituted Board panel saw grounds to revisit them. Appx55-57; Appx6272-6273. And in all events, Centripetal was permitted to present its evidence and arguments to the three-judge panel that rendered the final decision.

Centripetal also makes no real effort to reconcile its requested relief with its delay in "raising a known ground for recusal." *Centripetal*, 38 F.4th at 1035. APJ McNamara has disclosed his ownership of Cisco stock since at least 2015, and Centripetal had his financial disclosure forms by September 29, 2022. Yet Centripetal did not file a recusal motion until December 30, 2022. Even focusing on the period from September to December, Centripetal's unnecessary three-month delay consumed more than a quarter of the one-year period to complete the inter partes review proceeding. *See* 35 U.S.C. § 316(a)(11). The Board did not abuse its discretion in concluding that this timing "strongly suggests" that Centripetal was strategically waiting to see if it received "a favorable decision" from either the Supreme Court or the Precedential Opinion Panel before deciding whether to raise the recusal issue. Appx81-82; *see In re United Shoe Mach. Corp.*, 276 F.2d 77, 79 (1st Cir. 1960) ("[A] party, knowing of a ground for requesting disqualification, can not be permitted to wait and decide whether he likes subsequent treatment that he receives.").

Nor is this a case where an adjudicator failed to "carefully examine possible grounds for disqualification" or to "promptly disclose them when discovered."

28

*Liljeberg*, 486 U.S. at 868.  APJ McNamara's financial disclosure information is publicly available, and the record shows that he was attentive to and proactive about potential financial conflicts.  Three business days after Centripetal filed its recusal motion, APJ McNamara explained why his participation comported with applicable ethics rules but nonetheless withdrew from the case to "reduce the number of issues and simplify the briefing."  Appx6651-6652.  As noted above, his withdrawal allowed a reconstituted panel to consider the merits of the recusal issue and the patentability challenge.

For many of the same reasons, sustaining the final decision reached by a panel of APJs who undisputedly have no conflict in the matter would not impair "the public's confidence" in the administrative process.  *Liljeberg*, 486 U.S. at 864.  APJ McNamara did not act akin to the district judge in *Centripetal*, who issued merits rulings in "a case in which he ha[d] a known financial interest in one of the parties," 38 F.4th at 1039, but instead promptly withdrew to eliminate any semblance of partiality.  More broadly, Centripetal does not (Br. 38-39) identify, let alone substantiate, any widespread public perception that the facts of this case "are symptomatic of an increasingly common problem" among executive employees. *Centripetal*, 38 F.4th at 1038.  In fact, OGE solicited public input before issuing and amending its regulations, and several commenters supported the increase to $15,000 of the de minimis threshold in § 2640.202(a).  *See* 67 Fed. Reg. at 12,444. APJ McNamara's participation at a preliminary stage of this case while holding Cisco

stock worth less than that amount does not call into question the final written

decision issued after a full trial-like proceeding without his involvement.

## CONCLUSION

For the foregoing reasons, this Court should uphold the Patent Trial and

Appeal Board's decision that the administrative proceeding comported with applicable

ethics rules and due process.

Respectfully submitted,

*Of Counsel:*

FARHEENA Y. RASHEED
  *Acting Solicitor*

AMY J. NELSON
  *Acting Deputy Solicitor*

ROBERT J. MCMANUS
  *Senior IP Legal Counsel*

PETER AYERS
  *Senior Counsel for Patent Law and Litigation*

KAKOLI CAPRIHAN
  *Associate Solicitor*

  *U.S. Patent and Trademark Office*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JOSHUA M. SALZMAN

 */s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

January 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Brian J. Springer*
Brian J. Springer

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Circuit Rule 32(b)(1) because it contains 7,479 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer

**ADDENDUM**

# TABLE OF CONTENTS

5 C.F.R. § 2635.401 .................................................................................A1

5 C.F.R. § 2635.402 .................................................................................A1

5 C.F.R. § 2640.202 .................................................................................A4

## 5 C.F.R. § 2635.401

### § 2635.401. Overview.

This subpart contains two provisions relating to financial interests. One is a disqualification requirement and the other is a prohibition on acquiring or continuing to hold specific financial interests. An employee may acquire or hold any financial interest not prohibited by § 2635.403. Notwithstanding that his acquisition or holding of a particular interest is proper, an employee is prohibited in accordance with § 2635.402 of this subpart from participating in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him has a financial interest, if the particular matter will have a direct and predictable effect on that interest. See also part 2640 of this chapter, for additional guidance amplifying § 2635.402.


## 5 C.F.R. § 2635.402

### § 2635.402. Disqualifying financial interests.

**(a) *Statutory prohibition.*** An employee is prohibited by criminal statute, 18 U.S.C. 208(a), from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him under this statute has a financial interest, if the particular matter will have a direct and predictable effect on that interest.

> **Note:**
>
> Standards applicable when seeking non-Federal employment are contained in subpart F of this part and, if followed, will ensure that an employee does not violate 18 U.S.C. 208(a) or this section when he is negotiating for or has an arrangement concerning future employment. In all other cases where the employee's participation would violate 18 U.S.C. 208(a), an employee shall disqualify himself from participation in the matter in accordance with paragraph (c) of this section or obtain a waiver or determine that an exemption applies, as described in paragraph (d) of this section.

**(b) *Definitions.*** For purposes of this section, the following definitions shall apply:

**(1) *Direct and predictable effect.***

**(i)** A particular matter will have a direct effect on a financial interest if there is a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest. An effect may be direct even though it does not occur immediately. A

A1

particular matter will not have a direct effect on a financial interest, however, if the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter. A particular matter that has an effect on a financial interest only as a consequence of its effects on the general economy does not have a direct effect within the meaning of this subpart.

**(ii)** A particular matter will have a predictable effect if there is a real, as opposed to a speculative possibility that the matter will affect the financial interest. It is not necessary, however, that the magnitude of the gain or loss be known, and the dollar amount of the gain or loss is immaterial.

**Note:**

If a particular matter involves a specific party or parties, generally the matter will at most only have a direct and predictable effect, for purposes of this subpart, on a financial interest of the employee in or with a party, such as the employee's interest by virtue of owning stock. There may, however, be some situations in which, under the above standards, a particular matter will have a direct and predictable effect on an employee's financial interests in or with a nonparty. For example, if a party is a corporation, a particular matter may also have a direct and predictable effect on an employee's financial interests through ownership of stock in an affiliate, parent, or subsidiary of that party. Similarly, the disposition of a protest against the award of a contract to a particular company may also have a direct and predictable effect on an employee's financial interest in another company listed as a subcontractor in the proposal of one of the competing offerors.

**Example 1:**

An employee of the National Library of Medicine at the National Institutes of Health has just been asked to serve on the technical evaluation panel to review proposals for a new library computer search system. DEF Computer Corporation, a closely held company in which he and his wife own a majority of the stock, has submitted a proposal. Because award of the systems contract to DEF or to any other offeror will have a direct and predictable effect on both his and his wife's financial interests, the employee cannot participate on the technical evaluation team unless his disqualification has been waived.

**Example 2:**

Upon assignment to the technical evaluation panel, the employee in the preceding example finds that DEF Computer Corporation has not submitted a proposal. Rather, LMN Corp., with which DEF competes for private sector business, is one of the six offerors. The employee is not disqualified from serving on the technical evaluation panel. Any effect on the employee's financial interests as a result of the agency's decision to award or not award the systems contract to LMN would be at most indirect and speculative.

. . .

**(3)** *Particular matter.* The term particular matter encompasses only matters that involve deliberation, decision, or action that is focused upon the interests of specific persons, or a discrete and identifiable class of persons. Such a matter is covered by this subpart even if it does not involve formal parties and may include governmental action such as legislation or policy-making that is narrowly focused on the interests of such a discrete and identifiable class of persons. The term particular matter, however, does not extend to the consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons. The particular matters covered by this subpart include a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation or arrest.

**Example 1:**

The Internal Revenue Service's amendment of its regulations to change the manner in which depreciation is calculated is not a particular matter, nor is the Social Security Administration's consideration of changes to its appeal procedures for disability claimants.

**Example 2:**

Consideration by the Interstate Commerce Commission of regulations establishing safety standards for trucks on interstate highways involves a particular matter.

**(4)** *Personal and substantial.* To participate personally means to participate directly. It includes the direct and active supervision of the participation of a subordinate in the matter. To participate substantially means that the employee's involvement is of significance to the matter. Participation may be substantial even though it is not determinative of the outcome of a particular matter. However, it requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. A finding of substantiality

should be based not only on the effort devoted to a matter, but also on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participating in a critical step may be substantial. Personal and substantial participation may occur when, for example, an employee participates through decision, approval, disapproval, recommendation, investigation or the rendering of advice in a particular matter.

(c) *Disqualification.* Unless the employee is authorized to participate in the particular matter by virtue of a waiver or exemption described in paragraph (d) of this section or because the interest has been divested in accordance with paragraph (e) of this section, an employee shall disqualify himself from participating in a particular matter in which, to his knowledge, he or a person whose interests are imputed to him has a financial interest, if the particular matter will have a direct and predictable effect on that interest. Disqualification is accomplished by not participating in the particular matter.

. . .

(d) *Waiver of or exemptions from disqualification.* An employee who would otherwise be disqualified by 18 U.S.C. 208(a) may be permitted to participate in a particular matter where the otherwise disqualifying financial interest is the subject of a regulatory exemption or individual waiver described in this paragraph, or results from certain Indian birthrights as described in 18 U.S.C. 208(b)(4).

(1) *Regulatory exemptions.* Under 18 U.S.C. 208(b)(2), regulatory exemptions of general applicability have been issued by the Office of Government Ethics, based on its determination that particular interests are too remote or too inconsequential to affect the integrity of the services of employees to whom those exemptions apply. See the regulations in subpart B of part 2640 of this chapter, which supersede any preexisting agency regulatory exemptions.

. . .

. . .

## 5 C.F.R. § 2640.202

### § 2640.202. Exemptions for interests in securities.

(a) *De minimis exemption for matters involving parties.* An employee may participate in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership by the employee, his spouse or minor children of securities issued by one or more entities affected by the matter, if:

**(1)** The securities are publicly traded, or are long-term Federal Government, or are municipal securities; and

**(2)** The aggregate market value of the holdings of the employee, his spouse, and his minor children in the securities of all entities does not exceed $15,000.

> **Example 1 to paragraph (a):**
>
> An employee owns 100 shares of publicly traded stock valued at $3,000 in XYZ Corporation. As part of his official duties, the employee is evaluating bids for performing computer maintenance services at his agency and discovers that XYZ Corporation is one of the companies that has submitted a bid. The employee is not required to recuse himself from continuing to evaluate the bids.

> **Example 2 to paragraph (a):**
>
> In the preceding example, the employee and his spouse each own $8,000 worth of stock in XYZ Corporation, resulting in ownership of $16,000 worth of stock by the employee and his spouse. The exemption in paragraph (a) of this section would not permit the employee to participate in the evaluation of bids because the aggregate market value of the holdings of the employee, spouse and minor children in XYZ Corporation exceeds $15,000. The employee could, however, seek an individual waiver under 18 U.S.C. 208(b)(1) in order to participate in the evaluation of bids.

> **Example 3 to paragraph (a):**
>
> An employee is assigned to monitor XYZ Corporation's performance of a contract to provide computer maintenance services at the employee's agency. At the time the employee is first assigned these duties, he owns publicly traded stock in XYZ Corporation valued at less than $15,000. During the time the contract is being performed, however, the value of the employee's stock increases to $17,500. When the employee knows that the value of his stock exceeds $15,000, he must disqualify himself from any further participation in matters affecting XYZ Corporation or seek an individual waiver under 18 U.S.C. 208(b)(1). Alternatively, the employee may divest the portion of his XYZ stock that exceeds $15,000. This can be accomplished through a standing order with his broker to sell when the value of the stock exceeds $15,000.

**(b)** *De minimis exemption for matters affecting nonparties.* An employee may participate in any particular matter involving specific parties in which the disqualifying financial interest arises from the ownership by the employee, his spouse,

or minor children of securities issued by one or more entities that are not parties to the matter but that are affected by the matter, if:

**(1)** The securities are publicly traded, or are long-term Federal Government or municipal securities; and

**(2)** The aggregate market value of the holdings of the employee, his spouse and minor children in the securities of all affected entities (including securities exempted under paragraph (a) of this section) does not exceed $25,000.

### Example 1 to paragraph (b):

A Food and Drug Administration advisory committee is asked to review a new drug application from Alpha Drug Co. for a new lung cancer drug. A member of the advisory committee owns $20,000 worth of stock in Mega Drug Co., which manufactures the only similar lung cancer drug on the market. If approved, the Alpha Drug Co.'s drug would directly compete with the drug sold by the Mega Drug Co., resulting in decreased sales of its lung cancer drug. The committee member may participate in the review of the new drug.

. . .