# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————

CENTRIPETAL NETWORKS, LLC,

*Appellant*,

v.

PALO ALTO NETWORKS, INC., CISCO SYSTEMS, INC.,
KEYSIGHT TECHNOLOGIES, INC.,

*Appellees*,

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office,

*Intervenor.*

———————

On Appeal from the United States Patent and Trademark Office
Nos. IPR2022-00182, IPR2022-001151, IPR2022-01199

———————

## APPELLANT'S REPLY BRIEF

———————

MATTHEW J. DOWD
ROBERT J. SCHEFFEL
DOWD SCHEFFEL PLLC
1717 Pennsylvania Ave.,
NW Ste 1025
Washington, D.C. 20006
(202) 559-9175

PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Appellant Centripetal Networks, LLC*

March 11, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

ARGUMENT ........................................................................................ 3

I.    The Proceedings Were Tainted By Actual And Apparent Impartiality .......... 3

    A.    The Board Flouted Executive-Branch Regulations and the Fundamental Principles Underlying Them .......................................... 3

    B.    Centripetal Did Not Unduly Delay in Requesting Recusal .............. 10

    C.    Vacatur Is Necessary ........................................................ 12

II.    The Board's Decision Contains Fatal Procedural Errors ............................. 15

    A.    The Board Violated the APA and the Due Process Clause ................. 15

    B.    The Board Also Violated Statutory Limitations on IPR ..................... 20

III.    The Board's Unpatentability Rulings Cannot Stand ................................... 21

    A.    Buruganahalli Does Not Disclose the Challenged Claims' Rule-Based Filtering of Encrypted Packets ................................................. 22

        1.    The Board disregarded the challenged claims' plain language ...................................................................... 22

        2.    The Board adopted a wholly unsustainable construction of "Uniform Resource Identifier" ....................... 24

        3.    The Board ignored unrebutted evidence that Centripetal's invention is a significant advance over the prior art ...................................................................... 27

    B.    The Board Improperly Discounted or Dismissed Centripetal's Objective Evidence of Nonobviousness ............................................. 29

        1.    The Board ignored compelling evidence that Cisco copied the challenged claims .................................................. 29

        2.    The Board unduly minimized Centripetal's evidence that the challenged claims satisfy a long-felt need ................. 30

CONCLUSION ................................................................................................. 31

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Corephotonics, Ltd.*,
  81 F.4th 1353 (Fed. Cir. 2023).................................................. 15, 20

*Carman v. United States*,
  75 F.Supp. 717 (Ct. Cl. 1948) .............................................................7

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
  38 F.4th 1025 (Fed. Cir. 2022)................................................... 12, 14

*Chianelli v. EPA*,
  8 F.App'x 971 (Fed. Cir. 2001)............................................................12

*Cuozzo Speed Techs., LLC v. Lee*,
  579 U.S. 261 (2016)............................................................................14

*CyWee Group Ltd. v. Google LLC*,
  59 F.4th 1263 (Fed. Cir. 2023).............................................................12

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
  881 F.3d 1354 (Fed. Cir. 2018)............................................................28

*Google LLC v. EcoFactor, Inc.*,
  92 F.4th 1049 (Fed. Cir. 2024).............................................................26

*In re Centripetal Networks, LLC*,
  2023 WL 3477282 (Fed. Cir. 2023).....................................................15

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016)............................................................15

*In re Murchison*,
  349 U.S. 133 (1955)............................................................................13

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004).............................................................21

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  941 F.3d 1133 (Fed. Cir. 2019) ...........................................................29

*Mayfield v. Nicholson*,
   444 F.3d 1328 (Fed. Cir. 2006) .........................................................26

*Preemption Devices, Inc., v. Minn. Min. & Mfg. Co.*,
   732 F.2d 903 (Fed. Cir. 1984) ...........................................................28

*SAS Inst., Inc. v. Iancu*,
   138 S.Ct. 1348 (2018) .......................................................................21

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ..................................................................... 24, 26

*United States v. Kelley*,
   712 F.2d 884 (1st Cir. 1983) .............................................................11

*Williams v. Pennsylvania*,
   579 U.S. 1 (2016) ....................................................................... 13, 14

**Statutes**

18 U.S.C. §208(a) .................................................................................4

18 U.S.C. §208(b)(2) .............................................................................4

18 U.S.C. §216(a)(1) .............................................................................4

18 U.S.C. §216(b) .................................................................................4

35 U.S.C. §316(a)(11) .....................................................................11, 12

**Regulations**

5 C.F.R. §2635.101 ...............................................................................4

5 C.F.R. §2635.501(a) .........................................................................3, 4

5 C.F.R. §2635.501 note ....................................................................... 5

5 C.F.R. §2635.502(a) ...........................................................................6

5 C.F.R. §2635.502(d) .........................................................................5, 8

5 C.F.R. §2635.503(a) ...........................................................................7

5 C.F.R. §2638.102 ............................................................................. 6

## INTRODUCTION

In back-to-back adjudications involving the same patent, Centripetal Networks, LLC, was subjected to the ultimate double standard. In round one, Centripetal saw a $2.6-billion judgment against Cisco Systems, Inc., wiped out because a district court judge belatedly discovered that his wife owned roughly $4,500 in Cisco stock. In round two, an APJ who owned up to *three times more* Cisco stock not only instituted an IPR that could insulate Cisco from billions of dollars in infringement liability, but granted Cisco's request to join those proceedings—and then when Centripetal understandably cried foul, the APJ decried Centripetal's request for recusal as meritless on his way out the door, and his colleagues followed up by threatening Centripetal with sanctions. That result is so palpably unfair that intervening PTO guidance will ensure that it never happens again. But in a remarkable act of dissonance, the PTO and Appellees insist that Centripetal is entitled to no relief whatsoever. That position defies the applicable regulations, non-negotiable due process guarantees, and common sense.

The PTO and Appellees would have this Court look only to 5 C.F.R. §2640.202, which provides a safe harbor from criminal liability when executive-branch officials fail to recuse from matters despite owning up to $15,000 in stock in an affected party. But §2640.202 hardly stands alone. Criminal liability aside, other provisions demand recusal to avoid the appearance of partiality, and the PTO itself

now recognizes that "the *appearance* of conflicts of interest may counsel in favor of recusal" even though an official's stock holdings fall within the safe harbor. PTO Mem. 2, bit.ly/468iVic. The PTO has no valid basis for denying Centripetal the right to the appearance and reality of an impartial adjudicator that it will now provide *every other party* going forward. This Court should remedy that failure and vacate and remand with instructions to begin afresh before a truly impartial panel of APJs.

Beyond this serious ethical issue, the Board's decision suffers from several procedural and substantive flaws. The Board ruled against Centripetal by adopting arguments that no party ever advanced, including that Centripetal's '856 patent does not adequately explain how to apply its claimed rules to encrypted packets. Even if Appellees *had* raised such an argument, the Board *still* could not have considered it given the statutory limits on IPR. In all events, the Board's substantive conclusions about the '856 patent are untenable. The Board ignored abundant evidence that Centripetal's technology is a significant advance over the prior art of Buruganahalli. It is no surprise, then, that the Board's conclusion that the prior art is "essentially the same" as the challenged claims blinks reality: Buruganahalli merely sorted data flows at the threshold based on a top-level domain name, whereas the '856 patent discloses a far more sophisticated method of filtering encrypted traffic in real time, based on specified rules. The Board's decision should be reversed.

# ARGUMENT

## I. The Proceedings Were Tainted By Actual And Apparent Impartiality.

### A. The Board Flouted Executive-Branch Regulations and the Fundamental Principles Underlying Them.

In light of the Director's intervening guidance, one might have expected the PTO's intervenor brief to include a *mea culpa*, if not an outright confession of error. Instead, it appears the substance of the Director's message (as opposed to its effective date) has not yet reached the agency's litigators, as they have doubled down on the Board's theory that there is nothing to see here because 5 C.F.R. §2640.202's safe harbor from criminal liability begins and ends the ethics analysis. That misguided theory cannot be squared with the text and structure of the regulations, the fundamental due process principles animating them, or basic common sense.

Office of Government Ethics regulations put appearance-of-impartiality concerns front-and-center and do not waive them for four-figure holdings. All federal employees, not just those in adjudicative roles or those serving in senior posts, must "take[] appropriate steps to avoid an appearance of loss of impartiality in the performance of [their] official duties." 5 C.F.R. §2635.501(a). Consistent with that obligation, "an employee should not participate in [any] matter involving specific parties which he knows is likely to affect the financial interests of a member of his household" if "a reasonable person with knowledge of the relevant facts would

question his impartiality in the matter." *Id.* Thinking oneself impartial is not enough; appearances matter.

Nor does an official discharge his responsibilities to the parties and the broader public simply by doing the minimum necessary to avoid criminal liability. It is generally a crime for an executive-branch "officer or employee" to "participate[] personally and substantially" in any "matter in which" he knows that he or a loved one "has a financial interest." 18 U.S.C. §208(a). Given the stakes—even *non*-willful violators face up to a year in prison and a $50,000 fine, *id.* §216(a)(1), (b)— Congress authorized "the Director of the Office of Government Ethics" to create a safe harbor from criminal liability. *Id.* §208(b)(2). The Director did so, as relevant here, in 5 C.F.R. §2640.202(a), which provides a bright-line rule: Federal officials will not face imprisonment for participating in matters involving parties in which they own less than $15,000 in publicly traded stock. A bright-line rule may make sense when it comes to criminal liability. But it should go without saying that doing just enough to avoid imprisonment will not always "ensure that every citizen can have complete confidence in the integrity of [the relevant proceedings]," let alone dispel "a reasonable person['s]" qualms about adjudicative officers owning party stock. 5 C.F.R. §§2635.101, 2635.501(a).

Indeed, the OGE regulations make the point explicit. Because "[q]uestions regarding impartiality *necessarily arise* when an employee's official duties impact

upon the employee's own financial interests," *id.* §2635.501 note (emphasis added), the regulations counsel all federal employees to recuse from any matter in which they own an interest in a party, *even one sufficiently small that participating* "*would not violate 18 U.S.C. 208(a)*," whenever their participation would "raise a question in the mind of a reasonable person about [their] impartiality," *id.* §2635.502(d) (emphasis added).

That should have made this a straightforward case for recusal. APJ McNamara instituted IPR of the '856 patent and granted Cisco's joinder motion with full knowledge that invalidating Centripetal's patent could insulate Cisco from billions in liability. That was no abstraction; when he voted to institute IPR, APJ McNamara was well aware that Cisco was facing a $2.6-*billion* infringement verdict (which had not yet been vacated), as Centripetal's preliminary response argued that the IPR petition was an improper effort to attack that verdict. *See* Appx3915-3918; Appx3937-3946. Yet rather than recuse in light of Cisco's interest, APJ McNamara instituted the IPR, allowed Cisco to join it, and only then withdrew while decrying Centripetal's recusal motion as meritless. Appx0118; Appx0210-0211; Appx0247-0248; Appx6652; Br.19-20. That extraordinary rebuke all but ensured his colleagues would continue to carry the torch after he withdrew. And that is exactly what happened: APJ Moore not only remained on the panel, but blasted Centripetal for daring to raise concerns about APJ McNamara's stock ownership, Appx0061-0083;

asked *every single question* at the oral hearing; Appx7020-7080; and authored the final decision holding the '856 patent invalid, Appx0001-0060. With that full "knowledge of the relevant facts," it is difficult to see how a "reasonable person" would *not* have concerns about the Board's conduct in this case. *See* 5 C.F.R. §2635.502(a).

The Board's vitriolic response to Centripetal's recusal motion only served to underscore the problem. *See* Appx0074; Appx0082; Br.20-21. The PTO pointedly chooses to ignore this vitriol rather than defend the indefensible. Appellees, for their part, dismiss the Board's harshness, comparing it to purportedly "inflamed rhetoric" in Centripetal's opening brief. Resp.43. Talk about apples and oranges. Centripetal is a litigant, and its counsel are ethically obligated to represent it zealously. The Board's members, in contrast, are ethically obligated to deliver the reality and appearance of impartiality. Chastising a litigant for raising an ethical concern sufficiently serious *that the Director will not let it recur* is pretty much the opposite.

The PTO and Appellees twist themselves into knots trying to deny that appearances matter here. *See* PTO.Br.18-21; Resp.36-38. They even go so far as to claim that "overarching principles" like "'impartiality'" and "'act[ing] at all times in the public's interest'" are inapposite. Resp.36 (quoting 5 C.F.R. §2638.102). Fortunately for the rule of law, they are mistaken.

For instance, the PTO claims that 5 C.F.R. §2635.502(d), which makes clear that recusal may still be called for even when an official's holding is below the safe-harbor threshold, applies only in "situations where an employee has a relationship with someone whose interest would be affected by a particular matter," not where the employee *himself* is the one with the interest. PTO.Br.20; *see also* Resp.38. That assertion defies not just text and structure, but all reason. Section 2635.502 is housed in part 2635's subpart E, which is titled "Impartiality in Performing Official Duties." Subpart E explicitly governs cases in which the financial conflict is *the official's own* direct conflict, not just a loved one's. *See, e.g.*, 5 C.F.R. §2635.503(a) (executive-branch official may not "participat[e]" in matters in which his "former employer is a party or represents a party if he received an extraordinary payment from that [employer] prior to entering Government service"). And while §2635.502 refers to "financial interest[s] of a member of [an official's] household," that does not mean that it exempts federal officials' own personal financial interests. To state the obvious, a federal official is a member of his own household. *See, e.g.*, *Carman v. United States*, 75 F.Supp. 717, 719 (Ct. Cl. 1948) ("The members of his household consisted of himself and his wife[.]"). There is thus no reason to read subpart E generally or §2635.502(d) specifically to be more permissive about an adjudicator's own financial holdings than those of his parent or paramour.

As a fallback, the PTO asserts that superiors may authorize non-recusal when "the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's … operations." PTO.Br.20-21; 5 C.F.R. §2635.502(d). But the Board did not invoke that provision here, and for good reason. Given the high stakes and litigation-like nature of IPR proceedings and the constitutional underpinnings of the appearance-of-impartiality standard, it is doubtful that a superior could dispense with the appearance of impartiality in IPR proceedings based on the government's assessment of its own interest in administrative convenience.

Switching gears, Appellees claim that Centripetal conceded in its *Cisco* certiorari briefing that APJ McNamara's stock holding was "permissible." Resp.31. Nonsense. Centripetal's certiorari briefing posed the same (as-yet-unanswered) question posed here: Given that the "'ultimate concern is the public's perception of fair justice, how can it be acceptable for an APJ to rule in favor of a company in which he holds $14,999 in stock, but irrelevant'" that a district court judge "'ruled *against* his *much smaller* financial interest?'" Resp.15 (quoting Centripetal Cert. Reply). What Centripetal argued in the *Cisco* proceedings, in other words, was that two things could not both be true (especially in litigating a single patent): (1) a $4,500 financial interest held by a family member of a federal judge necessitates

vacatur of a multibillion-dollar judgment; and (2) a financial interest more than three times that size held by an APJ himself does not create an appearance of impropriety.

Finally, Appellees and the PTO complain that APJs should not be subject to "special" rules. Resp.38; PTO.Br.3. That ignores that APJs discharge a "special" function, and that determining whether an executive-branch officer appears impartial to the objective observer is necessarily case-specific and context-sensitive. While every executive-branch official should appear impartial to the citizenry, only a few oversee adversary proceedings, bear the title of "judge," and take on all the trappings of the courtroom. Thus, while the appearance-of-impartiality standard may be the same across the executive branch, what is necessary to satisfy that standard is not one-size-fits-all. *See* Br.32-34.

Even the PTO has belatedly recognized as much. Given "PTAB and TTAB judges' unique roles," the PTO will "avoid empaneling cases to judges" with a financial interest, "*regardless of the dollar value*," going forward. PTO Mem. 2 (emphasis in original). The Director's Memorandum reiterates that the "*appearance of conflicts of interest*" is sufficient to "counsel in favor of recusal even when the financial interests in question fall below the thresholds identified." *Id.* Indeed, if an APJ learns after being empaneled that she or a family member owns a stake in a party, then the APJ now must "either request repaneling or confer with the USPTO's Office of General Counsel." *Id.* at 3-4. Thus, under the current standard, even a

single dollar of Cisco stock would be sufficient to render an APJ conflicted at the outset. Juxtaposing the PTO's new zero-tolerance approach with the Board's vitriolic reaction to Centripetal's concerns shows precisely why the Board's conduct would not appear impartial to a reasonable observer.

## B. Centripetal Did Not Unduly Delay in Requesting Recusal.

Rather than confront "the merits of Centripetal's challenge" directly, Resp.34, Appellees complain about *when* Centripetal raised it. But there was no delay, strategic or otherwise, in filing the recusal motion. Nor do Appellees (or the PTO) point to any authority indicating that financial holdings and appearances of partiality can be ignored if they are not raised at the earliest juncture. In all events, the only reason the recusal motion was not filed sooner was the need for due diligence—a necessary (and laudable) antecedent step before filing a recusal motion.

Centripetal did not receive APJ McNamara's financial disclosures for the years 2014 through 2019 until September 29, 2022. Appx0081. Those disclosures made clear that a conflicted APJ was on the instituting panel. Centripetal then promptly compiled and submitted requests to the Department of Commerce for additional disclosures covering APJ McNamara's more recent financial holdings. Br.37. The Department did not respond until November 16, 2022—and when it did, it issued a "warning" that Centripetal's submission "could appear to be requested for

commercial use" and thus could be a *criminal* "violation."[1]  That warning understandably led Centripetal and its counsel to undertake further evaluation. Appellees' suggestion that Centripetal nonetheless should have raced to file a recusal motion in these circumstances is fanciful.

Appellees attack Centripetal's due-diligence efforts, claiming that "three months can be unacceptably long" "[i]n context."  Resp.33.  But the only "context" they cite is a forty-year-old out-of-circuit case in which a statutory deadline required an affidavit to be filed "not less than ten days before the beginning of the term at which the proceeding is to be heard."  *United States v. Kelley*, 712 F.2d 884, 887 (1st Cir. 1983).  This case could not be more different.  The defendant in *Kelley* took no action between learning of the new evidence and eventually informing the court (well after the statutory deadline had passed); Centripetal worked diligently to acquire the information it needed before taking the serious step of filing a motion for recusal.

The PTO complains that Centripetal's due diligence consumed a substantial amount of the one-year period allotted for IPR.  *See* PTO.Br.28.  But the agency ignores that the Director can "extend the 1-year period" for an additional six months "for good cause," 35 U.S.C. §316(a)(11), and can even "adjust the time … in the

---

[1] The email communication did not find its way into the PTAB record, though Centripetal can provide it to the Court if needed.

case of joinder," *id.*; *see, e.g.*, *CyWee Group Ltd. v. Google LLC*, 59 F.4th 1263, 1267 (Fed. Cir. 2023).  Doing so here would have been eminently reasonable—and certainly far more so than lambasting Centripetal for raising concerns that the Director now agrees are sufficiently weighty to justify recusal going forward.

### C.    Vacatur Is Necessary.

It is "inimical to the credibility of the judiciary" for a judge to preside over a case in which he or his family has a financial interest; it is an even more serious problem for "courts to allow those rulings to stand." *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1038-39 (Fed. Cir. 2022).  Indeed, "denial of the right to an impartial judge can never be harmless error." *Chianelli v. EPA*, 8 F.App'x 971, 980 (Fed. Cir. 2001).  Those principles demand vacatur here.

Because APJ McNamara's conflict tainted the entire proceeding, justice requires vacatur all the way down.  As discussed, *see supra* p.5, APJ McNamara was fully aware that Cisco had a direct and material interest in the proceedings *before* he voted to institute IPR, as Centripetal's preliminary response argued that the IPR petition was an improper attempt to attack the multibillion-dollar judgment Centripetal had secured against Cisco.  The fundamental error below was that a conflicted APJ actively participated in the initial decision to institute IPR.

Justice requires vacatur of the Board's joinder decisions for similar reasons.  APJ McNamara's vote-now, withdraw-later approach to recusals is indefensible.

While Centripetal may not have a "right to choose its adversaries," Resp.46, it certainly has a right to an impartial adjudicator and untainted panel. *See, e.g.*, *In re Murchison,* 349 U.S. 133, 136 (1955) (recognizing the right to trial by impartial decisionmakers as a basic requirement of due process). And, *contra* PTO.Br.17-18, 29, APJ McNamara's withdrawal did not solve the problem because APJ Moore participated in the proceedings from start to finish. Indeed, APJ Moore picked up right where APJ McNamara left off—excoriating Centripetal's recusal motion, asking *every single question* at argument, and authoring the final written decision. *See supra* pp.5-6. Simply put, the panel that ultimately invalidated the '856 patent remained irrevocably tainted.

In arguing to the contrary, Appellees misread *Williams v. Pennsylvania*, 579 U.S. 1 (2016). *See* Resp.47. *Williams* is unequivocal that the "participation" of a conflicted judge affects the "whole adjudicatory framework." 579 U.S. at 16. That is why a conflicted judge's failure to recuse is "structural error even if [he] did not cast a deciding vote." *Id.* at 14. In *Williams*, the "inability to guarantee complete relief" did not "justify withholding a remedy altogether," *id.* at 16, and the Court remanded for rehearing "before the disqualified judge's colleagues." Resp.47. Here, however, not all APJs were "exposed to a disqualified judge," *Williams*, 579 U.S. at 16, so Centripetal is not doomed to the same imperfect remedy. On the flip side,

denying vacatur here would "produce injustice in other cases" and undermine the public's confidence in the judicial process. *Centripetal*, 38 F.4th at 1038.

As explained, the "increasingly common problem" of financially interested adjudicators has the attention of major newspapers, Congress, and belatedly even the PTO. *Id.* at 1038-39. The Board's treatment of Centripetal makes this a particularly easy case for a full remedy: If a party seeks recusal of an APJ who could not even be empaneled under current PTO policy and is met with inflamed reprisals rather than a measured response, it "simply cannot plausibly be argued that public confidence in the judiciary will be degraded by a decision [to] vacate." *Id.* at 1039. In all events, vacatur will do justice in this case but will not have an outsized prospective effect, as the PTO now ensures a fair process at the outset. *See, e.g.*, *Williams*, 579 U.S. at 14 ("The fact that most jurisdictions have these rules in place suggests that today's decision will not occasion a significant change in recusal practice.").

Appellees (but not the PTO) make a last-ditch effort to prevent vacatur by claiming that this Court "lacks jurisdiction to do so" because 35 U.S.C. §314(d) bars appellate review of the determination whether to institute IPR. Resp.44. But the Supreme Court has gone out of its way not to "categorically preclude review" of decisions to institute IPR in cases where there may be a crosscutting "problem with the entire proceeding." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 275 (2016).

Centripetal pursued mandamus relief in this Court in part to preempt the notion that §314(d) acts as a jurisdictional shield for conflicted APJs. In any event, this Court has already indicated that Centripetal could "raise its arguments"—including APJ McNamara's votes to institute IPR and to join Cisco, and the Board's subsequent threat of sanctions in response to a recusal motion, all of which featured heavily in Centripetal's mandamus arguments—"after [the Board's] final written decision." *In re Centripetal Networks, LLC*, 2023 WL 3477282, at *1 (Fed. Cir. 2023).[2]

## II. The Board's Decision Contains Fatal Procedural Errors.

Ethical issues aside, there are several additional reasons why the Board's decision cannot stand. The PTO does not even attempt to address these flaws, and Appellees' efforts to defend the Board's decision are unavailing.

### A. The Board Violated the APA and the Due Process Clause.

The Board may not "adopt arguments" that "were not[] raised by the petitioner during an IPR." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016); *see, e.g.*, *Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1360-62 (Fed. Cir. 2023). Yet that is exactly what happened below. That alone requires reversal.

---

[2] That alone defeats the PTO's suggestion that Centripetal should have raised its ethical "grievance" with the "OGE itself." PTO.Br.25. So too does the Director's Memorandum; Centripetal raised its grievance directly to the Board, and the agency itself saw fit to respond with precisely the safeguards Centripetal requested—just not for Centripetal's benefit, *see* PTO Mem. at 4.

In the IPR, the parties began from the premise that the '856 patent discloses filtering encrypted packets using a claimed set of rules—as the plain text of the challenged claims makes clear, *see* Appx0015. The disputed issue was whether the prior art of Buruganahalli *also* disclosed filtering encrypted packets using the claimed rules. *Compare* Appx6078-6088 (PAN: "Buruganahalli teaches rule-based filtering of encrypted packets"), *with* Appx6319-6331 (Centripetal: "Buruganahalli does not teach filtering encrypted packets based on the claimed packet-filtering rules"). The Board, however, concocted and embraced a theory that Appellees never raised: that *the '856 patent* "does not describe applying the claimed rules to encrypted packets" in the first place. Appx0004. Setting aside the substantive flaws in that theory, *see infra* pp.21-24, and the fact that it ultimately rests on a purported written-description defect that the Board was statutorily barred from considering, *see infra* pp.20-21, the Board plainly violated the APA and the Due Process Clause by denying Centripetal an opportunity to present briefing or expert testimony to refute the Board's *sua sponte* analysis. *See* Br.40-44.

Appellees cannot avoid this conclusion. They first argue that Centripetal "could and did respond to" the argument *Appellees advanced* before the Board, "which was that Buruganahalli disclosed filtering encrypted packets." Resp.52. That is a non sequitur. To be sure, Centripetal not only responded to but refuted that argument, explaining that Buruganahalli's threshold sorting of packet flows, based

on the hello message, is a far cry from the '856 patent's "filtering [of] encrypted packets based on the claimed packet-filtering rules." Appx6323; *see* Appx6319-6331. But Centripetal had no opportunity to address the very different arguments that *the Board concocted*, which ultimately drove the Board's decision. Appellees never argued that "the '856 patent does not describe applying rules to encrypted pa[ckets]," Appx0044; *see* Appx0004; or that the '856 patent fails to adequately "explain[] how to apply th[e claimed] rules to a packet without decrypting it first," Appx0023; *see* Appx0004; or that the patent examiner made an "error" during prosecution, Appx0044; Appx0004; or that it is not "possible to apply some of [the claimed] rules to encrypted packets," Appx0023. The Board came up with each of those theories, which together formed the crux of its analysis, all by itself—and all without the benefit of briefing or expert testimony.

Unable to credibly claim that they pressed these arguments, Appellees try to rewrite the Board's opinion to obfuscate just how far it departed from what the parties presented. *See* Resp.50-55. But the Board did not merely "note" the examiner's amendment during prosecution, much less as "confirmat[ion] … that the claimed rules need not be applied *directly* to encrypted packets." Resp.51. It undertook a lengthy, *sua sponte* analysis of the amendment, ultimately (but incorrectly) concluding that the amendment was an "error" that resulted in issuance of claims that "recite filtering encrypted packets using a set of criteria appropriate

for decrypted packets, without any explanation of how that can be done." Appx0004; Appx0044; *see* Appx0019-0024. Nor did the Board find that the challenged claims "do[] not require applying packet-filtering rules *directly* to encrypted packets, but merely filtering those packets '*based on*' one or more specified rules." Resp.50-51. In fact, the Board *never drew a distinction* between "direct" and "indirect" application of the claimed rules. That is unsurprising. Although Appellees' brief in this Court repeats, mantra-like, the argument that the '856 patent does not "disclose applying packet-filtering rules *directly* to encrypted packets," Resp.54 (emphasis added); *see also* Resp.2, 23-24, 50-53, 55-56, this theory is new on appeal. None of Appellees' many submissions to the Board below mentioned the purported distinction between rules that act directly on encrypted packets and those that act only indirectly. *See* Appx0353-0401; Appx4141-4150; Appx6077-6101; Appx7124-7157; Appx8833-8868.

Curiously, Appellees assert that Centripetal "agrees" with their revisionist account of the Board's decision. Resp.55. But far from "admit[ting]" that the '856 patent does not "disclose applying packet-filtering rules directly to encrypted packets," Resp.54, Centripetal has consistently maintained that the claims disclose "applying rules directly to encrypted packets" during a secure communication session, Br.22; *see* Br.48, and that its technology need not "analyze the encrypted payload portion of the encrypted packets" when applying the rules, Br.49. That is

not "tr[ying] to have it both ways," Resp.54; it is how Centripetal's innovative method works. Unlike Buruganahalli's method, which merely makes a threshold decision of whether to allow a secure connection and then routes subsequent traffic flows accordingly, the '856 patent discloses rule-based filtering of encrypted packets *during* a secure session. *See* Br.7-10, 15-16, 47-50. Centripetal's technology thus applies rules directly to encrypted packets, such that a subset of encrypted packets within a given session may be "logged," even as other encrypted packets in that same session are "dropped." *See* Br.48-49, Br.53-54; Appx5946-5947(¶65). And while the claimed rules may be *based*, in part, on information found in the encrypted payload of packets that were decrypted during prior sessions, *see* Appx0104-0105(4:64-5:55), they are *applied* without decrypting and examining the payload of the encrypted packets being filtered, *see* Appx5940(¶54) (citing Appx0107-08(9:66-10:14, 11:51-65)).

In short, Appellees' claim that "the Board's bottom-line determination [was] that the packet-filtering rules need not be applied *directly* to encrypted packets," Br.55, is fanciful. The Board was clear: It rejected Centripetal's "primary argument" based on a *sua sponte* determination that "the '856 patent does not describe applying rules to encrypted patents," supposedly because the examiner erred in approving the patent without an adequate "explanation of how that can be done." Appx0004; Appx0044; *see* Appx0023-0024. Because these arguments were not raised below,

the Board erred by adopting them.  *See Corephotonics*, 81 F.4th at 1360-62.  And Appellees do not dispute that this error prejudiced Centripetal.  *Compare* Br.44 n.4, *with* Resp.50-55.

## B.    The Board Also Violated Statutory Limitations on IPR.

The problems with the Board's *sua sponte* analysis run deeper:  It violates §311(b) of the America Invents Act, which does not authorize the cancellation of claims in an IPR based on an inadequate written description under 35 U.S.C. §112.  *See* Br.44-46.  Appellees concede that the Board may not cancel a patent during IPR based on a §112 issue, including written description, even if the issue "ari[ses] in the course of the proceedings."  *Compare* Br.45, *with* Resp.50-55.  They nonetheless maintain that there is no violation here because (they say) the Board "never made" any "written-description finding."  Resp.50.  Appellees hang their hat on footnote 7 of the Board's opinion, which states:  "We do not consider whether these issues might give rise a problem under 35 U.S.C. §112 because this proceeding is limited to grounds 'that could be raised under section 102 or 103.'"  Resp.50 (emphasis omitted) (quoting Appx0024 n.7).  But the Board doth protest too much; its felt-need to include the footnote in the first place just underscores the Board's awareness that it was, in substance, making a finding that the claims, as issued, failed the written-description requirement.  *See* Appx0004; Appx0019-0024; Appx0043-0044.

On Appellees' view, the Board may cancel a patent based on a purported written-description deficiency during IPR, so long as it couches its "ultimate unpatentability" determination in terms of "obviousness." Resp.51-52. That cannot be correct. After all, a (purported) written-description issue can almost always be leveraged, through claim construction, to bolster a §102 or §103 argument; the Board need only rewrite the claims due to a purported lack of written description, and then conclude that the rewritten claims (thus stripped of the innovation) are "the same" as the prior art. Indeed, that is precisely what the Board did here. *See* Appx0004; Appx0023-0024; Appx0043-0044; Appx0049; Appx0053-0054. But just as claims cannot be rewritten to preserve their validity, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004), it is equally impermissible for the Board to rewrite Centripetal's claims under the guise of a written-description analysis in order to reach its "obviousness" conclusion. The Board cannot be permitted to evade the statutory limitations on its power so easily. *See SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1358 n.* (2018) (the Board lacks "power to do indirectly what it cannot do directly").

## III. The Board's Unpatentability Rulings Cannot Stand.

Unsurprisingly, the Board's numerous procedural missteps resulted in major substantive errors that independently require reversal.

### A. Buruganahalli Does Not Disclose the Challenged Claims' Rule-Based Filtering of Encrypted Packets.

#### 1. The Board disregarded the challenged claims' plain language.

The Board's linchpin finding that the '856 patent "does not describe applying the claimed rules to encrypted packets," Appx0004, is flatly inconsistent with the patent's plain text. The challenged claims disclose not only (1) "identifying packets comprising encrypted data" and (2) "determining … packets comprising encrypted data that corresponds to … network-threat indicators," but also (3) "filtering," based on a particular rule criteria, *both* "packets comprising the portion of the unencrypted data" *and* "the determined packets comprising the encrypted data." Appx0115(25:22-45). The patent specification confirms that this rule-based filtering of encrypted packets—using rules to "log … or drop the packets" in steps #19 and #35—is separate from *both* the threshold routing of unencrypted packets (e.g., step #17) *and* the filtering of decrypted data by a proxy (e.g., step #22). *See* Appx0106-0109(8:65-9:46, 9:66-10:14, 10:56-11:35, 14:19-34). The '856 patent thus represents a significant advance over the prior art: Instead of just extracting the top-level destination domain from the "hello message" and using it to make a threshold determination about how to route entire streams from that domain (as Buruganahalli describes), Centripetal's technology filters encrypted packets in the midst of a secure communication session, without decryption, using a wealth of data that it previously collected and logged to perform the analysis. *See* Br.8-10.

The Board initially recognized that, by their terms, the challenged claims "recite filtering encrypted packets" using the claimed rules. Appx0004; *see* Appx0015-0016 (recognizing that step #19 involves the claimed rules "acting on *encrypted* packets"). But it ultimately nullified this key innovative aspect of Centripetal's technology by finding, *sua sponte*, that "it does not appear possible to apply some of [the claimed] rules to encrypted packets." Appx0023; *see* Appx0004; Appx0043-0044. As explained, this was an error because the rules operate based on already logged information and can thus be applied directly to encrypted packets without the decryption that was previously necessary to filter encrypted traffic. Br.49-50; *see* Appx4631-4634. The Board simply failed to grasp this critical aspect of Centripetal's novel technology—which is no surprise, given the lack of briefing or expert testimony focused on the point. *See supra* pp.15-19.

Although Appellees gesture toward what the Board actually found—namely, that the challenged claims (shorn of key innovations) are "essentially the same" as Buruganahalli, Appx0004—they offer no meaningful defense of it. *See* Resp.57 (citing Appx0034; Appx0042-0044; Appx0049; Resp.7-9). Nor could they. Buruganahalli discloses making a threshold determination, before establishing a secure session, of whether to allow the free flow of encrypted messages from a given destination domain, route all traffic from the session to a trusted man-in-the-middle for decryption and analysis, or block any secure session from being established. *See*

Br.7-8.  In contrast, the '856 patent collects and logs data from a variety of sources; uses that data to create detailed rules; and then applies those rules to individual encrypted packets *during* a secure session, without decrypting the packets, such that some packets within a given session may be logged and others may be dropped.  *See* Br.8-10; Appx5946-47 (¶¶64-66); Appx5940(¶¶54-56).  There is simply no universe in which these two technologies are "the same."  Appx0004; Appx0043.

Appellees therefore spend most of their energy defending arguments that bear no resemblance to the ones the Board actually adopted.  First, Appellees reprise their mistaken assertion that the '856 patent "does not require applying any rules directly to the encrypted packets."  Resp.56; *cf.* Resp.50-55.  But, again, the '856 patent *does* apply the claimed rules to encrypted packets; Centripetal has never bought into the Board's denial of that reality; and Appellees' new distinction between "direct" and "indirect" application of packet-filtering rules does not remotely reflect "the Board's understanding of the claims' scope," Resp.56.  *See supra* pp.17-19.  That purported distinction cannot serve as a basis for affirmance; it is found nowhere in the Board's decision, and the decision "cannot be upheld" except on "the grounds upon which the agency acted."  *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).

### 2. The Board adopted a wholly unsustainable construction of "Uniform Resource Identifier."

Appellees do not dispute that the "domain name" Buruganahalli extracts from the handshake traffic is a top-level identifier (e.g., mynetwork.com), while the URI

that the '856 patent uses to filter encrypted packets is a far more specific identifier (e.g., http://www.mynetwork.com/files/downloads/malicious). *Compare* Br.50-51, *with* Resp.61-62. Nor do Appellees dispute that the top-level domain name is found in the unencrypted "hello message," whereas the URI for a particular session is found in the packet's payload, or "application layer." Br.51. Given those undisputed facts, there is not substantial evidence to support the Board's decision to equate the "domain name" Buruganahalli extracts from the handshake traffic with the URI that the '856 patent uses to filter encrypted packets.

Appellees' contention (at 57-58) that Centripetal somehow forfeited this argument is meritless. Appellees had the burden to show that Buruganahalli disclosed each challenged claim limitation, and they never even attempted to equate Buruganahalli's use of a top-level domain name with the '856 patent's filtering based on URIs until the oral hearing. In fact, the petition instead relied on Buruganahalli's filtering of packets—*after decryption*—"by scanning content in the application layer where a URL would be found." Appx0394; *see* Appx4642-4643. Centripetal thus had no reason to preemptively "raise" the distinction between "URI" and "domain name" before the Board, let alone to seek a claim construction of "URI." *Contra* Resp.58-59. And when Appellees finally made this argument during the oral hearing, Centripetal's counsel was flabbergasted; he immediately objected, both on the ground that "[Appellees] never ma[de] the argument before" and because it

reflected a "fundamental technical misunderstanding." Appx7077-7080. In short, Centripetal forfeited nothing.

Appellees' attempt to defend the merits of the Board's *sua sponte* construction of "URI" is weaker still. The Board may not "adopt[] a claim construction in its final written decision that neither party requested nor anticipated"; it must instead provide "notice and opportunity for the parties to respond." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1057 (Fed. Cir. 2024). Had the Board followed that rule here, Centripetal could have clarified that "URI" refers to the detailed identifier (e.g., a URL) found in a packet's "application layer" (i.e., payload), in contrast to a top-level domain name found in unencrypted "handshake" traffic. After all, the claims list "URI" alongside four other types of information that are also found in the application layer. Appx0115(25:30-38). And, to state the obvious, the mere fact that a domain name is "a component of a URL" does not somehow mean that Buruganahalli implicitly discloses filtering packets based on an *entire* URI—much less using a URI to filter *encrypted* packets, as disclosed in the challenged claims.

Finally, there is no basis to accept Appellees' invitation to affirm "on a ground different from that invoked by the [Board]." *Mayfield v. Nicholson*, 444 F.3d 1328, 1334 (Fed. Cir. 2006) (citing *Chenery*, 318 U.S. at 87). Appellees try to evade *Chenery* by asserting that "Centripetal did not dispute … Buruganahalli's teaching of the other packet-filtering rules" below. Resp.61 n.5; *cf.* Appx0115(25:30-38)

(disclosing filtering based on "protocol version," "method," "request," or "command"). That is nonsense. Centripetal has consistently maintained that Buruganahalli does not teach filtering encrypted packets based on *any* of the '856 patent's claimed rules because *all* of them are based on information found in the application layer. *See* Appx6319-6323; Appx7047-7048; Appx7051-7053. And the Board certainly did not think Buruganahalli taught filtering of encrypted packets using any of the other rules, as it opined that it was not even *possible* to apply them to encrypted packets. Appx0023. Therefore, the Board's decision cannot be upheld on that basis.

### 3. The Board ignored unrebutted evidence that Centripetal's invention is a significant advance over the prior art.

At bottom, the record simply does not support the Board's conclusion that Buruganahalli is "essentially the same" as the challenged claims. *See* Appx0004. To the extent Buruganahalli "filters" packets, it undisputedly does so "prior to the set-up of the encrypted data communication" (or after decryption). Appx0029-0030. In contrast, the '856 patent discloses *ongoing* rule-based filtering of encrypted packets, *during* a secure communication session and *without having to decrypt* those encrypted packets. *See* Br.53-54. As a result, the '856 patent provides numerous advantages over Buruganahalli, including the ability to alter the packet-filtering rules being applied during a given session, as well as "added flexibility … to: (i) end a secure session that is later deemed to be a threat per an updated rule, or (ii) allow

a secure session to pass through without any further processing per an updated rule that indicates the secure session is not a threat." Appx5940(¶56).

Appellees cannot and do not dispute that the Board closed its eyes to these significant advancements over the prior art. *See* Resp.63-64. They instead attempt to excuse it on the purported ground that "most" of these advantages "are not in the claims." Resp.63-64. But "[i]t is entirely proper … in evaluating nonobviousness, for a court to take into account advantages flowing directly from the invention patented." *Preemption Devices, Inc., v. Minn. Min. & Mfg. Co.,* 732 F.2d 903, 907 (Fed. Cir. 1984). And here, the cited advantages flow directly from the claims, which describe first receiving and "identifying packets comprising encrypted data" during a secure session, and then "filtering" those that "correspond[] to … network-threat indicators." Appx0115(25:15-49). It is perfectly appropriate (and common) to use expert testimony to elucidate such advantages. *See, e.g.*, *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) (expert explained "differences" between prior art and asserted claims, as well as "benefits" of the latter). The Board was not justified in simply ignoring the '856 patent's innovative features.

### B. The Board Improperly Discounted or Dismissed Centripetal's Objective Evidence of Nonobviousness.

#### 1. The Board ignored compelling evidence that Cisco copied the challenged claims.

This Court has expressly held that the Board may not disregard "evidence of actual copying efforts." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1138-39 (Fed. Cir. 2019). Centripetal introduced just such evidence here, including unrebutted evidence that (1) its executives had meetings with Cisco executives during 2016 in which they presented confidential information regarding the '856 patent's method for "inspect[ing] encrypted traffic," Appx4943; *see* Appx4937-4944; (2) Cisco employees then decided to study Centripetal's patented claims, Appx4850-4851; and (3) less than a year later, Cisco released products capable of filtering encrypted traffic for network threats, Appx3384; Appx7171. What is more, Centripetal introduced expert testimony that Cisco likely copied the challenged claims, *see* Appx4849-4850; Appx3523-3524, and a district court decision finding "compelling evidence" of copying, *see* Appx3388-3389; Appx3393; Appx3398.

Appellees assert that the Board "could not simply defer to" Judge Morgan's well-reasoned factual findings because his decision had been vacated (albeit on unrelated grounds), Resp.65, but the Board itself recognized that it did not need to do any such thing, *see* Appx0054 (acknowledging that "some of the underlying evidence" was "available"). Nor did the Board need to "sift through a 3,000-page

transcript," Resp.65; Centripetal had already done that and presented the Board with specific evidence of actual copying. The Board offered no valid reason for summarily refusing to even consider that evidence, Appx0054, and Appellees likewise fail to supply one.

2. **The Board unduly minimized Centripetal's evidence that the challenged claims satisfy a long-felt need.**

Appellees do not dispute that as of December 2015, when the '856 patent was filed, the telecommunications industry had long recognized the need for methods to detect threats in encrypted traffic without decrypting the traffic. *Compare* Br.58-59, *with* Resp.65-66. Indeed, Cisco's June 2017 press release described detecting security threats in encrypted traffic as a "challenge previously thought to be unsolvable." Appx7171. Appellees suggest that "Buruganahalli had already solved the alleged problem," Resp.65, but that just does not wash. The record below and the briefs in this appeal make abundantly clear that Buruganahalli's threshold sorting of packet flows is a far cry from the dynamic, real-time filtering of encrypted traffic that the '856 patent discloses. The Board was not justified in brushing aside the strong evidence that Centripetal's technology satisfies a long-felt need, and the Board's conclusion that the challenged claims are "essentially the same" as Buruganahalli, Appx0049-0050, must be reversed.

## CONCLUSION

For the foregoing reasons, the Court should reverse the cancellation of claims 1, 24, and 25 of the '856 patent. At the very least, the Court should vacate the Board's institution decision and remand with instructions for a new panel, untainted by any conflict, to decide institution afresh.

Respectfully submitted,

s/Paul D. Clement

MATTHEW J. DOWD
ROBERT J. SCHEFFEL
DOWD SCHEFFEL PLLC
1717 Pennsylvania Avenue NW
Suite 1025
Washington, DC 20006
(202) 559-9175

PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN*
MARIEL A. BROOKINS*
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

* Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellant Centripetal Networks, LLC*

March 11, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 6,991 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

March 11, 2024

                                                s/Paul D. Clement
                                                Paul D. Clement